UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

----------------------------------------------------------------x
In re                                                           :     Chapter 11
                                                                :
PARAGON OFFSHORE PLC, *et al.*,                                 :     Case No. 16-10386 (CSS)
                                                                :
                                                                :     Jointly Administered
          Debtors.[1]                                           :
                                                                :     Hearing Date: 5/11/16 at 10:00 a.m. (ET)
                                                                :     Obj. Deadline: 5/4/16 at 4:00 p.m. (ET)
----------------------------------------------------------------x

**MOTION OF DEBTORS FOR AUTHORITY TO (I) IMPLEMENT
POSTPETITION EARLY RETIREMENT PROGRAM AND
(II) PAY SEVERANCE TO INDIVIDUALS WHOSE EMPLOYMENT
WITH THE DEBTORS MAY BE TERMINATED IN THE FUTURE
PURSUANT TO SECTIONS 363, 503(c), AND 105(a) OF THE BANKRUPTCY CODE**

Paragon Offshore plc and its affiliated debtors in the above-captioned chapter 11 cases, as debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), respectfully represent as follows in support of this motion (this "**Motion**"):

**Relief Requested**

1.  Pursuant to sections 363, 503(c), and 105(a) of title 11 of the United States Code (the "**Bankruptcy Code**"), the Debtors request authority to (i) implement the Early Retirement Program and pay the Early Retirement Payments, each as defined herein, and (ii) pay

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Paragon Offshore plc (6017); Paragon Offshore Finance Company (6632); Paragon International Finance Company (8126); Paragon Offshore Holdings US Inc. (1960); Paragon Offshore Drilling LLC (4541); Paragon FDR Holdings Ltd. (4731); Paragon Duchess Ltd.; Paragon Offshore (Luxembourg) S.à r.l. (5897); PGN Offshore Drilling (Malaysia) Sdn. Bhd. (9238); Paragon Offshore (Labuan) Pte. Ltd. (3505); Paragon Holding SCS 2 Ltd. (4108); Paragon Asset Company Ltd. (2832); Paragon Holding SCS 1 Ltd. (4004); Paragon Offshore Leasing (Luxembourg) S.à r.l. (5936); Paragon Drilling Services 7 LLC (7882); Paragon Offshore Leasing (Switzerland) GmbH (0669); Paragon Offshore do Brasil Ltda.; Paragon Asset (ME) Ltd. (8362); Paragon Asset (UK) Ltd.; Paragon Offshore International Ltd. (6103); Paragon Offshore (North Sea) Ltd.; Paragon (Middle East) Limited (0667); Paragon Holding NCS 2 S.à r.l. (5447); Paragon Leonard Jones LLC (8826); Paragon Offshore (Nederland) B.V.; and Paragon Offshore Contracting GmbH (2832). The Debtors' mailing address is 3151 Briarpark Drive, Suite 700, Houston, Texas 77042.

severance to individuals whose employment with the Debtors may be terminated in the future, pursuant to the terms described herein.

2. A proposed form of order approving the relief requested herein is annexed hereto as **Exhibit A** (the "**Proposed Order**").

## Jurisdiction

3. This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated February 29, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b) and, pursuant to Rule 9013–1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), the Debtors consent to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

4. On February 14, 2016 (the "**Petition Date**"), each of the Debtors commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code. The Debtors' chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"). The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.

5. Additional information regarding the circumstances leading to the commencement of these chapter 11 cases and information regarding the Debtors' business and capital structure is set forth in the Declaration of Ari Lefkovits in Support of the Debtors' Chapter 11 Petitions and Related Requests for Relief (Docket No. 17) and the Declaration of James A. Mesterharm in Support of the Debtors' Chapter 11 Petitions and Related Requests for Relief (Docket No. 18).

### The Debtors' Prepetition Severance Policy

6. Under the Debtors' present business practices and employee related policies, which practices and policies existed as of the Petition Date, upon the termination, without cause, of the employment of a non-insider (as such term is defined in section 101(31) of the Bankruptcy Code), the Debtors pay such employee any severance payments required under applicable law (the "**Statutory Severance Payments**"), as well as any additional payments owed to the employee on account of, among other things, any accrued and unused vacation days at the employee's base compensation rate or as is legally required in the employment jurisdiction, other similar payments relating to accrued and unused temporary leave, and healthcare benefits, where applicable (together with the payment of the Statutory Severance Payments, the "**Statutory Severance and Benefits Payments**"). In addition, the Debtors retain discretion to award a terminated employee severance payments of up to three (3) months' pay (the **"Discretionary Payments"** and together with the Statutory Severance and Benefits Payments, the **"Prepetition Severance Policy"**), in addition to any Statutory Severance and Benefits Payments, in exchange for the employee's agreement to release and waive any claims against the Debtors based upon facts occurring on or prior to the date the terminated employee signed the agreement (a "**Release**"). Typically, only employees who service the Debtors' shore-based operations have received the Discretionary Payments, due primarily to the fact that such employees are generally

3

not entitled to robust Statutory Severance Payments and, for this reason, absent the Discretionary Payments, their payments under the Prepetition Severance Policy would be de minimis.

7. On March 8, 2016, the Court entered the Final Order (I) Authorizing Debtors (A) To Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation, (B) To Maintain Employee Benefit Programs and Pay Related Administrative Obligations, and (C) To Pay Temporary Employee Obligations, and (II) Authorizing Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor All Fund Transfer Requests Related to Such Obligations Pursuant to Sections 105(a), 363(b), and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004 (Docket No. 133) (the "**Wage Order**"), which authorized the Debtors to, among other things, maintain and continue to honor and pay, in their discretion, all amounts with respect to the prepetition Debtors' business practices and policies for their employees, including those payments made under the Prepetition Severance Policy.

**The Debtors' Proposed Early Retirement Payments and Postpetition Severance Payments**

8. As the Court is aware, the Debtors are operating in an unpredictable economic environment. In this challenging environment, the Debtors are continually considering ways in which to reduce overall operating expenses while maintaining a robust, loyal, and qualified workforce. To this end, the Debtors reviewed the Prepetition Severance Policy and, in consultation with their professionals and with reference to comparable policies employed by peers in the industry, determined that it would be in the best interests of the Debtors' respective estates and their stakeholders to (i) implement a program whereby Eligible Employees, as defined herein, may elect to retire early in exchange for a payout (the "**Early Retirement Program**") and (ii) provide, at their discretion, severance payments to employees who may be terminated in the future without cause. In each case, such payments shall only be made upon the

4

employee's execution of a Release and shall be in addition to the Statutory Severance and Benefits Payments.

### A. Early Retirement Program

9. The Debtors are seeking to implement the Early Retirement Program, pursuant to which employees age sixty (60) or above who have been employed by the Debtors (or their former parent, Noble Corporation plc) for at least ten (10) years (the "**Eligible Employees**"), may elect, on a voluntary basis, to retire early in exchange for a payout, subject to the execution of a Release. In total, there are an estimated fourteen (14) Eligible Employees, none of whom are "insiders" as such term is defined under section 101(31) of the Bankruptcy Code. The Early Retirement Program is intended to incentivize the Eligible Employees, each of whom is nearing the age of retirement, to retire prematurely and allow the Debtors to promote younger and emerging talent from within the Company to fill the newly created vacancies.

10. Under the Early Retirement Program, the Debtors, at their discretion, will offer Eligible Employees, a payout in the amount of three (3) to six (6) months' pay (the "**Early Retirement Payments**"), in addition to the Statutory Severance and Benefits Payments. In determining the amount of Early Retirement Payments to which an Eligible Employee should be entitled, the Debtors will consider, among other things, the nature of the employee's role within the Company (*i.e.*, the Early Retirement Payments to those employees who serve in more senior positions will be greater than the Early Retirement Payments to employees who serve in more junior positions), as well as the amount of the Eligible Employee's Statutory Severance Payments. The Debtors estimate that the total Early Retirement Payments that would be paid to an Eligible Employee range from approximately $7,900 to $110,000.[2] In the aggregate,

---

[2] This range applies only to twelve (12) employees as two (2) of the Eligible Employees will only receive the Statutory Severance and Benefits Payments under the Early Retirement Program.

assuming all Eligible Employees elect to participate in the program, the Debtors estimate that the Early Retirement Payments will equal approximately $720,510.

## B. Postpetition Severance Payments

11. The Debtors do not currently anticipate further reductions in force while in chapter 11; however, the possibility of future reductions in force cannot be eliminated entirely. Accordingly, by this Motion, the Debtors are requesting authority to pay, at their discretion, severance payments of up to six (6) months' pay to any employee terminated in connection with future reductions in force (the "**Postpetition Severance Payments**"), in addition to any required Statutory Severance and Benefits Payments, and subject to the execution of a Release. As is the case with the Early Retirement Payments, the Postpetition Severance Payments awarded to an employee terminated in connection with a future reduction in force will be determined on a case-by-case basis and will depend on the employee's position with the Company and the nature of the respective employee's Statutory Severance Payments. In the event that the Debtors do implement a future reduction in force while in chapter 11, the Debtors do not anticipate the amount of Postpetition Severance Payments to exceed $850,000 in the aggregate for approximately 10 employees, none of whom are "insiders" as such term is defined in section 101(31) of the Bankruptcy Code.

12. In sum, by this Motion, the Debtors are seeking authority to pay, in the aggregate, up to approximately $1,570,510 in discretionary severance payments, which payments are in excess of the Statutory Severance and Benefits Payments.

6
RLF1 14413612V.1

## Basis for Relief

### A. Approval of the Early Retirement Payments and the Postpetition Severance Payments Is Authorized Under Sections 363(b) and 105(a) of the Bankruptcy Code[3]

13. The Debtors' implementation of the Early Retirement Program and the payment of the Early Retirement Payments and the Postpetition Severance Payments, if any, are sound exercises of the Debtors' business judgment and should be approved. Section 363(b) provides that "the trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve the use of the debtor's assets outside the ordinary course of business pursuant to section 363(b), a Court must find a "sound business purpose" that justifies such use of estate property. *See, e.g., In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 175-76 (D. Del. 1991) (adopting the "sound business purpose" test to evaluate motions brought pursuant to section 363(b)); *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999) (same); *see also In re Elpida Memory, Inc.*, No. 12-10947 (CSS), 2012 WL 6090194, at *5 (Bankr. D. Del. Nov. 20, 2012) (noting that it is "well-settled" that a debtor may use its assets outside the ordinary course where such use "represents the sound exercise of business judgment"). Thus, courts should approve transactions outside the ordinary course of business, including transactions such as the payments contemplated herein, where such transactions are supported by the sound business judgment of a

---

[3] The Debtors believe that continuing to pay the Statutory Severance and Benefits Payments are ordinary course postpetition transactions that do not require approval by the Court. Moreover, such payments are consistent with the authority granted to the Debtors under the Wage Order. Nevertheless, the Debtors believe that the payment of such amounts easily satisfies the requirements under section 363(b) of the Bankruptcy Code as such payments are, in many instances, required under applicable non-bankruptcy law or pursuant to the Debtors' contractual obligations. The nonpayment of such amounts would result in real economic and legal consequences to the Debtors. For instance, nonpayment of any Statutory Severance Payment could cause government authorities to take precipitous actions against the Company, including preventing the Debtors from conducting business in the applicable jurisdiction or seeking to lift the automatic stay, which would disrupt the Debtors' day-to-day operations and could potentially impose significant costs on the Debtors' estates. Accordingly, ongoing payment of such amounts is appropriate and in the best interests of the Debtors' estates.

debtor's management.  *See, e.g., In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987); *In re Indus. Valley Refrigeration & Air Conditioning Supplies, Inc.*, 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987).

        14.       Where valid business justifications exist, there is a strong presumption "that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *See Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1992) (citation omitted).  Furthermore, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct." *Comm. of Asbestos-Related Litigants v. Johns-Manville Corp. (In re Johns-Manville Corp.)*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) (citation omitted).  Indeed, courts "are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence." *See Integrated Res.*, 147 B.R. at 656 (citation omitted).

        15.       In addition, under section 105(a) of the Bankruptcy Code, a bankruptcy court has authority to approve payments, including the payments contemplated herein, where such payments will serve to preserve or protect the value of the debtor's assets.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of" the Bankruptcy Code.  11 U.S.C. § 105(a).  Pursuant to section 105(a), a court may fashion an order or decree that helps preserve or protect the value of a debtor's assets.  *See, e.g., Chinichian v. Campolongo (In re Chinichian)*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *In re Cooper*

*Props. Liquidating Tr.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) (noting that the bankruptcy court is "one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

16. The Debtors' determination that the implementation of the Early Retirement Program and the payment of the associated Early Retirement Payments, as well as the Postpetition Severance Payments, if any, constitute sound business judgment and is in the best interest of the Debtors' and their respective estates, must be viewed in light of the current economic market. As stated before, the Debtors are operating in an unpredictable economic market where, over the last few years, the demand for the Debtors' services has significantly declined due largely to a sustained drop in oil prices and, hence, demand for offshore drilling. Undoubtedly, the struggling offshore drilling industry has caused some concern among the Debtors' employees, who fear that their job security may be in jeopardy; a fear that was likely compounded by the commencement of these chapter 11 cases. The Debtors have every intention, however, to successfully emerge from chapter 11 in the near future and to continue operating as a more healthy company on an ongoing basis. To do so, the Debtors must retain qualified, well-trained, and loyal employees, and must implement programs and policies to incentivize such highly-skilled and marketable employees to remain with the Company despite the turbulent economic environment. As described below, the Early Retirement Program and the proposed Postpetition Severance Payments have been designed to achieve the Debtors' objective of protecting and preserving their ongoing operations by incentivizing the Debtors' critical employees to remain with the Company.

9

17. The Early Retirement Program is intended to maintain the business continuity of the Debtors during this down cycle. By incentivizing Eligible Employees to retire prematurely, the Debtors hope to create more opportunity within the Company for junior employees who may fill the vacancy created by early retirement of an Eligible Employee and whose position may otherwise be eliminated due to the decreased demand for the Debtors' services. Absent this program, the Debtors may be unable to continue employing their more junior workforce. The loss of such qualified and experienced personnel will have serious detrimental effects on the Debtors' ongoing business operations, particularly upon the natural retirement of the Eligible Employees, as, at such time, the Debtors may be left with no qualified individuals from within the Company to fill the vacancies in these senior positions and the Debtors will have no alternative but to expend time and resources to find qualified employees from outside the Company. Under such circumstances, the Debtors would not only incur the additional costs associated with recruiting, hiring, and training the new personnel, but also will experience disruption and delay in their day-to-day operations as they transition these new employees into the Eligible Employees' former roles. Based on the Debtors' experience and the experience of peer companies, it is extremely difficult and costly to incentivize an employee who has left the Company (either voluntarily or as a result of a reduction in force) to subsequently return, especially in this down cycle. Additionally, by securing the employment of the Debtors' more junior workforce, who have and will continue to build a history with the Company and who are familiar with the Debtors' critical safety programs, the Early Retirement Program has the added benefit of ensuring that the Debtors have a well-trained and experienced workforce that is prepared to immediately respond to a positive pivot in the market for offshore drilling services.

18.     Accordingly, the implementation of the Early Retirement Program will allow the Debtors to fill more senior positions with employees from within the Company before it is too late and avoid the costs that would be associated with filling the vacancies caused by the natural retirement of the Eligible Employees with external candidates, and help to ensure that the Debtors retain their junior employees whose services are critical to the Debtors' ongoing operations and a successful reorganization.

19.     Similarly, the Debtors determined, in their business judgment, that seeking authority to make Postpetition Severance Payments, in the event of a subsequent reduction in force, will assist in present efforts to retain the Debtors' remaining critical employees.  The Debtors' remaining employees may perceive their future with the Debtors as uncertain in light of the bankruptcy cases, as well as the current economic environment in which the Debtors operate. To retain such employees, the Debtors must provide them with as much economic security and reassurance as possible under the circumstances.  The Debtors believe that seeking authority to pay the Postpetition Severance Payments will give the remaining employees the confidence and financial incentive necessary to remain with the Debtors and to see these cases through to a successful conclusion.  Naturally, should the Debtors decide to implement further reductions in force, the Postpetition Severance Payments will be offset by the cost savings earned in connection with the Company's reduced headcount.

20.     In addition to incentivizing critical employees to remain with the Company, the expression of the Debtors' appreciation for an employee's service and loyalty through the Early Retirement Payments and the Postpetition Severance Payments, particularly to the Eligible Employees who are highly visible within the Company, will have the overall effect

11

RLF1 14413612V.1

of improving workplace morale, which will naturally impact productivity, attitude, and quality of work, and will help to ensure the success of the Debtors' reorganization efforts.

21. Moreover, the Debtors believe that entitlement to the Early Retirement Payments or the Postpetition Severance Payments will incentivize those employees who must remain with the Company for some period of time subsequent to the termination or election of early retirement to transition their workload to remaining employees, or in some cases to train remaining employees regarding transferred responsibilities, in an orderly and reliable fashion. Without the prospect of payment, there is little or no incentive for a retiring or terminated employee to assist the Debtors in effectuating an orderly transition of responsibilities.

22. With respect to the amount of the payments, the Debtors determined, in accordance with their sound business judgment and in consultation with their professionals, that to realize the aforementioned benefits, an additional severance payment or payout in the range of three (3) to six (6) months' salary was appropriate. This range of payment, although in excess of the Debtors' historical practice, is generally not in excess of those payments offered to employees by similar companies upon termination without cause or retirement.

23. Finally, employees who receive either the Early Retirement Payments or the Postpetition Severance Payments will execute a Release, waiving any claims based upon facts occurring on or prior to the date the terminated employee signed the agreement. The Releases will have the added benefit of mitigating potential claims and the related legal and other costs that, regardless of merit, may arise from employment-based causes of action, thus providing further cost-savings to the Company.

RLF1 14413612V.1

24. For the foregoing reasons, the implementation of the Early Retirement Program, and payment of the Early Retirement Payments and the Postpetition Severance Payments, if any, constitute a sound exercise of business judgment and should be approved.

**B.   The Relief Requested Herein is Similarly Appropriate Under Section 503(c) of the Bankruptcy Code**

25. Section 503(c) of the Bankruptcy Code applies to certain transactions "outside the ordinary course of business" with respect to a debtor's employees. Specifically, section 503(c) provides criteria for courts to use in approving certain types of payments to insiders and "other transfers or obligations that are outside the ordinary course." Section 503(c) comprises three subsections: (i) a general prohibition against retention plans for insiders; (ii) limitations on severance payments for insiders; and (iii) standards governing other transfers to certain employees, among others, that are outside of the ordinary course of business. The Debtors submit that the first two subsections of section 503(c) are inapplicable to the instant relief, as the employees proposed to receive the Early Retirement Payments or the Postpetition Severance Payments are not insiders. To the extent that the Court determines, however, that section 503(c)(3) applies to the Debtors' request to make the Early Retirement Payments or the Postpetition Severance Payments, the Debtors believe the requisite standard has been met.

26. The relevant inquiry under section 503(c)(3) is whether the proposed plan is "justified by the facts and circumstances" of the case. 11 U.S.C. § 503(c)(3). Courts have generally used a form of the "business judgment" standard for approving transactions under section 363(b) to determine whether the section 503(c)(3) "facts and circumstances" standard has been satisfied. *See, e.g.*, *In re Nobex Corp.*, No. 05-20050, Hr'g Tr. 86: 18–25, 87: 1–4 (Bankr. D. Del. Jan. 12, 2006) (noting that the section 503(c)(3) standard is "nothing more than a reiteration of the standard under 363 . . . the business judgment of the debtor"); *see also In re*

13

*AMR Corp.*, 490 B.R. 158, 166 (Bankr. S.D.N.Y. 2013) (stating that "[c]ourts now apply the business judgment standard to motions seeking to pay employees pursuant to [s]ection 503(c)(3) for payments that do not concern retention or severance payments to insiders."); *In re Velo Holdings, Inc.*, 472 B.R. 201, 212 (Bankr. S.D.N.Y. 2012) ("Courts have held that the 'facts and circumstances' language of section 503(c)(3) creates a standard no different than the business judgment standard under section 363(b).").

28. Here, as set forth above, the Debtors' determination to implement the Early Retirement Program and to make the Early Retirement Payments and the Postpetition Severance Payments, if any, are valid exercises of their reasonable business judgment. Accordingly, the relief sought herein is authorized by section 503(c)(3) of the Bankruptcy Code.

**C.   Similar Relief**

28. Finally, courts in this jurisdiction have frequently authorized the establishment or continued maintenance of employee severance programs with respect to non-insider employees. *See*, *e.g.*, *In re Allied Nevada Gold Corp., et al.*, Case No. 15-10503 (MFW) (Bankr. D. Del. Aug. 19, 2015) (Docket No. 868) (authorizing debtors to implement a postpetition severance plan); *In re A123 Systems, Inc.*, Case No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8, 2012) (Docket No. 315) (same); *In re Linens Holding Co.*, Case No. 08-10832 (CSS) (Bankr. D. Del. July 1, 2008) (Docket No. 758) (authorizing severance payments to non-insider employees); *In re Buffets Holdings, Inc*., Case No. 08-10141 (MFW) (Bankr. D. Del. Mar. 27, 2008) (Docket No. 593) (same); *In re Am. Bus. Fin. Servs., Inc*., Case No. 05-10203 (MFW) (Bankr. D. Del. Mar. 9, 2005) (Docket No. 374) (authorizing debtors to implement severance plan).

**Notice**

29.     No trustee, examiner, or statutory committee of creditors has been appointed in these chapter 11 cases.  Notice of this Motion has been provided to (i) the Office of the United States Trustee for the District of Delaware; (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Sandeep Qusba, Esq., Kathrine A. McLendon, Esq., and Morris J. Massel, Esq.), counsel to JPMorgan Chase Bank, N.A. (a) as administrative agent under the Senior Secured Revolving Credit Agreement, dated as of June 17, 2014 (the "**Revolver Agent**"), and (b) as collateral agent under the Guaranty and Collateral Agreement, dated as of July 18, 2014 ("the "**Collateral Agent**"); (iv) Landis Rath & Cobb LLP, 919 Market Street, Wilmington, DE 19801 (Attn: Adam G. Landis, Esq. and Kerri Mumford, Esq.), co-counsel to the Revolver Agent and the Collateral Agent; (v) Kaye Scholer LLP, 250 West 55th Street, New York, NY 10019 (Attn: Mark F. Liscio, Esq. and Scott D. Talmadge, Esq.), counsel to Cortland Capital Market Services L.L.C. as administrative agent under the Senior Secured Term Loan Agreement, dated as of July 18, 2014 (the "**Term Loan Agent**"); (vi) Potter Anderson & Corroon, 1313 N. Market Street, 6th Floor, Wilmington, DE 19801 (Attn: Jeremy W. Ryan, Esq.), co-counsel for the Term Loan Agent; (vii) Morgan, Lewis, & Bockius LLP, 101 Park Avenue, New York, NY 10178 (Attn: James O. Moore, Esq., Glenn E. Siegel, Esq., and Joshua Dorchak, Esq.), counsel to Deutsche Bank Trust Company Americas as trustee under the Senior Notes Indenture, dated as of July 18, 2014, for the 6.75% Senior Notes due 2022 and the 7.25% Senior Notes due 2024; (viii) Paul, Weiss, Rifkind, Wharton, & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019 (Attn: Andrew N. Rosenberg, Esq. and Elizabeth R. McColm, Esq.), counsel to certain holders of the 6.75% Senior Notes due 2022 and the 7.25% Senior Notes due 2024; (ix) Young Conaway Stargatt & Taylor, LLP, Rodney Square, 1000

North King Street, Wilmington, DE 19801 (Attn: Pauline K. Morgan, Esq.), co-counsel to certain holders of the 6.75% Senior Notes due 2022 and the 7.25% Senior Notes due 2024; (x) the Securities and Exchange Commission; (xi) the Internal Revenue Service; (xii) the United States Attorney's Office for the District of Delaware; and (xiii) all parties who filed a request for service of notices under Bankruptcy Rule 2002.

**No Previous Request**

30.     No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WHEREFORE the Debtors respectfully request entry of the Proposed Order granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: April 22, 2016
       Wilmington, Delaware

      */s/ Joseph C. Barsalona II*
RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
Paul N. Heath (No. 3704)
Amanda R. Steele (No. 5530)
Joseph C. Barsalona II (No. 6102)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

-and-

WEIL, GOTSHAL & MANGES LLP
Gary T. Holtzer (admitted *pro hac vice*)
Stephen A. Youngman (admitted *pro hac vice*)
Alfredo R. Pérez (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for the Debtors
and Debtors in Possession