**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

-------------------------------------------------------x
                        :

In re                      :      **Chapter 11**
                        :

**PARAGON OFFSHORE PLC,** *et al.,*  :      **Case No. 16–10386 (CSS)**
                        :

                        :      **Jointly Administered**

          **Debtors.**[1]      :
-------------------------------------------------------x

### DEBTORS' SUPPLEMENTAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

[1] The Debtors in the Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Paragon Offshore plc (6017); Paragon Offshore Finance Company (6632); Paragon International Finance Company (8126); Paragon Offshore Holdings US Inc. (1960); Paragon Offshore Drilling LLC (4541); Paragon FDR Holdings Ltd. (4731); Paragon Duchess Ltd.; Paragon Offshore (Luxembourg) S.à r.l. (5897); PGN Offshore Drilling (Malaysia) Sdn. Bhd. (9238); Paragon Offshore (Labuan) Pte. Ltd. (3505); Paragon Holding SCS 2 Ltd. (4108); Paragon Asset Company Ltd. (2832); Paragon Holding SCS 1 Ltd. (4004); Paragon Offshore Leasing (Luxembourg) S.à r.l. (5936); Paragon Drilling Services 7 LLC (7882); Paragon Offshore Leasing (Switzerland) GmbH (0669); Paragon Offshore do Brasil Ltda.; Paragon Asset (ME) Ltd. (8362); Paragon Asset (UK) Ltd.; Paragon Offshore International Ltd. (6103); Paragon Offshore (North Sea) Ltd.; Paragon (Middle East) Limited (0667); Paragon Holding NCS 2 S.à r.l. (5447); Paragon Leonard Jones LLC (8826); Paragon Offshore (Nederland) B.V.; and Paragon Offshore Contracting GmbH (2832). The Debtors' mailing address is 3151 Briarpark Drive, Suite 700, Houston, Texas 77042.

# TABLE OF CONTENTS

Page

I.    INTRODUCTION AND PROCEDURAL HISTORY.......................................................1

II.   BACKGROUND ......................................................................................................6

    A.    Paragon's Business and Management........................................................6

    B.    Paragon's Assets .......................................................................................7

    C.    Paragon's Markets .....................................................................................7

    D.    The Debtors' Prepetition Indebtedness .....................................................8

    E.    Hiring of Lazard and Consideration of Approach to Restructuring ....................11

    F.    Preparation of Business Plan ..................................................................12

    G.    The Noble Settlement ..............................................................................14

    H.    Negotiation of Original Plan.....................................................................17

    I.    Terms of the Original Plan.......................................................................17

    J.    Updates to the Business Plan ..................................................................18

    K.    Preparation of Downside Sensitivity ........................................................19

    L.    The Modified Plan ....................................................................................21

    M.    Ad Hoc Group's Contribution ..................................................................24

III.   CONFIRMATION OF THE MODIFIED PLAN...........................................................24

    A.    The Modified Plan is Feasible ..................................................................25

        1.    The Market Recovery ...................................................................26

        2.    Paragon's Management is the Foundation of Feasibility...........................31

        3.    The Business Plan is Reasonable ................................................32

            (a)    Capital Expenditure Assumptions are Reasonable ........................32

            (b)    Dayrate Assumptions are Reasonable............................................38

            (c)    Paragon Will Be Able to Secure New Contracts ...........................41

RLF1 15448693V.1

(d)      Paragon Will Be Able to Refinance Its Debt ................................49

4.      The Modified Plan is Feasible Even if Recovery is Delayed ...................52

5.      Balance Sheet Solvency Testimony is Not Relevant and is Methodologically Inconsistent..................................................................55

6.      The Debtors Will be Able to Meet their Ongoing Obligations.................59

7.      Market Trading Prices are Not an Indicator of Feasibility .......................59

B.      The Noble Settlement Agreement is Fair, Reasonable, and in the Best Interest of the Debtors' Estates .............................................................................60

C.      The Secured Term Loan Claims are Not Impaired Under the Modified Plan ........................................................................................................................64

1.      The Modified Plan Does Not Violate Section 7.2 of the Secured Term Loan Agreement .............................................................................65

2.      The Grant of Liens in Additional Collateral Rigs Does Not Violate the Secured Term Loan Agreement ...........................................................67

3.      The Grant of Pledged Equity in Owners of Additional Collateral Rigs Does Not Violate the Secured Term Loan Agreement......................69

D.      The Debtors Will Pay All Required Default Interest to Reinstate the Secured Term Loan Claims ...................................................................................70

E.      The Modified Plan was Proposed in Good Faith....................................................72

F.      Payment of Noteholder Fees is Appropriate .........................................................75

Paragon Offshore plc ("**Paragon Parent**") and its affiliated debtors, as debtors and debtors in possession (collectively, the "**Debtors**" or "**Paragon**"), respectfully submit the following proposed supplemental findings of fact and conclusions of law:

## I.    INTRODUCTION AND PROCEDURAL HISTORY

1.    On February 14, 2016 (the "**Petition Date**"), each Debtor commenced with this Bankruptcy Court a voluntary case under chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  The Debtors are authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.    No trustee or examiner has been appointed pursuant to section 1104 of the Bankruptcy Code.  No statutory committee of unsecured creditors has been appointed pursuant to section 1102 of the Bankruptcy Code.  Further, in accordance with an order of this Bankruptcy Court, the Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).[2]

3.    On April 19, 2016, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors*, dated April 19, 2019 (Docket No. 318) (the "**Original Plan**") and *Disclosure Statement for Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors*, dated April 19, 2016 (Docket No. 319) (the "**Disclosure Statement**").  On April 4, 2016, the Court entered an order approving the Disclosure Statement.[3]

---

[2] *Order Directing Joint Administration of Chapter 11 Cases Pursuant to Bankruptcy Rule 1015(b)* (Docket No. 69).

[3] *Order (I) Approving Proposed Disclosure Statement and Form and Manner of Notice of Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling Confirmation Hearing and (IV) Establishing Notice and Objection Procedures for Confirmation of the Proposed Plan Pursuant to Sections 105, 502, 1125, 1126, and 1128 of the Bankruptcy Code and Bankruptcy Rules 2002, 3003, 3017, 3018, 3020, and 9006 and Local Rules 2002-1, 3017-1, and 9006-1* (Docket No. 248).

RLF1 15448693V.1

4.      Pursuant to the Original Plan, only holders of Claims in Class 3 (Revolving Credit Agreement Claims) and Class 5 (Senior Notes Claims) (together, the "**Voting Classes**") were entitled to vote on the Original Plan.  Holders of Claims in Class 1 (Priority Non-Tax Claims), Class 2 (Other Secured Claims), Class 4 (Secured Term Loan Claims), Class 6 (General Unsecured Claims), Class 7 (Intercompany Claims), Class 8 (Parent Interests), and Class 9 (Intercompany Interests) are unimpaired and, accordingly, are conclusively presumed to accept the Original Plan and are not entitled to vote on account of such Claims and Interests.

5.      As set forth in the *Certification of James Lee with Respect to the Tabulation of Votes on Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors* (Docket No. 433) (the "**Original Voting Certification**"), nearly 100 percent of the creditors in each of the Voting Classes voted to accept the Original Plan.

6.      The following objections to confirmation of the Original Plan were filed: (i) *Alief Independent School District and Fort Bend Independent School District's Limited Objection to Confirmation of Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors* (Docket No. 428) (the "**Texas Taxing Entities Objection**"), (ii) *Objection by the Internal Revenue Service to the Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors* (Docket No. 429) (the "**IRS Objection**"), (iii) *Objection of Cypress-Fairbanks Independent School District, Fort Bend County, and Harris County to Debtors Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and Its Affiliated Debtors* (Docket No. 430) (the "**Texas Taxing Authorities Objection**"), and (iv) *Objection of the Secured Term Loan Agent, on Behalf of the Secured Term Loan Lenders, to Confirmation of the Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors* (Docket No. 438) (the "**Original Term Loan Agent Objection**").  The Texas

Taxing Entities Objection, the IRS Objection, and the Texas Taxing Authorities Objection were resolved on the terms and conditions described on the record of the Initial Confirmation Hearing (as defined below).

7.       On June 14, 2016, the Debtors filed:  (i) the *Memorandum of Law in Support of Confirmation of Debtors' Second Amended Joint Chapter 11 Plan and Response to Certain Objections* (Docket No. 467) (the "**Original Confirmation Brief**"), and (ii) the *Declaration of Thomas B. Osmun in Support of Confirmation of Debtors' Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors* (Docket No. 468) (the "**Original Osmun Declaration**").

8.       The Confirmation Hearing on the Original Plan commenced on June 21, 2016 and continued on June 22, 23, 29 and 30, 2016 (the "**Initial Confirmation Hearing**").  The Debtors called five (5) witnesses at the Initial Confirmation Hearing:  (i) Mr. David Kurtz from Lazard, the Debtors' investment banker; (ii) Mr. Randall Stilley, Paragon's CEO and President; (iii) Mr. David Pursell from Tudor Pickering Holt & Co., as an expert witness; (iv) Mr. Doug Fordyce from Lazard, as an expert witness; and (v) Mr. Steven Manz, Paragon's Chief Financial Officer.

9.       On August 15, 2016, the Debtors filed the *Modified Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors*, dated August 15, 2016 (Docket No. 644) (as supplemented by the Plan Supplement (defined below), and as otherwise amended in accordance with the terms thereof, the "**Modified Plan**").[4]  In connection with the Original Plan and the Modified Plan, the Debtors filed various plan supplement documents

---

[4] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Modified Plan.

(Docket Nos. 399, 470, 493 and 682) (together, as may be amended, supplemented, restated or modified from time to time, the "**Plan Supplement**").

10.    On August 16, 2016, the Debtors filed the *Supplement to the Disclosure Statement for the Modified Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors* (Docket No. 657) (the "**Disclosure Statement Supplement**").  The Disclosure Statement Supplement reflects updated Business Plan projections (the "**Business Plan**").  On August 16, 2016, the Court entered an order approving the Disclosure Statement Supplement.[5]

11.    The Modified Plan differs from the Original Plan in that it includes modifications to the Revolving Credit Agreement Claims and the Senior Notes Claims. Specifically, the Amended and Restated Credit Agreement was revised to reduce the minimum liquidity requirement from $110 million to $103 million.  *Supplemental Declaration of Thomas B. Osmun in Support of Confirmation of Debtors' Modified Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors* (Docket No. 744) (the "**Supplemental Osmun Declaration**"), ¶ 9.  The Debtors have no EBITDA-based covenants until 2019 and covenants for 2019 and beyond were relaxed further.  *Id.*  The Senior Notes Claims were modified to: (1) reduce the cash payment to be provided to the holders of Senior Notes Claims from $345 million to $285 million; (2) remove certain contingent payments from the package of consideration to the holders of Senior Notes Claims; (3) provide for the issuance of $60 million unsecured New Notes; and, (4) increase the number of Parent Ordinary Shares to be issued to the holders of Senior Notes Claims from 35 to 47 percent.  *Id.*

---

[5] *Order (I) Approving Proposed Supplement to Disclosure Statement and (II) Establishing Deadlines and Procedures for Changing Votes on the Debtors' Modified Plan Pursuant to Sections 105, 1125, 1126, and 1127 of the Bankruptcy Code and Bankruptcy Rules 2002, 3017, 3018, 3019, 3020, and 9006 and Local Rules 2002-1, 3017-1, and 9006-1* (Docket No. 655) (the "**Supplemental Disclosure Statement Order**").

12.     The Voting Classes in the Modified Plan were the same as the Original

Plan.  *See supra* ¶ 4.  As demonstrated in the *Certification of James Lee with Respect to the*

*Tabulation of Votes on the Modified Second Amended Joint Chapter 11 Plan of Paragon*

*Offshore plc and its Affiliated Debtors* (Docket No. 734) (the "**Supplemental Voting**

**Certification**"), nearly 100 percent of the creditors in each of the Voting Classes voted to accept

the Modified Plan.

13.     On September 12, 2016, the Debtors filed the *Declaration of Todd D.*

*Strickler in Support of Approval of the Noble Settlement Agreement Pursuant to Bankruptcy Rule*

*9019* (PGN 239) (the "**Strickler Declaration**").

14.     On September 22, 2016, the Debtors filed the *Memorandum of Law in*

*Support of Confirmation of Debtors' Modified Second Amended Joint Chapter 11 Plan* (Docket

No. 743) (the "**Modified Confirmation Brief**") and the Supplemental Osmun Declaration.

15.     On September 23, 2016, the Debtors filed, and hereby incorporate by

reference as if fully set forth herein, their *Findings of Fact, Conclusions of Law, and Order*

*Confirming the Modified Second Amended Joint Chapter 11 Plan or Paragon Offshore plc and*

*its Affiliated Debtors* (Docket. No. 750).

16.     The confirmation hearing on the Modified Plan began on September 27,

2016 and concluded on September 30, 2016 (the "**Second Confirmation Hearing**" and, together

with the Initial Confirmation Hearing, the "**Confirmation Hearings**").  The Debtors called two

witnesses at the Second Confirmation Hearing:  (i) Mr. Randall Stilley, Paragon's CEO and

President; and (ii) Mr. Doug Fordyce from Lazard.

17.     The sole remaining objector to the Modified Plan at the Second

Confirmation Hearing was the Term Loan Agent (as defined below).  As discussed above, all

other objections to the Original Plan and Modified Plan were resolved prior to the Second Confirmation Hearing.

## II.    BACKGROUND

### A.    Paragon's Business and Management

18.    The Debtors are a global provider of offshore drilling rigs.  6/21/16 Hrg. Tr. at 134:24–135:12 (Stilley Test.).  They principally operate standard specification rigs, which are generally used for "development drilling" on preexisting oil and gas fields.  6/23/16 Hrg. Tr. at 91:22–93:1 (Fordyce Test.).  These rigs are also used for "workover," or fixing existing wells, as well as plugging and abandoning ("**P&A**") activities.  6/23/16 Hrg. Tr. at 90:6–93:1 (Fordyce Test.).  Over the past three years, approximately eighty percent of Paragon's business has consisted of development drilling, workovers, re-entry and P&A work.  9/27/16 Hrg. Tr. at 97:3–13 (Stilley Test.); 9/30/16 Hrg. Tr. at 105:24–106:12 (Leand Test.); 9/30/16 Hrg. Tr. at 128:3–129:3 (Fordyce Test.).

19.    In addition to providing rigs, the Debtors also operate the rigs on behalf of customers in the oil and gas industry.  6/21/16 Hrg. Tr. at 135:7–12 (Stilley Test.).  The Debtors' customers include large national and international E&P companies, midsize E&P companies and smaller independent companies.  6/21/16 Hrg. Tr. at 134:24–135:6 (Stilley Test.).  The Debtors have developed and maintained longstanding relationships with their customers located in geographically diverse regions.  6/21/16 Hrg. Tr. at 135:13–25 (Stilley Test.).

20.    The Debtors have over 2,000 employees and are managed by a board of directors (the "**Board**") whose members have both expertise and managerial experience in the oil and gas industry.  6/21/16 Hrg. Tr. at 134:5–11 (Stilley Test.).  The Debtors' senior management team is comprised of experienced professionals who have worked in the offshore drilling industry for decades.  6/21/16 Hrg. Tr. at 133:14–134:1 (Stilley Test.).  For instance, senior

6

management includes, among others, Mr. Randall Stilley (President and CEO), with over 40

years of experience, Mr. Andrew Tietz (Senior VP of Marketing and Contracts), with 25 years of

experience, and Mr. Charlie Yester (Senior VP of Operations), also with over 40 years of

experience. 6/21/16 Hrg. Tr. at 133:24–134:1 (Stilley Test.); TLA 620 (9/7/16 Depo. Tr. at

9:14–14:23 (Tietz Test.)). Furthermore, Paragon has management and employees dedicated to

each of the markets in which the Debtors operate, which enhances Paragon's relationships and

communications with customers in its regions. 6/21/16 Hrg. Tr. at 135:13–25, 158:17–159:5

(Stilley Test.).

      **B.**    **Paragon's Assets**

      21.    The Debtors currently own 40 offshore drilling rigs (6/21/16 Hrg. Tr. at

132:20–21 (Stilley Test.)), including 34 jackup rigs (including two high specification, harsh

environment jackups (6/21/16 Hrg. Tr. at 179:7–21, 183:23–184:21, 210:1–21 (Stilley Test.)),

and six floating rigs (a/k/a "floaters," including three drillships and two semisubmersibles)

(6/21/16 Hrg. Tr. at 141:1–5, 210:2–3 (Stilley Test.)). The Debtors also have an inventory of

capital spares, or spare equipment, purchased before the Spinoff (as defined below) from Noble,

and idle rigs that can also be used for parts in lieu of making capital expenditures. 9/27/16 Hrg.

Tr. at 30:5–10, 44:18–22 (Stilley Test.).

      **C.**    **Paragon's Markets**

      22.    The Debtors currently operate in the North Sea, the Middle East, and

India. 6/21/16 Hrg. Tr. at 132:22–133:4 (Stilley Test.). Up until just a few months ago, they

were still operating in Brazil and West Africa, and they recently moved their final rig out of

Mexico. 6/21/16 Hrg. Tr. (Stilley Test.) at 175: 21–25. The Debtors' rigs are well-suited for

their particular markets. In the Middle East, for example, older rigs are often preferable for work

where normally pressured wells within well-understood fields and fairly shallow water make

drilling conditions less difficult.  6/21/2016 Hrg. Tr. at 187:4–20 (Stilley Test.).  In India, due to

the soft bottom conditions, rigs cause spud "can holes" around the platforms that can be up to 60

feet deep and require oil and gas producers to use a rig with the same footprint for subsequent

drilling projects.  6/21/16 Hrg. Tr. at 189:24–190:12 (Stilley Test.).

   23. In the North Sea, the Debtors have ten rigs.  6/21/2016 Hrg. Tr. at 176:13–

18 (Stilley Test.).  The North Sea, a primary market for the Debtors, is a difficult market for new

companies to gain entry because the region is expensive to operate in, there are high safety

standards to comply with, the conditions are harsh, and customers are risk-averse and tend to

work with companies with which they have worked before.  6/23/16 Hrg. Tr. at 97:17–98:4

(Fordyce Test.); 6/21/16 Hrg. Tr. at 181:5–9, 184:22–185:3 (Stilley Test.).  Although

competitors of Paragon have attempted to move into this region, it appears they have not been

successful in putting their rigs to work.  6/21/16 Hrg. Tr. at 181:2–4 (Stilley Test.).

   **D.** **The Debtors' Prepetition Indebtedness**

   24. On the Petition Date, the Debtors had approximately $1.43 billion of

secured indebtedness and approximately $1.02 billion in unsecured indebtedness, substantially

all of which was issued or guaranteed by the Debtors.  Disclosure Statement at 12.

   25. Paragon Parent and Paragon International Finance Company are borrowers

under that certain Senior Secured Revolving Credit Agreement, dated as of June 17, 2014, by

and among Paragon Parent and Paragon International Finance Company, as borrowers, the

lenders and issuing banks party thereto (the "**Revolver Lenders**") from time to time, JPMorgan

Chase Bank, N.A., as administrative agent, J.P. Morgan Securities LLC, Deutsche Bank

Securities Inc. and Barclays Bank plc, as Joint Lead Arrangers and Joint Lead Bookrunners, and

certain other parties thereto (as amended, restated, modified, or supplemented from time to time,

the "**Revolving Credit Agreement**"). *Id*.[6] The Revolving Credit Agreement provides for

revolving credit commitments, including letter of credit commitments and swingline

commitments, in an aggregate principal amount of $800 million (the "**Revolving Credit**

**Facility**," and the amounts outstanding thereunder, the "**Loans**"). *Id*. at 12–13.

26.    On September 3, 2015, Paragon Parent borrowed approximately $332

million under the Revolving Credit Agreement and, on December 23, 2015, Paragon Parent

borrowed an additional $11.5 million under the Revolving Credit Facility. *Id*. at 13. As of April

2016, the aggregate principal amount outstanding under the Revolving Credit Agreement was

$708.5 million in unpaid principal, plus interest, fees, and other expenses, in addition to

approximately $87.2 million of letters of credit. *Id*. The Loans bear interest, at Paragon Parent's

option, at either (i) an adjusted LIBOR plus an applicable margin ranging between 1.50 to 2.50

percent, depending on the Leverage Ratio (as defined in the Revolving Credit Agreement), or (ii)

a base rate plus an applicable margin ranging between 0.50 to 1.50 percent, depending on the

Leverage Ratio. *Id*. The Revolving Credit Agreement originally matured in July 2019. *Id*.

27.    Paragon Offshore Finance Company is the borrower under that certain

Senior Secured Term Loan Agreement, dated as of July 18, 2014, by and among Paragon Parent,

as parent, Paragon Offshore Finance Company, as borrower, the lender parties thereto, and

Cortland Capital Market Services LLC, as successor administrative agent (the "**Term Loan**

**Agent**") (as amended, restated, modified, or supplemented from time to time, the "**Secured**

**Term Loan Agreement**"). *Id*. The Secured Term Loan Agreement provided for a term loan in

an aggregate principal amount of $650 million (the "**Secured Term Loan**"). *Id*.

---

[6] PGN 22.

28.     As of April 2016, the aggregate amount outstanding under the Secured Term Loan Agreement was approximately $642 million in unpaid principal, interest, fees, and other expenses.  *Id*.  The Secured Term Loan bears interest at LIBOR plus 2.75 percent, subject to a minimum LIBOR rate of 1 percent or a base rate plus 1.75 percent at Paragon Offshore Finance Company's option.  *Id*.  The Secured Term Loan matures in July 2021.  *Id*.

29.     Paragon Parent is party to that certain Senior Notes Indenture, dated as of July 18, 2014, by and among Paragon Parent, as issuer, each of the guarantors named therein, and Deutsche Bank Trust Company Americas, as trustee (the "**Notes Trustee**"), and the other parties thereto, pursuant to which the Debtors issued 6.75 percent Senior Notes due 2022 in the aggregate principal amount of $500,000,000 (the "**6.75% Senior Notes**") and 7.25 percent Senior Notes due 2024 in the aggregate principal amount of $580,000,000 (the "**7.25% Senior Notes**" and, together with the 6.75% Notes, the "**Senior Notes**").  *Id*.  As of April 2016, the aggregate amount outstanding under the 6.75% Senior Notes was approximately $457 million in unpaid principal, plus interest, fees, and other expenses, and the aggregate amount outstanding under the 7.25% Senior Notes was approximately $527 million plus interest, fees, and other expenses.  *Id*.

30.     The obligations of Paragon Parent, Paragon International Finance Company, Paragon Offshore Finance Company, and the Debtor-guarantors, as applicable, under the Revolving Credit Agreement and the Secured Term Loan Agreement are secured pursuant to that certain Guaranty and Collateral Agreement, dated as of July 18, 2014 (as amended, restated, modified, or supplemented from time to time, the "**Guaranty and Collateral Agreement**").  *Id*. at 14.  Pursuant to the Guaranty and Collateral Agreement, each of the Debtors granted a first-priority lien on substantially all of its property other than "**Excluded Assets**," which include,

10

among other things, any deposit accounts and securities accounts, any Capital Stock in Unrestricted Subsidiaries (as defined in the Revolving Credit Agreement and Secured Term Loan Agreement), and any owned or leased real property.  *Id.*  The collateral includes the Collateral Rigs (as defined in the Revolving Credit Agreement and Secured Term Loan Agreement), capital stock of (i) the owners of the Collateral Rigs, (ii) Paragon International Finance Company, and (iii) Paragon Offshore Finance Company and certain other property pledged under the Collateral Documents (as defined in the Revolving Credit Agreement and Secured Term Loan Agreement). In addition, certain guarantors under the Guaranty and Collateral Agreement executed mortgages for each of the Collateral Rigs.  *Id.*

### E.    Hiring of Lazard and Consideration of Approach to Restructuring

31.    In 2015, the Debtors engaged Lazard to provide financial advice and restructuring services.  6/21/16 Hrg. Tr. at 22:22–23 (Kurtz Test.); 6/23/16 Hrg. Tr. at 78:18– 79:20 (Fordyce Test.); PGN 239 ¶ 34.  Over the course of two months, Lazard engaged in an intensive due diligence process that included review of the Debtors' company documents, rigorous examination of the Debtors' financials and business plans, and regular interaction with management, Board, and the finance and risk committee.  6/23/16 Hrg. Tr. at 79:8–83:22 (Fordyce Test.).

32.    Prior to selecting the restructuring alternative embodied by the Original Plan and Modified Plan, the Debtors considered various alternatives.  In October 2015, the Debtors presented their Board with three options.  The first option was to take no action, as the Debtors had substantial cash, no maturities in the near future, and would only have to deal with a single covenant breach in the first quarter of 2016.  6/21/16 Hrg. Tr. at 28:8–23 (Kurtz Test.). The second option was to equitize all of the Debtors' debt obligations.  6/21/16 Hrg. Tr. at 28:24–29:22 (Kurtz Test.).  The Board rejected this option because it would essentially wipe out

11

shareholders' interests at a time when Paragon had $735 million of cash on its balance sheet, an amount "vastly greater" than its liquidity needs.  *Id.*  The third option, which the Debtors ultimately pursued, was a plan that de-levered the Debtors' balance sheet, restructured financial covenants with the Revolver Lenders, and extended the maturity date of their Loans.  6/21/16 Hrg. Tr. at 30:17–32:4 (Kurtz Test.).

### F.    Preparation of Business Plan

33.    In the fall of 2015, over the course of several months, the Debtors initiated their annual budget process and began to prepare projections in connection with the restructuring options presented to the Board.  6/21/2016 Hrg. Tr. at 163:21–23 (Stilley Test.).  The budgets are designed to balance capital expenditures with, among other things, risk-adjusted opportunities in the marketplace.  6/21/2016 Hrg. Tr. at 161:20–162:6 (Stilley Test.).  The creation of the Debtors' budget is an iterative process that takes months to complete.  6/21/2016 Hrg. Tr. at 161:9–19 (Stilley Test.).  Initially, the field operations group and shore-based groups, as well as the corporate group, developed individual budgets for their departments and locations.  *Id.* at 161:9–13, 164:10–17.  The Debtors' management team then reviewed individual department budgets to ensure that assumptions were reasonable and accurate.  *Id.* at 161:9–19, 164:18–25, 165:21–166:16.  Indeed, every assumption was reviewed by the Debtors' CEO and President, Mr. Stilley, before presentation to the Board.  *Id.* at 164:18–25.

34.    In formulating the Business Plan, the Debtors took into account their current market position in each of the regions in which they anticipate operating (North Sea, Middle East, India, West Africa, and Mexico).  9/27/16 Hrg. Tr. at 37:24–38:10 (Stilley Test.); 6/21/16 Hrg. Tr. at 176:1–8 (Stilley Test.).  Paragon also considered information received directly from customers, employees on the ground in each region, and their decades of experience in the oil and gas industry.  9/27/16 Hrg. Tr. at 37:24–38:10 (Stilley Test.).

12

35.    The Debtors took a conservative approach in preparing the Business Plan. For instance, the Business Plan takes the "oversupply of rigs" into account, which is based on the expected marketed supply in each region.  6/21/2016 Hrg. Tr. 215:21–216:12 (Stilley Test.); 9/27/2016 Hrg. Tr. at 51:16–20 (Stilley Test.).  The Business Plan also does not assume a significant improvement in oil prices.  9/27/16 Hrg. Tr. at 39:14–16 (Stilley Test.).  Moreover, Mr. Stilley testified that he believes that the Debtors' budget accurately forecasts the capital expenditures needed to implement their Business Plan.  6/23/2016 Hrg. Tr. at 22:2–5 (Stilley Test.).  He further testified that the dayrates and utilization assumptions built into the Business Plan are conservative.  6/21/2016 Hrg. Tr. at 199:19–24 (Stilley Test.)

36.    The assumptions underlying the Business Plan were altered several times to reflect market changes and comments from the finance and risk committee in order to assess numerous possible scenarios.  6/21/16 Hrg. Tr. at 168:12–20 (Stilley Test.).  After Paragon filed for bankruptcy, the market continued to worsen and customers began cutting their budgets for 2016 by as much as fifty percent.  6/21/16 Hrg. Tr. at 168:24–169:5 (Stilley Test.).  The Debtors also received feedback from customers that caused them to be concerned about their ability to meet the near-term timetables in their forecast.  6/21/16 Hrg. Tr. at 49:22–50:19 (Kurtz Test.); 6/21/16 Hrg. Tr. at 168:21–169:16 (Stilley Test.).  As a result, the Debtors believed that the January business plan filed with the initial disclosure statement might need to be revised, especially for 2016, based upon changing information and market conditions.  6/21/16 Hrg. Tr. at 169:7 (Stilley Test.).  In an effort to be prudent and conservative, the Debtors adjusted their projections.  6/21/16 Hrg. Tr. at 49:22–50:19 (Kurtz Test.); 6/21/16 Hrg. Tr. at 168:21–169:16 (Stilley Test.).

13

37.    The Debtors' Business Plan going forward contemplates having 23 rigs, comprised of 22 jackups and one floating rig (a semisubmersible in the North Sea), 11 of which are already in operation. 6/21/16 Hrg. Tr. at 132:20–21, 145:3–6 (Stilley Test.).  Mr. Stilley testified at the Initial Confirmation Hearing that the Debtors' 10 remaining rigs are certainly not "old and cold" and that the Debtors intend to bring them back into service within the next couple of years. 6/21/16 Hrg. Tr. at 145:13–146:13 (Stilley Test.).  In fact, only two out of those 10 rigs are "cold-stacked," meaning there is nobody currently on the rig. 6/21/16 Hrg. Tr. at 145:13–146:13 (Stilley Test.).  Moreover, the Debtors have experience with bringing cold-stacked rigs back into service. 6/21/2016 Hrg. Tr. at 146:14–25 (Stilley Test.).  The Debtors estimate that it should not cost more than $3–$4 million to bring a "cold-stacked" rig back into service. 6/21/2016 Hrg. Tr. at 147:4–24 (Stilley Test.).

G.    **The Noble Settlement**

38.    The Debtors were spun-off from Noble in August 2014 (the "**Spinoff**"). PGN 239 ¶ 9.  Paragon and Noble are party to several separation agreements executed in connection with the Spinoff including a tax sharing agreement dated as of July 31, 2014 (the "**Tax Sharing Agreement**").  6/22/16 Hrg. Tr. at 5:3–4 (Stilley Test.); PGN 239 ¶ 10. Essentially, the Tax Sharing Agreement provides that Paragon assumed responsibility for certain tax liabilities for the Paragon entities, as well as for some of the Noble entities. 6/21/16 Hrg. Tr. at 217:13–21 (Stilley Test.); PGN 239 ¶ 17.  Also on July 21, 2016, the Debtors executed a side letter with Noble which modified the Tax Sharing Agreement to allow Noble to manage certain tax claims in Mexico. 6/22/16 Hrg. Tr. at 4:24–5:2, 5:10–13 (Stilley Test.).

39.    The Debtors were assessed a very significant tax liability in Mexico (the "**Mexican Tax Liabilities**"), arising from activities that occurred in 2010. 6/21/16 Hrg. Tr. at 39:3–8 (Kurtz Test.); PGN 239 ¶ 18.  Mr. Kurtz testified that, at the time of the restructuring

14

negotiations, the Mexican Tax Liabilities were estimated to be in the $190 million range, but could grow to approximately $300 million.  6/21/16 Hrg. Tr. at 39:9–12 (Kurtz Test.).

   40. Typically, taxes assessed by the Mexican government, including the Mexican Tax Liabilities, can be settled for "pennies on the dollar."  6/21/16 Hrg. Tr. at 39:13–23 (Kurtz Test.); PGN 239 ¶ 20.  However, during the pendency of any such challenge, the Debtors would have been required to post a performance bond for the full amount of the assessment.  6/21/16 Hrg. Tr. at 39:13–23 (Kurtz Test.); PGN 239 ¶ 20.  Thus, the Debtors would have potentially had to post a bond of approximately $200 million, and potentially even more, over the course of the Business Plan.  6/21/16 Hrg. Tr. at 217:13–218:18 (Stilley Test.); 6/22/16 Hrg. Tr. at 212:8–11 (Stilley Test.); PGN 239 ¶ 21.  Other than Noble, or utilizing cash collateral, the Debtors had no other source from which to obtain these funds.  6/22/16 Hrg. Tr. at 213:5–8 (Stilley Test.); PGN 239 ¶ 68.  In addition, assuming a $300 million tax assessment, the Debtors could have been potentially liable for up to $45 million in fees associated with posting the bond.  6/23/16 Hrg. Tr. at 32:19–33:8 (Stilley Test.).

   41. The term sheet for the Noble Settlement Agreement was executed in February 2016.  PGN 14 at 6.  The Noble Settlement confers two principal benefits on the Debtors:  (i) it redistributes responsibility for the Mexican Tax Liabilities and related taxes levied on Noble entities in a manner more favorable to the Debtors; and (ii) it requires Noble to provide direct bonding for the Mexican Tax Liabilities, thereby permitting Noble and the Debtors to dispute the legitimacy of these claims without requiring the Debtors to collateralize the bond, and in turn freeing up nearly $200 million of the Debtors' cash.  PGN 173 at 5; 6/22/16 Hrg. Tr. at 5:18–7:7 (Stilley Test.); 6/21/16 Hrg. Tr. at 39:3–40:11 (Kurtz Test); PGN 239 ¶¶  60, 68, 69. Noble agreed to assume all of the Noble entities' liability for the Mexican Tax Liabilities, as well

15

as half of any potential liability for the Paragon-related entities.  6/21/16 Hrg. Tr. at 218:21–

219:12 (Stilley Test.); PGN 239 ¶¶ 68, 69.  Noble has also agreed to manage the tax contesting

process, ensuring that the Debtors do not have to devote people and resources to that process.

6/21/16 Hrg. Tr. at 219:10–12 (Stilley Test.); PGN 239 ¶ 69.

        42.      In exchange for the aforementioned benefits, the Debtors agreed to give up

potential fraudulent conveyance claims that it had against Noble.  6/22/16 Hrg. Tr. at 7:8–11

(Stilley Test.); PGN 239 ¶ 54.  At the Board's direction, the Debtors' advisors (Weil and Lazard)

conducted an investigation of these potential claims by interviewing witnesses, reviewing

financial statements and performing financial analyses to evaluate the strength of these potential

claims.  6/22/16 Hrg. Tr. at 203:16–204:3 (Stilley Test.); PGN 239 ¶ 30.  At a January 2016

Board meeting, the Debtors' advisors presented their findings to the Board.  6/22/16 Hrg. Tr. at

204:4–6 (Stilley Test.); PGN 239 ¶ 62.  The Debtors' advisors explained that the pursuit of

fraudulent conveyance claims against Noble would be expensive and the litigation could

potentially take a number of months.  6/22/16 Hrg. Tr. at 209:11–24 (Stilley Test.); PGN 239 ¶

62.

        43.      After extensive discussion, the Board determined that litigation with

Noble would have an uncertain outcome, be expensive and time consuming, and that the Noble

Settlement Agreement was in the best interest of the Debtors and their creditors.  6/22/16 Hrg.

Tr. at 7:12–17, 8:5–9:2 (Stilley Test.); PGN 239 ¶ 64.  Mr. Stilley explained that, absent the

Noble Settlement Agreement, a settlement of the Mexican Tax Liabilities along with litigation

over the fraudulent conveyance claims could have potentially cost the Debtors approximately

$105 million.  6/23/16 Hrg. Tr. at 33:21–25 (Stilley Test.).  More importantly, that course of

action would have required the Debtors to bond up to $300 million in Mexican Tax Liabilities

and could potentially have precluded the reorganization contemplated by the Modified Plan. 6/23/16 Hrg. Tr. at 34:1–4 (Stilley Test.); PGN 239 ¶ 68.

### H.    Negotiation of Original Plan

44.    The Original Plan was the product of extensive, good-faith negotiations between the Debtors and the Plan Support Parties.  Negotiations commenced in November of 2015, and on December 30, 2015, the Debtors reached a deal with the Ad Hoc Group of Senior Noteholders (the "**Ad Hoc Group**"), which included a $380 million cash payment.  6/21/16 Hrg. Tr. at 36:1–3, 41:3–8 (Stilley Test.).  The deal with the Ad Hoc Group was conditioned upon entering into the Noble Settlement Agreement, which was reached in January of 2016.  6/21/16 Hrg. Tr. at 41:3–17 (Stilley Test.).  Subsequently, the Debtors reached an agreement with the Revolver Lenders, which included a $165 cash payment and a two-year maturity extension. Given the cash payment to the Revolver Lenders, coupled with the Debtors' desire to only use up to approximately $500 million of cash in their restructuring, the Debtors subsequently renegotiated their agreement with the Ad Hoc Group and reduced their cash payment in exchange for an increased amount of equity in the Reorganized Debtors.  6/21/16 Hrg. Tr. at 42:20–44:18 (Stilley Test.).

### I.    Terms of the Original Plan

45.    Under the Original Plan, approximately $985 million of Senior Notes were to be satisfied in exchange for $345 million in cash, 35 percent equity in the reorganized Paragon Parent and certain deferred cash payments up to $50 million to the Ad Hoc Group.  PGN 212.  In consideration of a $165 million principal payment, the Revolving Credit Agreement would be amended to include, among other things, new minimum liquidity covenant of $110 million (with a 60-day grace period where liquidity must remain above $95 million), a leverage and interest coverage ratio covenant holiday through 2017, and an extended maturity date.  PGN 213.  The

Original Plan also cured and reinstated the Secured Term Loan Agreement and incorporated the Noble Settlement Agreement (discussed below).  6/21/2016 Hrg. Tr. at 34:16–35:14, 51:16–52:17 (Kurtz Test.).

> **J.**    **Updates to the Business Plan**

46.    Following the Initial Confirmation Hearing, the Debtors updated the Business Plan to reflect actual financial results through June 30, 2016, and to account for known changes in contract utilization, dayrates, and capital expenditures.  PGN 178 (Business Plan forecast model).

47.    The Debtors have outperformed their projections through June, with a net change in cash of $94 million above projections,[7] and an out-performance on expected EBITDA by $78 million.[8]  9/28/16 Hrg. Tr. at 32:21–33:13 (Fordyce Test.); 9/27/16 Hrg. Tr. at 4:16–23, 6:6–19, 7:3–22 (Stilley Test.); PGN 215.  The Debtors' outperformance can be attributed to longer contracts, payment of receivables, and reduced costs.  9/28/16 Hrg. Tr. at 30:3–15 (Fordyce Test.); PGN 215.  Paragon's contract drilling expenses were 20 percent lower than projected, a $55 million savings.  9/28/16 Hrg. Tr. at 30:11–15 (Fordyce Test.); PGN 215.  At the same time, operating days for the first six months of 2016 were only 5–6 percent below projections, demonstrating that the savings represent real cost control, not just reduced activity.  9/28/16 Hrg. Tr. at 94:7–14 (Fordyce Test.).  As part of these efforts, Paragon negotiated very aggressively with its shipyards and suppliers to reduce costs.  9/27/16 Hrg. Tr. at 44:5–8 (Stilley Test.).  The Debtors have also been successful at lowering stacking costs and "handrail" costs,

---

[7] *Compare* PGN 10 at 50 (projecting $288 million in cash and $510 million to be paid to Ad Hoc Group and Revolvers upon emergence) *with* PGN 169 at 10 (form 10-Q demonstrating $892 million in cash at the end of second quarter 2016).

[8] *Compare* PGN 12 at 6 (projecting $104 million in adjusted EBITDA) *with* PGN 169 at 70 (demonstrating approximately $181 million adjusted EBITDA at the end of second quarter 2016).

which are operating costs required to operate the rigs while drilling.  9/28/16 Hrg. Tr. at 32:8–20

(Fordyce Test.).  Such cost cutting is ongoing, and importantly, the benefits thereof have *not*

been incorporated into the Business Plan or Downside Sensitivity.  9/28/16 Hrg. Tr. at 32:8–20,

94:1–23 (Fordyce Test.).

>        48.        These first and second quarter results are reflected in the Business Plan.

9/27/16 Hrg. Tr. at 6:20–23 (Stilley Test.).

>    **K.        Preparation of Downside Sensitivity**

>        49.        After the Initial Confirmation Hearing, the Debtors and their advisors

prepared a downside sensitivity analysis to the Debtors' Business Plan (the "**Downside**

**Sensitivity**").  PGN 181 (Downside Sensitivity forecast model).  The Downside Sensitivity is not

a revised business plan and the Debtors' Business Plan is still the best estimate of Debtors'

expectations.  9/28/16 Hrg. Tr. at 15:22–16:8 (Fordyce Test.); 9/27/16 Hrg. Tr. at 8:6–8, 12:11–

18 (Stilley Test.).  The Downside Sensitivity was constructed in the same manner as the Debtors'

Business Plan, but contains even more conservative inputs.   9/27/16 Hrg. Tr. at 12:11–18

(Stilley Test.); 9/28/16 Hrg. Tr. at 29:6–20 (Fordyce Test.); PGN 185.  The Downside Sensitivity

is essentially a "stress test" of Paragon's Business Plan that assumes a longer and more

prolonged downturn and slower recovery.  9/27/16 Hrg. Tr. at 7:3–8:5 (Stilley Test.); 9/30/2016

Hrg. Tr. at 133:21–22 (Fordyce Test.).

>        50.        In formulating the Downside Sensitivity, Paragon's management team,

including Randy Stilley, Steve Manz, Andrew Tietz, Blake Morris, and Todd Strickler, evaluated

the current market and forecasted how a hypothetical downturn of an additional 12 to 18 months

would impact Paragon's rigs in each region in which they operate.  9/28/16 Hrg. Tr. at 27:21–

28:12 (Fordyce Test.); 9/27/16 Hrg. Tr. at 8:9–14, 10:7–25, 11:16–23, 128:6–12 (Stilley Test.).

Considering that an additional 12 to 18 month delay would render this downturn the longest in

the industry's history, these assumptions represent a very conservative approach.  9/27/16 Hrg. Tr. at 9: 22–10:6, 14:3–8 (Stilley Test.).

51.     In putting together the Downside Sensitivity, the Debtors analyzed their current contractual situation in each region, their decades of industry experience, feedback from their employees on the ground in each region, and information received directly from their customers.  9/27/16 Hrg. Tr. at 12:19–25 (Stilley Test.).[9]  The Debtors' assumptions were reviewed and tested by the Debtors' advisor, Lazard.  Lazard reviewed the analysis rig by rig, market by market, and prodded management on the logic of their choices.  9/28/2016 Hrg. Tr. at 17:6–18 (Fordyce Test.).  Lazard also participated in discussions with the Board and creditor groups to update the directors on the Debtors' potential future performance, and to negotiate additional cushion should the downside scenario actually occur.  9/28/16 Hrg. Tr. at 17:25–18:19 (Fordyce Test.).

52.     The Downside Sensitivity made significant adjustments to dayrates,[10] utilization, and capital expenditures,[11] including adding increased costs for rigs that were out of service longer.  PGN 178, 180, 181, 183; 9/27/16 Hrg. Tr. at 11:24–12:3 (Stilley Test.).  In contrast to the Modified Plan, the Downside Sensitivity assumed that 17 of the Debtors' 23 rigs have dayrates reduced by approximately 20 percent, and that dayrates will start low and increase slowly.  PGN 185; 9/28/16 Hrg. Tr. at 34:12–35:20 (Fordyce Test.); PGN 216–217 (demonstrative of dayrates and utilization assumptions).  Further, 13 rigs had utilization negatively revised, including removal of the L1115 altogether.  *Id.*  The Debtors' utilization

[9] As Mr. Stilley testified, the Debtors did not use third party analyst's input in developing their models, as they tend to be overly optimistic when the industry is doing well and overly pessimistic in downturns. 9/27/2016 Hrg. Tr. at 13:2–12, 125:12–23 (Stilley Test.).

[10] PGN 185 (comparing utilization and dayrates in Business Plan and Downside Sensitivity).

[11] PGN 180 and 183 (comparing capital expenditures in Business Plan and Downside Sensitivity).

20

assumptions are significantly lower in the Downside Sensitivity than in the Business Plan, and

remain lower for a longer period of time with a much slower recovery.  9/27/2016 Hrg. Tr. at

15:21–16:1 (Stilley Test.).  Further, compared to the Modified Plan, the Downside Sensitivity

assumes certain contracts will be canceled, and allows additional idle time in between rig

contracts.  PGN 185; 9/27/2016 Hrg. Tr. at 16:2–6 (Stilley Test.).  Based on Mr. Fordyce's

testimony, the reduced dayrates are a reasonable and conservative assumption.  9/28/16 Hrg. Tr.

at 29:6–20, 43:17–44:16 (Fordyce Test.).

    53.  The Downside Sensitivity's revised assumptions result in $770 million

less in aggregate projected revenue and $591 million less in aggregate adjusted EBITDA than the

Business Plan, reductions of 26 percent and 54 percent, respectively.  PGN 219; 9/28/16 Hrg. Tr.

at 28:13–25 (Fordyce Test.); 9/27/16 Hrg. Tr. at 32:16–33:15 (Stilley Test.).[12]  The revised

assumptions do not include reduced operating costs per rig which would likely occur in the

downside scenario, so the decrease in revenue greatly impacts EBITDA.  9/28/16 Hrg. Tr. at

42:11–43:16 (Fordyce Test.).  As Mr. Fordyce testified, a 50 percent decrease in EBITDA is a

conservative assumption in comparison with the reduction typically seen in other downside

analyses he has undertaken (20–30 percent).  9/28/16 Hrg. Tr. at 29:6–20, 43:17–44:16 (Fordyce

Test.).  Significantly, the amount of cash on hand under the Downside Sensitivity—$177 million

cash at end of projection period and $143 million cash at the end of 2018—is in excess of

required covenants.  PGN 222; 9/28/16 Hrg. Tr. at 46:11–48:10 (Fordyce Test.).

  **L.**  **The Modified Plan**

    54.  After developing and testing the Downside Sensitivity, Paragon

approached the Revolver Lenders and the Ad Hoc Group to negotiate changes to the Original

---

[12] These overall reductions are evidenced by comparing PGN 173 at 18 (projecting $3.4 billion in operating revenue in Business Plan) with PGN 220 ($2.6 billion in Downside Sensitivity).

Plan. 9/27/16 Hrg. Tr. at 33:16–21 (Stilley Test.). Negotiations commenced in the middle of

July through about the first week of August. 9/27/16 Hrg. Tr. at 33: 22–34:4 (Stilley Test.). The

Debtors were able to negotiate with the Revolver Lenders to reduce the minimum liquidity

covenant from $110 million to $103 million, lower the corresponding 60-day grace period

amount from $95 million to $88 million, and adjust covenant holidays so that Paragon has no

EBITDA-based covenants until 2019. PGN 213; 9/28/16 Hrg. Tr. at 22:18–23:25 (Fordyce

Test.); 9/27/16 Hrg. Tr. at 34: 24–35:11 (Stilley Test.). The Revolver Lenders also agreed to

delay the testing of the maximum net leverage ratio and minimum interest coverage ratios until

first quarter 2019, instead of in 2018. PGN 213; 9/28/16 Hrg. Tr. at 22:18–23:25 (Fordyce

Test.); 9/27/16 Hrg. Tr. at 34: 24–35:11 (Stilley Test.).

      55.    The Debtors also negotiated with the Ad Hoc Group to reduce the cash

payment to the Ad Hoc Group by $60 million, from $345 million to $285 million, and to remove

the deferred cash payments that were contemplated by the Original Plan. PGN 212–214

(summarizing terms of Modified Plan); 9/27/16 Hrg. Tr. at 35:12–22 (Stilley Test.); 9/28/16 Hrg.

Tr. at 21:12–22:16 (Fordyce Test.). As compensation for giving up $60 million in cash in

connection with the Modified Plan and the right to contingent payments, the Ad Hoc Group

received an increase in their pro forma ownership of common shares (from 35 to 47 percent) and

issuance of $60 million in unsecured New Notes. PGN 212; 9/28/16 Hrg. Tr. at 21:12–22:16,

105:17–106:22 (Fordyce Test.); 9/27/2016 Hrg. Tr. at 35:12–22 (Stilley Test.).

      56.    Paragon also negotiated with Noble to receive reimbursement for amounts

paid under the Noble Settlement Agreement with a $5 million note instead of cash (the

"**Amended Noble Settlement**"). PGN 213; 9/28/16 Hrg. Tr. at 25:6–20 (Fordyce Test.); 9/27/16

Hrg. Tr. at 36:7–14 (Stilley Test.).

57.    The results of these negotiations are cushions against the covenants in the Amended and Restated Credit Agreement.  Under the Modified Plan, the Debtors will have minimum 67 percent net leverage, 122 percent interest coverage, and 137 percent liquidity cushions.  PGN 224; 9/28/16 Hrg. Tr. at 50:25–52:13 (Fordyce Test.).  Under the downside scenario, the Debtors would have minimum 10 percent EBITDA and 39 percent liquidity cushions.  PGN 225; 9/28/16 Hrg. Tr. at 52:14–24 (Fordyce Test.); 9/27/2016 Hrg. Tr. at 35:7–11 (Stilley Test.).  Moreover, under the Modified Plan, the Debtors will be able to refinance debts by 2019, well before they will be required to do so in 2021, and will have leverage and coverage ratios in line with Moody's Baa-rated companies by 2018 and near investment grade metrics by 2019.   PGN 226; 9/28/16 Hrg. Tr. at 52:25–54:2 (Fordyce Test.).

58.    In sum, the Modified Plan de-leverages the Debtors by eliminating $1 billion in debt, converts the Revolving Credit Facility into a term loan and extends its maturity by two years, and reduces the Debtors' interest expense by approximately half.  Pursuant to the Modified Plan, Paragon will emerge with approximately $379 million in cash.  PGN 214; 9/28/16 Hrg. Tr. at 27:9–16 (Fordyce Test.).  The Modified Plan also provides the Debtors more flexibility, and incorporates Paragon's year-to-date performance, including the outperformance on EBITDA and cash, recent contract updates, which have been both positive and negative, and the results of further negotiations with the Debtors' stakeholders including, among others, additional cash from the Ad Hoc Group and certain covenant holidays.  9/28/16 Hrg. Tr. at 10:16–11:4, 26:13–24 (Fordyce Test.).  In addition, under the Modified Plan, Paragon would have $487 million in cash at end of the projection period and $694 million of net debt at the end of projection period, which is down from just under $1.1 billion at emergence, reflecting

23

scheduled amortizations and repayments under cash flow sweeps.  PGN 221; 9/28/16 Hrg. Tr. at

45:24–46:8 (Fordyce Test.).

### M.    Ad Hoc Group's Contribution

59.    The Debtors began negotiating with the Ad Hoc Group in the fall of 2015,

before filing for bankruptcy.  9/27/16 Hrg. Tr. at 60:8–11 (Stilley Test.).  Throughout the entire

process, the Ad Hoc Group continued to work with Paragon in developing a plan and negotiating

with the Revolver Lenders.  9/27/16 Hrg. Tr. at 60:12–14 (Stilley Test.).  Even after Paragon

developed the Downside Sensitivity, the Ad Hoc Group agreed to forgo $60 million in cash and

other items, including the right to receive two potential payments which had been contingent on

the Debtors' EBITDA levels in 2016 and 2017.  PGN 212; 9/27/16 Hrg. Tr. at 60:15–18 (Stilley

Test.); 9/28/16 at 21:12–22:16 (Fordyce Test.).   They also assisted in negotiating an

advantageous settlement with Noble.  9/27/16 Hrg. Tr. at 60:21–25 (Stilley Test.).

## III.    CONFIRMATION OF THE MODIFIED PLAN

60.    The Debtors' seek confirmation of the Modified Plan including the

Amended Noble Settlement.  The Term Loan Agent objects to confirmation of the Modified

Plan, contending that:  (i) the Modified Plan is not feasible; (ii) the Term Loan Lenders are

impaired under the Modified Plan; (iii) the Debtors may not reinstate the Secured Term Loan;

(iv) the Modified Plan was not proposed in good faith; and (v) the Modified Plan improperly

provides for the payment of the unsecured noteholders' professional fees.  The Term Loan Agent

has withdrawn its prior objection to the Amended Noble Settlement.  For the reasons fully set

forth below, the Court approves the Amended Noble Settlement, overrules the Term Loan

Agent's objections to confirmation, and confirms the Modified Plan.

24

A. **The Modified Plan is Feasible**

61. A debtor must prove a chapter 11 plan's feasibility by a preponderance of the evidence. *In re T-H New Orleans Ltd. P'Ship*, 116 F.3d 790, 801 (5th Cir. 1997) (*citing In re Briscoe Enter., Ltd. II*, 994 F.2d 1160, 1165 (5th Cir. 1993)); *see also In re W.R. Grace & Co.*, 475 B.R. 34, 114 (D. Del. 2012) ("The debtor bears the burden of proof on this inquiry, and must show by a preponderance of the evidence that a reorganization plan is feasible."). Section 1129(a)(11) of the Bankruptcy Code codifies the feasibility requirement, permitting confirmation of a plan if "[c]onfirmation of the plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan . . . ." 11 U.S.C. § 1129(a)(11).

62. Section "1129(a)(11) does not require a guarantee of the plan's success; rather the proper standard is whether the plan offers a 'reasonable assurance' of success." *In re Indianapolis Downs*, 486 B.R. 286, 298 (Bankr. D. Del. 2013); *see also In re W.R. Grace & Co.*, 475 B.R. at 115 ("In making this finding, the bankruptcy court need not require a guarantee of success, but rather only must find that 'the plan present[s] a workable scheme of organization and operation from which there may be reasonable expectation of success.'") (citations omitted). Speculative prospects of failure cannot defeat feasibility. *See In re Drexel Burnham*, 138 B.R. 723, 762 (Bankr. S.D.N.Y. 1992) ("The mere prospect of financial uncertainty cannot defeat confirmation on feasibility grounds . . . .") (citing *In re U.S. Truck Co.*, 47 B.R. 932, 944 (E.D. Mich. 1985), *aff'd*, 800 F.2d 581 (6th Cir. 1986)).

63. Courts consider various factors in assessing the feasibility of a plan of reorganization, including: (i) the adequacy of the debtor's capital structure; (ii) the earning power of its business; (iii) economic conditions; (iv) the ability of the debtor's management; (v) the probability of the continuation of the same management; and (vi) any other related matters

25

which determine the prospects of a sufficiently successful operation to enable performance of the provisions of the plan.  *See In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226–27 (Bankr. D.N.J. 2000).  The "Debtors are not required to view [their] business and economic prospects in the worst possible light."  *In re Am. Consol. Transp. Companies, Inc.*, 470 B.R. 478, 491 (Bankr. N.D. Ill. 2012).  Rather, "[w]here the projections are credible, based upon the balancing of all testimony, evidence, and documentation, even if the projections are aggressive, the court may find the plan feasible."  *In re T–H New Orleans Ltd. P'ship*, 116 F.3d at 802.

64.     Contrary to the Term Loan Agent's assertion, balance sheet solvency at emergence is not a feasibility requirement.  Rather, solvency is merely a factor considered by some courts where relevant.  *See In re W.R. Grace & Co.*, 475 B.R. at 163 n.137.  Here, however, the Court finds that the Term Loan Agent has made no showing that any such purported insolvency will have any effect on the Debtors' ability to perform such as to render the Modified Plan not feasible.  *See infra* section III.A.5.  Accordingly, balance sheet solvency is not a relevant factor in considering the feasibility of the Modified Plan.

65.     For the reasons fully set forth below, and based upon this Court's fact-intensive inquiry and the evidence presented at the Confirmation Hearings, the Court concludes that the Modified Plan "present[s] a workable scheme of organization and operation from which there may be reasonable expectation of success."  *In re W.R. Grace & Co.*, 475 B.R. at 163 n.137 (quotation omitted).  Accordingly, the Modified Plan satisfies the requirements of section 1129(a)(11) of the Bankruptcy Code.

## 1.     The Market Recovery

66.     In determining feasibility, courts consider the current and expected economic conditions of a debtor's industry.  *In re Greate Bay Hotel & Casino, Inc.*, 251 B.R. 213, 226–27 (Bankr. D.N.J. 2000).  Here, the Debtors are in the offshore drilling industry and

26

their Business Plan contemplates the continued operation of 23 drilling rigs.  6/21/16 Hrg. Tr. at 134:24–135:6 (Stilley Test.); 6/22/16 Hrg. Tr. at 15:24–16:7 (Stilley Test.).  The overwhelming majority of the Debtors' work—80 percent—consists of re-entries, workovers, well intervention, and development drilling.  *Id.*; 9/30/16 Hrg. Tr. at 105:24–106:12 (Leand Test.).  The Debtors argue that their business and the oil and gas industry is cyclical and is showing signs of recovery, while the Term Loan Agent argues the Debtors' projections are overly optimistic.  For the reasons set forth below, the Court finds that the Debtors presented sufficient evidence that industry conditions support a finding of feasibility.

67.    The current and expected economic conditions of this industry are well-established.  As the Debtors and their expert credibly testified, due to the cyclical supply and demand of oil and gas, a recovery in the offshore drilling industry is expected.  9/27/16 Hrg. Tr. at 8:17–9:8, 75:2–7 (Stilley Test.); 9/28/16 Hrg. Tr. at 5:9–6:16 (Fordyce Test.).  Following a downturn, the industry always recovers.  9/27/16 Hrg. Tr. at 8:17–25 (Stilley Test.).  The current cycle is the longest in this generation:  already 24 months long.  9/27/16 Hrg. Tr. at 9:14–21 (Stilley Test.).  Thus, the relevant inquiry is not *if* a recovery will occur, but *when*.  9/27/16 Hrg. Tr. at 8:22–23, 75:2–7 (Stilley Test.).

68.    The Court determines that the evidence presented at the Confirmation Hearings demonstrated that the bottom of the current downturn is behind us, and that the recovery has already started.  9/27/16 Hrg. Tr. at 69:15–18 (Stilley Test.); 9/28/16 Hrg. Tr. at 5:12–6:5 (Fordyce Test.).  Indeed, the price of oil, having bottomed out in February of this year at $29.90 a barrel, has increased to the point where it is now trading at a significantly higher price.  9/30/16 Hrg. Tr. at 28:10–16 (Leand Test.).  Oil prices have already risen to over $50 a barrel as of October 2016, a 66 percent increase over the last 7 months.  This increase has led

producers—Paragon's clients—to begin planning for additional spending as they ramp up for increased offshore drilling and workovers next year.  9/28/16 Hrg. Tr. at 5:13–6:5 (Fordyce Test.).  Indeed, whereas the market for drilling rigs two years ago was quiet, industry participants are starting to see "some stirring in the spot market."  PGN 189 at 18 (comments from Per Wulff, CEO of Seadrill Limited).  Likewise underscoring that a recovery has begun, the debt and equity markets for oil and gas companies and service companies are opening up and providing capital to invest.  9/28/16 Hrg. Tr. at 6:12–15 (Fordyce Test.).

69.     The Court further notes, and the Term Loan Agent's expert, Mr. Leand agrees, that based on the forecast relied upon and put into evidence by the Term Loan Agent, the price of oil is expected to increase.  9/29/16 Hrg. Tr. at 167:9–12 (Leand Test.) (citing TLA 525).  And, with an increase in oil price, as Mr. Leand testified, there would be an associated increase in rig activity.  9/29/16 Hrg. Tr. at 151:10–14 (Leand Test.).  As Mr. Leand further conceded, at some point demand for offshore drilling rigs will increase.  9/30/16 Hrg. Tr. at 27:10–14 (Leand Test.).

70.     In any event, the Court is convinced by the evidence that the Debtors' business is not directly tied to any particular oil price, and that the Business Plan does not assume a significant improvement in oil prices.  9/27/16 Hrg. Tr. at 39:14–40:8 (Stilley Test.).  Instead, different customers require different oil prices for different projects.  6/21/2016 Hrg. Tr. at 191:6–10 (Stilley Test.); 9/27/16 Hrg. Tr. at 39:14–40:3, 124:7–15 (Stilley Test.).  For example, Mr. Stilley explained that "most of our customers in the Middle East, they're happy with almost any oil price because, you know, their marginal cost to go and do a workover or a re-entry on a well, or even a development well, is probably less than $20 a barrel, so they don't really care."  6/21/16 Hrg. Tr. at 191:11–15 (Stilley Test.).  However, once oil prices do increase,

28

the demand for Paragon's services will increase about six months afterward.  9/27/16 Hrg. Tr. at

41:4–9 (Stilley Test.).  Additionally, the Debtors do not expect a temporary drop in oil prices to

have much of an impact on the Debtors' stance going forward.  9/27/16 Hrg. Tr. at 124:8–10

(Stilley Test.).

      71.     The Court further finds that the Debtor's expert credibly testified that, as

the market recovers, it does so in order of lowest to highest cost options: certain onshore drilling

returns first, then shallow-water offshore, followed by deep-water.  9/28/16 Hrg. Tr. at 5:18–24

(Fordyce Test.).  The economic threshold for Paragon's customers for these types of projects is

low and, accordingly, these projects will be the first to occur in a recovering offshore drilling

industry as producers increase activity to stave off production declines from natural depletion.

9/28/16 Hrg. Tr. at 5:13–6:5 (Fordyce Test.); 9/30/16 Hrg. Tr. at 128:3–129:3 (Fordyce Test.).

As Mr. Fordyce testified, onshore drilling has already begun to increase in certain regions

(9/30/16 Hrg. Tr. at 137:20–138:7 (Fordyce Test.) (citing TLA 526)), which is a prelude to an

increase is shallow-water offshore drilling, Paragon's primary market.  9/30/16 Hrg. Tr. at

127:25–129:3, 129:4–130:2 (Fordyce Test.).  Indeed, the Debtors also credibly testified that they

have had increasing conversations with customers about work that was deferred in 2015 and

early 2016.  6/22/2016 Hrg. Tr. at 141:25–142:10 (Stilley Test.).  Although the increasing price

of oil, revitalization of the debt and equity markets, and heightened capital expenditures in the

Permian basin indicate the start of the recovery, Paragon's Business Plan conservatively

forecasts that the recovery for the offshore drilling industry will not start until 2017.  9/27/16

Hrg. Tr. at 8:24–25 (Stilley Test.).

      72.     The Term Loan Agent contends that, at best, the current supply overhang

in the offshore drilling market will not normalize for another three to three and a half

29

years.  TLA 619; 9/29/16 Hrg. Tr. at 174:1–175:9 (Leand Test.).  But the Court finds that the

Term Loan Agent's assertion about the possibility of a delayed recovery does not defeat

confirmation of the Debtors' Modified Plan.  To defeat confirmation, the Term Loan Agent must

present solid, factual evidence that the Debtors' plan is not reasonable; the "mere possibility"

that the downturn *may* persist for an unprecedented period of time does not prevent confirmation.

*In re Ridgewood Apartments of DeKalb Cty., Ltd.*, 183 B.R. 784, 789 (Bankr. S.D. Ohio 1995)

(satisfaction of the feasibility requirement "does not require proof that meeting the economic

projections is certain") (citation omitted).

> 73.    The Court also notes that the Term Loan Agent has imposed a higher

burden on the Debtors, mandating certainty, when all that is required under the law is "a

reasonable assurance of success."  *In re Jennifer Convertibles, Inc.*, 447 B.R. 713, 725 (Bankr.

S.D.N.Y. 2011); *see also In re Couture Hotel Corp.*, 536 B.R. 712, 739 (Bankr. N.D. Tex. 2015)

(finding the objector's argument that a "strong economic downturn" could prevent the debtor

from covering its operating costs within the next ten years to be insufficient to rebut the debtor's

projections based on the historical operations of the business and industry; rejecting plan on

other grounds); *In re Placid Oil Co.*, 92 B.R. 183, 187 (Bankr. N.D. Tex. 1988) (confirming

debtor's plan, noting that the debtor's economic assumptions were reasonable and that, despite

"reservations expressed relating to the uncertainties of oil and gas pricing and similar cyclical

factors," the debtors' business plan was feasible and capable of being performed).  In *In re*

*Jennifer*, the court confirmed the plan, relying on the testimony of the debtors' financial advisor

that the debtors' projections appeared reasonable based on historic data, the current operations of

the debtors, and the overall market and economic conditions.  *Id.*

74.     Here too, based on the evidence presented and the credible testimony of the Debtors and their advisor, the Court finds that the Debtors have presented sufficient evidence to demonstrate that industry conditions support a finding of feasibility of the Modified Plan, and the Term Loan Agent's hypothesis that the downturn will persist indefinitely is insufficient to defeat such a determination.

## 2.    Paragon's Management is the Foundation of Feasibility

75.     The Court also finds and concludes that Paragon's experienced board and management factors heavily in the feasibility of the Debtors' Modified Plan. *See, e.g.*, *In re Mayer Pollock Steel Corp.*, 174 B.R. 414, 423 (Bankr. E.D. Pa. 1994) (finding that the debtors' management was of "adequate capability and quite loyal," and had a proven track record that supported the feasibility of the plan); *In re Temple Zion*, 125 B.R. 910, 917 (Bankr. E.D. Pa. 1991) (finding the fact that the debtors had maintained and strengthened their financial stance during the bankruptcy case evidence of the capability of management in support of a finding of feasibility).  The Court finds that the Debtors' management's substantial experience and successful performance (including during the Chapter 11 Cases) supports feasibility here.

76.     The Court agrees with the evidence presented at the Confirmation Hearings that Paragon's management team is comprised of experienced professionals who have worked in the offshore drilling industry for decades.  6/21/16 Hrg. Tr. at 133:14–134:1, 134:5–11 (Stilley Test.).   In addition, the Debtors Board is active and its members have both expertise and managerial experience in the offshore oil and gas industry.  6/21/16 Hrg. Tr. at 134:5–11 (Stilley Test.).  Paragon's management and personnel are uniquely familiar with Paragon's rigs (6/23/16 Hrg. Tr. at 12:1–13 (Stilley Test.)), have demonstrated past experience with formulating a budget for Paragon and meeting that budget (6/21/16 Hrg. Tr. at 163:2–18 (Stilley Test.)), and have the ability to manage costs to maintain liquidity (6/23/16 Hrg. Tr. at 36:11–37:17 (Stilley

31

Test.)).  Paragon's management and personnel have long-standing, personal relationships with

Paragon's customers, providing the Debtors with critical knowledge of their customers'

processes, budgets, drilling and capital expenditure plans, and business needs.  6/21/16 Hrg. Tr.

at 135:13–25 (Stilley Test.).

77.    Indeed, the Court notes that the Debtors have secured new contracts,

including contract extensions, despite challenges faced during the pendency of the Chapter 11

Cases.  6/22/16 Hrg. Tr. at 162:3–6 (Stilley Test.); 9/27/16 Hrg. Tr. at 56:2–10, 95:16–18,

101:22–102:7 (Stilley Test.).  Although Paragon has lost certain contracts during the course of

and because it is restructuring (9/27/16 Hrg. Tr. at 55:13–20 (Stilley Test.)), many of Paragon's

customers are eager for it to emerge from the restructuring process in order to continue their

business relationships.  *Id.* at 55:13–20 (Stilley Test.).  And it is telling that other customers,

including Nexen, Centrica, and Wintershall, have executed new contracts or extended existing

contracts with Paragon during the restructuring process.  *Id.*; *see also* 9/27/16 Hrg. Tr. at 95:16–

18 (discussing Paragon's new contract with Tulip for rig C461); 9/28/16 Hrg. Tr. at 100:17–19

(Fordyce Test.) (discussing Paragon's contract with Nexen for rig MSS1).  The evidence showed

certain customers, like Nexen, who are willing to wait three months to award Paragon a contract,

have a strong desire to work with Paragon even in this challenging period.  9/27/16 Hrg. Tr. at

83:24–84:8 (Stilley Test.).  The Court believes that this is a testament to the effectiveness of

Paragon's skilled management and marketing team in this competitive market.

### 3.    The Business Plan is Reasonable

#### (a)    Capital Expenditure Assumptions are Reasonable

78.    The Term Loan Agent argues that the capital expenditure assumptions

contained in the Business Plan are unrealistic. The Debtors posit that the capital expenditures

they have allotted in the Business Plan are reasonable, given the well-maintained current state of

RLF1 15448693V.1

their rigs, their careful formulation and review of each potential upcoming project, and their recent track-record of keeping costs down.  The Court has determined that the evidence presented at the Confirmation Hearings demonstrates that the Debtors' capital expenditure assumptions are well-reasoned and credible, and that such soundness further contributes to the feasibility of the Modified Plan.

79.     The Debtors' management team spends considerable time managing capital expenditures throughout the year.  6/23/16 Hrg. Tr. at 11:13–25 (Stilley Test.).  The evidence shows that Paragon's need for capital expenditures is highly dependent on the condition of each particular drilling rig, inventory of capital spares on hand, and the requirements of any particular customer for a specific new contract: all factors the Term Loan Agent's witnesses apparently disregarded.  9/27/16 Hrg. Tr. at 42:1–43:25, 49:11–19 (Stilley Test.).  Unlike Mr. Leand, who arbitrarily tacked on an extra $10–$15 million in additional capital expenditures for each of Paragon's rigs (9/30/16 Hrg. Tr. at 92:18–94:22 (Leand Test.)), the Court finds that Paragon's management team regularly projects its capital expenditures on a rig-by-rig basis and considered all relevant factors.

80.     Moreover, the Court determines credible the evidence that the management team, along with the operations team and engineering group led by Mr. Charlie Yester, carefully formulates the capital expenditure budget and reviews each proposed capital expenditure project.  6/21/16 Hrg. Tr. at 213:9–18 (Stilley Test.); 9/27/16 Hrg. Tr. at 42:1–12 (Stilley Test.).  For each rig, Paragon considers past expenditures, current conditions, idle time, and anticipated projects.  9/27/16 Hrg. Tr. at 42:1–12 (Stilley Test.).  The Debtors have also included sufficient funds in the capital expenditure budget for reactivation costs.  6/23/16 Hrg. Tr. at 16:15–18 (Stilley Test.).  In addition to the annual budgeting process, Mr. Stilley and Mr.

Yester also review the capital expenditure budget on a monthly basis, and Mr. Stilley must

personally approve any capital expenditures in excess of the budget.  6/23/16 Hrg. Tr. at 12:21–

13:4 (Stilley Test.); 9/27/16 Hrg. Tr. at 42:13–21, 43:1–7 (Stilley Test.).  Further, the Debtors

have removed discretionary capital expenditures from their budget in 2016 and 2017 in order to

reduce unnecessary capital expenditures, and have aggressively negotiated with shipyards and

suppliers during the downturn in order to further reduce capital expenditures.  6/23/16 Hrg. Tr. at

19:19–23 (Stilley Test.); 9/27/16 Hrg. Tr. at 43:8–18, 44:3–9 (Stilley Test.).  As a result of

aggressive management, including the implementation of cost reduction and efficiency initiatives

over the past 18 months (6/23/2016 Hrg. Tr. at 19:24–20:4 (Stilley Test.)), capital expenditures

in 2015, and so far in 2016, were lower than expected.  6/23/16 Hrg. Tr. at 19:24–20:10 (Stilley

Test.).

   81. The Court finds that the projected capital expenditures in the Business

Plan are not only supported by management's rigorous process, but also by empirical fact.  From

2010 to 2014—a period in which Noble was preparing the rigs for potential sale or spin-off—

Noble spent approximately $535.5 million on capital expenditures for the rigs that are in the

Business Plan.  9/28/16 Hrg. Tr. at 56:5–59:21 (Fordyce Test.); PGN 228.  For the period from

2015 to 2019, the Debtors anticipate spending approximately $496.4 million on the same rigs,

only 7 percent lower than Noble spent during the years leading up to the Spinoff.  9/28/16 Hrg.

Tr. at 56:5–59:21 (Fordyce Test.); PGN 228.  This small reduction is reasonable and supportable

by the availability of spare equipment, management's focus on eliminating discretionary capital

expenditures, the condition of Debtors' rigs following the Spinoff, and lower steel and shipyard

labor prices.  9/28/16 Hrg. Tr. at 56:18–25, 60:22–61:9 (Fordyce Test.).  Moreover, the amount

of money Noble spent during a prolonged upturn was unusually high, as it was preparing rigs for a potential sale.  9/27/16 Hrg. Tr. at 45:23–46:3 (Stilley Test.).

82.   Because Noble already updated the rigs, including spending on long-lived capital equipment, Paragon will not have to spend as much money going forward.  *Id*. at 46:4–12; 9/28 Hrg. Tr. at 56:21–23 (Fordyce Test.).  The Debtors have chosen to reactivate their best-maintained rigs, *i.e.*, those that have been in the shipyard fairly recently, have been recently upgraded, or were operating most recently.  6/23/16 Hrg. Tr. at 18:5–18 (Stilley Test.).  The Debtors' ample supply of spare equipment, including top drives, certified blowout preventers, and motors and generators, will also help reduce capital expenditure outlays associated with reactivation.  6/23/16 Hrg. Tr. at 16:23–18:1 (Stilley Test.).

83.   The Court does not agree with the Term Loan Agent's arguments regarding capital expenditures.  Mr. Leand's failure to properly evaluate the Debtors' rigs, inventory, and capital expenditure projections is evident, making his proposed adjustments to the Debtors' Business Plan for capital expenditures meaningless.  Indeed, the Court concludes that Mr. Leand did not inspect the Debtors' rigs (6/30/16 Hrg. Tr. at 143:11–12, 145:5–6 (Leand Test.)), did not take into account the Debtors' inventory of capital spares and other equipment (6/30/16 Hrg. Tr. at 18:24–19:1 (Leand Test.)), and failed, as described below, to accurately calculate the amounts budgeted for capital expenditures in the Debtors' projections by ignoring the amounts already included for capital spares allocations, and made other errors.

84.   Mr. Leand alleges that the Debtors need to spend an additional $150 million already included in additional capital expenditures.  9/30/16 Hrg. Tr. at 77:21–78:2 (Leand Test.).  Putting aside the fact that this assertion ignores the condition of the Debtors' rigs and existing inventory, the supposed gap is largely bridged by including the amounts the Debtors

35

have already allocated in their Business Plan (and Downside Sensitivity) to other capital

expenditures and capital spares.  Mr. Leand admitted that, in calculating the difference between

what he thought needed to be spent and the Debtors' budget for 2017, he failed to count a large

portion, approximately $13 million, already included in the Debtors' Downside

Sensitivity.  9/30/16 Hrg. Tr. at 97:20–100:1 (Leand Test.) (discussing PGN 181 at 156:7

(showing total capital expenditures for 2017 and the subset of capital expenditures used by Mr.

Leand)).  Extrapolating that error for the entire Business Plan projection period (2016–2019),

Mr. Leand fails to account for approximately $60 million already included in the Debtors'

Business Plan for capital expenditures.  PGN 228 (calculating total Capital Spares/Other for

2016–2019 shown in red box).  Having failed to take already budgeted amounts into

consideration, in addition to his failure to account for spares in inventory (6/30/16 Hrg. Tr. at

18:24–19:1 (Leand Test.)), the Court determines Mr. Leand's assumption that it is necessary to

add $10–$15 million to the capital expenditure budget for each rig is not supported by the

evidence and is not credible.

        85.      Mr. Leand also added $10–$15 million to the Debtors' projected capital

expenditure estimates for special surveys and $3 million for intermediate surveys.  6/30/2016

Hrg. Tr. at 135:21–136:5 (Leand Test.).  However, the Court does not believe that such

significant capital expenditures will be required to perform the SPS surveys, because it agrees

with the evidence presented at the Confirmation Hearings that the Debtors' rigs have been

properly maintained.  6/23/2016 Hrg. Tr. at 15:25–16:9 (Stilley Test.).  The Court notes that the

Debtors have also been conservative in their SPS survey estimates and the Debtors' budget sets

aside sufficient funds for SPS surveys.  6/21/2016 Hrg. Tr. at 211:24–212:4, 213:6–8 (Stilley

Test.).

36

86.    The Court also does not find support in the record for Mr. Leand's assertion that 10 rigs need to be scrapped because the Debtors lack adequate capital to keep them in service.  The Debtors have set forth sufficient evidence to prove that those rigs have been thoroughly assessed and capital expenditures have been budgeted accordingly.  6/21/2016 Hrg. Tr. at 206:22–207:17 (Stilley Test.); 9/27/2016 Hrg. Tr. at 43:17–25 (Stilley Test.).  Further, Mr. Stilley testified that the Debtors have sufficient capital to put these rigs back to work.  6/21/2016 Hrg. Tr. at 209:5–16 (Stilley Test.); 9/27/2016 Hrg. Tr. at 43:9–16 (Stilley Test.).

87.    Despite the Term Loan Agent's suggestions otherwise, the Court finds that Paragon's fleet is in excellent condition.  9/27/2016 Hrg. Tr. at 50:21–24 (Stilley Test.).  The Debtors perform both routine maintenance and preventative maintenance on an ongoing basis.  6/21/2016 Hrg. Tr. at 147:25–148:13 (Stilley Test.).  Five years prior to the Spinoff, Noble invested $1.8 billion in upgrades and maintenance for its rigs, approximately $536 million of which was spent on rigs that will form the basis of the Debtors' fleet going forward. 6/21/2016 Hrg. Tr. at 149:2–9, 152:11–13 (Stilley Test.).  The Court finds that, as both Mr. Stilley and Mr. Fordyce have testified, the Debtors' capital expenditure numbers are conservative and include adequate allotments of capital for spending throughout the projection period.  9/27/16 Hrg. Tr. at 44:9–22, 50:8–14 (Stilley Test.); 9/28/16 Hrg. Tr. at 61:10–16 (Fordyce Test.); PGN 238 (comparing historical and projected capital expenditures by rig); PGN 228 (showing historical capital expenditures of Noble-era rigs).  Thus, based on the Debtors' processes, the condition of the Debtors' rigs, the capital spares inventory on hand, and the budget set aside for the rigs in the future, the Debtors are more than capable of maintaining the rigs under the Business Plan, thereby supporting the feasibility of the Modified Plan.

37

(b)      **Dayrate Assumptions are Reasonable**

88.      The Term Loan Agent argues that the dayrate assumptions built into the Business Plan are hyper-aggressive.  The Debtors contend that their assumptions—based on industry expertise, historical trends, and information from customers—are conservative.  Based on a review of the testimony and evidence, the Court finds that the Debtors' projected dayrates in the Business Plan are reasonable.

89.      As the Debtors testified, the determination of the dayrates was a collaborative effort by the Debtors' senior management team, with input from employees on the ground in each region in which they operate, as well as review by the Debtors' advisors.  9/27/16 Hrg. Tr. at 38:1–10 (Stilley Test.).  The Debtors relied on their extensive experience in the industry, including how dayrates have rebounded in previous downturns, its own customer relationships, and knowledge of the market.  6/23/16 Hrg. Tr. at 23:2–24:25 (Stilley Test.).  They made conservative forecasts, analyzing the dayrates rig-by-rig and market-by-market. 6/21/2016 Hrg. Tr. at 199:19–24 (Stilley Test.); 9/27/16 Hrg. Tr. at 16:12–15 (Stilley Test.).

90.      As a result of these analyses, the Debtors assumed that it takes four years to return to 2014 dayrates on a nominal basis, even though dayrates have historically moved much faster.  6/23/2016 Hrg. Tr. at 25:22–26:4 (Stilley Test.).  The Debtors' assumptions contain significantly lower dayrates in the near term and do not project a rapid increase in dayrates in 2017.  6/23/2016 Hrg. Tr. at 27:7–22 (Stilley Test.).

91.      The Term Loan Agent criticizes the Debtors' dayrate projections as too optimistic, but the Court finds Mr. Leand's analysis unpersuasive.  Mr. Leand relies, primarily, on third-party analyst estimates, which are often overly optimistic when the market is up and overly pessimistic when it is down.  9/27/16 Hrg. Tr. at 13:2–15, 142:2–8 (Stilley Test.).  Further, Mr. Leand's testimony that dayrates would remain flat through 2019 (6/30/16 Hrg. Tr. at

38

130:9–12 (Leand Test.)), is inconsistent with the fact that dayrates have never remained flat in this highly cyclical industry (6/21/16 Hrg. Tr. at 206:2–15 (Stilley Test.)).  *See In re Am. Trailer & Storage, Inc.*, 419 B.R. at 429 (declining to adopt objecting party's expert's assumption that revenues would remain flat, rather than grow, during 2011, where no justification for that assumption was offered).

92.     In analyzing the historical cycles and how dayrates have rebounded in the offshore drilling industry following the past five downturns, Mr. Fordyce showed that the dayrates projected in the Debtors' Business Plan are quite conservative by comparison:

| | Brent Price Trough | 12-Month Average Jackup Dayrate % Change (Y-O-Y) | | | Cumulative 3-Year Change |
|---|---|---|---|---|---|
| | | 2017E | 2018E | 2019E | |
| **Disclosure Statement** | Feb-16 | 10% | 20% | 11% | 46% |
| **Downside Sensitivity** | Feb-16 | 2% | 15% | 6% | 25% |
| | | Months After Brent Price Bottom | | | Cumulative 3-Year Change |
| | | 12-23 Mo's | 24-35 Mo's | 36-47 Mo's | |
| **Downturn 1** | Feb-09 | (6%) | 11% | 30% | 36% |
| **Downturn 2** | Nov-01 | 0% | 34% | 51% | 103% |
| **Downturn 3** | Dec-98 | 66% | 32% | (27%) | 61% |
| **Downturn 4** | Feb-94 | 14% | 25% | 60% | 129% |
| **Downturn 5** | Jul-86 | 70% | 9% | 22% | 126% |

PGN 227.  This chart shows the previous five downturns in the industry and how the dayrates for jackup rigs changed over time, including on a three-year cumulative basis.  9/28/16 Hrg. Tr. at 40:15–41:18 (Fordyce Test.).

93.     The Business Plan assumes a cumulative three-year average increase in dayrates of 46 percent over the projection period, while the Downside Sensitivity assumes a cumulative three-year average increase of 25 percent.  Significantly, 46 percent is just above the

lowest cumulative historical recovery over the past thirty years, which took place in 2009, and the 25 percent is beneath all such historical recoveries. 9/28/16 Hrg. Tr. at 41:19–42:7 (Fordyce Test.) (referencing PGN 227).

94.     Even though the Debtors do not base their Business Plan on an immediate recovery of oil prices, a correlation of historical prices and jackup dayrates as contained in the exhibit proffered by the Term Loan Agent (TLA 559) nevertheless supports the conservative dayrate projections made by the Debtors in their Business Plan and Downside Sensitivity. Even at the current oil price of approximately $50 per barrel (9/30/16 Hrg. Tr. 42:19-43:14 (Leand Test.), the Court finds that the Debtors' dayrate projections are supportable. In the exhibit proffered by the Term Loan Agent, RBC Capital Markets measured the elasticity of jackup dayrates compared to crude oil prices since 1984 and found that, at a price between $50 and $65 per barrel, jackups have commanded an average dayrate of between approximately $102,500 and $120,000 per day.



TLA 559 at 13. By comparison, the average dayrates in the Business Plan ($106,128 (for second half of 2016), $94,526 (2017), $118,820 (2018), and $130,886 (2019)) are largely consistent with historic dayrates corresponding to when oil sold for between $50 and $65 per barrel. PGN

40

185 (showing dayrates that can be averaged for the referenced results); TLA 559 at 13.  And indeed, the Debtors' average dayrates under the Downside Sensitivity of  $105,286 (for second half of 2016), $85,713 (2017), $90,612 (2018), and $100,260 (2019) are equal to or less than what TLA 559 shows to have been historically supported even by the current oil price of $50 per barrel.  9/30/16 Hrg. Tr. 42:15–43:14; PGN 185 (showing dayrates that can be averaged for the referenced results).  As Mr. Leand agreed, "whether it's [$]47 [per barrel] or [$]48 [per barrel] or [$]50 [per barrel], the dayrates would be between a hundred and $105,000 [per day] . . . ." 9/30/16 Hrg. Tr. 43:10-14 (Leand Test.).

95.    Accordingly, in light of the historical data and credible testimony of the Debtors and Mr. Fordyce, the Court finds that the projected dayrates in the Business Plan are reasonable.

### (c)    Paragon Will Be Able to Secure New Contracts

96.    The Court additionally concludes that, in light of the Debtors' current market position, the Debtors have been and will continue to secure new contracts going forward. The Court further finds that the new rigs being developed in China do not likely pose a threat to the Debtors business in the North Sea and certainly does not render the Modified Plan unfeasible. Similarly, the Term Loan Agent's arguments regarding the purported supply overhang of rigs are unpersuasive.

### (i)    Paragon's Current Markets and Marketing Process

97.    The Business Plan contemplates that the Debtors will continue to work in five regions around the world:  the North Sea, Middle East, India, West Africa and Mexico. 6/21/16 Hrg. Tr. at 175:19–176:8 (Stilley Test.).  The record demonstrates that the Debtors' rigs are well-suited for their particular markets.  6/21/16 Hrg. Tr. at 187:4–20 189:24–190:12 (Stilley Test.).  For example, the Debtors understand that additional tenders will come out in India, either

41

later this year or early next year, and the majority of those tenders will be seeking rigs similar to the Debtors' rigs.  6/21/16 Hrg. Tr. at 189:8–15 (Stilley Test.).  Moreover, the Debtors' established presence in their primary market, the North Sea, provides a significant advantage over potential competitors in that area.  6/23/16 Hrg. Tr. at 97:17–98:4 (Fordyce Test.); 6/21/16 Hrg. Tr. at 181:7–22 (Stilley Test.).  The Debtors' Business Plan is reasonable in accounting for these market-specific factors.

98.    With respect to the processes required to obtain new contracts, the Debtors recognized that formal tenders are on the increase in the industry.  9/27/16 Hrg. Tr. at 41:10–25 (Stilley Test.).  Mr. Stilley described the various methods through which Paragon secures contracts.  6/21/16 Hrg. Tr. at 156:18–157:21, 159:6–160:9 (Stilley Test.).  The Term Loan Agent's expert, Mr. Burke, provided additional detail on this process.  In the competitive tendering process, a customer establishes factors to evaluate competing companies and weigh bids.  9/29/16 Hrg. Tr. at 96:19–97:16 (Burke Test.).  Those factors generally include a review of a company's financial stability, health and safety statistics, the availability of the proposed rig, a detailed review of the rig, the equipment on the rig, previous operational experience, recent previous operational experience, key personnel proposed, the crew of the rig, and the experience of the crew working with the particular rig, and any alternative offers the contractors propose. 9/29/16 Hrg. Tr. at 98:1–15 (Burke Test.).  Mr. Burke based his analysis only on three factors (financial condition, rig age, and rig availability) and summarily concluded, without further analysis, that Paragon would be at "some" disadvantage when engaging in competitive tendering processes.  9/29/16 Hrg. Tr. at 87:3–8, 109:19–110:6 (Burke Test.).

99.    However, as the Debtors showed during the Second Confirmation Hearing, Mr. Burke's general disparagement of the Debtors' ability to secure future contracts in

42

a competitive tendering process is entirely hypothetical and unsubstantiated.  Indeed, it is

hornbook law that an expert's testimony must be accompanied by sufficient factual foundation.

*See, e.g.*, *Elcock v. Kmart Corp.*, 233 F.3d 734, 754 (3d Cir. 2000).  This requires "more than

subjective belief or unsupported speculation."  *Daubert v. Merrel Dow Pharmaceuticals, Inc.*,

509 U.S. 579, 590 (1993); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("nothing in either

*Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that

is connected to existing data only by the *ipse dixit* of the expert").  The Court finds that Mr.

Burke's testimony does not meet this fundamental, threshold requirement.

100.    For example, Mr. Burke's testimony concerning Paragon's

competitiveness entirely ignores that Paragon has secured new contracts, including contract

extensions, even during the pendency of the Chapter 11 Cases.  6/22/16 Hrg. Tr. at 162:3–6

(Stilley Test.).  As noted, customers including Nexen, Centrica, Tulip, and Wintershall have all

either executed new contracts or extended existing contracts with Paragon during this

restructuring.  9/27/16 Hrg. Tr. at 55:13–20, 56:5–8, 95:16–18 (Stilley Test.).  Yet, Mr. Burke

admitted he was entirely unaware of whether Paragon had won or lost any contracts within the

last year.  9/29/16 Hrg. Tr. at 121:7–11 (Burke Test.).

101.    Furthermore, Mr. Burke's general testimony regarding Paragon's financial

condition is contradicted by Mr. Fordyce's specific and unrebutted analysis (PGN 229), showing

which companies have been awarded contracts in 2016, and that Paragon's financial health "will

be in the middle of the pack."  9/28/16 Hrg Tr. at 38:13–39:25 (Fordyce Test.); *see also In re*

*TMI Litigation*, 193 F.3d 613, 676 (3d Cir.1999) (expert's conclusion that flies in the face of the

data is the "antithesis of good science"); *Bruno v. Bozzuto's, Inc.*, 311 F.R.D. 124, 144 (M.D. Pa.

2015) (expert witness required to conduct "at a minimum, an appropriate mix of careful fact-gathering *and* constructive analysis . . .") (emphasis added).

102.    Indeed, rather than employ a reliable methodology, Mr. Burke's opinions are based solely on his own *ipse dixit*. 9/29/16 Hrg. Tr. at 88:1–4 (Burke Test.) (testifying that he conducted no specific analysis of Paragon's competitors and relied on his general familiarity with the industry). Mr. Burke admitted that he has not worked on any project involving standard specification jackup rigs since over a year before the beginning of the recent downturn. 9/29/16 Hrg. Tr. at 117:22–25 (Burke Test.). He has not performed any analysis of Paragon's performance in past competitive tenders. 9/29/16 Hrg. Tr. at 110:14–16 (Burke Test.); *id.* at 121:7–11 (testifying that he is not aware whether Paragon has lost or won any contracts in the last year where it was involved in a competitive tendering process). Nor did Mr. Burke speak to any of Paragon's customers. 9/29/16 Hrg. Tr. at 118:1–4 (Burke Test.). He further failed to review the financials of Paragon's competitors (9/29/16 Hrg. Tr. at 88:1–4 (Burke Test.)), any of Paragon's lease agreements (9/29/16 Hrg. Tr. at 118:14–21 (Burke Test.)), or the Business Plan (9/29/16 Hrg. Tr. at 86:13–21 (Burke Test.)). He did not examine whether any of Paragon's peers signed new contracts this year while also being highly leveraged. 9/29/16 Hrg. Tr. at 119:22–120:1 (Burke Test.). Mr. Burke provided *no* reliable foundation for his testimony that Paragon will be disadvantaged post-emergence. In essence, the only information provided by Mr. Burke's testimony is a list of factors commonly utilized in the competitive tender process across a much broader segment of the oil and gas industry, which establishes nothing.

103.    Indeed, despite presenting himself as able to provide expert opinion testimony as to how Paragon will fare in the competitive tender process going forward, Mr. Burke conceded that he considered only three of the six categories he believed to be relevant

44

to a potential tender.  And, as he admitted at the Second Confirmation Hearing, Paragon may

well have a competitive advantage in the areas he failed to examine.  9/29/16 Hrg. Tr. at 122:4–9

(Burke Test.) (conceding that Paragon's health and safety statistics "were very good"), 122:11–

123:4.  Thus, this Court gives no weight to Mr. Burke's analysis, which was highly general in

nature and otherwise pointedly selective.

(ii)    **Jackup Rigs Currently under Development in China Do Not Negatively Impact the Modified Plan**

104.    Similarly, the Court finds that the record does not support Mr. Leand's

testimony that "new build" jackup rigs that are currently being developed in China will compete

for Debtors' business in the North Sea (6/30/16 Hrg. Tr. at 116:14–117:14 (Leand Test.)), and

that these new build rigs therefore do not render the Debtors' Business Plan unfeasible.  The

majority of the 110 jackup rigs currently being developed in China are not harsh-environment

rigs and do not pose any threat to the Debtors' business in the North Sea.  6/30 /2016 Hrg. Tr. at

139:24–140:9 (Stilley Test.).

105.    Moreover, Mr. Leand himself acknowledged that the rigs being developed

in China will require a significant amount of capital to complete, will require much expense and

time to transport around the world, and that "a large percent of these rigs" will never be delivered

because the parties that ordered them can no longer afford them.  6/30/2016 Hrg. Tr. at 118:18–

119:21 (Leand Test.); 9/27/2016 Hrg. Tr. at 51:21–52:13 (Stilley Test.).  Further, Mr. Leand

provided no answer for Mr. Stilley's unrebutted testimony that many new-build rigs are

unfinished and will not enter the market in the foreseeable future and indeed, if indirectly, so

confirmed.  9/27/16 Hrg. Tr. at 51:21–52:2 (Stilley Test.); TLA 540 at 24–26 (listing new-build

rigs "[a]lready delayed" and "likely to be delayed"); 9/30/16 Hrg. Tr. at 64:21–65:12 (Leand

Test.) (admitting that he does not know when the new-build rigs will enter the market).  Mr.

45

Stilley also stated that many new-build rigs have been sitting in shipyards for over two years, still waiting for a buyer, whereas the existing, currently marketed rigs (like Paragon's) will be the first rigs to be employed when rig demand increases.  9/27/16 Hrg. Tr. at 52:3–52:13 (Stilley Test.).  Indeed, Mr. Leand himself anticipates defaults on a number of new-build rig orders. 9/30/16 Hrg. Tr. at 64:17–20, 118:9–13 (Leand Test.).

106.    Further, the Court concludes that there is insufficient evidence that, even assuming any of these new rigs enter the market, they will compete in the same market space as the Debtors' fleet.  Rather, the testimony shows that most of the new builds are not harsh-environment rigs and thus do not pose any threat to the Debtors' largest market, the North Sea, without substantial expenditures.  6/23/16 Hrg. Tr. at 138:22–140:9 (Stilley Test.).  It is not in dispute that the Debtors primarily operate standard specification rigs used for development drilling, workover, re-entry, or P&A activities which, over the past three years, accounted for approximately 80 percent of the Debtors' work.  6/23/16 Hrg. Tr. at 90:6–93:1 (Fordyce Test.); 9/27/16 Hrg. Tr. at 39:22–40:3, 40:9–15 (Stilley Test.); 9/30/16 Hrg. Tr. at 127:25–128:11 (Fordyce Test.).  It is similarly uncontested that the new-build rigs are typically better-suited for exploration.  6/21/16 Hrg. Tr. at 154:14–155:17 (Stilley Test.); 9/27/16 Hrg. Tr. at 52:14–53:12 (Stilley Test.); 6/30/16 Hrg. Tr. at 95:19–96:16 (Leand Test.); 9/30/16 Hrg. Tr. at 105:8–106:12 (Leand Test.).  Moreover, the Court finds credible the evidence set forth by the Debtors that new rigs are more expensive to operate, as they burn more fuel, tend to have bigger crews, and have more electronic equipment that needs to be maintained.  9/27/16 Hrg. Tr. at 54:7–24 (Stilley Test.).  As a result of these factors, certain customers, particularly those engaged in the type of work Paragon does, prefer established, efficient, and lower-cost rigs for the type of work they need done.  9/27/16 Hrg. Tr. at 52:14–54:24 (Stilley Test.).

46

107.    Finally, the Court concludes that Mr. Leand's opinion relies on a series of faulty assumptions based on the impact these new-build jackup rigs will have on the broader market, including assuming they will come into the market "as they're currently scheduled." 9/29/16 Hrg. Tr. at 162:19–24 (Leand Test.); TLA 609.  Mr. Leand, who assumed that all 108 new-builds he analyzed will enter the market by 2020, admitted he does not know when or even if they will actually do so.  9/30/16 Hrg. Tr. at 64:25–65:12 (Leand Test.).  Specifically, a Morgan Stanley report on which Mr. Leand relied for other aspects of his opinion, but ignored for this aspect, projects on-time delivery for only 14 of the 113 jackup rigs currently on order. TLA 540 at 24–26; 9/30/16 Hrg. Tr. at 59:23–61:914 (Leand Test.).  Among the other facts that Mr. Leand did not factor into his analysis is that same report's projection of a nearly two-year delay, to 3Q 2018, for delivery of the West Titan rig that his own analysis projects will be delivered on January 1, 2017.  TLA 540 at 26; TLA 608 at 4; 9/30/16 Hrg. Tr. at 61:18–63:21 (Leand Test.).

108.    The Court thus gives minimal weight to Mr. Leand's testimony and analyses regarding these new-build rigs, which do not impact the feasibility of the Modified Plan.

### (iii)    The Current Market Overhang Will Not Negatively Impact the Modified Plan

109.    The Term's Loan Agent's argument that the current supply overhang of drilling rigs in the market will prevent Paragon from being able to secure new contracts is similarly not credible.  The Court thus agrees with the Debtors' CEO (Mr. Stilley) that the Modified Plan properly accounts for the current oversupply of rigs.  6/21/16 Hrg. Tr. at 215:21–216:12 (Stilley Test.); 9/27/16 Hrg. Tr. at 51:16–20 (Stilley Test).

47

110.    Specifically, the Court disagrees with Mr. Leand's conclusion that analyses regarding that the market will continue to be "vastly oversupplied [] over the projection period" (9/29/16 Hrg. Tr. at 167:13–18 (Leand Test.)), for three primary reasons.  First, Mr. Leand opines that if one assumes the fastest historical rate of recovery, which he alleges to have been 6.5 rigs per month, it will take three to three-and-a-half years to reach the market-norm of effective full-utilization with 50 to 75 spare rigs.  TLA 619; 9/29/16 Hrg. Tr. at 174:1–175:9 (Leand Test.).  But at the Second Confirmation Hearing, upon a closer review of the data on which he relied, Mr. Leand admitted that from February 1987 to January 1988, the market recovered from a trough of 204.29 working rigs to 291.81 working rigs, or a rate of approximately 8 rigs per month.  TLA 607 at 1–2; TLA 619; 9/30/16 Hrg. Tr. at 55:2–56:15 (Leand Test.).

111.    Second, while the rate of historical rig per month recovery is relevant, it is not necessarily an absolute indicator of the years to come.  The record, including testimony from Mr. Leand, reflects that oil production is up and rig efficiency is down since the 1980's, and that as the market continues to recover, it will be able to absorb more rigs than before.  9/30/16 Hrg. Tr. at 130:14–131:13 (Fordyce Test.); 9/30/16 Hrg. Tr. at 27:10–14, 54:4–24 (Leand Test.). The Court draws the only logical conclusion it can from these undisputed facts:  the per-month recovery rate for offshore rigs will be larger than in previous cycles, and that any historical rates of recovery are of limited relevance.

112.    There are two additional factors impacting Mr. Leand's analysis.  First, he did not account for, or prepare any analysis documenting, expected rig retirements over any period of time (9/30/16 Hrg. Tr. at 64:21–24, 67:16–19 (Leand Test.)), thus making his estimates of time needed to work through the rig overhang ungrounded.  9/30/16 Hrg. Tr. at 64:21–24,

48

67:16–19 (Leand Test.).  Second, as the Debtors demonstrated, Mr. Leand's projected three to three-and-a-half year recovery period includes new-build rigs, which as the Court previously determined, are far from a certainty to come into the market within that timeframe.  *See supra* ¶¶ 104–108.

113.    When applying a recovery rate of 8 rigs per month, it would take only 18 to 21 months to fully recover the 154 to 179 rigs necessary to reach the market-norm spare capacity of 50 to 75 rigs and full effective utilization.  9/30/16 Hrg. Tr. at 57:18–59:4 (Leand Test.).  Given that this potential 18 to 21 month rebound would occur well before any such recovery contemplated by the Business Plan, which accounts for a gradual recovery, and the Downside Sensitivity delays that assumed recovery by an additional 12 to 18 months (9/28/16 Hrg. Tr. at 27:17–28:2 (Fordyce Test.)), the Court finds that, if anything, Mr. Leand's market-supply analysis demonstrates that the Debtors' assumptions are eminently reasonable.

114.    In sum, the Term Loan Agent's arguments that the Debtors will not receive new contracts are not credible.  Instead, based on the Debtors' rigs, the specific markets in which they operate, and the Debtors' vast experience in marketing their rigs though all available avenues, the Debtors' contract projections are reasonable.  The Term Loan Agent's arguments regarding new rigs in China and the supply overhang, even if true, are insufficient to defeat feasibility.

### (d)    Paragon Will Be Able to Refinance Its Debt

115.    The Term Loan Agent further argues that the Debtors' financial condition and their purported inability to secure future contracts at the dayrates projected in the Business Plan would cause the Debtors to breach their financial covenants and be unable to refinance their debts at maturity.  The Debtors contend that, even under the hypothetical prolonged recovery in the Downside Sensitivity, they will be able to refinance their debts at maturity.  The Court finds

49

that the evidence presented at the Confirmation Hearings demonstrates that the Debtors will likely be able to refinance their debt at maturity.

116.    The Debtors will need to refinance approximately $1 billion in 2021.  As Mr. Fordyce testified, under the Modified Plan, Paragon will likely be able to refinance its 2021 maturities in 2019, a year-and-a-half earlier than necessary, with its credit rating solidly trending towards the Baa range on the Moody's scale.  9/28/16 Hrg. Tr. at 53:23–54:2 (Fordyce Test.); PGN 226.  Under the Downside Sensitivity, the ratios of 4.7x debt-to-EBITDA and 3.4x EBITDA-to-interest place Paragon closer to the B range.  9/28/16 Hrg. Tr. at 54:10–14 (Fordyce Test.).  However, the Court finds credible that even under this metric, Paragon will be generating cash in a recovering market, and will still be able to refinance its debt as it comes due.  9/28/16 Hrg. Tr. at 53:23–54:22 (Fordyce Test.).  Indeed, under the Business Plan, the Debtors will have cash on hand of approximately $487 million at the end of 2019 and resulting net debt of only $694 million.  PGN 221.  Furthermore, by 2021, the Debtors should have two Prospector rigs that can serve as additional collateral.  9/28/16 Hrg. Tr. at 108:15–17 (Fordyce Test.).

117.    Mr. Fordyce also testified that although Moody's reports indicate that approximately $110 billion in debt will mature in the oil and gas sector over the next five years, with half of the bond and term debt maturing by 2019, the leveraged finance market should still be functioning well given that it is a multi-trillion-dollar market.  9/28/16 Hrg. Tr. at 110:16–20 (Fordyce Test.) (referencing TLA 598).  The Court agrees that the Moody's report is not illustrative of the true amount that will be refinanced by 2021 given that many of the companies on the oil field services list will refinance prior to maturity, or may file for bankruptcy and eliminate debt in their restructuring.  9/28/16 Hrg. Tr. at 111:12–19 (Fordyce Test.).

118.    Notably, Mr. Fordyce testified that Lazard currently has more than 20 engagements in the oil market that include raising capital for distressed companies, which indicates there is an appetite for refinancing debt like Paragon's.  The Court finds credible Mr. Forydce's expert opinion that even assuming all relevant companies in the oil services sector were to wait until 2021 to refinance, the leveraged finance market would be able to accommodate those transactions.  9/28/16 Hrg. Tr. at 111:23–112:6 (Fordyce Test.).

119.    Further, under the extended downturn assumed in the Downside Sensitivity, the Debtors would still be able to refinance their debts.  Mr. Fordyce testified that a prolonged downturn will cause more companies to file for bankruptcy, leaving the Debtors with adequate cash and elevated credit metrics to enable them to refinance.  Refinancing under the Downside Sensitivity will likely cost the Debtors more, but in Mr. Fordyce's expert opinion, the leveraged lending market in the oil and gas sector will still be available.  9/28/16 Hrg. Tr. at 112:7–23 (Fordyce Test.).

120.    Accordingly, based on the Debtors' reasonable projections, their outperformance thus far, and the testimony of Mr. Fordyce, the Debtors have provided sufficient evidence to demonstrate they will be able to refinance their debts as they come due, based on their financial ratios and the availability of additional collateral (Prospector rigs).  *See In re Am. Trailer & Storage*, 419 B.R. at 431 (confirming plan based on the testimony of the debtor's financial expert that if the debtor met the plan projections, its financial ratios would be sufficient to satisfy loan requirements to obtain refinancing); *In re Am. Consol. Transp. Companies, Inc.*, 470 B.R. 478, 491 (Bankr. N.D. Ill. 2012) (finding that the debtors were likely to meet their debts as they come due despite poor historical performance).  And even if they materially underperform and meet only the Downside Sensitivity numbers, the record demonstrates that

51

they will still be able to refinance their debts as they come due based on their financial ratios and the availability of additional collateral.

### 4.    The Modified Plan is Feasible Even if Recovery is Delayed

121.    Between the Initial and Second Confirmation Hearing, the Debtors constructed a Downside Sensitivity that tested the Business Plan in the case of prolonged downturn and delayed recovery in the offshore drilling industry.  PGN 181; 9/27/16 Hrg. Tr. at 7:23–8:5, 12:7–10 (Stilley Test.).  The Term Loan Agent argues that both the Modified Plan and the Downside Sensitivity are unrealistic and therefore not achievable.  On the other hand, the Debtors argue that the Downside Sensitivity, applying lower dayrates, utilization and other assumptions, demonstrates that the Debtors' Modified Plan is feasible.  The Court agrees that given the additional cushion built into the Modified Plan, even under a prolonged downturn, the Debtors' Modified Plan is feasible.

122.    The Downside Sensitivity was built in the same way as the Business Plan, but with considerably more conservative assumptions.  9/27/16 Hrg. Tr. at 12:11–18 (Stilley Test.).  The main difference between the Downside Sensitivity and the Business Plan is that the former assumes an additional 12 to 18 months in the recovery of the offshore drilling industry.  9/27/16 Hrg. Tr. at 8:9–14, 128:6–12 (Stilley Test.).  Notably, as Mr. Stilley testified, such a delayed recovery would make this the longest downturn in the industry by a wide margin.  9/27/16 Hrg. Tr. at 9:22–10:6, 14:3–8 (Stilley Test.).

123.    The evidence shows that in creating the Downside Sensitivity, Paragon's management team (including Randy Stilley (President and CEO), Steven Manz (Senior VP and CFO), Andrew Tietz (Senior VP of Marketing and Contracts), Blake Morris (VP of Corporate Financial Planning and Analysis), and Todd Strickler (Senior VP and General Counsel)) reviewed the current market situation, analyzed how it would impact each region and rig, and

52

then built a model based on this information.  9/27/16 Hrg. Tr. at 10:7–25, 11:16–23 (Stilley

Test.).  This team also made adjustments based on differences in utilization, capital expenditures,

and costs for rigs that were out of service longer.  9/27/16 Hrg. Tr. at 11:24–12:3 (Stilley Test.).

Other factors that drove the assumptions were the current contract situations in each region,

information received from employees who work in the field on a day-to-day basis with their

customers, input from the customers themselves, and input from Paragon's marketing

organization.  9/27/16 Hrg. Tr. at 12:19–13:1 (Stilley Test.).

   124. Mr. Stilley testified that the assumed dayrates and utilization under the

Downside Sensitivity are indicative of a fairly extreme scenario.  9/27/16 Hrg. Tr. at 26:16–22

(Stilley Test.).  The dayrate assumptions in the Downside Sensitivity are lower than those in the

updated Business Plan by about 20 percent on average.  9/27/16 Hrg. Tr. at 14:23–15:11 (Stilley

Test.). Utilization, *i.e.*, the ratio of rigs working to those available on a given date, is much lower

in the Downside Sensitivity than in the Business Plan and remains lower for a longer period of

time with a slower pace of recovery.  9/27/16 Hrg. Tr. at 15:21–16:1 (Stilley Test.).  Further,

compared to the Modified Plan, the Downside Sensitivity assumes that certain contracts will be

canceled, and allows additional idle time between rig contracts.  PGN 185; 9/27/2016 Hrg. Tr. at

16:2–6 (Stilley Test.).

   125. The Downside Sensitivity likewise accounts for capital expenditures on a

rig-by-rig basis.  For those rigs projected as idle during the entirety of the Downside Sensitivity

but assumed operating in the Business Plan, capital expenditures were removed.  9/27/16 Hrg.

Tr. at 27:18–28:8 (Stilley Test.).  By the same token, however, the Downside Sensitivity

attributes additional capital expenditures based on expected increased expected reactivation costs

to those rigs forecasted to move back into operation at a later date than in the Business Plan.
9/27/16 Hrg. Tr. at 27:18–28:8 (Stilley Test.).

126.    Based on the Downside Sensitivity, the Debtors negotiated additional
cushion in the Modified Plan against the covenants in the Debtors' credit agreement.  The
minimum quarter-end cushion against the Business Plan for net leverage is 67 percent; for
interest coverage is 122 percent; and for liquidity is 137 percent.  PGN 224; 9/28/16 Hrg. Tr. at
51:12–23 (Fordyce Test.).  These same cushions under the Original Plan of reorganization were
30–40 percent.  9/28/16 Hrg. Tr. at 52:3–10 (Fordyce Test.).  The increased cushions provide
Paragon increased flexibility.  9/28/16 Hrg. Tr. at 50:25–52:13 (Fordyce Test.).  Indeed, the
Debtors will emerge with $379 million in cash on the balance sheet.  9/30/16 Hrg. Tr. at 137:20–
138:7 (Fordyce Test.).  Under the Downside Sensitivity, the Debtors would have a minimum of
10 percent EBITDA and 39 percent liquidity cushions.  9/28/16 Hrg. Tr. at 52:14–24 (Fordyce
Test.).

127.    The liquidity covenant under the Modified Plan also affords the Debtors
increased flexibility. Under the Modified Plan, the minimum liquidity required is $103 million.
9/28/16 Hrg. Tr. at 24:12–21 (Fordyce Test.); PGN 213.  If the Debtors' cash balance drops
below $103 million, then the Debtors are granted a 60-day grace period, provided their liquidity
does not drop below $88 million.  9/28/16 Hrg. Tr. at 24:12–21 (Fordyce Test.); PGN 213.  Mr.
Fordyce testified that Lazard performed a rigorous analysis of the liquidity and debt roll forward,
whereby he used projected revenues and factored in costs and sources of capital, capital
expenditures, amortization, and debt in order to derive the Debtors' forecasted cash balance.
9/28/16 Hrg. Tr. at 45:1–23 (Fordyce Test.); PGN 221.  The Debtors are forecasted to have $487
million in cash under the Business Plan (9/28/16 Hrg. Tr. at 46:2–4 (Fordyce Test.)), and $177

54

million under the Downside Sensitivity (9/28/16 Hrg. Tr. at 46:16–17 (Fordyce Test.)), at the end

of the projection period.  PGN 221–222.  Lazard concluded that the Business Plan and Downside

Sensitivity projections indicate the Debtors will have sufficient liquidity and cash flow to make

interest and debt service payments through the end of the projection period.  *Id*.  In fact, even at

the lowest point in the Downside Sensitivity, the Debtors are forecasted to have $142 million in

cash, which would be more than sufficient to satisfy the $103 million liquidity covenant.

9/28/16 Hrg. Tr. at 47:8–49:10 (Fordyce Test.); PGN 223. Accordingly, that Court finds that

even if the recovery is slower than expected, Paragon will likely not breach its covenants.  The

Modified Plan is therefore feasible.

### 5.   Balance Sheet Solvency Testimony is Not Relevant and is Methodologically Inconsistent

128.   The Court concludes that the Term Loan Agent has not demonstrated the

relevance of the testimony of its expert, Mr. Fischel, regarding the Debtors' purported balance

sheet insolvency at emergence.  Moreover, the Court takes issue with certain aspects of Mr.

Fischel's methodology.

129.   Contrary to the Term Loan Agent's argument, there is no requirement of

balance sheet insolvency as a condition of plan emergence; rather, solvency is merely a factor

considered by some courts, where relevant, in assessing feasibility.  *See In re W.R. Grace & Co.*,

475 B.R. at 163 n.137.  The Court has determined that the Term Loan Agent has made no

showing that any such purported insolvency will have any effect on the Debtors' ability to

perform as necessary to make the Modified Plan feasible.

130.   The Debtors set forth credible evidence at the Second Confirmation

Hearing that any insolvency at emergence will have no effect on their business, and in turn will

not render the Modified Plan unfeasible.  Specifically, Mr. Stilley testified that he anticipates

55

there will be no problems closing the Amended and Restated Credit Agreement with the Revolver Lenders, and that "a hundred percent" of the Revolver Lenders signed Paragon's Plan Support Agreement.  9/27/16 Hrg. Tr. at 58:1–8 (Stilley Test.).  Mr. Stilley also testified that Paragon has "a very good relationship" with the Prospector lease counterparty and that he does not foresee there being any issues with them calling a default, especially considering the forbearances that they have already granted.  9/27/16 Hrg. Tr. at 58:22–59:9 (Stilley Test.).  Furthermore, Mr. Stilley stated that he does not expect any of Paragon's customers to utilize a discounted cash flow based solvency analysis of the Downside Sensitivity in order to attempt to terminate a contract with Paragon.  9/27/16 Hrg. Tr. at 59:15–60:3 (Stilley Test.).  The Term Loan Agent neither questioned any of the Debtors' witnesses nor presented any evidence of its own on this subject.  Accordingly, the Court finds that, because the Term Loan Agent failed to show the Debtors' purported insolvency's effect on the feasibility of the Modified Plan, Mr. Fischel's testimony regarding the same has no bearing on the feasibility of the Modified Plan.

131.    The Court also determines that, even if it were relevant, Mr. Fischel's testimony and analyses regarding the Debtors' purported insolvency is questionable in certain respects.  First, the Court concludes that Mr. Fischel's analyses are based only on the Downside Sensitivity, not on the Debtors' actual Business Plan.  9/29/16 Hrg. Tr. at 29:8–12, 86:13–21 (Fischel Test.).  Mr. Fischel's rationale for ignoring the Modified Plan is that it is not "credible" (9/29/16 Hrg. Tr. at 40:22–41:25 (Fischel Test.)), but his assertion in that regard rests primarily on his own analysis of "industry data," which was not, for the most part, actual historical data, but rather the projections of unnamed and unevaluated analysts, whom he neither identified nor himself vetted for their reliability.  9/28/16 Hrg. Tr. at 215:24–216:9, 218:17–19, 219:5–7,

56

221:14–222:1, 222:19–223:4, 223:12–16 (Fischel Test.).  *Cf. Teleglobe USA, Inc. v. BCE Inc. (In re Teleglobe Commc'ns Corp.)*, 392 B.R. 561, 599–600 (Bankr. D. Del. 2008) (rejecting expert's conclusion that the debtors were balance sheet insolvent where the expert relied on select third party analyses "without any analysis of their validity").  Given his admitted lack of familiarity with the offshore drilling industry, Mr. Fischel's reliance on this "industry data" was improper.  9/28/16 Hrg. Tr. at 212:14–213:10 (Fischel Test.).  Mr. Fischel's dependence on oil futures going out to 2019, which he posited further buttressed his view that the Modified Plan was not reasonable, was similarly unjustified.  9/28/16 Hrg. Tr. at 225:17–23, 226:11–23, 229:23–230:19, 231:22–232:1, 232:2–9 (Fischel Test.).

      132.    Second, while the Court understands, as Mr. Fischel testified, that valuation using a discounted cash flow analysis is neither "exact" nor "precise" (9/28/16 Hrg. Tr. at 187:21–188:17 (Fischel Test.)), the Court nevertheless concludes that Mr. Fischel's determination of the Debtors' terminal value in his discounted cash flow analysis of the Debtors' enterprise value was not based on a reliable methodology.  Mr. Fischel multiplied his discounted cycle multiple (4.75x derived from seven years of data) by average EBITDA for the four years of 2016–19 (actual for first half of 2016 and projected in the Downside Sensitivity for the second half), *i.e.*, $174 million, resulting in a present terminal value of $604 million.  9/29/16 Hrg. Tr. at 31:19–32:4, 33:7–16 (Fischel Test.); TLA 444; PGN 236.  The Court concludes that, if Mr. Fischel was going to determine Paragon's terminal EBITDA value using an averaging method as opposed to simply using Paragon's 2019 projected EBITDA of $283 million (TLA 444; PGN 236), he should have done so based on the full EBITDA cycle, instead of calculating his average based on only the "partial cycle" of 2016 to 2019, as he admitted he did.  9/29/16 Hrg. Tr. at 32:5–15 (Fischel Test.).

133.     As Mr. Fischel testified, one tries to do the best one can with the
"available data."  *See id.*  But here, although Mr. Fischel purported to derive his 4.75x valuation
cycle multiple on a full industry cycle of seven years of available data (TLA 442; TLA 443), he
then applied it to an average of only four years of EBITDA, including two that represented true
trough years and one in only partial recovery (9/30/16 Hrg. Tr. at 133:11-134:9 (Fordyce Test.)).
While acknowledging that industry cycles can be measured either trough-to-trough or crest-to-
crest, here Mr. Fischel examined neither, notwithstanding the fact that there *was* "available data"
for the three years 2013–15, which went back to the prior crest and could have been used to
determine the average year's EBITDA over the seven year cycle (2013–19).  9/29/16 Hrg. Tr. at
31:5–7 (Fischel Test.) (agreeing that a cycle is "trough to trough" or "crest to crest"); 9/29/16
Hrg. Tr. at 32:16–20 (Fischel Test.) (stating that the 2016–2019 timeframe on which he premises
his terminal value analysis is only a "partial cycle").  Had Mr. Fischel considered the full cycle,
the average EBITDA would have been $426.4 million[13]—two-and-a-half times the $174 million
average he used—which would lead to a terminal cash value under Mr. Fischel's analysis of
approximately $1.5 billion rather than the $604 million Mr. Fischel computed (TLA 444).  The
Court concludes that, because this revised outcome would have changed Mr. Fischel's
conclusion of purported balance sheet insolvency upon emergence, Mr. Fischel's methodology is
unreliable.

134.     Given that it is both irrelevant and not based on a reliable methodology,
the Court will give no weight to Mr. Fischel's testimony regarding the Debtors' purported
insolvency at emergence.

---

[13] EBITDA (values in millions: $850.7 (2013), $866.8 (2014), $570.7 (2015), $183 (2016), $47 (2017), $184 (2018),
and $283 (2019).  *See* PGN 236; TLA 427; TLA 429; TLA 444.  The average of these values is $426.4 million.

**6.      The Debtors Will be Able to Meet their Ongoing Obligations**

135.     The testimony at the Confirmation Hearings established that the Debtors will likely be able to meet their ongoing obligations.

136.     The Debtors have reviewed their current Business Plan and believe that there is a sufficient liquidity cushion to cover their financial covenants.  6/23/16 Hrg. Tr. at 36:16–37:17 (Stilley Test.); 9/27/2016 Hrg. Tr. at 57:21–25 (Stilley Test.).  The Debtors' base minimum liquidity covenant in the Amended and Restated Credit Agreement has been reduced to $103 million.  9/27/2016 Hrg. Tr. at 34: 24–35:11 (Stilley Test.).  Many of the variable costs in the Business Plan, including insurance costs, support costs, G&A expenses and corporate costs, can be reduced if needed.  6/23/16 Hrg. Tr. at 36:16–37:17 (Stilley Test.).  Thus, the Debtors have a significant liquidity cushion already, but as Mr. Stilley testified, they have "other levers that [they] can pull" to maintain liquidity.  6/23/16 Hrg. Tr. at 36:16–37:17 (Stilley Test.).

**7.      Market Trading Prices are Not an Indicator of Feasibility**

137.     The Term Loan Agent asserts that the current market trading price of the Debtors' indebtedness serves as evidence that the Modified Plan is not viable.  However, as Mr. Kurtz testified at the Initial Confirmation Hearing, market trading prices are not instructive and largely irrelevant in this case because financial institutions make their decisions based upon their financial analysis of a company's value and the ability of the company to pay its debt, not by the debt trading price.  6/21/16 Hrg. Tr. at 123:5–124:1 (Kurtz Test.).  Moreover, the Secured Term Loan's low interest rate, lack of financial covenants, and extended maturity, can all impact its trading price.  6/21/16 Hrg. Tr. at 124:3–14 (Kurtz Test.).  Also, as Mr. Leand himself acknowledged, the presence of a contested confirmation hearing could "highlight the execution risk" associated with the Term Loan and depress its value.  6/30/16 Hrg. Tr. at 160:3–6 (Leand Test.).

59

138.     In short, this Court finds the Debtors' and their advisor's analyses

persuasive and concludes that the Debtors have met their burden of proposing a plan that offers

"a 'reasonable assurance' of success." *In re Indianapolis Downs*, 486 B.R. 286, 298 (Bankr. D.

Del. 2013).  Accordingly, for all of the foregoing reasons, the Court finds that the Modified Plan

is feasible and satisfies section 1129(a)(11) of the Bankruptcy Code.  *In re Am. Consol. Transp.*

*Companies, Inc.*, 470 B.R. 478, 491 (Bankr. N.D. Ill. 2012) ("'[W]here the projections are

credible, based upon the balancing of all testimony, evidence, and documentation, even if the

projections are aggressive, the court may find the plan feasible.'" *In re T-H New Orleans Ltd.*

*P'Ship*, 116 F.3d at 802.

**B.      The Noble Settlement Agreement is Fair, Reasonable, and in the Best
          Interest of the Debtors' Estates**

139.     The Noble Settlement is fair, reasonable and in the best interests of the

Debtors' estates.  Bankruptcy Rule 9019 governs the approval of compromises and settlements

and provides that "[o]n motion by [a debtor] and after notice and a hearing, the court may

approve a compromise or settlement."  Fed. R. Bankr. P. 9019.  Furthermore, section 105(a) of

the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is

necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."  11 U.S.C. §

105(a).

140.     Courts have long considered compromises to be a "normal part of the

process of reorganization."  *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v.*

*Anderson*, 390 U.S. 414, 424 (1968) (citations omitted).  They are favored in bankruptcy to

minimize litigation and expedite the administration of the estate.  *See Myers v. Martin (In re*

*Martin)*, 91 F.3d 389, 393 (3d Cir. 1996).  Accordingly, the decision to approve a particular

settlement lies "within the sound discretion of the bankruptcy court."  *In re World Health Alts.,*

60

*Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (citations omitted); *In re Key3Media Grp.*, 336 B.R. 87, 92 (Bankr. D. Del. 2005) (citations omitted).  Ultimately, the settlement must be fair, reasonable, and in the best interests of the debtors' estates.  *See Law Debenture Trust Co. of N.Y. v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 95–96 (D. Del. 2006) (citing *In re Martin*, 91 F.3d at 394) (citations omitted); *In re Marvel Entm't Grp., Inc.*, 222 B.R. 243, 249 (D. Del. 1998) (citations omitted); *see also In re Key3Media Grp., Inc.*, 336 B.R. at 92 ("Under Rule 9019(a), the bankruptcy court has a duty to make an informed, independent judgment that the compromise is fair and equitable.") (citing *Protective Comm. for Indep. S'holders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968)).

141.    A court need not decide the numerous issues of law and fact raised by the settlement, nor need it be convinced that the settlement is the best possible compromise.  *See In re World Health Alts., Inc.*, 344 B.R. at 296; *In re Key3Media Grp., Inc.*, 336 B.R. at 92.  Rather, a court should canvass the issues to see whether the settlement "falls below the lowest point in the range of reasonableness."  *In re World Health Alts., Inc.*, 344 B.R. at 296 (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also In re Key3Media Grp., Inc.*, 336 B.R. at 93 (internal quotations and citations omitted).  In determining whether a settlement should be approved under Bankruptcy Rule 9019, a court must assess and balance the value of the claim being compromised against the value to the estate of the acceptance of the compromise in light of several factors:  (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors.  *In re Martin*, 91 F.3d at 393.  The Noble Settlement satisfies the *Martin* factors, as it is fair, reasonable, and in the best interests of the Debtors' estates.

61

142.     The probability of success in litigation.  As Mr. Todd Strickler, the

Debtors' general counsel explained, beginning in September 2015, Lazard conducted an analysis

of the Debtors' potential fraudulent conveyance claims against Noble.  PGN 239 ¶¶ 35–38.  In

mid-October, Lazard presented its analysis to, among others, Mr. Strickler, Weil and Paragon's

finance and risk committee.  Id. ¶ 39.  Based upon Lazard's analysis of solvency at the time of

the Spinoff, Mr. Strickler concluded that the Debtors had a substantial fact issue as to whether a

constructive fraudulent conveyance claim against Noble could be sustained.  Id. ¶ 40.  Moreover,

comparing the consideration the Debtors paid at the time of the Spinoff to the estimated value the

Debtors received, Mr. Strickler concluded that it would be very difficult to prove that the

Debtors did not receive reasonably equivalent value in the transaction, thereby making it difficult

to prove any form of fraudulent conveyance.  Id.  Lazard's analysis confirmed the conclusion

that, at a minimum, any claims against Noble were going to be very difficult to successfully

assert.  Id.

143.     The likely difficulties in collection.  The Debtors may face the typical

challenges a plaintiff faces in collecting a large award, including, among other things, the delay

and cost that may result from pursuing collection against a well-capitalized company that has the

means to seek appeals.

144.     The complexity of the litigation involved, and the expense, inconvenience,

and delay necessarily attending it.  As Mr. Stilley testified, at a January 2016 Board meeting, the

Debtors' advisors presented the results of their claims analysis to the Debtors' Board.  6/22/16

Hrg. Tr. at 204:4–6 (Stilley Test.).  The Debtors' advisors explained to the Board that the pursuit

of fraudulent conveyance claims against Noble would be expensive and the litigation could

potentially take a number of months.  6/22/16 Hrg. Tr. at 209:11–24 (Stilley Test.).  Specifically,

62

Mr. Stilley explained that, absent the Noble Settlement Agreement, a settlement of the Mexican Tax Liabilities along with litigation over the fraudulent conveyance claims could potentially cost the Debtors approximately $105 million.  6/23/16 Hrg. Tr. at 33:21–25 (Stilley Test.).  More importantly, that course of action would have required the Debtors to bond up to $300 million in Mexican Tax Liabilities and could potentially have precluded the reorganization contemplated by the Modified Plan.  6/23/16 Hrg. Tr. at 34:1–4 (Stilley Test.).  After extensive discussion, the Board agreed that litigation with Noble would be uncertain, expensive and time consuming. 6/22/16 Hrg. Tr. at 7:12–17, 8:5–9:2 (Stilley Test.).

145.    The paramount interests of the creditors.  At the Confirmation Hearings, the Debtors showed that, without the Noble Settlement Agreement, the Debtors' restructuring under the terms of the Modified Plan—which enjoys the overwhelming support of the Debtors' constituencies—would not be possible.

146.    First, Noble's agreement to cover all of the tax bonds in Mexico provides the Debtors with significant liquidity to help facilitate their restructuring.  PGN 239 ¶ 68. Paragon had no other viable options for bonding in Mexico, and without Noble's agreement, the Debtors would have had to post cash to fully collateralize the bonds.  *Id.*  Paragon, together with its advisors, estimated at the time of the Noble Settlement that the total amount of cash required to collateralize the bonds would be between $200 and $300 million, depending on a number of factors, and could remain outstanding for a number of years.  *Id.*; 6/21/16 Hrg. Tr. at 217:13–218:18 (Stilley Test.); 6/22/16 Hrg. Tr. at 212:8–11 (Stilley Test.).  Other than Noble, the Debtors had no other source from which to obtain these funds.  6/22/16 Hrg. Tr. at 213:5–8 (Stilley Test.); PGN 239 at 21.

63

147.    Second, as Mr. Strickler explained, Noble's agreement to:  (i) cover all of the tax bonds in Mexico for 2005–2010, (ii) cover 100 percent of the future liability for Mexican tax assessments for the Noble entities, (iii) cover 50 percent of the future liability for Mexican tax assessments for the Paragon entities, and (iv) take over management of the process in Mexico, provides significant value for the Debtors' estates and is in the best interests of the Debtors' creditors.  PGN 239 ¶ 69.  With the Noble Settlement Agreement, Paragon received the bonding it needed but could not obtain elsewhere and obtained the flexibility it needed to negotiate a potential restructuring with its other creditor constituencies, both outcomes that were incredibly valuable to Paragon.  *Id*.

148.    Furthermore, the Debtors' voting creditors overwhelmingly found the Noble Settlement Agreement was in the paramount interests of the creditors.  The Noble Settlement Agreement was fully described in the Disclosure Statement and all Impaired classes of Claims voted in favor of the Modified Plan as described therein.  Finally, the Term Loan Agent has withdrawn its objection to the Noble Settlement Agreement.

149.    Accordingly, the Debtors have satisfied the *Martin* factors and the Noble Settlement Agreement is approved.

### C.    The Secured Term Loan Claims are Not Impaired Under the Modified Plan

150.    The Term Loan Agent objects to the reinstatement of the Secured Term Loan Claims, arguing that the Modified Plan, specifically the Amended and Restated Credit Agreement, alters the contractual rights under the Secured Term Loan Agreement.[14]  The Term Loan Agent's argument centers on the interpretation of the Amended and Restated Credit Agreement, the Secured Term Loan Agreement, the Collateral Agency Agreement, dated as of

---

[14] *See* 11 U.S.C. § 1124(2)(E).

July 18, 2014 (the "**Collateral Agency Agreement**"), and the Guaranty and Collateral

Agreement, dated as of July 18, 2014 (the "**Guaranty and Collateral Agreement**" and, together

with the Secured Term Loan Agreement and the Collateral Agency Agreement, the "**Term Loan**

**Documents**"), each of which is governed by New York law.[15]  For the reasons set forth below,

the Court holds that the Term Loan Documents are unambiguous and the Secured Term Loan

Claims are not impaired under the Modified Plan.

> 1.    **The Modified Plan Does Not Violate Section 7.2 of the Secured Term
> Loan Agreement**

151.    The Term Loan Agent argues that the Debtors' granting of additional

collateral (the "**Additional Collateral**") to the Revolver Lenders to secure an amount of

obligations under the Amended and Restated Credit Agreement in excess of $150 million

violates Section 7.2 of the Secured Term Loan Agreement.[16]

152.    The Court disagrees.  Section 7.2 limits the Debtors' ability to grant liens

but provides for certain negotiated exceptions to such limitation including those contained in the

definition of "Permitted Lien."[17]  The Term Loan Agent's argument incorrectly assumes the liens

on the Additional Collateral will be granted in reliance on the "general lien basket" referenced in

clause (z) of the definition of Permitted Liens in the Secured Term Loan Agreement.[18]  However,

the entire amount of the outstanding obligations under the Amended and Restated Credit

Agreement are permitted to be secured by liens granted pursuant to the basket referenced in

clause (a) of the definition of Permitted Liens in the Secured Term Loan Agreement.  That clause

---

[15] PGN 24 (Collateral Agency Agreement); PGN 23 (Guaranty and Collateral Agreement); PGN 21 (Secured Term Loan Agreement).

[16] Term Loan Agent Obj. ¶¶ 57–58; PGN 21 (Secured Term Loan Agreement) § 7.2.

[17] *Id.*

[18] *Id.*; *see also* PGN 21 (Secured Term Loan Agreement) § 1.1 (Definition of Permitted Lien, clause (z)).

permits "[l]iens on assets of the Parent or any of its Restricted Subsidiaries securing Indebtedness and other Obligations under the Senior Credit Facilities . . . that was permitted to be incurred under this Agreement . . . ."[19]

       153.   The Term Loan Agent also argues that if Additional Collateral is granted to the Revolver Lenders, it should also be provided to the Term Loan Agent.  The Court again disagrees.  There is nothing in clause (a) of the definition of Permitted Liens, or elsewhere in the Term Loan Documents, requiring that additional liens granted for the benefit of the Revolver Lenders must also be granted for the benefit of the Term Loan Lenders.  If the Term Loan Agent intended to require all additional liens to be granted on behalf of both facilities, it could have included specific language in the Secured Term Loan Agreement to explicitly reflect that intent.  In fact, unlike the Secured Term Loan Agreement, the Revolving Credit Agreement specifically provides that all additional liens granted to the Term Loan Agent must also be granted to the Revolver Lenders.[20]  The Secured Term Loan Agreement was entered into a few weeks after the Revolving Credit Agreement, and, having seen the existence of such language in the Revolving Credit Agreement, the Term Loan Agent could have easily included such language in the Secured Term Loan Agreement.  As another example, the Secured Term Loan Agreement specifically states that all Incremental Facilities be secured on a *pari passu* basis with the Secured Term Loan Agreement.[21]  Accordingly, it is evident that the Term Loan Agent chose specific instances where it considered it important to include language regarding lien priorities.  Therefore, absent specific contractual language mandating that the Additional Collateral granted

---

[19] PGN 21 (Secured Term Loan Agreement) § 1.1 (Definition of Permitted Lien, clause (a)).

[20] PGN 25 (Amended and Restated Credit Agreement) § 7.2(h) ("provided that if any Liens are granted to secure the Existing Term Loan Obligations, *such Liens are also granted to secure the other Secured Obligations*.").

[21] PGN 21 (Secured Term Loan Agreement) (Definition of Permitted Incremental Facility, clause (a)).

to the Revolver Lenders must also be granted to the Term Loan Lenders, the Debtors are

permitted under the Secured Term Loan Agreement to provide the Additional Collateral to the

Revolver Lenders.

154.    Out of an abundance of caution, the Debtors negotiated in the Amended

and Restated Credit Agreement a "savings clause" (the "**Savings Clause**") that provides that if

the Court approves the grant of Additional Collateral but its decision is later reversed on appeal,

the liens granted on Additional Collateral in excess of $150 million will be *void ab initio*.[22]  The

Savings Clause ensures that under no circumstances will a default occur under the Secured Term

Loan Agreement.[23]

### 2.    The Grant of Liens in Additional Collateral Rigs Does Not Violate the Secured Term Loan Agreement

155.    The Term Loan Agent argues that the grant of an exclusive lien in

Additional Collateral Rigs in favor of the Revolver Lenders violates the Collateral Agency

Agreement.  The Term Loan Agent contends that because the Additional Collateral Rigs fall

---

[22] PGN 25 (Amended and Restated Credit Agreement) § 11.26 provides:  "Amount of Credit Agreement Secured Obligations.  Notwithstanding anything to the contrary in this Agreement or in any other Loan Document (including any provisions intended to benefit from other overriding language), if it is judicially determined by a court of competent jurisdiction that any grant of a Lien on any Credit Agreement Collateral would conflict with the Existing Term Loan Agreement or trigger an Event of Default under the Existing Term Loan Agreement, then, unless such judicial determination is stayed, (i) the Credit Agreement Secured Obligations shall immediately be deemed to have been limited to $150,000,000 as of the date of the initial grant of the Lien in respect thereof and (ii) the Liens granted on the Credit Agreement Collateral to the Credit Agreement Collateral Agent shall be limited to and shall not secure any amounts in excess of $150,000,000 of Credit Agreement Secured Obligations. In the event such judicial determination is subsequently reversed (irrespective of whether a stay was sought or granted), such Liens (and the amount of Credit Agreement Secured Obligations) shall be reinstated as of the date of such reversal or, if set forth in such judicial determination, as of the effective date. For the avoidance of doubt, this Section 11.26 shall have no impact on (x) any Liens on the Shared Collateral or (y) the Liens securing the Credit Agreement Secured Obligations not in excess of $150,000,000."

[23] The footnote that the Term Loan Agent cites in the Term Loan Agent Objection (PGN 25 (Amended and Restated Credit Agreement) Ex. D at n.30)) will be removed from the Amended and Restated Credit Agreement.

67

within the definition of Collateral Rig Mortgages in the Collateral Agency Agreement, such

Additional Collateral Rigs must also be pledged to the Term Loan Lenders.[24]

156.   The Court disagrees.  The term "Collateral Rig Mortgages" in the

Collateral Agency Agreement only includes mortgages "executed and delivered by a Grantor."[25]

"Grantors," in turn, is defined as a loan parties under both the Secured Term Loan Agreement

and the Revolving Credit Agreement (as it may be amended by the Amended and Restated

Credit Agreement) which sign or join the Collateral Agency Agreement.[26]  However, the

Additional Collateral Rigs will be owned by subsidiaries of Paragon Parent that are only loan

parties under the Amended and Restated Credit Agreement and, therefore, do not fall within the

definition of "Grantors."  Thus, looking at the Term Loan Documents and their operative

provisions, not only is there no requirement that a subsidiary of Paragon Parent that becomes a

loan party for purposes of the Amended and Restated Credit Agreement also become a loan party

under the Secured Term Loan Agreement, but the Term Loan Agent has not pointed to any

provision in the Collateral Agency Agreement or any other Term Loan Document that *requires*

that Collateral Rig Mortgages be provided to the Collateral Agent for the benefit of the Term

Loan Lenders.  The Collateral Agency Agreement is an agreement that merely serves to appoint

the Collateral Agent to act as collateral agent and provides *authority* to the Collateral Agent to

act in its capacity as a trustee with respect to any Collateral Rig Mortgages that are entered into.

It does not impose on the Debtors an obligation to provide any collateral, including the

Additional Collateral Rigs.  As a result, the Term Loan Agent has not pointed to any contractual

---

[24] The Debtors have noted that this argument is purely theoretical because there will be no Additional Collateral Rigs as of the effective date of the Amended and Restated Credit Agreement.  Original Confirmation Brief at ¶ 57.

[25] PGN 24 (Collateral Agency Agreement) § 1.1 (Definition of Collateral Rig Mortgages).

[26] PGN 24 (Collateral Agency Agreement) § 1.1 (Definition of Grantor).

right that is being impaired.  Accordingly, the Court concludes that the grant of an exclusive lien in Additional Collateral Rigs does not violate the Collateral Agency Agreement.

### 3. The Grant of Pledged Equity in Owners of Additional Collateral Rigs Does Not Violate the Secured Term Loan Agreement

157.    The Term Loan Agent argues that the grant of pledged equity in owners of Additional Collateral Rigs in favor of the Revolver Lenders violates the Guaranty and Collateral Agreement.[27]  The Term Loan Agent has asserted that owners of Additional Collateral Rigs fall within the definition of Collateral Rig Owners in the Amended and Restated Credit Agreement (and therefore must be pledged to the Collateral Agent for the Term Loan Lenders under the Guaranty and Collateral Agreement).[28]

158.    The Court again disagrees.  The Guaranty and Collateral Agreement does not define Collateral Rig Owner.  It instead references the definition in the Revolving Credit Agreement, as amended by the Amended and Restated Credit Agreement.  The Amended and Restated Credit Agreement's amended definition of Collateral Rig Owner explicitly provides that any reference to Collateral Rig Owner in the Guaranty and Collateral Agreement refers solely to Collateral Rig Owners who own rigs that have been pledged for the benefit of the Term Loan Lenders and the Revolving Lenders.[29]  In other words, the Amended and Restated Credit Agreement, by means of the definition of Collateral Rig Owners or otherwise, does not create an affirmative obligation to pledge additional collateral to the Term Loan Lenders under the Guaranty and Collateral Agreement because it expressly carves out Additional Collateral Rigs

---

[27] Term Loan Agent Obj. ¶ 60.  According to the Term Loan Agent, the Guaranty and Collateral Agreement "requires a pledge of equity in the owners of the Additional Collateral Rigs" to the collateral agent for the Term Loan Lenders.  *Id.*

[28] *Id.*

[29] PGN 25 (Amended and Restated Credit Agreement) § 1.1 (Definition of Collateral Rig Owner).

RLF1 15448693V.1

(and as a result, the owners of the Additional Collateral Rigs) for purposes of the Guaranty and

Collateral Agreement.[30]  Since the Term Loan Agreement does not limit the manner in which the

Revolving Credit Agreement, including the definitions in the Guaranty and Collateral

Agreement, can be amended, the grant of the equity of the owners of the Additional Collateral

Rigs does not run afoul of the Term Loan Documents.

159.    Accordingly, for the foregoing reasons, the Court concludes that the

Secured Term Loan Claims are not impaired under the Modified Plan.

**D.    The Debtors Will Pay All Required Default Interest to Reinstate the Secured Term Loan Claims**

160.    The Term Loan Agent asserts that the Debtors' Business Plan is not viable

because it does not include payment of default interest to the Term Loan Lenders even after their

claims have been reinstated and cured under the Bankruptcy Code.[31]  However, the Modified

Plan provides for full satisfaction of all amounts outstanding under the Secured Term Loan

Agreement, including payment of default interest accrued during the pendency of the case.[32]

The Court disagrees with the Term Loan Agent's claim that default interest is owed beyond the

effective date of the Plan to the maturity of the Secured Term Loan Agreement, *i.e.*, after the

Term Loan Lenders have been restored to their original, non-default position.

161.    Default interest is not owed post-effective date to the maturity of a

reinstated debt[33] because reinstatement is designed to restore the Term Loan Agent to the same

---

[30] *Id.* Additionally, like the Term Loan Agent's argument with regard to the grant of liens in the Additional Collateral Rigs, this argument is practically irrelevant because there are no new equity owners of Additional Collateral Rigs being pledged.

[31] Term Loan Agent Objection ¶¶ 61–67.

[32] Osmun Declaration ¶ 16.

[33] The court's decision in *In re 139-141 Owners Corp.*, 306 B.R. 763, 773 (Bankr. S.D.N.Y. 2004), *aff'd in part, vacated in part, remanded*, 313 B.R. 364 (S.D.N.Y. 2004) is an exception and distinguishable on its facts.  The court

position it occupied prepetition, prior to the Debtors' bankruptcy default.  *See, e.g.*, *In re Onco Inv. Co.,* 316 B.R. 163, 167 (Bankr. D. Del. 2004) (noting that reinstatement and cure "do not just 'de-accelerate' the debt; *they roll back the clock to the time before the default existed*") (emphasis added); *see also In re 243rd St. Bronx R&R LLC*, No. 11 B 13321, 2013 Bankr. LEXIS 1161, *3–5 (Bankr. S.D.N.Y. Mar. 21, 2013) (holding that a debtor is only required to pay default interest for the pre-petition period) ("[T]he general rule [under 1124] is that a creditor is entitled to claim prepetition interest at the contract rate as permitted under state law . . . The principles regarding payment of post-petition default interest are different [and governed by section 506(b)].").[34]  Requiring the Debtors to pay default interest post-effective date through to the maturity of its debt would ignore the purpose of reinstatement, which is to place the parties in their pre-default positions.  As the Second Circuit noted in *In re Taddeo*, 685 F.2d 24, 29 (2d Cir. 1982), citing to the legislative history of section 1124: "The holder of a claim or interest who under the plan is restored to his original position, when others receive less or get nothing at all, is fortunate indeed and has no cause to complain." (citing S. Rep. No. 989, 95th Cong., 2d Sess. 120 (1978)).[35]

---

found section 1124 of the Bankruptcy Code to have no impact on default interest and instead evaluated the right to default interest payment under sections 105(a) and 506(b) of the Bankruptcy Code.  The court concluded that default interest on the reinstated debt was warranted where the solvent Debtor's bankruptcy case was a single asset case initiated for the sole purpose of avoiding default interest.  No courts in the Third Circuit have cited this case, favorably or otherwise.

[34] *See also In re Energy Future Holdings Corp.*, No. 14-10979 (CSS), 2016 WL 3135827, at *10 (Bankr. D. Del. June 3, 2016) (discussing *Onco* in dicta; noting that the *Onco* court concluded that "the debtor had cured the default and given the secured creditor everything to which it was entitled under the documentation.").

[35] None of the cases the Term Loan Agent cites provides persuasive support for its contention that default interest is required after reinstatement of its loan.  *See In re Moody Nat'l SHS Houston H, LLC*, 426 B.R. 667, 680 (Bankr. S.D. Tex. 2010) (holding that section 1124 does not impact a creditor's ability to receive default interest on prepetition claim and cure amount); *In re 1 Ashbury Court Partners, L.L.C.*, No. 11-10131, 2011 WL 4712010, at *4 (Bankr. D. Kan. Oct. 5, 2011) (same); *In re Sagamore Partners, Ltd.*, 620 F. App'x 864, 869 (11th Cir. 2015) (same); *In re Gen. Growth Props., Inc.*, 451 B.R. 323, 331 (Bankr. S.D.N.Y. 2011) (holding that creditor was entitled to default interest through the effective date of the plan); *In re Schatz*, 426 B.R. 24, 28 (Bankr. D.N.H. 2009) (holding that creditor was entitled to default interest only on prepetition arrearage).

71

162.     Because the Debtors will have paid on the effective date, or as soon as practicable thereafter, all interest due under the Secured Term Loan Agreement, including accrued default interest, as required, they are satisfying the cure requirement of section 1124(2)(A), as defined by section 1123(d).  Furthermore, the Modified Plan provides full payment of reliance damages pursuant to section 1124(2)(C) of the Bankruptcy Code—inclusive of accrued default interest and the payment of reasonable expenses and fees—and reinstates the Secured Term Loan Claims at the bargained for, pre-default interest rate.[36]  Accordingly, the Court finds that reinstatement of the Secured Term Loan Claims, as set out in the Modified Plan is appropriate, complies with requirements of the Bankruptcy Code and has been accurately accounted for in the Debtors' Business Plan.

### E.     The Modified Plan was Proposed in Good Faith

163.     "The Third Circuit has stated that the touchstone of the good faith inquiry is the plan itself and whether it will achieve a result consistent with the objectives and purposes of the Bankruptcy Code." *In re W.R. Grace & Co.*, 475 B.R. at 87 (citations omitted); *see also In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (same).  Courts should consider whether a plan (i) "fosters a result consistent with the [Bankruptcy] Code's objectives"; (ii) "has been proposed with honesty and good intentions and with a basis for expecting that reorganization can be effected"; and (iii) exhibits "a fundamental fairness in dealing with the creditors." *In re W.R. Grace & Co.*, 475 B.R. at 87–88.  Applying these factors, the Court finds that the Modified Plan was proposed in good faith.

164.     With regard to the first factor, the Supreme Court has identified the two objectives of chapter 11 as preserving going concerns and maximizing property available to

---

[36] Osmun Declaration ¶ 16.

satisfy creditors. *See Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*, 526 U.S. 434, 453 (1999); *see also In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 119 (3d Cir. 2004) (same). The Modified Plan is consistent with these objectives. All stakeholders, with the exception of the Senior Notes Claims, are receiving a 100 percent recovery on their claims or interests.[37] Holders of Senior Notes Claims are also receiving a meaningful recovery, as evidenced by their overwhelming acceptance of the Modified Plan.[38]

165.   As discussed *supra* ¶ 32, the Debtors considered various restructuring alternatives and concluded that the Modified Plan was the alternative that best achieved the Debtors' reorganization objectives. The Modified Plan: (i) eliminates $1.2 billion in debt from the Debtors' balance sheet: (ii) reduces interest expense by approximately $63 million; (iii) extends the maturity of the Revolving Credit Agreement; (iv) provides the Debtors with a more favorable covenant package; (v) includes the Noble Settlement Agreement, which resolves the Noble tax bonding issue; and (vi) allows equity to retain 53 percent of the Reorganized Debtors. 6/21/2016 Hrg. Tr. at 51:16–52:17 (Kurtz Test.); 6/23/2016 Hrg. Tr. at 87:7–88:3 (Fordyce Test.). The Court finds that the Modified Plan is the product of extensive, good-faith negotiations between the Debtors and the Plan Support Parties.

166.   The Court further determines that the Term Loan Agent's statement that liquidation is preferable to the Modified Plan is not supported by the evidence. Indeed, Mr. Kurtz testified that Lazard concluded that the Debtors have significant going concern value. 6/21/16 Hrg. Tr. at 35:18–22 (Kurtz Test.).

---

[37] Disclosure Statement at 5–7.

[38] Voting Certification (Docket No. 433).

167.    The second factor requires that the plan be proposed "with honesty and good intentions." *In re W.R. Grace & Co.*, 475 B.R. at 87–88. "To find a lack of 'good faith' courts have examined whether the debtor intended to abuse the judicial process and the purposes of the reorganization provisions." *In re Sound Radio, Inc.*, 93 B.R. at 853; *see also In re W.R. Grace & Co.*, 475 B.R. at 88 (same). A plan is not proposed in good faith "when no realistic possibility of an effective reorganization exists and it is evident that the debtor seeks to delay or frustrate the legitimate efforts of secured creditors to enforce their rights." *In re Sound Radio, Inc.*, 93 B.R. at 853. The Term Loan Agent did not even attempt to introduce any evidence at the Confirmation Hearings to support a finding that the Debtors intended to abuse the judicial process or frustrate the efforts of the Term Loan Agent to enforce its rights.

168.    The Court also finds that the Debtors engaged in good-faith negotiations with their key stakeholders to reach the consensual resolutions embodied in the Modified Plan. The presence of an arm's-length negotiation with creditors is indicative of good faith. *See, e.g.*, *In re U. S. Mineral Prods. Co.*, No. 01-2471, 2005 Bankr. LEXIS 3259, *53 (Bankr. D. Del. Nov. 29, 2005) ("The totality of the circumstances surrounding the formulation and proposal of the Plan demonstrate that the Plan is the result of extensive arms-length negotiations between and among the Chapter 11 Trustee, the Trade Committee, the Legal Representative, the ACC and others, and further demonstrate that the Plan was proposed in good faith . . . .").

169.    The third factor that the courts consider is whether the "the debtor exhibited a fundamental unfairness when dealing with its creditors." *In re W.R. Grace & Co.*, 475 B.R. at 89. The Term Loan Agent asserts that the Modified Plan "puts the risk on the back of the Term Loan Lenders who receive no cash under the Plan" and who "are unlikely to see a

recovery on their claims."[39]  The Court disagrees.  First, "different treatment of a creditor, by

itself, does not necessarily run afoul of the good faith standard."  *In re W.R. Grace & Co.*, 475

B.R. at 90.  This is particularly true where, as here, the Secured Term Loan Claims are

unimpaired and receiving exactly what they would have received absent a bankruptcy filing.  *See*

*id.* ("In order to constitute bad faith, the differing treatment of the creditors would need to have a

serious disparate effect on the parties.  This is not the case here.  To the contrary, the Joint Plan

as proposed would pay AMH's claim in full and leave it unimpaired.").  As discussed *supra* at

sections III.A.4, the Debtors will have sufficient liquidity to make payments on the Secured

Term Loan Agreement until its maturity.

170.    Moreover, the fact that the Debtors negotiated an agreement with the Plan

Support Parties, but not the Term Loan Lenders, does not preclude a finding that the Modified

Plan was proposed in good faith.  *See, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. 314, 364 (Bankr. D.

Del. 2011) (holding that a plan was proposed in good faith even though the equity committee did

not participate in plan negotiations); *In re W.R. Grace & Co.*, 468 B.R. at 90 ("the Bankruptcy

Code does not require that all creditors participate in plan negotiations").[40]

171.    For the foregoing reasons, the Court finds that the Modified Plan was

proposed in good faith, satisfying section 1129(a)(3) of the Bankruptcy Code.

F.    **Payment of the Ad Hoc Group's Fees is Appropriate**

172.    Because the Court approves the Modified Plan, which provides for the

payment of the Ad Hoc Group's Fees (Modified Plan § 5.11), the Court need not determine

whether the Ad Hoc Group satisfies the standards set forth in section 503(b)(3)(D) of the

---

[39] Term Loan Agent Objection at ¶ 75.

[40] The Term Loan Agent was invited to participate in the Original Plan negotiations early on, but failed to avail itself of the opportunity to participate in the negotiations before the Debtors ultimately reached agreement on the terms of a consensual restructuring with the more proactive Revolver Lenders and Ad Hoc Group.

Bankruptcy Code which requires that the Ad Hoc Group make a substantial contribution to the Chapter 11 Cases.

173.    However, even if the Court would have to find that the Ad Hoc Group made a substantial contribution, it easily could.  As the Debtors showed at the Confirmation Hearings, the Ad Hoc Group worked with Paragon in developing the Modified Plan and negotiating with the Revolver Lenders.  6/21/16 Hrg. Tr. at 60:8–25 (Stilley Test.); 9/27/16 Hrg. Tr. at 60:8–14 (Stilley Test.).  Even after Paragon developed the Downside Sensitivity, the Ad Hoc Group agreed to forego $60 million in cash.  6/21/16 Hrg. Tr. at 60:8–25 (Stilley Test.); 9/27/16 Hrg. Tr. at 60:15–18 (Stilley Test.).  The Ad Hoc Group also assisted in negotiating the Noble Settlement Agreement.  6/21/16 Hrg. Tr. at 60:8–25 (Stilley Test.); 9/27/16 Hrg. Tr. at 60:21–25 (Stilley Test.).  The Court thus finds that the Ad Hoc Group has made a substantial contribution to the Chapter 11 Cases and that the payment of its fees is appropriate.


Dated: _____, 2016

_____
The Honorable Christopher S. Sontchi
United States Bankruptcy Judge

RLF1 15448693V.1