VIA EMAIL: bod@paragonoffshore.com; dtaylor@paragonoffshore.com; lahlstrom@paragonoffshore.com

January 17, 2017

Board of Directors of Paragon Offshore, plc.
3151 Briarpark Drive, Suite 700
Houston, Texas 77042


Dear Members of the Board:

We, shareholders of Paragon Offshore, plc., (hereafter "Paragon"or "the Company"), are writing to express our grave concerns for the progress thus far in the restructuring of our company.

Collectively, our group owns more than twenty-five percent (25%) of shares outstanding of the Company. We number more than fifty (50) individuals, from five (5) countries around the world, who come from many, many different walks of life. Some of us are medical doctors, some of us are unemployed, some of us are mechanical engineers, small business owners, information technology consultants, programmers, pilots, financial advisers, firefighters, lawyers, accountants, nurses, oil rig operators, as well as a more than one current employee of the Company.

To date, we have unquestioningly put our faith in the Board and management to make the best decisions possible for the Company. We have also given ample time to the Company's new Chief Executive Officer to develop and implement a revised business plan and we are encouraged by the recent recovery in the jackup market. This recovery has been evidenced by the fact that one of Paragon's main competitors, Ensco, has been gaining contracts in the very areas that Paragon once had a prominent presence.

However, we are greatly discouraged and disappointed by the lack of engagement from the Company with its shareholders. The Company has repeatedly stated their intention to work with "all stakeholders," yet, to our knowledge, you have not engaged any shareholders in informal or formal discussions, or to participate in any form with the ongoing negotiations with the Term Lenders, Revolver or Bondholders.

This will not stand and we hereby call on the Board of Directors to formally address our concerns outlined below.

   A. SUGGESTIONS ON SOURCES OF LIQUIDITY:

      I. NOBLE SETTLEMENT
      The previous settlement agreements with Noble Corp. (hereinafter "Noble") were imbalanced and improperly favored Noble. In fact, one source close to the issue has described the settlement as having the goal of *letting Noble off the hook*. It is both inconceivable and plausibly fraudulent, no matter the condition of the offshore market,

that all thirty-four (34) jackup rigs, five (5) drillships, and three (3) semisubmersibles that were spun-off by Noble into the Company were written down from $3.3 billion to $2.4 billion within the first quarter of Paragon's IPO.

A write-down of that magnitude requires substantial analysis that surely began shortly after the IPO, at the earliest. Crude oil prices had started to drop but were still in the mid-eighty dollar ($80) range by the end of the third quarter (3Q). In addition, that write-down doesn't factor in the complete implosion of the Brazilian offshore drilling market. Former Paragon CEO, Mr. Randall Stilley, in reporting the Company's Third Quarter Results on November 10, 2014, stated that the impairment of those rigs "does not affect our (the Company) outlook for the Brazilian market." In other words, the Company took the impairment on the value of the rigs without formally adjusting their outlook on the Brazilian market. That suggests the rigs were improperly valued within a mere fifty-seven (57) days of the Company's IPO even though the price of oil was still more than forty-percent (40%) greater than it is today.

Moreover, Noble transferred around $1.6B debt to Paragon via the IPO in the form of a $0.6B term loan and approximately $1B in unsecured 2022 and 2024 bonds. In December 2012, Noble's standard specification drilling business, which ultimately became Paragon, had $334M in debt. In December 2013, around $1.2B in new debt was transferred to this same standard specification drilling business. The inflated equipment value helped Noble transfer more debt to Paragon, but the true market equipment value (per market comparables and the writeoffs) reflects that Paragon was disproportionately given a higher than reasonable level of debt.

In addition, Paragon was given nearly all of the Petrobras and Pemex contracts, which contained unfavorable provisions against Paragon, and would result in early terminations of the drilling rigs.

Then, just sixteen (16) months after the spin-off, Paragon Offshore filed for Chapter 11. The rigs that Paragon received from Noble are now worth a mere $900M, and both of the creditors who were supposed to be secured by these rigs are completely underwater.

Quite obviously we were given a terrible deal by Noble and we are highly suspicious. We may not be the only ones who think this way. During the most recent Noble earnings call, Gregory Lewis, an analyst at Credit Suisse Securities, inquired as to how much longer the Noble management believed that Paragon would be in Chapter 11. This question came from the analyst nearly two and a half (2.5) years after Paragon was spun-off from Noble. This question or a question similar to it has been asked by analysts, who do not have a stake in either company, on a majority of Noble's earnings calls.

We demand that instead of fighting amongst ourselves, the stakeholders of Paragon come together and go after substantial compensation from Noble as well as the auditor who approved the rig valuations at the time of the spin-off.  The responsibility Noble has toward Paragon; including but not limited to, Paragon's employees, Paragon's

shareholders, and Paragon's creditors during this restructuring is obvious to everyone except, well, Noble.

II. <u>MINIMUM LIQUIDITY COVENANT IN REVOLVER</u>
As he noted in his ruling, Judge Sontchi believes that, "Under its covenants with the Revolver Lenders, Paragon is required to maintain certain liquidity levels. In addition, in order to run its business, Paragon needs sufficient working capital."
It has been our assessment that creditors will have obtained some additional guarantee from the non-debtor assets of the Company. We believe the minimum liquidity level covenant should be removed from the agreement altogether. This would provide us a majority of the liquidity we need in order to exit Chapter 11.

III. <u>BOARD OF DIRECTORS AND MANAGEMENT SHOULD SET AN EXAMPLE</u>
Paragon isn't the company that it once was or that we all expected it to be. However, with the right steps it CAN succeed in the vision we have for it as the low-cost, high-quality offshore drilling company. It seems the current environment is perfect for Paragon's niche of being able to operate efficiently for the lower day rates. The breakeven price for operators in shallow waters is the lowest of all offshore drilling. In order for us to turn this Company around, executive management needs to show that they understand the reality of the situation and assist in bringing costs down. It will only help to create goodwill from others that need to make offers as well.

By restructuring the Board of Directors' compensation to restricted stock units only, we could come up with an additional $2M needed to exit Chapter 11. This would also keep all of our interests aligned in preserving shareholder value and stopping the financial bleed of the company. We should all have our interests aligned in the future success of Paragon by making sacrifices for it's survival.

In addition, we also believe you should remove the following clause from Mr. Taylor's success bonus agreement, "(c) conversion of the chapter 11 cases of any of the Paragon Debtors holding all or substantially all of the assets of the Company and its affiliates to a bankruptcy case under chapter 7 of the Bankruptcy Code."

Members of the Board, we expect to reward you for success, we will not reward you for failure.

IV. <u>PROFESSIONAL FEES</u>
Our highly compensated restructuring professionals have still not delivered any success and instead have plagued the Company's financial position like a cancer. There seems to be no shame in piling on costs to the Company. To state this tragedy a different way, if Paragon was given a full refund of the costs incurred by professionals in this restructuring we would have half of the liquidity needed to exit Chapter 11, or $100M. It seems perfectly clear that the Board of Directors has no concern with awarding ridiculous fees for the restructuring professionals and that those same professionals as well as the executive management are the only ones who have benefitted from this situation.

Because of your poor capital allocation, our employees, shareholders, and the creditors have all suffered, irreparably under this failed guidance and leadership.

V. <u>PETROBRAS AND PEMEX</u>
Another source of liquidity can be found in obtaining settlements from Petróleo Brasileiro S.A. And Petróleos Mexicanos. It has been a while since any insight into that pursuit has been issued and it seems that this is an additional source of liquidity that has been forgotten altogether. These additional sources of liquidity can be found, but that should be the responsibility of the Board and the Company management to do so. Additional dilution of shareholders is not a source of liquidity.

B. <u>QUESTIONS FOR THE BOARD:</u>

I. Can the Board confirm that their main priority (main priority being defined as "the solution being pursued and investigated by the members of the Board, that consumes or utilizes the highest amount of financial resources, the greatest amount of time, and demands the greatest sense of urgency in relation to other issues at hand") is in pursuing sources of liquidity unrelated to diluting the current shareholders of Paragon Offshore?

II. What is the highest amount of dilution to current shareholders that the Board of Directors will allow? Based on testimony that was made during the restructuring proceedings, we know that previously the Board had allowed of a dilution of no more than 50%. Has this threshold changed?

III. What kind of assurances can be provided by the Board of Directors to the shareholders that our interests are still represented by this current Board of Directors.

IV. Why has the Company management not made any attempts to discuss the restructuring with the shareholders although it has stated it has been in talks with all stakeholders. Without explicit guarantees that shareholders will be left with a majority of the equity in the reorganized Paragon, we will simply have to clean up the mess the Board will have left, and thus fulfill the responsibilities that you have been compensated for and agreed to all this time.

V. Can you explain in great detail your interpretation of Judge Sontchi's ruling? It seems to us that Judge Sontchi created a very clear roadmap for an acceptable plan to exit Chapter 11. It seems that we simply need to give out less cash to the creditors and request that the maturities on the Revolver Loans as well as the Term Loans be extended out past their current maturities. This would allow for the industry to recover and for Paragon to be able to attain the refinancing of these loans that Judge Sontchi is concerned with.

If the Board does not believe that it can answer our questions and address our concerns and carry out the requests we have listed so far, please let us know so that we can finalize the process of

organizing an Extraordinary General Meeting with the explicit intent to replace the entire Board of Directors.

Out of loyalty and appreciation, we have withheld the formation of an official Equity Committee in the restructuring because we want to avoid complicating the issues at hand and adding more costs to the huge amount of fees that are already being paid out on a monthly basis. However. at the same time we can't deny that after the ruling, and especially after the change in management, we do not really know if the interests of shareholders are still being represented. The creditors, as might be expected, have been very effective at making Paragon appear as a lost cause and for any residual equity to be worthless.

On a positive note, aside from the cancelled contracts, the bankruptcy, the numerous professional fees, and decline of the offshore industry, the Company is performing exceptionally well. It also has substantial assets in the form of cash, rigs, contracts, and a sterling reputation for performance and productivity. There is much to fight for on our behalf, and we write to you today to state that if the Board will not fight for us, we will find a new Board that will.

To that end,  we respectfully request that you post a response to this letter on the Paragon Offshore website, in the Investor Relations section, five (5) business days from today, or no later than the close of business on Monday, January 23, 2017.


Best Regards,


/s/ Bijan Badihian; Shares Held: 4,395,592

/s/ Scott Jones; Shares Held: 206,500

/s/ Therman Wheeler; Shares Held: 207,000

/s/ Scott Lumsden; Shares Held: 52,000

/s/ Jeff Koepke; Shares Held: 275,000

/s/ Mazyn Barash; Shares Held:  92,110

/s/ Alan Pierson; Shares Held: 7,000

/s/ John Sotiriou; Shares Held: 89,111

/s/ Marcel de Groot; Shares Held: 3,943,984

/s/ Michael R. Hammersley; Shares Held: 70,000

/s/ William Sproger;  Shares Held: 500,000

/s/ William Baird; Shares Held: 93,660

/s/ James T Mariani; Shares Held 88,188

/s/ Scott Pletch; Shares Held: 966,000

/s/ Eric Gersten; Shares Held: 12,000

/s/ Robin Hood; Shares Held:  67,000

/s/ Stephan Anderson; Shares Held: 1,000,000

/s/ Roelant Mier; Shares Held: 100,008

/s/ Chukwuemeka Igboanugo; Shares Held: 172,500

/s/ Patrice Boesler; Shares Held: 43,100

/s/ Mila McKinley; Shares Held: 14,000

/s/ Patrick Sullivan; Shares Held: 150,000

/s/ William Scheets; Shares Held: 22,000

/s/ Christopher Farmer; Shares Held: 20,000

/s/ Bo Pang; Shares Held: 100,000

/s/ Brian Fink; Shares Held 150,000

/s/ James Rudd; Shares Held:182,000

/s/ Gary Lavergne; Shares Held: 115,000

/s/ Theo Muller; Shares Held & Controlled: 2,734,500

/s/ Hao Bui; Shares Held: 833,500

/s/ Charles Bennett; Shares Held: 451,222

/s/ Robby Griesche; Shares Held: 98,950

/s/ David Kotthoff; Shares Held: 458,290

/s/ Matthew Hobbs; Shares Held: 53,000

/s/ Daniel Lawrence; Shares Held: 70,000

/s/ Thomas Dynan; Shares Held: 52,000

/s/ Yubo Huang; Shares Held: 81,063

/s/ Mark Anthony Lipari; Shares Held: 110,000

s/ Linda Eligwe; Shares Held: 46,976

/s/ Andre S. DuBois, III; Shares Held: 14,350

/s/ Howard J. Leonard, representing Stewardship Partners; Shares Held: 3,084,293

/s/ Evan Pletch; Shares Held: 10,000

/s/ Kent Hughes; Shares Held: 100,000

/s/Pieter de Waard; Shares Held: 247,000

/s/ Jose Alejandro Benavides Treviño; Shares Held: 3,125

/s/ Katie Vigil; Shares Held: 39,000

/s/ Tal Raichman; Shares Held: 200,000

/s/ Koji Sado; Shares Held: 309,920

/s/ Scott Reistad; Shares Held: 157,107

/s/ Rein Eikelboom; Shares Held: 47,000

/s/ Philip Johnson; Shares Held: 73,000


The Unofficial Equity Committee of the Shareholders of Paragon Offshore, plc
investors@paragonoffshoreshareholders.com


Cc: The Honorable Judge Christopher S. Sontchi