## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

-------------------------------------------------------x
                                             :

In re                            :         **Chapter 11**

                                       :

**PARAGON OFFSHORE PLC**, *et al.*,    :         **Case No. 16–10386 (CSS)**

                                       :

                                       :         **Jointly Administered**

                  Debtors.[1]      :

-------------------------------------------------------x

## DISCLOSURE STATEMENT FOR THIRD JOINT CHAPTER 11 PLAN
## OF PARAGON OFFSHORE PLC AND ITS AFFILIATED DEBTORS

> **THIS IS NOT A SOLICITATION OF ACCEPTANCE OR REJECTION OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THE DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT TO DATE.**

WEIL, GOTSHAL & MANGES LLP
Gary T. Holtzer
Stephen A. Youngman
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

RICHARDS, LAYTON & FINGER, P.A.
Mark D. Collins (No. 2981)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

*Attorneys for Debtors*

*Attorneys for Debtors*

Dated:   March 10, 2017
             Wilmington, Delaware

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Paragon Offshore plc (6017); Paragon Offshore Finance Company (6632); Paragon International Finance Company (8126); Paragon Offshore Holdings US Inc. (1960); Paragon Offshore Drilling LLC (4541); Paragon FDR Holdings Ltd. (4731); Paragon Duchess Ltd.; Paragon Offshore (Luxembourg) S.à r.l. (5897); PGN Offshore Drilling (Malaysia) Sdn. Bhd. (9238); Paragon Offshore (Labuan) Pte. Ltd. (3505); Paragon Holding SCS 2 Ltd. (4108); Paragon Asset Company Ltd. (2832); Paragon Holding SCS 1 Ltd. (4004); Paragon Offshore Leasing (Luxembourg) S.à r.l. (5936); Paragon Drilling Services 7 LLC (7882); Paragon Offshore Leasing (Switzerland) GmbH (0669); Paragon Offshore do Brasil Ltda.; Paragon Asset (ME) Ltd. (8362); Paragon Asset (UK) Ltd.; Paragon Offshore International Ltd. (6103); Paragon Offshore (North Sea) Ltd.; Paragon (Middle East) Limited (0667); Paragon Holding NCS 2 S.à r.l. (5447); Paragon Leonard Jones LLC (8826); Paragon Offshore (Nederland) B.V.; and Paragon Offshore Contracting GmbH (2832).  The Debtors' mailing address is 3151 Briarpark Drive, Suite 700, Houston, Texas 77042.

**DISCLOSURE STATEMENT, DATED MARCH 10, 2017**

**Solicitation of Votes on the**
**Plan of Reorganization of**

**PARAGON OFFSHORE PLC,** *ET AL.*

**from the holders of outstanding**

- **REVOLVER SECURED CLAIMS AND TERM LOAN SECURED CLAIMS**
- **SENIOR NOTES CLAIMS AND SECURED LENDER UNSECURED CLAIMS**
  - **GENERAL UNSECURED CLAIMS**

> **THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 5:00 P.M., PREVAILING EASTERN TIME ON MAY 19, 2017, UNLESS EXTENDED BY THE DEBTORS.  THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS MARCH 14, 2017 (THE "RECORD VOTING DATE").**

---

**RECOMMENDATION BY THE DEBTORS**

The Board of Directors of Paragon Offshore plc ("**Paragon Parent**") and the board of directors, managers, members, or partners, as applicable, of each of its affiliated Debtors (as of the date hereof) have unanimously approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.

---

**HOLDERS OF CLAIMS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE VOTING ON THE PLAN.**

**CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995 AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.**

**FURTHER, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT.  DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT.  THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT.**

**NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS HEREIN.  THE DEBTORS HAVE NOT AUTHORIZED ANY PERSON TO GIVE ANY INFORMATION OR ADVICE, OR TO MAKE ANY REPRESENTATION, IN CONNECTION WITH THE PLAN OR THIS DISCLOSURE STATEMENT.**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED.  THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THIS DISCLOSURE STATEMENT.**

**THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION.  NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.  ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.**

# TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................ 1

II. OVERVIEW OF THE DEBTORS' OPERATIONS ........................................................ 8

    A.    The Debtors' Business ........................................................................................ 8

    B.    The Company's Drilling Fleet and Drilling Contracts....................................... 8

    C.    The Debtors' History and Organizational Structure ........................................ 9

    D.    Directors and Officers...................................................................................... 11

    E.    Regulation of the Debtors' Business ............................................................... 11

    F.    The Debtors' Capital Structure ....................................................................... 12

    G.    Significant Prepetition Contracts and Leases.................................................. 14

III. KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES .................... 14

    A.    Collapse in Oil Prices ..................................................................................... 14

    B.    Contract Terminations and Renegotiations...................................................... 15

    C.    Prepetition Deleveraging Initiatives ............................................................... 16

IV. EVENTS DURING THE CHAPTER 11 CASES ........................................................ 16

    A.    Commencement of Chapter 11 Cases and First Day Motions ......................... 16

    B.    Other Procedural Motions and Retention of Professionals ............................. 19

    C.    The Original Plan, the Second Amended Plan, and Subsequent Negotiations ................. 19

    D.    Appointment of Official Committee of Unsecured Creditors........................... 22

    E.    Request for Equity Committee.......................................................................... 22

    F.    Claims Administration ..................................................................................... 22

    G.    Sale Procedures Motion ................................................................................... 23

    H.    The U.K. Administration ................................................................................. 23

V. MATTERS INVOLVING PARAGON PARENT AND NON-DEBTORS ........................................ 24

    A.    Litigation......................................................................................................... 24

    B.    Tax Disputes ................................................................................................... 24

VI. SUMMARY OF THE PLAN ....................................................................................... 26

    A.    Administrative Expense Claims, Fee Claims, and Priority Tax Claims ........... 26

    B.    Classification of Claims and Interests............................................................. 28

    C.    Treatment of Claims and Interests .................................................................. 30

    D.    Means for Implementation; Post-Effective Date Governance ......................... 33

    E.    Distributions.................................................................................................... 40

    F.    Procedures for Resolving Claims..................................................................... 44

G. Executory Contracts and Unexpired Leases ........................................................ 47

H. Conditions Precedent to the Occurrence of the Effective Date ......................... 50

I. Effect of Confirmation ........................................................................................ 51

J. Retention of Jurisdiction ..................................................................................... 56

K. Miscellaneous Provisions .................................................................................... 58

VII. FINANCIAL INFORMATION AND PROJECTIONS ......................................... 62

A. Consolidated Condensed Projected Financial Information ............................... 62

B. Assumptions to the Projections ........................................................................... 65

VIII. VALUATION ANALYSIS ...................................................................................... 67

A. Estimated Reorganization Valuation of the Debtors .......................................... 67

IX. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES
LAWS ....................................................................................................................... 69

X. CERTAIN TAX CONSEQUENCES OF THE PLAN ........................................... 70

A. Certain U.S. Federal Income Tax Consequences of the Plan ........................... 70

B. Certain U.K. Tax Consequences of the Plan ...................................................... 84

XI. CERTAIN RISK FACTORS TO BE CONSIDERED .......................................... 85

A. Certain Bankruptcy Law Considerations ........................................................... 86

B. Additional Factors Affecting the Value of the Reorganized Debtors ............... 89

C. Risks Relating to the Debtors' Business and Financial Condition .................... 89

D. Factors Relating to Securities to Be Issued Under the Plan, Generally ........... 91

E. Risks Related to an Investment in the New Equity Interests ............................ 92

F. Additional Factors ............................................................................................... 93

XII. VOTING PROCEDURES AND REQUIREMENTS ............................................ 94

A. Parties Entitled to Vote ....................................................................................... 94

B. Voting Deadline ................................................................................................... 94

C. Voting Procedures ............................................................................................... 95

D. Waivers of Defects, Irregularities, etc. .............................................................. 98

XIII. CONFIRMATION OF THE PLAN ....................................................................... 98

A. Confirmation Hearing ......................................................................................... 98

B. Objections To Confirmation ............................................................................... 99

C. Requirements for Confirmation of the Plan ..................................................... 101

XIV. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ............... 106

A. Alternative Plan of Reorganization .................................................................. 106

RLF1 17158271V.1

B.      Sale Under Section 363 of the Bankruptcy Code ............................................................ 106

C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law............................... 106

XV. CONCLUSION AND RECOMMENDATION ................................................................................ 106

RLF1 17158271V.1

# I.
# INTRODUCTION

The Debtors submit this Disclosure Statement in connection with the solicitation (the "**Solicitation**") of votes on the *Third Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors*, dated March 10, 2017 (the "**Plan**," attached hereto as **Exhibit A**).  The debtors under the Plan are Paragon Offshore plc and its affiliates that are issuers of or guarantors under the company's debt (together with Paragon Parent, the "**Debtors**").[2]  Capitalized terms used in this Disclosure Statement, but not defined herein, have the meanings ascribed to them in the Plan.  To the extent any inconsistencies exist between this Disclosure Statement and the Plan, the Plan governs.

The Debtors are commencing this Solicitation after extensive discussions over the past several months among Paragon Parent, the Debtors, and certain of their key creditor constituencies.  As a result of these negotiations, the Debtors, the Term Loan Agent, the Revolving Credit Facility Agent, the Steering Committee of Revolving Lenders, and the Ad Hoc Committee of Term Lenders (together with the Steering Committee of Revolving Lenders, the "**Requisite Lenders**") have reached a comprehensive settlement on a deleveraging transaction that would restructure the existing debt obligations of the Debtors in chapter 11 through the Plan (the "**Restructuring**").

As of the Effective Date, the Plan represents a full, final, integrated, complete, and good faith compromise, settlement, release, and resolution of, among other matters, disputes and potential litigation among the Debtors, the Term Loan Agent, the Revolving Credit Facility Agent, the Revolving Lenders and the Term Lenders (together with the Revolving Lenders, the "**Secured Lenders**"), regarding all Term Loan Claims, all Revolver Claims, all rights, Claims, and interests arising out of the Adequate Protection Order, all disputes and issues in connection with or relating to encumbered and unencumbered assets and to the validity, extent, and priority of the Liens securing the Revolver Claims and Term Loan Claims, including with respect to Cash held by Paragon Parent and Intercompany Claims, and the matters, disputes, and litigations described in Section 5.1 of the Plan (collectively, the "**Settled Claims**"), including, with respect to each Debtor: (i) the amount, value, and treatment under the Plan of the Term Loan Claims and the Revolver Claims; (ii) the amount, value, and treatment under the Plan of the Settled Adequate Protection Claim; (iii) the validity, scope, extent, and priority of the Liens securing the Term Loan Claims and the Revolver Claims including with respect to Cash held by the Debtors; (iv) the valuation of encumbered and unencumbered assets; (v) any Causes of Action that the Debtors or the Reorganized Debtors, as applicable, could potentially assert against the holders of Settled Claims; and (vi) the rights with respect to, and security interests, in the Debtors' Intercompany Claims.

There are three (3) primary creditor groups whose acceptances of the Plan are being solicited:

1.   Holders of a Revolver Secured Claim or a Term Loan Secured Claim (Class 3);

2.   Holders of a Senior Notes Claim or a Secured Lender Unsecured Claim (Class 4); and

3.   Holders of a General Unsecured Claim (Class 5).

Below is a short summary of the treatment of various creditor groups under the Plan.  Greater detail on such treatment is provided later in this Disclosure Statement.

Settled Claims comprising Revolver Secured Claims and Term Loan Secured Claims (Class 3) will be Allowed.  On the Effective Date, each holder of an Allowed Revolver Secured Claim or an Allowed Term

---

[2] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Plan.

Loan Secured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, in exchange for and on account of such Allowed Revolver Secured Claim or Allowed Term Loan Secured Claims, as applicable: its Pro Rata share of (i) Cash Collateral, (ii) Unencumbered Cash in an amount equal to the Settled Adequate Protection Claim of no less than $352 million and (iii) the Take Back Debt.  For the avoidance of doubt, the Existing Letters of Credit will continue to remain outstanding, pursuant to and subject to the terms of the Existing L/C Escrow Agreement(s) and the New Letter of Credit Agreement.

For purposes of treatment in Class 4, (i) Settled Claims comprising Term Loan Unsecured Claims will be Allowed in the aggregate principal amount of approximately Six Hundred Forty-Two Million Dollars ($642,000,000) and (ii) Settled Claims comprising Revolver Unsecured Claims will be Allowed in the aggregate principal amount of approximately Seven Hundred Seventy-Seven Million Dollars ($777,000,000).  On the Effective Date, each holder of an Allowed Senior Notes Claim or an Allowed Secured Lender Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, in exchange for and on account of such Allowed Claim, its Pro Rata share of (i) the Net Distributable Cash and (ii) the New Equity Interests (subject to dilution by the Management Incentive Plan Securities).  Distributions received under the Plan by holders of Allowed Senior Notes Claims will be subject to the rights of the Senior Notes Indenture Trustee to payment of fees, expenses, indemnification obligations, and Liens, including any charging lien, securing such right to payment under the Senior Notes Indenture.   The Senior Notes Indenture Trustee's exercise of its charging lien will occur before any distributions are made to holders of Allowed Senior Notes Claims.  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Class 4 Disputed Claims Reserve and will withhold New Equity Interests in respect of Disputed Claims in Class 4, if any, in accordance with Section 7.7 of the Plan.  Any amounts remaining after payment of all Disputed Claims in Class 4 will be distributed as provided in Sections 6.16 and 7.7 of the Plan.

Except to the extent that a holder of an Allowed General Unsecured Claim (Class 5) and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, in exchange for, and on account of such holder's rights with respect to and under such Allowed General Unsecured Claim its Pro Rata share of the General Unsecured Claims Distribution, subject to Section 7.7 of the Plan.  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the General Unsecured Claims Reserve in Cash.  Distributions from the General Unsecured Claims Reserve will be available for General Unsecured Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter. Any amounts remaining after payment of all Allowed General Unsecured Claims will be distributed as provided in Sections 6.16 and 7.7 of the Plan.

After giving effect to the Restructuring Transactions, all Parent Interests (Class 8) will be deemed valueless and will not receive any distribution under the Plan.  Parent Interests will be treated in accordance with the U.K. Administration.

Prior to the Effective Date, the directors of Paragon Parent will seek an administration order from the English Court pursuant to paragraph 13 of Schedule B1 of the Insolvency Act 1986 to appoint the U.K. Administrators to implement the U.K. Sale Transaction of all or substantially all of Paragon Parent's Assets to a new holding company ("**Reorganized Paragon**") on or prior to the Effective Date pursuant to the U.K. Implementation Agreement.  Upon appointment, the U.K. Administrators will assume the management of the affairs, business and property of Paragon Parent with all powers necessary or expedient to do so, including the power to effect the U.K. Sale Transaction pursuant to the U.K. Implementation Agreement.

THE PLAN PROVIDES THAT HOLDERS OF ALL CLAIMS OR INTERESTS WHO VOTE TO ACCEPT THE PLAN, HOLDERS OF CLAIMS OR INTERESTS THAT ARE UNIMPAIRED UNDER THE PLAN AND DO NOT TIMELY OBJECT TO THE RELEASES PROVIDED FOR IN THE PLAN, HOLDERS OF CLAIMS OR INTERESTS WHOSE VOTE TO ACCEPT OR REJECT THE PLAN IS SOLICITED BUT WHO DO NOT VOTE EITHER TO ACCEPT OR TO REJECT THE PLAN AND DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN, AND HOLDERS OF CLAIMS OR INTERESTS WHO VOTE TO REJECT THE PLAN BUT DO NOT OPT OUT OF GRANTING THE RELEASES SET FORTH IN THE PLAN ARE DEEMED TO HAVE GRANTED THE RELEASES THEREIN.

The Restructuring, including the U.K. Administration, will leave the Debtors' business intact under Reorganized Paragon and will substantially de-lever it, providing for the reduction of approximately $2.3 billion of the Debtors' debt and $58 million of the Debtors' annual cash interest expense upon the completion of the Restructuring.  This deleveraging will enhance the Debtors' long-term growth prospects and competitive position and allow the Debtors to emerge from their chapter 11 cases (the "**Chapter 11 Cases**") as reorganized entities better positioned to withstand a depressed market for offshore contract drilling.

**WHO IS ENTITLED TO VOTE**:  Under the Bankruptcy Code, only holders of claims or interests in "impaired" Classes are entitled to vote on the Plan (unless, for reasons discussed in more detail below, such holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code).  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under the Plan unless (i) the Plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the Plan, among other things, cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

The following table summarizes, assuming an Effective Date of July 31, 2017, (i) the treatment of Claims and Interests under the Plan, (ii) which Classes are impaired by the Plan, (iii) which Classes are entitled to vote on the Plan, and (iv) the estimated recoveries for holders of Claims and Interests.  The table is qualified in its entirety by reference to the full text of the Plan.  For a more detailed summary of the terms and provisions of the Plan, see Section VI—Summary of the Plan below.  A detailed discussion of the analysis underlying the estimated recoveries, including the assumptions underlying such analysis, is set forth in the Valuation Analysis in Section VIII.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery | Estimated Amount of Allowed Claims or Interests |
|---|---|---|---|---|---|---|
| 1 | Priority Non-Tax Claims | The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim will receive, in full and final satisfaction, | Unimpaired | No (Deemed to accept) | 100% | $0 - $150,000 |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery | Estimated Amount of Allowed Claims or Interests |
|---|---|---|---|---|---|---|
| | | compromise, settlement, release, and discharge of and in exchange for such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business, will be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities without further actions by holders of such Priority Non-Tax Claims or further approval by the Bankruptcy Court. | | | | |
| | | Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Priority Non-Tax Claims Retained Amount.  Distributions from the Priority Non-Tax Claims Retained Amount will be available for Priority Non-Tax Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter.  Any amounts remaining after payment of all Allowed Priority Non-Tax Claims will be distributed as provided in Section 6.16 of the Plan. | | | | |
| 2 | Other Secured Claims | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) Reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy the provisions of section 1129(a)(9) of the Bankruptcy Code.

Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Other Secured Claims | Unimpaired | No (Deemed to accept) | 100% | $0 - $150,000 |

RLF1 17158271V.1

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery | Estimated Amount of Allowed Claims or Interests |
|---|---|---|---|---|---|---|
|  |  | Retained Amount.  Distributions from the Other Secured Claims Retained Amount will be available for Other Secured Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter, except for Other Secured Claims that will be Reinstated on the Effective Date.  Any amounts remaining after payment of all Allowed Other Secured Claims will be distributed as provided in Section 6.16 of the Plan. |  |  |  |  |
| 3 | Revolver Secured Claims and Term Loan Secured Claims | Settled Claims comprising Revolver Secured Claims and Term Loan Secured Claims will be Allowed.  On the Effective Date, each holder of an Allowed Revolver Secured Claim or an Allowed Term Loan Secured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, in exchange for and on account of such Allowed Revolver Secured Claim or Allowed Term Loan Secured Claims, as applicable: its Pro Rata share of (i) Cash Collateral, (ii) Unencumbered Cash in an amount equal to the Settled Adequate Protection Claim, and (iii) the Take Back Debt.  For the avoidance of doubt, the Existing Letters of Credit will continue to remain outstanding, pursuant to and subject to the terms of the Existing L/C Escrow Agreement(s) and the New Letter of Credit Agreement. | Impaired | Yes | 31% | $1,419,550,000 |
| 4 | Senior Notes Claims and Secured Lender Unsecured Claims | For purposes of treatment in Class 4, (i) Settled Claims comprising Term Loan Unsecured Claims will be Allowed in the aggregate principal amount of approximately Six Hundred Forty-Two Million Dollars ($642,000,000) and (ii) Settled Claims comprising Revolver Unsecured Claims will be Allowed in the aggregate principal amount of approximately Seven Hundred Seventy-Seven Million Dollars ($777,000,000).  On the Effective Date, each holder of an Allowed Senior Notes Claim or an Allowed Secured Lender Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, in exchange for and on account of such Allowed Claim, its Pro Rata share of (i) the Net Distributable Cash and (ii) the New Equity Interests (subject to dilution by the Management Incentive Plan Securities).  Distributions received under the Plan by holders of Allowed Senior Notes Claims will be subject to the rights of the Senior Notes Indenture Trustee to payment of fees, expenses, indemnification obligations, and Liens, including any charging lien, securing such right to payment under the Senior | Impaired | Yes | 23% - 29% | $2,440,300,000 |

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery | Estimated Amount of Allowed Claims or Interests |
|---|---|---|---|---|---|---|
| | | Notes Indenture.  The Senior Notes Indenture Trustee's exercise of its charging lien will occur before any distributions are made to holders of Allowed Senior Notes Claims.<br><br>Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Class 4 Disputed Claims Reserve and will withhold New Equity Interests in respect of Disputed Claims in Class 4, if any, in accordance with Section 7.7 of the Plan.  Any amounts remaining after payment of all Disputed Claims in Class 4 will be distributed as provided in Sections 6.16 and 7.7 of the Plan. | | | | |
| 5 | General Unsecured Claims | Except to the extent that a holder of an Allowed General Unsecured Claim and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, in exchange for, and on account of such holder's rights with respect to and under such Allowed General Unsecured Claim its Pro Rata share of the General Unsecured Claims Distribution, which will be Cash in the amount equal to the lesser of (a) 26% of the amount of such holder's Allowed General Unsecured Claim and (b) its Pro Rata share of $5 million, or such higher amount as may be agreed between the Debtors and the Requisite Lenders, subject to Section 7.7 of the Plan.<br><br>Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the General Unsecured Claims Reserve in Cash.  Distributions from the General Unsecured Claims Reserve will be available for General Unsecured Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter. Any amounts remaining after payment of all Allowed General Unsecured Claims will be distributed as provided in Sections 6.16 and 7.7 of the Plan. | Impaired | Yes | 23% - 26% | $10,000,000 - $22,000,000[3] |

---

[3] This amount does not include estimated amounts for any rejection damages claims that may be asserted at a later date.

| Class | Claim or Equity Interest | Treatment | Impaired or Unimpaired | Entitlement to Vote on the Plan | Approx. Percentage Recovery | Estimated Amount of Allowed Claims or Interests |
|---|---|---|---|---|---|---|
| 6 | Intercompany Claims | On or after the Effective Date, all Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Reorganized Debtors in their sole discretion.  All Intercompany Claims between any Debtor and a non-Debtor affiliate will be Unimpaired under the Plan. | Unimpaired | No (Deemed to accept) | 100% | N/A |
| 7 | Subordinated Claims | Subordinated Claims are subordinated to Claims in Class 5 or to the same priority as Parent Interests in Class 8, as applicable, pursuant to the Plan and section 510 of the Bankruptcy Code. The holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Claims. | Impaired | No (Deemed to reject) | 0% | N/A |
| 8 | Parent Interests | After giving effect to the Restructuring Transactions, all Parent Interests will be deemed valueless and will not receive any distribution under the Plan.  Parent Interests will be treated in accordance with the U.K. Administration. | Impaired | No (Deemed to reject) | 0% | N/A |
| 9 | Intercompany Interests | On the Effective Date, at the option of the Reorganized Debtors and with the reasonable consent of the Term Loan Agent and the Revolving Credit Facility Agent, all Allowed Intercompany Interests will either (i) remain unaffected by the Plan and continue in place following the Effective Date or (ii) be cancelled (or otherwise eliminated) and holders of such cancelled Intercompany Interests will not receive or retain any property under the Plan. | Unimpaired / Impaired | No (Deemed to accept/reject) | 0% or 100% | N/A |

**WHERE TO FIND ADDITIONAL INFORMATION**:  Paragon Parent currently files quarterly and annual reports with, and furnishes other information to, the Securities and Exchange Commission ("**SEC**").  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link.  Each of the following filings is incorporated as if fully set forth herein and is a part of this Disclosure Statement.  Later information filed with the SEC that updates information in the filings incorporated by reference will update and supersede that information:

- Form 10-K for the fiscal year ended December 31, 2015, filed with the SEC on March 11, 2016.

- Form 10-Q for the quarter ended March 31, 2016, filed with the SEC on May 10, 2016, Form 10-Q for the quarter ended June 30, 2016, filed with the SEC on August 9, 2016, and Form 10-Q for the quarter ended September 30, 2016, filed with the SEC on November 9, 2016.

- Forms 8-K filed with the SEC on March 24, 2016, April 7, 2016, July 29, 2016, August 8, 2016, August 10, 2016, November 29, 2016, and January 18, 2017.

7

**II.**
**OVERVIEW OF THE DEBTORS' OPERATIONS**

    **A.**    **The Debtors' Business**

Paragon Parent, along with its Debtor and non-Debtor subsidiaries (collectively, the "**Paragon Group**" or the "**Company**"), is a global provider of offshore drilling rigs.  Paragon's operated fleet includes 34 jackups, including two high-specification, heavy duty/harsh environment jackups, and five floaters (four drillships and one semisubmersible).  Paragon's primary business is contracting its rigs, related equipment and work crews to conduct oil and gas drilling and workover operations for its exploration and production customers on a dayrate basis around the world.  Paragon's principal executive offices are located in Houston, Texas.  Paragon Parent is a public limited company registered in England and Wales with company number 08814042 and registered office at 20-22 Bedford Row, London, WC1R 4JS, England.

For the year ended December 31, 2015, the audited and consolidated financial statements of the Paragon Group reflected total revenues of approximately $1,492,428,000 and a net loss of $941,374,000.  As of December 31, 2015, the Paragon Group's audited and consolidated balance sheet reflected assets totaling approximately $2,383,865,000 and liabilities totaling approximately $2,890,455,000.  Each of the Debtors is either an issuer or guarantor of the Paragon Group's debt.

    **B.**    **The Company's Drilling Fleet and Drilling Contracts**

The Company's drilling fleet is composed of 34 jackup rigs, four drillships, and one semisubmersible. Jackup rigs are mobile, self-elevating drilling platforms equipped with legs that can be lowered to the ocean floor.  Each of the Company's jackups is cantilevered, meaning that the drilling platform may be extended out from the hull to perform drilling or workover operations over pre-existing platforms or structures.  Drillships are self-propelled vessels that maintain their position over a well through the use of a fixed mooring system or a computer-controlled dynamic positioning system.  Semisubmersibles are floating platforms that can be submerged to a predetermined depth so that a portion of the hull is below the water surface during drilling in order to improve stability.  Similar to drillships, semisubmersibles maintain their position over a well through the use of a fixed mooring system or a computer-controlled dynamic positioning system.

The Company operates for leading national, international, and independent oil and gas companies in active hydrocarbon producing markets, principally in the North Sea, the Middle East, and India.

    **1.**    **The North Sea**

The Company presently has nine jackups and one semisubmersible in the North Sea.  The units typically operate in the British and Dutch sectors of the North Sea for independent oil and gas companies.  Two of the nine jackups are high-specification rigs currently operating in the North Sea that were acquired through Paragon Parent's acquisition in late 2014 and early 2015 of Prospector Offshore Drilling S.A. ("**Prospector**").  Additionally, Paragon Parent acquired certain subsidiaries of Prospector that have contracted to build three new high specification rigs.  The acquisition of the Prospector assets, which are owned by non-Debtor subsidiaries and are not subject to these proceedings, is described further in Section II.C herein.  The remainder of the North Sea assets are standard specification rigs.  The Company currently has seven jackups and one semisubmersible that are stacked in the North Sea.

### 2.    Africa

The Company presently has three jackups in West Africa, where the Company's customers are predominantly a mix of U.S. (e.g., Noble Energy, Marathon Oil Corporation), European (e.g., Perenco, Dana Incorporated, Glencore) and indigenous African (e.g., South Atlantic Petroleum, PanAfrican Energy) independent exploration and production companies.  Currently, all three of the Company's jackups in West Africa are stacked.

### 3.    The Middle East

The Company presently has seven jackups in the Middle East, working primarily for national oil companies in the United Arab Emirates ("**UAE**").  Five of the Company's jackups in the Middle East are currently stacked.  In October 2016, the Company received an early termination notice for one of the jackups in the Middle East.  The Company also has one drillship stacked in the Middle East.

### 4.    India

The Company presently has three jackups via modified bareboat charters in India.  Through this structure, the Company charters these jackups to a local operating company, which then contracts these jackups to the Oil and Natural Gas Corporation, the Indian state-owned oil company.

### 5.    Mexico and the U.S. Gulf of Mexico

Eleven jackup rigs and one drillship are stacked in the U.S. Gulf of Mexico.  The Debtors' previous operations in Mexico were entirely with Petróleos Mexicanos ("**Pemex**"), the Mexican state-owned oil company.  Pemex accounted for 9% of the Debtors' operating revenues in 2015, 16% of the Debtors' operating revenues in 2014, and 19% of the Debtors' operating revenues in 2013.

### 6.    Southeast Asia

The Company has one jackup stacked in Malaysia.

### 7.    Puerto Rico

The Company has two drillships stacked in Puerto Rico.

### C.    The Debtors' History and Organizational Structure

### 1.    Spin-Off from Noble Corporation

The Company was founded through a spin-off from Noble Corporation plc ("**Noble**"), an offshore drilling company incorporated as a public limited company under the laws of England and Wales with a principal place of business in Houston, Texas.  Paragon Parent was incorporated on December 13, 2013 as "Noble Spinco Limited" and, on February 7, 2014, changed its name to "Paragon Offshore Limited."  On July 17, 2014, Paragon Parent was re-registered as "Paragon Offshore plc," a public limited company under the laws of England and Wales with a principal place of business in Houston, Texas.

On August 1, 2014, Noble completed the spin-off of the Company by (i) transferring to Paragon Parent the assets and liabilities constituting most of Noble's standard specification drilling business (the "**Separation**") and (ii) making a *pro rata* distribution to its shareholders of all of Paragon Parent's issued and outstanding ordinary shares (the "**Distribution**" and, together with the Separation, the "**Spin-Off**").

The rigs comprising Noble's standard specification business consisted of 34 jackups, five drillships, three semisubmersibles, a floating production, storage, and offloading vessel ("**FPSO**"), and related assets and businesses.  In exchange, Paragon Parent granted Noble an intercompany note in the amount of approximately $1,730,000,000 and incurred various liabilities accruing before and after completion of the Spin-Off.  Additionally, Paragon Parent borrowed $650,000,000 under the Term Loan Agreement and issued $1,080,000,000 under the Senior Notes Indenture.  Paragon Parent used these borrowings to satisfy the intercompany note.  The rigs transferred to the Company through the Spin-Off had an average age of 35 years.  Paragon Parent did not have any material assets or liabilities prior to the Spin-Off.

During 2014, the Company identified indicators of impairment, including lower crude oil prices, a decrease in contractual activities particularly for floating rigs, and resultant projected declines in dayrates and utilization.  In the fourth quarter of 2014, the Company concluded that a triggering event occurred requiring it to perform an impairment analysis of its fleet of drilling rigs. The Company compared the net book value of its drilling rigs to the relative recoverable value, which was determined using an undiscounted cash flow analysis.  As a result of this analysis, Paragon Parent determined that three of its rigs and its FPSO were impaired.  Paragon Parent also decided to scrap four other vessels at this time.  Each of these rigs was acquired from Noble in connection with the Spin-Off.  Paragon Parent's estimate of fair value of these drilling rigs resulted in the recognition of an impairment loss of $1.1 billion for the year ended December 31, 2014.

## 2.    Prospector Acquisition

On November 17, 2014, Paragon Parent acquired 89.3 million, or 94.4%, of the outstanding shares of Prospector, an offshore drilling company organized in Luxembourg and traded on the Oslo Axess, from certain shareholders and in open market purchases for approximately $190 million in cash.  In December 2014, Paragon Parent purchased an additional 4.1 million shares of Prospector for approximately $10 million in cash, increasing its ownership to approximately 93.4 million shares, or 98.7%.  On January 22, 2015, Paragon Parent settled a mandatory tender offer for additional outstanding shares, increasing its ownership to approximately 99.6% of the outstanding shares of Prospector.  Finally, on February 23, 2015, Paragon Parent acquired all remaining issued and outstanding shares in Prospector.  In the aggregate, Paragon Parent spent approximately $202 million to acquire 100% of Prospector and funded the purchase of these shares using proceeds from the Revolving Credit Facility and cash on hand.  During the first quarter of 2015, Paragon Parent repurchased $100 million par value of Prospector's 2019 Second Lien Callable Bonds at a price of 101% of par, plus accrued interest, pursuant to change of control provisions under the bonds.  Paragon Parent also repaid the principal balance outstanding under Prospector's 2018 Senior Secured Credit Facility, which totaled approximately $261 million (including accrued interest).  Paragon Parent made these payments through the use of cash on hand and borrowings under the Revolving Credit Facility.

The Prospector acquisition expanded and enhanced Paragon's global fleet by adding two high specification jackups contracted to Total E&P U.K. Limited and Elf Exploration U.K. Limited for use in the United Kingdom region of the North Sea.  Moreover, Paragon acquired subsidiaries of Prospector that contracted for the construction of three newbuild high specification jackup rigs in China by Shanghai Waigaoqiao Ship Co. Ltd. ("**SWS**").  The three rigs are currently scheduled for delivery in October 2017.  Each newbuild is being built pursuant to a contract between one of Prospector's subsidiaries and SWS, without a Paragon Parent or Prospector parent company guarantee or other direct recourse to any other subsidiary of Paragon Parent other than the applicable Prospector subsidiary.

On July 24, 2015, the Company executed a combined $300 million transaction with subsidiaries of SinoEnergy (collectively, the "**Lessors**") relating to the two high specification jackup units acquired in the Prospector acquisition.  The Company sold these rigs to the Lessors and immediately leased them

from Lessors for a period of five years with a repurchase obligation at the end of the lease term pursuant to a lease agreement for each unit (the "**Lease Agreements**").  The Lease Agreements provide for an event of default if Paragon Parent files a case under chapter 11 of the Bankruptcy Code.  Due to the filing of its Chapter 11 Cases, Paragon Parent negotiated a forbearance under the Lease Agreements through April 15, 2016, which was subsequently extended through March 7, 2017.  On March 7, 2017, the Company obtained a forbearance through August 1, 2017, that becomes a permanent waiver of the event of default upon the Effective Date of the Plan.  Approximately 11.3% of Paragon's EBITDA for calendar year 2015 was attributable to the Prospector entities.

### 3.  Corporate Structure

The Debtors have incorporated entities in a number of jurisdictions, including the Bahamas, Bermuda, Brazil, Cayman Islands, Cyprus, Delaware, Hungary, India, Luxembourg, Malaysia, Mexico, the Netherlands, Nigeria, Norway, Scotland, Singapore, Switzerland, and Venezuela.  All of the Debtors are direct or indirect subsidiaries of Paragon Parent, and, together, constitute the issuers and guarantors of all of the Paragon Group's debt.  Paragon's corporate structure chart, attached hereto as **Exhibit B**, along with the Prospector corporate structure chart, attached hereto as **Exhibit C**, provide an illustrative representation of the corporate structure of the Paragon Group and Prospector.

### D.  Directors and Officers

Paragon Parent's current board of directors is composed of J. Robinson West, Chairman, Anthony R. Chase, Thomas L. Kelly II, John P. Reddy, Dean E. Taylor, and William L. Transier.

Paragon Parent's current senior management team is composed of Dean E. Taylor, Interim President and Chief Executive Officer, Lee M. Ahlstrom, Senior Vice President and Interim Chief Financial Officer, William C. "Charlie" Yester, Senior Vice President—Operations, Andrew W. Tietz, Senior Vice President—Marketing and Contracts, Anirudha "Sunil" Pangarkar, Senior Vice President—Special Projects, Supply Chain and Maintenance, Todd D. Strickler, Senior Vice President of Administration, General Counsel and Corporate Secretary, and Ale Veltmann, Vice President—Chief Accounting Officer.

On November 10, 2016, the Company's board of directors announced that it had appointed Dean E. Taylor to serve as Interim President and Chief Executive Officer, and Lee M. Ahlstrom to serve as Interim Chief Financial Officer.

The composition of the board of directors of each Reorganized Debtor will be disclosed prior to the entry of the order confirming the Plan in accordance with 11 U.S.C. § 1129(a)(5).

### E.  Regulation of the Debtors' Business

The Debtors' operations are conducted in the United States and foreign jurisdictions and are subject to governmental laws, regulations, and treaties in the countries in which they operate.  The laws, regulations, and treaties that impact the Debtors' operations include those relating to the operation of drilling units, environmental protection, health and safety, various restrictions on oil and natural gas exploration and development, taxation of the Debtors' earnings and the earnings of the Debtors' expatriate personnel, immigration restrictions for expatriate personnel, minimum requirements for the use of local employees and suppliers, duties and restrictions on the importation and exportation of drilling units and other equipment, local currency requirements, and restrictions on repatriated cash.

F.    **The Debtors' Capital Structure**

1.    **Equity Ownership**

Paragon Parent is a public company and files annual reports with, and furnishes other information to, the SEC.  Before December 18, 2015, the ordinary shares of Paragon Parent were traded on the New York Stock Exchange (the "**NYSE**") under the symbol "PGN."  On August 6, 2015, Paragon Parent received a letter from the NYSE stating that Paragon Parent was not in compliance with the NYSE's continued listing standards.  Specifically, the letter noted that for 30 consecutive trading days, the average closing price for the ordinary shares of Paragon Parent was below the minimum $1.00 per share requirement for continued listing on the NYSE.  On December 17, 2015, Paragon Parent received a letter (the "**Suspension Notice**") from the NYSE notifying the Company that the NYSE had suspended trading in Paragon Parent's shares effective immediately.  The NYSE determined that Paragon Parent's ordinary shares were no longer suitable for listing based on "abnormally low" price levels.  Paragon Parent's ordinary shares have been trading on the over the counter markets under the trading symbol "PGNPF" between December 18, 2015 and February 12, 2016 and under the symbol "PGNPQ" since February 14, 2016.

2.    **Prepetition Indebtedness**

The Debtors' significant prepetition indebtedness included secured financing obligations in the amount of approximately $1,437,537,000 and unsecured financing obligations in the amount of approximately $1,020,750,000.  The Debtors' secured and unsecured financing obligations are described in greater detail below.  Such description is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.  As noted above, substantially all of the Paragon Group's debt is issued or guaranteed by the Debtors.

(a)    **Revolving Credit Facility**

Paragon Parent and Paragon International Finance Company are borrowers under that certain Senior Secured Revolving Credit Agreement, dated as of June 17, 2014, by and among Paragon Parent and Paragon International Finance Company, as borrowers, the lenders and issuing banks party thereto from time to time, JPMorgan Chase Bank, N.A., as administrative agent (the "**Revolving Credit Facility Agent**"), J.P. Morgan Securities LLC, Deutsche Bank Securities Inc. and Barclays Bank plc, as Joint Lead Arrangers and Joint Lead Bookrunners, and certain other parties thereto, (as amended, restated, modified, or supplemented from time to time, the "**Revolving Credit Agreement**").  The Revolving Credit Agreement provides for revolving credit commitments, including letter of credit commitments and swingline commitments, in an aggregate principal amount of $800,000,000 (the "**Revolving Credit Facility**," and the amounts outstanding thereunder, the "**Revolving Loans**").  The Revolving Credit Agreement is secured by a first priority lien as described in clause (c) below.  The Revolving Credit Agreement matures in July 2019.

On September 3, 2015, Paragon Parent borrowed approximately $332,000,000 under the Revolving Credit Agreement, which represented substantially all of the remaining undrawn amount that was available to Paragon Parent under the Revolving Credit Facility at that time.  On December 23, 2015, Paragon Parent borrowed an additional $11,500,000 under the Revolving Credit Facility.  Such proceeds are being held in a deposit account in the name of Paragon Parent and have not been commingled with other funds.  As of the date hereof, the aggregate principal amount outstanding under the Revolving Credit Agreement is $709,100,000 in unpaid principal, plus interest, fees, and other expenses, in addition to approximately $68,575,000 of letters of credit.  The Revolving Loans bear interest, at Paragon Parent's option, at either (i) an adjusted LIBOR plus an applicable margin ranging between 1.50% to 2.50%,

depending on the Leverage Ratio (as defined in the Revolving Credit Agreement), or (ii) a base rate plus an applicable margin ranging between 0.50% to 1.50%, depending on the Leverage Ratio (as defined in the Revolving Credit Agreement).

(b)    **Term Loan**

Paragon Offshore Finance Company is the borrower under that certain Senior Secured Term Loan Agreement, dated as of July 18, 2014, by and among Paragon Parent, as the parent guarantor, Paragon Offshore Finance Company, as borrower, the lenders party thereto, and Cortland Capital Market Services LLC, as successor administrative agent (as amended, restated, modified, or supplemented from time to time, the "**Term Loan Agreement**").  The Secured Term Loan Agreement provided for a term loan in an aggregate principal amount of $650,000,000 (the "**Term Loan**").  The Term Loan is secured by a first priority lien as described in clause (c) below.  The Term Loan matures in July 2021.

As of the date hereof, the aggregate principal amount outstanding under the Term Loan Agreement is approximately $641,875,000 in unpaid principal, plus interest, fees, and other expenses.  The Term Loan bears interest at LIBOR plus 2.75%, subject to a minimum LIBOR rate of 1% or a base rate plus 1.75%, at Paragon Offshore Finance Company's option.

(c)    **Guaranty and Collateral Agreement**

The obligations of Paragon Parent, Paragon International Finance Company, Paragon Offshore Finance Company, and the Debtor-guarantors, as applicable, under the Revolving Credit Agreement and the Term Loan Agreement are together secured pursuant to that certain Guaranty and Collateral Agreement, dated as of July 18, 2014 (as amended, restated, modified, or supplemented from time to time, the "**Guaranty and Collateral Agreement**"), in favor of JPMorgan Chase Bank, N.A., as collateral agent (the "**Collateral Agent**").  Pursuant to the Guaranty and Collateral Agreement, each of the Debtors granted a first-priority lien on substantially all of its property other than "**Excluded Assets**," which Excluded Assets include, among other things, any deposit accounts and securities accounts, any Capital Stock in Unrestricted Subsidiaries (as defined in the Revolving Credit Agreement and Term Loan Agreement), and owned or leased real property.  The collateral includes the Collateral Rigs (as defined in the Revolving Credit Agreement and Term Loan Agreement), capital stock of (i) the owners of the Collateral Rigs, (ii) Paragon International Finance Company, and (iii) Paragon Offshore Finance Company and certain other property pledged under the Collateral Documents (as defined in the Revolving Credit Agreement and Term Loan Agreement).  In addition, certain guarantors under the Guaranty and Collateral Agreement executed and delivered to the Collateral Agent mortgages for each of the Collateral Rigs.

(d)    **6.75% and 7.25% Senior Notes**

Paragon Parent is party to that certain Senior Notes Indenture, dated as of July 18, 2014, by and among Paragon Parent, as issuer, each of the guarantors named therein, and Deutsche Bank Trust Company Americas, as trustee, and the other parties thereto (as amended, restated, modified, or supplemented from time to time, the "**Senior Notes Indenture**"), pursuant to which the Company issued 6.75% Senior Notes due 2022 in the aggregate principal amount of $500,000,000 (the "**6.75% Senior Notes**") and 7.25% Senior Notes due 2024 in the aggregate principal amount of $580,000,000 (the "**7.25% Senior Notes**" and, together with the 6.75% Notes, the "**Notes**").  As of the date hereof, the aggregate amount outstanding under the 6.75% Senior Notes is approximately $456,572,000 in unpaid principal, plus interest, fees, and other expenses, and the aggregate amount outstanding under the 7.25% Senior Notes is approximately $527,010,000 plus interest, fees, and other expenses.

### G. Significant Prepetition Contracts and Leases

As more fully described in this Disclosure Statement, the Paragon Group's most significant contracts are, and have been, its revenue contracts with its customers, which include, and have included, leading national, international, and independent oil and gas companies. The Company contracts its rigs, related equipment and work crews to conduct oil and gas drilling and workover operations for its exploration and production customers on a dayrate basis around the world. These contracts may vary in duration, as the Company contracts its services for a specific period of time or a period necessary to drill a defined number of wells. The Company also has contracts with numerous vendors, some of which are key to its business, relating to the provision of equipment, personnel, or services necessary to support its business. During its Chapter 11 Cases, the Company plans to operate in the ordinary course and to continue its relationships with its contract counterparties and vendors without interruption.

In connection with the Spin-Off, Noble, Paragon Parent, and certain of their respective subsidiaries entered into the following agreements (collectively, the "**Separation Agreements**")[4]:

- that certain Master Separation Agreement (the "**Master Separation Agreement**"), dated as of July 31, 2014, by and between Noble and Paragon Parent, which details the actions necessary to effectuate the Spin-Off;

- that certain Tax Sharing Agreement (the "**Tax Sharing Agreement**"), dated as of July 31, 2014, by and between Noble and Paragon Parent, which generally requires Paragon Parent to indemnify Noble for all taxes attributable to the standard specification drilling business, and in turn requires Noble to indemnify Paragon Parent against all taxes attributable to the high specification drilling business; and

- that certain Employee Matters Agreement, dated as of July 31, 2014, by and between Noble and Paragon Parent, under which Paragon Parent assumed certain Noble employment plans and created certain new plans to provide employee benefits.

Each of the Agreements is governed by New York law.

In addition to their contracts in the ordinary course of business and the Separation Agreements, the Debtors have an office lease in Houston, Texas, where their corporate headquarters are located. The Debtors also own and lease administrative offices, marketing offices, and sites used primarily for storage, maintenance, and repairs for drilling rigs and equipment in various locations worldwide.

### III.
### KEY EVENTS LEADING TO THE COMMENCEMENT OF CHAPTER 11 CASES

### A. Collapse in Oil Prices

Demand for drilling services depends on, among other things, commodity prices, actual or potential changes in these prices, and the level of activity in offshore oil and gas exploration and development and production markets (which may be significantly affected by the prices of these commodities). As a result, the offshore contract drilling industry is a cyclical business, with periods of high demand, short rig supply, and high dayrates when the price of oil is high, followed by periods of lower demand, excess rig supply, and low dayrates when the price of oil is low. Additionally, the offshore drilling business is

---

[4] Descriptions of the Agreements provided herein are for the convenience of the Bankruptcy Court and parties in interest. To the extent there are any ambiguities or inconsistencies between the summaries and the corresponding document, the terms of the latter shall govern in all respects.

highly competitive.  Contracts are traditionally awarded on a competitive bid basis and, in times of low oil prices, offshore drilling companies may be forced to idle, stack, or scrap rigs, adversely affecting their revenues and profitability.

In the summer of 2014, Brent crude oil prices – a key factor in determining customer activity levels – began to decline, dropping from roughly $115 per barrel in June 2014 to approximately $60 per barrel by December of the same year.  As a result of this swift and substantial decline in oil prices, many of the Debtors' customers (which include national, international, and independent oil and gas companies) reduced their exploration and development capital expenditures by as much as 20 to 25% in 2015.  Oil prices continued to decline in 2015, closing at $37.28 per barrel on December 31, 2015 – an additional 35% decrease over the course of a volatile year.  This reduced demand has led to an oversupply of rigs competing for limited tendering activity.  The oversupply of rigs has been compounded by a significant expansion of supply of (mostly non-contracted) newbuild rigs in recent years.  As of the Petition Date, Brent crude oil prices had declined by an additional approximately 10%.  Several exploration and production companies announced that they planned to reduce capital spending by 20% or more in 2016 as a result of expectations of continued low commodity prices.

Because of the amount of debt the Debtors incurred in connection with the Spin-Off and the nature of the assets acquired, the Debtors were not equipped to absorb the ongoing and precipitous decline in oil and gas prices and the corresponding decline in demand for their services.  Although the Debtors do not face any maturities on their secured debt until 2019, the severity and duration of the market downturn has increased the risk that existing customer contracts, some of which are due to expire in the near term, will not be renewed or will be renewed at materially reduced prices.  The Debtors have also suffered the effects of termination of longer-term contracts, such as the Pemex Contracts and Petrobras Contracts (as defined and described below).

### B.    Contract Terminations and Renegotiations

Throughout 2015, a number of drilling contractors reported contract cancellations by their customers.  The terms of certain of the Paragon Group's drilling contracts permit early termination of the contract by the customer, without cause, generally exercisable upon advance notice to the Company and, in some cases, without requiring an early termination payment.  In May 2015, one of Paragon Parent's subsidiaries received written notices of termination from Pemex with respect to drilling contracts on three of the Company's jackups (the "**Pemex Contracts**").  Under these contracts, Pemex had the right to terminate upon 30 days' notice without making an early termination payment.  The three rigs are currently stacked.  Additionally, Pemex offered Paragon Parent the option of accepting significantly lower dayrates or facing early termination with respect to rigs that remained under contract to Pemex.  By the end of 2015, Pemex went from being one of Paragon Parent's largest customers to employing only a single working rig.  The Company's last remaining contract with Pemex terminated in March of 2016.

In addition to Pemex, another large customer, Petrobras, has contested the term of each of the Company's drilling contracts (the "**Petrobras Contracts**") for the Paragon DPDS2 and the Paragon DPDS3 in connection with the length of prior shipyard projects relating to these rigs and released the Paragon DPDS2 effective September 29, 2015. Under the Company's interpretation of the Petrobras Contracts, the Paragon DPDS3 was scheduled to work until August 2017.  However, in accordance with Petrobras' interpretation of the Petrobras Contracts, the Paragon DPDS3 was released in August 2016.  Both rigs are currently stacked in a shipyard in Puerto Rico.  Backlog related to this dispute is not included in the Company's reported backlogs as of September 30, 2016. Paragon will vigorously pursue all legal remedies available to it under the Petrobras Contracts.

Furthermore, as exploration and production companies seek to reduce expenses, they have approached the Company and other drilling companies to seek reductions in current contract dayrates.  Referred to as "blend and extend" discussions, these conversations are sometimes mutually beneficial – for example, if a drilling contractor agrees to lower its contract dayrate in exchange for an exploration and production company's agreement to add time to the contract term.  In some cases, such as those the Company faced in Mexico, drilling contractors may have no choice but to lower their dayrates or face termination.  The Company has been (and may continue to be) engaged in similar discussions, which could have negative near-term impacts on revenues despite potentially providing longer-term contracts.

### C.    Prepetition Deleveraging Initiatives

In the fall of 2015, facing a continuing decline in Brent crude oil prices and corresponding decline in demand for offshore drilling services, the Debtors, under the direction of an independent committee of Paragon Parent's Board of Directors, retained restructuring advisors to explore long-term solutions to improve Paragon Parent's overall balance sheet strength and to engage the company's lenders and noteholders with the intent of maximizing value for the company's shareholders and other stakeholders.  On February 12, 2016, the Debtors entered into a plan support agreement (the "**Plan Support Agreement**") with the Revolving Lenders and an ad hoc group of holders of Senior Notes Claims (the "**Noteholders**") regarding the terms of a consensual restructuring.

As discussed further below, on November 29, 2016, the Revolving Lenders and the Noteholders gave notice of the termination of the Plan Support Agreement, effective December 2, 2016, as a result of, among other things, the lapse of the outside milestone date required under the Plan Support Agreement for confirmation of the Second Amended Plan (as defined herein).

### IV.
### EVENTS DURING THE CHAPTER 11 CASES

The Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on February 14, 2016 (the "**Petition Date**").  The filing of the petitions commenced the Chapter 11 Cases, at which time the Debtors were afforded the benefits, and became subject to the limitations, of the Bankruptcy Code.

### A.    Commencement of Chapter 11 Cases and First Day Motions

The Debtors are operating their business in the ordinary course during the pendency of the Chapter 11 Cases as they had prior to the Petition Date.  To facilitate the prompt and efficient implementation of the Plan through the Chapter 11 Cases, shortly after the Petition Date, the Debtors obtained authority to have the Chapter 11 Cases administered jointly before the Honorable Christopher S. Sontchi.  On the Petition Date, the Debtors also filed various motions seeking relief from the Bankruptcy Court to ensure a seamless transition between the Debtors' prepetition and postpetition business operations, facilitate a smooth reorganization through the Chapter 11 Cases, and minimize any disruptions to the Debtors' operations.  The following is a brief overview of the relief the Debtors obtained to maintain their operations in the ordinary course.

### 1.    Cash Management System

The Debtors maintain a centralized cash management system designed to receive, monitor, aggregate, and distribute cash among the Paragon Group.  On the Petition Date, the Debtors filed a motion seeking authority from the Bankruptcy Court to continue the use of their existing cash management system, bank accounts, and related business forms, as well as to continue their intercompany arrangements with non-Debtors to avoid a disruption in the Debtors' operations and facilitate the efficient administration of the

Chapter 11 Cases. The Bankruptcy Court granted this relief on an interim basis on February 17, 2016, and on a final basis on April 6, 2016.

### 2.    Use of Cash Collateral

To address their working capital needs and fund their reorganization efforts, the Debtors require the use of cash subject to liens (the "**Cash Collateral**") granted in favor of the holders of the Revolver Claims and the Term Loan Claims pursuant to the Guaranty and Collateral Agreement. On the Petition Date, the Debtors filed a motion seeking authority from the Bankruptcy Court to continue to use the Cash Collateral in the ordinary course of business subject to certain restrictions. The Bankruptcy Court granted this relief on an interim basis on February 17, 2016, and on a final basis on March 9, 2016 (Docket No. 140) (as further supplemented and amended, the "**Final Cash Collateral Order**"). The Bankruptcy Court further extended this relief on September 26, 2016 and December 20, 2016. On March 8, 2017, the Debtors filed a motion with the Bankruptcy Court requesting a further extension of this relief through June 5, 2017 (Docket No. 1222). In exchange for the continued use of the Cash Collateral, the Debtors are providing the holders of the Revolver Claims and the holders of the Term Loan Claims with, among other things, first priority replacement liens on the Debtors' unencumbered property and junior replacement liens on certain of the Debtors' encumbered property as adequate protection for any diminution in value of their respective interests in the collateral securing the Revolving Loans under the Revolving Credit Agreement and the Term Loan. In addition, the Debtors' adequate protection obligations constitute superpriority claims under section 507(b) of the Bankruptcy Code.

On February 3, 2017, the Creditors' Committee (as defined below) filed a motion (Docket No. 1078) seeking, the following modifications, among others, to the Final Cash Collateral Order: (i) the Creditors' Committee should receive an additional 45 days from the entry of an order granting the motion to challenge the enforceability, priority or extent of the Revolving Lenders' and Term Lenders' prepetition liens (the "**Challenge Period**"); (ii) up to $150,000 of the Revolving Lenders' and Term Lenders' prepetition collateral should be made available for the Creditors' Committee to challenge the enforceability, priority or extent of the Revolving Lenders' and Term Lenders' prepetition liens; (iii) the fees of the Creditors' Committee's professionals should be included in the Final Cash Collateral Order's fee carveout; and (iv) the Creditors' Committee should receive the same reports relating to Cash Collateral as provided to other parties. On February 21, 2017, the Bankruptcy Court denied the Creditors' Committee's request to extend the Challenge Period, along with the Creditors' Committee's request for $150,000 to be made available to fund an investigation of the prepetition liens. However, the Debtors and the Requisite Lenders agreed that the Creditors' Committee's professional fees will be included in the Final Cash Collateral Order's fee carveout and that the Creditors' Committee will receive the requested reports.

### 3.    Taxes

Pursuant to the Plan, the Debtors intend to pay all taxes and regulatory obligations in full. To minimize any disruption to the Debtors' operations and ensure the efficient administration of the Chapter 11 Cases, on the Petition Date, the Debtors filed a motion seeking authority from the Bankruptcy Court to pay all taxes, fees, and similar charges and assessments that arose prepetition, including any such amounts that become due and owing postpetition, to the appropriate taxing, regulatory, or other governmental authority in the ordinary course of the Debtors' business. The Bankruptcy Court granted this relief on an interim basis on February 17, 2016, and on a final basis on March 8, 2016.

RLF1 17158271V.1

### 4.    Utilities

In the ordinary course of business, the Debtors incur certain expenses related to essential utility services, such as electricity, gas, water, satellite, and telecommunications.  Accordingly, on the Petition Date, the Debtors filed a motion seeking (i) authority from the Bankruptcy Court to continue payments to such utility providers in the ordinary course and (ii) approval of procedures to provide such utility providers with adequate assurance that the Debtors will continue to honor their obligations in the ordinary course.  The Bankruptcy Court granted this relief on an interim basis on February 17, 2016, and on a final basis on March 8, 2016.

### 5.    Insurance

As is common in the contract offshore drilling industry, the Debtors maintain a complex and comprehensive insurance program (the "**Paragon Insurance Program**") designed to protect their property, assets, key personnel, and business operations.  The maintenance of certain insurance coverage is essential to the Debtors' operations and is required by laws, various regulations, financing agreements, and revenue contracts.  The Debtors believe that the satisfaction of their obligations relating to the Paragon Insurance Program, whether arising pre- or postpetition, is necessary to maintain the Debtors' relationships with their insurance providers and ensure the continued availability and commercially reasonable pricing of such insurance coverage.  Accordingly, on the Petition Date, the Debtors filed a motion seeking authority from the Bankruptcy Court to continue to honor their obligations under the Paragon Insurance Program in the ordinary course.  The Bankruptcy Court granted this relief on an interim basis on February 17, 2016, and on a final basis on March 9, 2016.

### 6.    Employee Wages and Benefits

The Debtors' business, including the operation of the Debtors' drilling assets, is labor intensive and relies upon thousands of employees, crew members, and contractors worldwide.  Additionally, many of the Debtors' employees are employed by non-Debtor affiliates who are dependent on funding from the Debtors to compensate these employees.  To minimize the uncertainty and potential distractions associated with the Chapter 11 Cases and the potential disruption of the Debtors' operations resulting therefrom, on the Petition Date, the Debtors filed a motion seeking authority from the Bankruptcy Court to continue to honor their obligations to their workforce in the ordinary course of business, including (i) the payment of pre- and postpetition wages, salaries, reimbursable employee expenses, and accrued and unpaid employee benefits and (ii) the continuation of the Debtors' benefit programs and policies.  The Bankruptcy Court granted this relief on an interim basis on February 17, 2016, and on a final basis on March 8, 2016.

### 7.    Trade Payables

In the ordinary course of business, the Paragon Group incurs various fixed, liquidated, and undisputed payment obligations (the "**Trade Payables**") to various third-party providers of goods and services that facilitate the Debtors' business operations (the "**Trade Creditors**").  On the Petition Date, the Debtors filed a motion seeking interim and final authority from the Bankruptcy Court to pay, in the ordinary course of business, allowed prepetition claims (the "**Trade Claims**") of the Trade Creditors, many of which are located in jurisdictions outside the United States.  The Bankruptcy Court granted this relief on an interim basis on February 17, 2016, and on a final basis on March 8, 2016 (the "**Trade Creditors Order**").  Since the Petition Date, approximately $33.4 million of Trade Claims have been paid pursuant to the Trade Creditors Order.

B.    <u>**Other Procedural Motions and Retention of Professionals**</u>

The Debtors have filed several other motions that are common to chapter 11 proceedings of similar size and complexity as the Chapter 11 Cases, including applications to retain various professionals to assist the Debtors in the Chapter 11 Cases.

C.    <u>**The Original Plan, the Second Amended Plan, and Subsequent Negotiations**</u>

On April 19, 2016, the Debtors filed the *Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors* (Docket No. 318) (together with all supplements thereto, the "**Original Plan**"). The Bankruptcy Court held a confirmation hearing on the Original Plan, which commenced on June 21, 2016 and continued on June 22, 23, 29, and 30, 2016. Thereafter, on July 8, 2016, the Bankruptcy Court conducted a chambers conference with representatives of the Debtors, the Revolving Lenders, the Term Lenders, and the Noteholders. At the chambers conference, the Bankruptcy Court communicated its concerns regarding the feasibility of the Original Plan, including with respect to the achievability of the projected dayrates and rig utilization contemplated by the Debtors' business projections.

To address the Bankruptcy Court's concerns, on August 15, 2016, the Debtors filed the *Modified Second Amended Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors*, dated August 15, 2016 (Docket No. 644) (together with the Original Plan, and with all supplements thereto, the "**Second Amended Plan**"). In connection with the Second Amended Plan, the Debtors prepared an update to their projections reflecting actual financial results through June 30, 2016, and the impact of certain known contracting delays. In addition, the Debtors prepared a downside sensitivity case to their projections illustrating the additional liquidity and financial covenant flexibility required to operate the Debtors' business if the expected market recovery were to be delayed an additional 12 to 18 months (for a total of approximately four (4) years) from what was contemplated under the original projections—including if both dayrates and utilization rates for the Debtors' offshore drilling rigs were significantly lower than expected in their business plan. The Debtors, together with the Revolving Lenders and Noteholders, negotiated certain modifications to the Original Plan that established cushions and additional flexibility even in a downside scenario.

The confirmation hearing on the Second Amended Plan commenced on September 27, 2016 and concluded on September 30, 2016. By oral ruling on October 28, 2016, and by order dated November 15, 2016, the Bankruptcy Court denied confirmation of the Second Amended Plan (Docket No. 890) (the "**Confirmation Decision**").

Consequently, on November 29, 2016, the Revolving Lenders and the Noteholders gave notice of the termination of the Plan Support Agreement, effective December 2, 2016, as a result of, among other things, the lapse of the outside milestone date required under the Plan Support Agreement for confirmation of the Second Amended Plan.

After the Confirmation Decision, the Debtors devoted their time to developing an alternative chapter 11 restructuring proposal that would address the concerns raised by the Bankruptcy Court and form the basis for a consensual deal. First, as the foundation of any restructuring proposal, the Debtors developed a new business plan (the "**New Business Plan**") using significantly more conservative dayrate and rig utilization expectations and assumptions, which have been adjusted as a result of, among other things, the Court's Confirmation Decision and the Debtors' actual financial performance in chapter 11 over the course of this past year. The New Business Plan reflects countless hours of input from the full management team and their professional advisors. The New Business Plan aims to achieve the following goals, among others: (i) reduce cash burn to make the Debtors' business cash flow neutral on an operating basis (excluding discontinued operations, working capital swings and start-up capital and financing expenditures) in the

near-term; (ii) right-size the Debtors' business by reducing its asset base and focusing their operations on key geographical areas, allowing the Debtors to recapitalize with significantly lower fixed costs, less capital, and less debt; and (iii) maximize optionality and value by increasing the runway for the Debtors until a market turnaround at no, or greatly reduced, cost. The New Business Plan was validated by an independent third party and approved by the board of directors of Paragon Parent.

The Plan and the New Business Plan address the concerns that the Bankruptcy Court expressed in the Confirmation Decision about the feasibility of the Second Amended Plan and the Debtors' previous business plan. The key differences between the Plan and Second Amended Plan are, among others: (i) under the Plan, the Debtors will emerge from bankruptcy with only $85 million in debt, whereas, under the Second Amended Plan, the Debtors would have emerged from bankruptcy with over $1.2 billion in debt; and (ii) the reduced size of the Debtors' business upon implementation of the New Business Plan will reduce the future operating costs and cash needs of the Company. The Debtors believe that the Restructuring contemplated by the Plan will enable the Debtors to meet their obligations upon emergence from chapter 11, and confirmation of a Plan is not likely to be followed by liquidation or the need for further financial reorganization.

The Debtors presented the New Business Plan to all three major creditor groups – the Revolving Lenders, the Term Loan Lenders, and the Noteholders – and their advisors, provided their thoughts about the current market and future prospects, and outlined potential constructs for a chapter 11 restructuring that all three creditor groups could support. The Debtors spent hours meeting with and negotiating with all three creditor groups regarding potential proposals for a consensual plan. During these meetings, some of which were held with all creditor groups and others with specific creditor groups, a number of important legal and factual issues were discussed. In addition, since October 2016, the Debtors have responded to each group's numerous diligence requests, held a number of conference calls and face to face meetings with advisors, and in some instances, with principals to discuss the parties' questions and positions regarding the same legal and factual issues.

Ultimately, when the parties could not coalesce around a global deal, the Debtors were faced with the prospect of languishing in chapter 11 indefinitely, to the irreparable detriment of their business, or negotiating, as quickly as possible, a restructuring that two of their three creditor groups could support. The Debtors chose the latter. Within two weeks after negotiations of a global deal stalled, the Debtors arrived at an agreement in principle with the Requisite Lenders, the Term Loan Agent, and the Revolving Credit Facility Agent.

Pursuant to the Debtors' agreement with the Requisite Lenders, the Term Loan Agent, and the Revolving Credit Facility Agent, now embodied in the Plan, approximately $2.4 billion of previously existing debt will be eliminated in exchange for a combination of cash, debt, and to-be-issued new equity. The Term Lenders and Revolving Lenders are projected to receive their pro rata share of approximately $418 million in Cash, subject to certain adjustments, $85 million in Take Back Debt, and approximately 58% of the New Equity Interests. The Noteholders are projected to receive approximately $47 million in Cash, subject to certain adjustments, and approximately 42% of the New Equity Interests. Existing shareholders will not receive a recovery under the Plan. As discussed further below, to effectuate the Restructuring contemplated in the Plan, particularly the treatment of the Parent Interests, Paragon Parent will commence the U.K. Administration.

The foundation of the Plan is the comprehensive, integrated settlement (the "**Plan Settlement**") of a variety of claims that the Secured Lenders have asserted against the Debtors, including the Settled Adequate Protection Claim. Pursuant to the Final Cash Collateral Order, in exchange for the continued use of the Secured Lenders' Cash Collateral, the Debtors provided the Revolving Lenders and Term Loan Lenders with, among other things, first priority replacement liens on the Debtors' unencumbered property

and junior replacement liens on certain of the Debtors' encumbered property as adequate protection for any diminution in value of their respective interests in the collateral securing the Revolving Loans under the Revolving Credit Agreement and the Term Loan.

A critical issue in their negotiations leading up to the formulation of the Plan was the amount of Adequate Protection Obligations.  The Debtors calculated the Adequate Protection Obligations based upon the diminution in value of the Secured Lenders' prepetition Collateral from and after the Petition Date.  The Collateral includes, among other things, the Debtors' rigs, receivables, general intangibles, a portion of the Debtors' Cash, and property, plants and equipment.  Based upon a review of its rig appraisals, historical financial statements, and the New Business Plan, and with the input of their advisors, the Debtors calculated the diminution in value of the various asset classes comprising the Secured Lenders' Collateral.  The analysis revealed that the overall value of the Collateral has diminished by over $300,000,000 since the Petition Date, when taking into account the above factors and all adequate protection payments made and anticipated to be made throughout these cases pursuant to the Final Cash Collateral Order.  Based upon their own analysis, the Secured Lenders contend that the diminution in the value of their Collateral exceeds $600,000,000.  Ultimately, the Debtors and Requisite Lenders agreed upon a Settled Adequate Protection Claim of not less than $352,000,000.

In addition to the Settled Adequate Protection Claims, the Requisite Lenders have agreed to accept Take Back Debt in an amount equal to $85,000,000, notwithstanding the fact that the value of the underlying collateral base value is well in excess of the amount of the Take Back Debt.  Finally, the Secured Lenders have also asserted that approximately $343,000,000 of Cash held by Paragon Parent, which cash is the proceeds of draws under the Revolving Credit Agreement described above, is subject to the Liens of the Secured Lenders.  The Debtors have disputed such assertion.  To avoid the cost and expense of complex litigation regarding this issue, the Requisite Lenders determined to compromise this dispute as part of the overall settlements reflected in the Plan.

The Plan Settlement satisfies the requirements of Bankruptcy Rule 9019, which governs the approval of compromises and settlements.  Bankruptcy Rule 9019 provides that "[o]n motion by the [debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  A settlement does not have to be the best possible compromise; rather, a court should canvass the issues to see whether the settlement "falls below the lowest point in the range of reasonableness."  *In re World Health Alts., Inc.*, 344 B.R. 291, 296 (Bankr. D. Del. 2006) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)); *see also In re Key3Media Grp., Inc.*, 336 B.R. 87, 93 (Bankr. D. Del. 2005) (internal quotations and citations omitted).

Ultimately, a settlement must be fair, reasonable, and in the best interests of the debtors' estates.  *See Law Debenture Trust Co. of New York v. Kaiser Aluminum Corp. (In re Kaiser Aluminum Corp.)*, 339 B.R. 91, 95-96 (D. Del. 2006) (citing *Myers v. Martin (In re Martin)*, 91 F.3d 389, 394 (3d Cir. 1996)) (citations omitted).  In determining whether a settlement should be approved under Bankruptcy Rule 9019, a court must assess and balance the value of the claim being compromised against the value to the estate of the acceptance of the compromise in light of several factors:  (i) the probability of success in litigation; (ii) the likely difficulties in collection; (iii) the complexity of the litigation involved, and the expense, inconvenience, and delay necessarily attending it; and (iv) the paramount interest of the creditors.  *In re Martin*, 91 F.3d at 393.

The Debtors, with the assistance of their legal and financial advisors, have determined that the benefits of the settlement of the Settled Claims outweigh the benefits of litigation, the outcome of which would be uncertain, complex, protracted, and expensive.  Absent a resolution of the Settled Claims, the Debtors would not have been able to achieve consensus with the Requisite Lenders on the term of the

21

Restructuring. Accordingly, the Debtors believe that the Plan Settlement is fair, reasonable and in the best interests of the Debtors' estates.

On February 20, 2017, in an effort to reach a global settlement in these cases, the Debtors, the Term Loan Agent, the Revolving Credit Facility Agent, and the Creditors' Committee agreed to mediate certain issues relating to the Plan and Plan Settlement, including, among others, the Settled Claims and the Noble Settlement Agreement. By order dated February 21, 2017, the Bankruptcy Court assigned these issues to mediation (the "**Mediation**") and appointed the Honorable Kevin J. Carey as mediator (the "**Mediator**") (Docket No. 1140). The Mediation is scheduled to take place on April 5, 2017 and April 6, 2017. If the Mediation is successful, and a global settlement is achieved, the Plan may be amended to reflect such settlement.

### D.    Appointment of Official Committee of Unsecured Creditors

On January 27, 2017, the United States Trustee for the District of Delaware (the "**U.S. Trustee**") appointed a Committee of Unsecured Creditors (the "**Creditors' Committee**") (Docket No. 1059). The three members of the Creditors' Committee are: (i) Loomis Sayles and Co., L.P.; (ii) Arosa Capital Management, L.P.; and (iii) Angelo Gordon & Co., LP. On February 2, 2017, the Creditors' Committee filed applications seeking to retain Paul, Weiss, Rifkind, Wharton & Garrison LLP as counsel (Docket No. 1141) and Young Conaway Stargatt & Taylor, LLP as local counsel (Docket No. 1142). On March 2, 2017, the Creditors' Committee filed an application seeking to retain Ducera Partners LLC as financial advisor (Docket No. 1192).

### E.    Request for Equity Committee

By letter dated January 30, 2017, counsel to certain holders of Paragon equity interests requested that the U.S. Trustee appoint an official committee of equity holders (the "**Equity Committee**"). By letter dated February 17, 2017, the U.S. Trustee declined to appoint an Equity Committee. On March 9, 2017, an unofficial committee of shareholders of Paragon Parent filed a motion with the Bankruptcy Court requesting the appointment of an Equity Committee (Docket No. 1223).

On February 22, 2017, Paragon Parent received a request (the "**EGM Request**") for an Extraordinary General Meeting ("**EGM**") from certain of its shareholders. As disclosed in a Schedule 14N filed with the SEC on February 22, 2017, these shareholders have nominated three (3) board members to replace Paragon Parent's existing board of directors. The Company is reviewing the EGM Request and evaluating potential responses.

### F.    Claims Administration

On December 16, 2016, the Bankruptcy Court entered an order (Docket No. 958) establishing the following bar dates for the filing of Proofs of Claim in these Chapter 11 Cases:

- February 10, 2017 at 5:00 p.m. (prevailing Eastern Time), as the general bar date (the "**General Bar Date**") for all Claims (including Claims by governmental units), except as noted below;

- the later of (a) the General Bar Date and (b) thirty (30) days after the claimant is served with notice of entry of an order of the Bankruptcy Court authorizing the rejection of such executory contract or unexpired lease as the deadline for any claims arising from such rejection; and

- the later of (a) the General Bar Date; and (b) twenty-one (21) days after the claimant is served with notice of an amendment or supplement to the Schedules as the bar date for Claims amended or supplemented by the Debtors' amended or supplemented Schedules.

The General Bar Date has passed, and the Debtors and their advisors are reviewing and analyzing the proofs of claim that have been filed.

### G.    Sale Procedures Motion

As discussed above, the New Business Plan calls for a reduction in the Debtors' fleet to allow them to recapitalize with significantly lower fixed costs, less capital, and less debt.  Consequently, on February 2, 2017, the Debtors filed a motion with the Bankruptcy Court seeking approval of sale procedures to sell *de minimis* assets, including the rigs and related equipment that are not part of the New Business Plan (Docket No. 1074) (the "**Sale Procedures Motion**").  The rigs that the Debtors intend to sell are not being used and will be sold for scrap value.  The Debtors received and resolved certain informal comments received from the Creditors' Committee and the U.S. Trustee.  On February 14, 2017, DC Capital Advisors, Ltd., a shareholder holding approximately 3.5 million shares in Paragon Parent, filed an objection to the Sale Procedures Motion (Docket No. 1117).  The Sale Procedures Motion is scheduled to be heard by the Bankruptcy Court on March 27, 2017.

The Sale Procedures Motion seeks authority to sell or transfer *de minimis* assets – including rigs and related equipment - free and clear of all liens, claims, interests, and encumbrances thereon, subject to the approved sale procedures (the "**Sale Procedures**").  Pursuant to the Sale Procedures, for sales that generate net proceeds of less than $100,000, the Debtors may make the sale or transfer without providing notice or hearing.  If the sale or transfer will generate net proceeds of $100,000-$2.5 million, the Debtors must provide a notice of sale to certain parties including, among others, the Requisite Lenders and any other party that may have an interest in the asset.  The notice parties will have 10 days to object to the sale or transfer, and any unresolved objections must be filed with the Bankruptcy Court.  If no objections are made, the sale or transfer may proceed.  The sale procedures are designed to reduce the burden of seeking court approval for each rig that will be sold for little or no net proceeds.

### H.    The U.K. Administration

Under English law, a public limited company, such as Paragon Parent, cannot cancel its existing equity interests or amend its articles of association and issue new shares of the company to creditors through the chapter 11 proceeding absent shareholder consent. As such shareholder consent will not be sought, to effectuate the reorganization contemplated in the Plan, Paragon Parent is required to implement the U.K. Sale Transaction, and Reorganized Paragon will then issue the New Equity Interests (among other consideration) to holders of Allowed Class 4 Claims on account of such Claims.  Following implementation of the U.K. Sale Transaction, the existing equity shall be deemed valueless and shall not receive any distribution under the Plan. Under English law, absent shareholder consent, Paragon Parent cannot effectuate the reorganization contemplated in the Plan unless it commences the U.K. Administration.

Accordingly, prior to the Effective Date, the directors of Paragon Parent will seek an administration order from the English Court pursuant to paragraph 13 of Schedule B1 of the Insolvency Act 1986 to appoint the U.K. Administrators to implement the U.K. Sale Transaction pursuant to the U.K. Implementation Agreement.  Although the directors of Paragon Parent intend to seek appointment of the U.K. Administrators after the Confirmation Hearing but prior to the Effective Date, if circumstances warrant, the directors of Paragon Parent may seek an administration order from the English Court even earlier, including prior to the Confirmation Hearing.  Upon appointment, the U.K. Administrators will assume the

management of the affairs, business and property of Paragon Parent with all powers necessary or expedient to do so, including the power to effect the U.K. Sale Transaction pursuant to the U.K. Implementation Agreement.

The proposed U.K. Administrators will be certain partners of Deloitte LLP ("**Deloitte**").  Prior to the appointment of the U.K. Administrators, Deloitte will conduct due diligence and complete other preparatory work, including negotiating the U.K. Implementation Agreement with the relevant counterparties.  The Bankruptcy Court has approved Deloitte's retention to perform these services (Docket No. 1044).

The Plan contemplates that the Debtors will effectuate the U. K. Sale Transaction.  As fully set forth in Section VI.D.13 below, and in Section 5.13 of the Plan, prior to the Effective Date, Reorganized Paragon will be formed and will enter into the U.K. Implementation Agreement with Paragon Parent and the U.K. Administrators.  Pursuant to the U.K. Implementation Agreement, and pursuant to the U.K. Administration and the Plan, Reorganized Paragon will, prior to or substantially contemporaneously with the Effective Date, acquire all or substantially all of the Assets of Paragon Parent in consideration for the release in full of the debt outstanding under the Senior Notes, the Term Loan Agreement, and the Revolving Credit Agreement and will issue New Equity Interests to holders of Allowed Senior Notes Claims and the holders of Allowed Secured Lender Unsecured Claims and will enter into, among other things, the Take Back Debt Agreement, the New Letter of Credit Agreement, the Existing L/C Escrow Agreement(s), the Shareholders Agreement and the Registration Rights Agreement with the holders of Allowed Revolver Claims, the holders of Allowed Term Loan Claims and the holders of Senior Notes Claims, as applicable.

**V.**
**MATTERS INVOLVING PARAGON PARENT AND NON-DEBTORS**

      **A.**    <u>Litigation</u>

          **1.**    **Pending Litigation**

The Company is involved in a number of lawsuits and matters which have arisen in the ordinary course of business.  The Company does not expect any liability it may have in these matters to have a material adverse effect on its consolidated financial statements.  The Company, however, cannot predict with certainty the outcome or effect of pending or threatened litigation or legal proceedings, and the eventual outcome could materially differ from its current estimates.

      **B.**    <u>Tax Disputes</u>

In connection with the Spin-Off, Paragon Parent and Noble entered into the Tax Sharing Agreement, under which Paragon Parent is generally responsible for all taxes attributable to its business, whether accruing before, on, or after the date of the Spin-Off.  Noble is generally responsible for any taxes arising from the Spin-Off (and certain related transactions) that are imposed on Paragon Parent, Noble, or any of Noble's subsidiaries, with the exception that Paragon Parent is responsible for any such taxes resulting from certain actions or failures to act by Paragon Parent after the effective date of the Tax Sharing Agreement.

As of December 31, 2016, the Company has received certain tax audit claims, primarily in Mexico and Brazil, attributable to the Company's income, customs and other business taxes.  The Company has contested, or intends to contest, these assessments, including through litigation if necessary.  The

Company has no surety bonds or letters of credit associated with tax audit claims outstanding as of December 31, 2016.

In addition to the tax audit claims, in January 2015, a subsidiary of Noble received an unfavorable ruling from the Mexican Supreme Court on a tax depreciation position claimed in periods prior to the Spin-Off. Although the ruling does not constitute mandatory jurisprudence in Mexico, and the amount of the final liability is generally only a fraction of that initially assessed, the ruling creates potential indemnification exposure for Paragon Parent under the Tax Sharing Agreement.  Noble is the primary obligor to the Mexican tax authorities.

Prior to the Petition Date, Paragon Parent negotiated a settlement agreement by which it will release Noble with respect to certain claims, described further in Section VI.D.16, in exchange for Noble's agreement to provide direct bonding necessary for Paragon Parent to challenge the Mexican tax assessments.  The terms of such agreement are set forth in the Noble Settlement Agreement, filed as **Exhibit D** to the Plan Supplement dated May 20, 2016 (Docket No. 399).  The Noble Settlement Agreement and any amendments thereto will be included in the Plan Supplement.

The Noble Settlement Agreement contemplates that Paragon Parent will fully and unconditionally release Noble and its affiliates and subsidiaries and their respective officers and directors (collectively, the "**Noble Entities**") from any and all claims, obligations, rights, suits, damages, causes of action, remedies and liabilities whatsoever arising under, relating to or in connection with the Spin-Off, whether known or unknown, foreseen or unforeseen, arising on or before the Effective Date; *provided*, however that the Noble Entities will not be released from their respective obligations under the Separation Agreements.  In exchange, Noble will provide direct bonding, in the form of cash, a letter of credit, or any other assurance that satisfies any bonding or surety provider selected by the Noble Entities to issue the bond, to satisfy certain bonding requirements necessary to challenge assessments of applicable income and value-added taxes imposed by Mexican tax authorities relating to the Paragon Group's business for tax years 2005 through and including 2010.  The bonding will also cover any customs taxes for any period or portion thereof prior to the Spin-Off.  Upon final resolution of any assessment for this tax liability (or any portion thereof), Noble will pay 100% of the ultimate resolved amount of such tax for Noble Entities, and 50% of the ultimate resolved amount of such tax for the Paragon Group (except for customs taxes, for which Noble and Paragon Parent will each will pay 50% of the ultimate resolved amount).

In addition, on August 5, 2016, the Debtors entered into a binding term sheet with respect to an amendment to the Noble Settlement Agreement (the "**Noble Settlement Agreement Amendment**"). Upon effectiveness of the Noble Settlement Agreement Amendment, certain provisions of the Tax Sharing Agreement will be further amended to permit the Debtors, at their option, to defer up to $5 million in amounts owed to Noble under the Tax Sharing Agreement with respect to the Mexican tax assessments (the "**Deferred Noble Payment Amount**").  In consideration for this deferral, the Debtors would issue an unsecured promissory note to Noble in the amount of the Deferred Noble Payment Amount (the "**Noble Note**").  The Noble Note would accrue interest, quarterly, to be paid either: (x) in cash at 12% per annum, or (y) in kind at 15% per annum (in the Company's discretion).

Pursuant to the Original Plan, the Noble Settlement Agreement would have become effective upon the effective date of the Debtors' plan of reorganization if such plan were substantially similar to the Debtors' Original Plan.  The Plan contemplates that the Noble Settlement Agreement will become effective upon the effective date of the Plan.  In light of the differences between the Original Plan and the Plan, the Debtors intend to discuss this requirement with Noble. The Noble Settlement Agreement provides that Noble may unilaterally terminate the Noble Settlement Agreement only if: (i) the Debtors file a plan of reorganization with the Bankruptcy Court that does not incorporate the terms and conditions of the Noble Settlement Agreement, (ii) the Debtors file a motion before the Bankruptcy Court to terminate their

obligations under the Noble Settlement Agreement, or (iii) the release of claims by the Debtors in favor of Noble, is deemed invalid or unenforceable.

In its objection to the approval of the Disclosure Statement (Docket No. 1214), the Creditors' Committee asserts that the Debtors should disclose certain "material" changes in circumstance that may impact the value of the Noble Settlement to the Debtors' estates, including: (i) pursuant to certain changes in Mexican law, bonding for the Mexican tax assessments may no longer be required; (ii) the Plan and the New Business Plan project more limited activity in Mexico than the previous business plan; and (iii) the Mexican tax authorities have not filed any proofs of claim in these cases. The Creditors Committee further asserts the Debtors will need to explain the purported benefits of the settlement in light of these changes.  The Debtors continue to believe that the Noble Settlement Agreement satisfies the requirements of Bankruptcy Rule 9019.

## VI.
## SUMMARY OF THE PLAN

This section of the Disclosure Statement summarizes the Plan, a copy of which is annexed hereto as **Exhibit A**.  This summary is qualified in its entirety by reference to the Plan.

### A.    Administrative Expense Claims, Fee Claims, and Priority Tax Claims

#### 1.    Treatment of Administrative Expense Claims

Except to the extent that a holder of an Allowed Administrative Expense Claim (other than a Fee Claim) and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date and the date on which such Administrative Expense Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed Administrative Expense Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Administrative Expense Claim, Cash in an amount equal to the Allowed amount of such Claim; provided, that Allowed Administrative Expense Claims that arise in the ordinary course of the Debtors' business, as Debtors in Possession, will be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to such transactions, without further actions by holders of such Allowed Administrative Expense Claims or further approval by the Bankruptcy Court. For the avoidance of doubt, the treatment set forth in this paragraph will not be applicable to any Restructuring Expenses, which will be paid pursuant to Section 5.17 of the Plan, or to the treatment of the Administrative Expense Claims of the Term Lenders and the Revolving Lenders on account of the Adequate Protection Obligations, which will be paid pursuant to Section 4.3 of the Plan.

Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Administrative Expense Claims Retained Amount.  Distributions from the Administrative Expense Claims Retained Amount will be available for Administrative Expense Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter.  Any amounts remaining after payment of all Allowed Administrative Expense Claims (other than Fee Claims) will be distributed as provided in Section 6.16 of the Plan.

#### 2.    Treatment of Fee Claims

All Professional Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328,

330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5), 503(b)(6), or 1103 of the Bankruptcy Code will (a) file, on or before the date that is sixty (60) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order(s) relating to or allowing any such Fee Claim.  The Allowed amounts of such Fee Claims will be determined by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules, and any prior order of the Bankruptcy Court.

Retained Amount:  On or before the Effective Date, the Debtors will establish the Fee Claim Escrow Account with Cash equal to the aggregate Fee Claim Retained Amount for all Professional Persons.  The funding of the Fee Claim Escrow Account will be deemed a disbursement under 28 U.S.C. §1930.  To receive payment for unbilled fees and expenses incurred through the Effective Date, all Professional Persons will (i) estimate their accrued Fee Claims prior to and as of the Effective Date and (ii) estimate for expected fees and expenses for professional services rendered or costs incurred on account of these Chapter 11 Cases following the Effective Date and will deliver such estimates to the Debtors on or before the Effective Date.  If a Professional Person does not provide such estimates, the Debtors or Reorganized Debtors, as applicable, may estimate the unbilled fees and expenses of such Professional Persons; *provided*, that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Professional Person.  The Fee Claim Escrow Account will be maintained in trust for the Professional Persons.  Such funds in the Fee Claim Escrow Account will not constitute property of the Reorganized Debtors.  Subject to Section 2.2(a) of the Plan, Fee Claims owing to the Professional Persons and unpaid as of the Effective Date will be paid in Cash by the Reorganized Debtors from the Fee Claim Escrow Account, without interest or other earnings therefrom, as and when such Fee Claims are Allowed by a Bankruptcy Court order.  When all Allowed Fee Claims have been paid in full, any amounts remaining in the Fee Claim Escrow Account, if any, will be distributed as provided in Section 6.16 of the Plan.  If the Fee Claim Escrow Account is insufficient to pay the full Allowed amounts of the Fee Claims, remaining unpaid Allowed Fee Claims will be promptly paid by the Reorganized Debtors without any further action or order of the Bankruptcy Court.

Except as otherwise specifically provided in the Plan, from and after the Effective Date, each Debtor and Reorganized Debtor, as applicable, will pay in Cash the reasonable and documented legal fees and expenses incurred by such Debtor or Reorganized Debtor, as applicable, after the Effective Date in the ordinary course of business and without any further notice to or action, order or approval of the Bankruptcy Court.  With respect to fees and expenses incurred on or after the Effective Date, any requirement that Professional Persons comply with sections 327 through 331 and 1103 of the Bankruptcy Code will terminate, and each Debtor or Reorganized Debtor, as applicable, may employ and pay any Professional Person in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### 3.    Treatment of Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date and the date on which such Priority Tax Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Tax Claim will receive, at the option of the Debtors or the Reorganized Debtors, as applicable, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Priority Tax Claim, (i) Cash in an amount equal to the Allowed amount of such Claim, or (ii) equal annual installment payments in Cash (x) beginning on the Effective Date or as soon thereafter as reasonably practicable, or such later date as the Claim is due in the ordinary course over a period ending not later than five (5) years after the Petition Date, together with interest at the applicable non-bankruptcy rate as of the Confirmation Date, subject to

the sole option of the Reorganized Debtors to prepay the entire amount of the Allowed Priority Tax Claim and (y) in a manner not less favorable than the most favored non-priority unsecured claim provided for by the Plan; *provided*, that Allowed Priority Tax Claims that arise in the ordinary course of the Debtors' business, as Debtors in Possession, will be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to such transactions, without further actions by holders of such Priority Tax Claims or further approval by the Bankruptcy Court.

Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Priority Tax Claims Retained Amount.  Distributions from the Priority Tax Claims Retained Amount will be available for Priority Tax Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter.  Any amounts remaining after payment of all Allowed Priority Tax Claims will be distributed as provided in Section 6.16 of the Plan.

      **B.**    **Classification of Claims and Interests**

      **1.**    **Classification in General**

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*, that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

      **2.**    **Formation of Debtor Groups for Convenience Only**

The Plan groups the Debtors together solely for the purpose of describing treatment under the Plan, confirmation of the Plan, and making Plan Distributions in respect of Claims against and Interests in the Debtors under the Plan.  Unless expressly set forth in the Plan or in the Plan Supplement, the Plan will not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any Assets.  The Plan is not premised upon and will not cause the substantive consolidation of the Debtors or any non-Debtor affiliate, and, except as otherwise provided by or permitted under the Plan, all Debtors will continue to exist as separate legal Entities.

      **3.**    **Summary of Classification of Claims and Interests**

The following table designates the Classes of Claims against and Interests in the Debtors and specifies which Classes are: (i) Impaired and Unimpaired under the Plan; (ii) entitled to vote to accept or reject the Plan in accordance with section 1126 of the Bankruptcy Code, and (iii) deemed to accept or reject the Plan:

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|-------|---------------------------|------------|------------------|
| Class 1 | Priority Non-Tax Claims | Unimpaired | No (Deemed to accept) |
| Class 2 | Other Secured Claims | Unimpaired | No (Deemed to accept) |

| Class | Type of Claim or Interest | Impairment | Entitled to Vote |
|---|---|---|---|
| Class 3 | Revolver Secured Claims and Term Loan Secured Claims | Impaired | Yes |
| Class 4 | Senior Notes Claims and Secured Lender Unsecured Claims | Impaired | Yes |
| Class 5 | General Unsecured Claims | Impaired | Yes |
| Class 6 | Intercompany Claims | Unimpaired | No (Deemed to accept) |
| Class 7 | Subordinated Claims | Impaired | No (Deemed to reject) |
| Class 8 | Parent Interests | Impaired | No (Deemed to reject) |
| Class 9 | Intercompany Interests | Unimpaired/Impaired | No (Deemed to accept/reject) |

**4.      Separate Classification of Other Secured Claims**

Although all Other Secured Claims have been placed in one Class for purposes of nomenclature within the Plan, each Other Secured Claim, to the extent secured by a Lien on Collateral different from the Collateral securing another Other Secured Claim, will be treated as being in a separate sub-Class for the purposes of receiving Plan Distributions.

**5.      Elimination of Vacant Classes**

Any Class that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes will be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to such Class.

**6.      Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims eligible to vote and no holder of Claims eligible to vote in such Class votes to accept or reject the Plan, the Plan will be presumed accepted by the holders of such Claims in such Class.

**7.      Voting; Presumptions; Solicitation**

(a)      _Acceptance by Certain Impaired Classes_.  Only holders of Allowed Claims in Classes 3, 4, and 5 are entitled to vote to accept or reject the Plan.  An Impaired Class of Claims will have accepted the Plan if (i) the holders of at least two-thirds (2/3) in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (ii) the holders of more than one-half (1/2) in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.  Holders of Claims in Classes 3, 4, and 5 will receive ballots containing detailed voting instructions.

(b)      _Deemed Acceptance by Unimpaired Classes_.  Holders of Claims and Interests in Classes 1, 2, and 6, and to the extent holders of Interests in Class 9 are Unimpaired by the Plan pursuant

RLF1 17158271V.1

to Section 4.9 of the Plan, Class 9 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

(c)     Deemed Rejection by Impaired Classes.  Holders of Claims and Interests in Classes 7 and 8, and, to the extent holders of Interests in Class 9 are Impaired by the Plan pursuant to Section 4.9 of the Plan, Class 9 are conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Accordingly, such holders are not entitled to vote to accept or reject the Plan.

8.     **Cramdown**

If any Class of Claims entitled to vote on the Plan does not vote to accept the Plan, the Debtors may (a) seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code or (b) amend or modify the Plan in accordance with the terms hereof and the Bankruptcy Code.

9.     **No Waiver**

Nothing contained in the Plan will be construed to waive a Debtor's or other Person's right to object on any basis to any Claim, except upon the Effective Date, with respect to Settled Claims.

C.     **Treatment of Claims and Interests**

1.     **Class 1: Priority Non-Tax Claims**

The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Priority Non-Tax Claim and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed Priority Non-Tax Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Claim, Cash in an amount equal to the Allowed amount of such Claim; *provided*, that Allowed Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business, will be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents establishing, such liabilities without further actions by holders of such Priority Non-Tax Claims or further approval by the Bankruptcy Court.

Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Priority Non-Tax Claims Retained Amount.  Distributions from the Priority Non-Tax Claims Retained Amount will be available for Priority Non-Tax Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter.  Any amounts remaining after payment of all Allowed Priority Non-Tax Claims will be distributed as provided in Section 6.16 of the Plan.

2.     **Class 2: Other Secured Claims**

The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan.  Except to the extent that a holder of an Allowed Other Secured Claim and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date

and the date on which such Other Secured Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed Other Secured Claim will receive in full and final satisfaction, compromise, settlement, release, and discharge of and in exchange for such Allowed Claim, at the option of the Reorganized Debtors: (i) Cash in an amount equal to the Allowed amount of such Claim, (ii) Reinstatement or such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired pursuant to section 1124 of the Bankruptcy Code, or (iii) such other recovery necessary to satisfy the provisions of section 1129(a)(9) of the Bankruptcy Code.

Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Other Secured Claims Retained Amount.  Distributions from the Other Secured Claims Retained Amount will be available for Other Secured Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter, except for Other Secured Claims that will be Reinstated on the Effective Date.  Any amounts remaining after payment of all Allowed Other Secured Claims will be distributed as provided in Section 6.16 of the Plan.

### 3.    Class 3: Revolver Secured Claims and Term Loan Secured Claims

Settled Claims comprising Revolver Secured Claims and Term Loan Secured Claims will be Allowed. On the Effective Date, each holder of an Allowed Revolver Secured Claim or an Allowed Term Loan Secured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, in exchange for and on account of such Allowed Revolver Secured Claim or Allowed Term Loan Secured Claims, as applicable: its Pro Rata share of (i) Cash Collateral, (ii) Unencumbered Cash in an amount equal to the Settled Adequate Protection Claim, and (iii) the Take Back Debt.  For the avoidance of doubt, the Existing Letters of Credit will continue to remain outstanding, pursuant to and subject to the terms of the Existing L/C Escrow Agreement(s) and the New Letter of Credit Agreement.

### 4.    Class 4: Senior Notes Claims and Secured Lender Unsecured Claims

For purposes of treatment in Class 4, (i) Settled Claims comprising Term Loan Unsecured Claims will be Allowed in the aggregate principal amount of approximately Six Hundred Forty-Two Million Dollars ($642,000,000) and (ii) Settled Claims comprising Revolver Unsecured Claims will be Allowed in the aggregate principal amount of approximately Seven Hundred Seventy-Seven Million Dollars ($777,000,000).  On the Effective Date, each holder of an Allowed Senior Notes Claim or an Allowed Secured Lender Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, in exchange for and on account of such Allowed Claim, its Pro Rata share of (i) the Net Distributable Cash and (ii) the New Equity Interests (subject to dilution by the Management Incentive Plan Securities).  Distributions received under the Plan by holders of Allowed Senior Notes Claims will be subject to the rights of the Senior Notes Indenture Trustee to payment of fees, expenses, indemnification obligations, and Liens, including any charging lien, securing such right to payment under the Senior Notes Indenture.  The Senior Notes Indenture Trustee's exercise of its charging lien will occur before any distributions are made to holders of Allowed Senior Notes Claims.

Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Class 4 Disputed Claims Reserve and will withhold New Equity Interests in respect of Disputed Claims in Class 4, if any, in accordance with Section 7.7 of the Plan.  Any amounts remaining after payment of all Disputed Claims in Class 4 will be distributed as provided in Sections 6.16 and 7.7 of the Plan.

5.      **Class 5: General Unsecured Claims**

Except to the extent that a holder of an Allowed General Unsecured Claim and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release, and discharge of, in exchange for, and on account of such holder's rights with respect to and under such Allowed General Unsecured Claim its Pro Rata share of the General Unsecured Claims Distribution, subject to Section 7.7 of the Plan.

Retained Amount:  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the General Unsecured Claims Reserve in Cash.  Distributions from the General Unsecured Claims Reserve will be available for General Unsecured Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter. Any amounts remaining after payment of all Allowed General Unsecured Claims will be distributed as provided in Sections 6.16 and 7.7 of the Plan.

6.      **Class 6: Intercompany Claims**

On or after the Effective Date, all Intercompany Claims will be paid, adjusted, continued, settled, reinstated, discharged, or eliminated, in each case to the extent determined to be appropriate by the Reorganized Debtors in their sole discretion.  All Intercompany Claims between any Debtor and a non-Debtor affiliate will be Unimpaired under the Plan.

7.      **Class 7: Subordinated Claims**

Subordinated Claims are subordinated to Claims in Class 5 or to the same priority as Parent Interests in Class 8, as applicable, pursuant to the Plan and section 510 of the Bankruptcy Code. The holders of Subordinated Claims will not receive or retain any property under the Plan on account of such Claims.

8.      **Class 8: Parent Interests**

After giving effect to the Restructuring Transactions, all Parent Interests will be deemed valueless and will not receive any distribution under the Plan.  Parent Interests will be treated in accordance with the U.K. Administration.

9.      **Class 9: Intercompany Interests**

On the Effective Date, at the option of the Reorganized Debtors and with the reasonable consent of the Term Loan Agent and the Revolving Credit Facility Agent, all Allowed Intercompany Interests will either (i) remain unaffected by the Plan and continue in place following the Effective Date or (ii) be cancelled (or otherwise eliminated) and holders of such cancelled Intercompany Interests will not receive or retain any property under the Plan.

10.     **Debtors' Rights in Respect of Unimpaired Claims**

Except as otherwise provided in the Plan, nothing under the Plan will affect the rights of the Reorganized Debtors in respect of any Unimpaired Claim, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claim.

**11.    Treatment of Vacant Classes**

Any Claim or Interest in a Class that is considered vacant under Section 3.5 of the Plan will receive no Plan Distribution.

**D.    Means for Implementation; Post-Effective Date Governance**

**1.    Settlement of Term Loan Claims and Revolver Claims**

Pursuant to Bankruptcy Code sections 1123(a)(5) and 1123(b)(3) and Bankruptcy Rule 9019, the Plan incorporates and is expressly conditioned upon the approval and effectiveness of a comprehensive compromise and settlement by and among the Debtors, the Term Loan Agent, the Revolving Credit Facility Agent and the Requisite Lenders of numerous issues and disputes relating to the Adequate Protection Obligations, the Term Loan Claims and the Revolver Claims, and the allowance and treatment of such Settled Claims.  As of the Effective Date, the Plan accordingly represents a full, final, integrated, complete, and good faith compromise, settlement, release, and resolution of, among other matters, disputes and potential litigation among the Debtors, the Term Loan Agent, the Revolving Credit Facility Agent, the Term Lenders, and the Revolving Lenders regarding the Settled Claims, including: (i) the amount, value, and treatment under the Plan of the Term Loan Claims and the Revolver Claims; (ii) the amount, value, and treatment under the Plan of the Settled Adequate Protection Claims; (iii) the validity, scope, extent, and priority of the Liens securing the Term Loan Claims and the Revolver Claims including with respect to Cash held by the Debtors; (iv) the valuation of encumbered and unencumbered assets; (v) any Causes of Action that the Debtors or the Reorganized Debtors, as applicable, could potentially assert against the holders of Settled Claims; and (vi) the rights with respect to, and security interests, in the Debtors' Intercompany Claims.

The comprehensive compromise and settlement will be binding on the Debtors or the Reorganized Debtors, as applicable, on all Persons who have asserted or could assert any potential Causes of Action, and the Term Lenders and the Revolving Lenders concerning such Settled Claims compromised and settled under the Plan.  The comprehensive compromise and settlement is the fundamental foundation of the Plan.  As such, the approval and consummation of the Plan will conclusively bind all holders of Claims against or Interests in the Debtors and other parties in interest, and the releases and settlements effected under the Plan will be operative as of the Effective Date and subject to enforcement by the Bankruptcy Court from and after the Effective Date, including pursuant to the injunctive provisions of Sections 10.4, 10.5, and 10.8 of the Plan.

**2.    Continued Corporate Existence**

(a)    Except as otherwise provided in the Plan or pursuant to the U.K. Administration with respect to Paragon Parent, the Debtors will continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the Amended Certificates of Incorporation and the Amended By-Laws.  On or after the Effective Date, each Reorganized Debtor may, in its sole discretion, take such action as permitted by applicable law and such Reorganized Debtor's organizational documents as such Reorganized Debtor may determine is reasonable and appropriate, including causing: (i) a Reorganized Debtor to be merged into another Reorganized Debtor or an affiliate of a Reorganized Debtor; (ii) a Reorganized Debtor to be dissolved; (iii) the legal name of a Reorganized Debtor to be changed; or (iv) the closure of a Reorganized Debtor's Chapter 11 Case on the Effective Date or any time thereafter.

(b)    On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtors may take all actions as may be necessary or appropriate to effect any transaction

described in, approved by, or necessary or appropriate to effectuate the Plan, including: (i) the execution and delivery of appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan and the Plan Documents and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (ii) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms to which the applicable parties agree; (iii) the filing of appropriate certificates of incorporation and memoranda and articles of association and amendments thereto, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable law; (iv) the Restructuring Transactions; and (v) all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.

### 3.    Authorization, Issuance, and Delivery of New Equity Interests

On the Effective Date, Reorganized Paragon is authorized to issue or cause to be issued and will issue or cause to be issued the New Equity Interests, with the exception of any New Equity Interests to be withheld on account of Disputed Claims, for distribution in accordance with the terms of the Plan, without the need for any further corporate, partnership, limited liability company, or shareholder action. Reorganized Paragon will be authorized to issue or cause to be issued any New Equity Interests withheld on account of Disputed Claims in accordance with Section 7.7 of the Plan.  Upon the Effective Date, after giving effect to the U.K. Sale Transaction, the authorized capital stock of Reorganized Paragon will be that number of shares of New Equity Interests as may be designated in the Amended Certificate of Incorporation of Reorganized Paragon, and the New Equity Interests will be subject to the terms contained in the Amended Certificate of Incorporation of Reorganized Paragon, the Shareholders Agreement, and the Registration Rights Agreement.  The New Equity Interests will not be stapled with the Take Back Debt; New Equity Interests may be sold, assigned, transferred, hypothecated, or otherwise disposed of without any principal amount of Take Back Debt; and Take Back Debt may be sold, assigned, transferred, hypothecated, or otherwise disposed of without any number of New Equity Interests, in each case, subject to any transfer restrictions thereon.

### 4.    Take Back Debt Agreement, New Letter of Credit Agreement, and Existing L/C Escrow Agreement(s)

(a)    On the Effective Date, the Reorganized Debtors are authorized to execute, deliver, and enter into or cause to be executed, delivered, and entered into, and will execute, deliver, and enter into or cause to be executed, delivered, and entered into, all plan-related documents, including the Take Back Debt Agreement, the New Letter of Credit Agreement, the Existing L/C Escrow Agreement(s) and any related documents, agreements, instruments, or certificates, without the need for any further corporate, partnership, limited liability company, or shareholder action.  The Take Back Debt Agreement, the New Letter of Credit Agreement, and the Existing L/C Escrow Agreement(s) will constitute legal, valid, and binding obligations of Reorganized Paragon enforceable in accordance with their terms.

(b)    On the Effective Date, (i) upon the granting of Liens and the continuation of existing Liens in accordance with the Take Back Debt Agreement, the lenders thereunder will have valid, binding, and enforceable Liens on the collateral specified in the Take Back Debt Agreement and related guarantee and collateral documentation; and (ii) upon the granting of guarantees, mortgages, pledges, Liens, and other security interests and the continuation of existing guarantees, mortgages, pledges, Liens, and other security interests in accordance with the Take Back Debt Agreement, the guarantees, mortgages, pledges, Liens, and other security interests granted and continued to secure the obligations arising under the Take Back Debt Agreement will be granted and continued in good faith as an

34

inducement to the lenders thereunder to convert to term loans and/or extend credit thereunder and will be deemed not to constitute a fraudulent conveyance or fraudulent transfer, will not otherwise be subject to avoidance, and the priorities of such Liens and security interests will be as set forth in the Take Back Debt Agreement and related guarantee, collateral documentation, and intercreditor arrangements.  All Liens and security interests securing the Revolver Claims (other than with respect to the Existing Letters of Credit) and the Term Loan Claims as of the Petition Date are unaltered by the Plan, and all such Liens and security interests are created and perfected with respect to the obligations arising under the Take Back Debt Agreement to the same extent, in the same manner and on the same terms as they were with respect to the Revolver Claims (other than with respect to the Existing Letters of Credit) and Term Loan Claims. The Take Back Debt Agreement and the other Credit Documents (as such term is defined in the Take Back Debt Agreement) will constitute legal, valid, and binding obligations of the Reorganized Debtors party thereto or otherwise bound thereby, enforceable in accordance with their terms.

(c)        On the Effective Date, the Existing Letters of Credit will be deemed issued under the New Letter of Credit Agreement; on and after the Effective Date, the Revolving Lenders will continue to hold participations in the Existing Letters of Credit in accordance with their existing percentages as of immediately prior to the Effective Date.  On and after the Effective Date, (i) Reorganized Paragon will not have any ongoing draw reimbursement obligations on account of the Existing Letters of Credit, other than such reimbursement obligations as are set forth in the Plan and such letter of credit fees calculated based on percentages in effect under the Revolving Credit Agreement immediately prior to the Effective Date (which obligations will also be reflected in the New Letter of Credit Agreement), and (ii) the Reorganized Debtors will use commercially reasonable efforts to cause the Existing Letters of Credit to be returned undrawn.

On the Effective Date, the Existing L/C Escrow Agreement(s) will be executed in accordance with the terms set forth therein.

**5.        Cancellation of Certain Existing Agreements**

Except for the purpose of evidencing a right to a Plan Distribution, the 6.75% Notes, the 7.25% Notes, and the Senior Notes Indenture will be deemed cancelled on the Effective Date and obligations of the Debtors thereunder will be discharged.  The Senior Notes Indenture Trustee will be released from all duties under the Senior Notes Indenture; provided, however, that notwithstanding confirmation of the Plan or the occurrence of the Effective Date, the Senior Notes Indenture will continue in effect for the purposes of permitting the Senior Notes Indenture Trustee to (a) make distributions under the Plan as provided in the Plan and perform such other necessary functions with respect thereto, (b) seek compensation and/or reimbursement of fees and expenses in accordance with the terms of the Plan, and (c) maintain and assert any rights or exercise any charging liens for reasonable fees, costs, and expenses thereunder, including, without limitation, the right to seek indemnification.

**6.        Release of Liens**

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, upon the full payment or other satisfaction with respect to the applicable Claims made pursuant to the Plan, all Liens, Claims, or Interests in or against the property of the Estates will be fully released, terminated, extinguished, and discharged, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Entity. Any Entity holding such Liens, Claims, or Interests will, if necessary, pursuant to section 1142 of the Bankruptcy Code, promptly execute and deliver to the Reorganized Debtors such instruments of termination, release, satisfaction, and/or assignment (in recordable form) as may be reasonably requested by the Reorganized

Debtors and will incur no liability to any Entity in connection with its execution and delivery of any such instruments.

### 7.  Cash Flow Adjustments and Adjustments to the Minimum Cash Balance

(a)  Prior to the Effective Date and in accordance with the Cash Flow Adjustment Schedule, the Debtors will determine the Adjusted Minimum Cash Balance, if applicable, and the Net Distributable Cash.  All such calculations and determinations with respect to the Adjusted Minimum Cash Balance, if applicable, and the Net Distributable Cash will be subject to the reasonable consent of the Requisite Lenders; provided, however, that in no event will an amount less than the Minimum Cash Balance remain on the Reorganized Debtors' balance sheet as of the Effective Date.

### 8.  Officers and Boards of Directors

(a)  The officers and the composition of each board of directors of the Reorganized Debtors, including the New Board, will be disclosed prior to the entry of the Confirmation Order to the extent required by section 1129(a)(5) of the Bankruptcy Code.

(b)  Except to the extent that a member of the board of directors of a Debtor continues to serve as a director of such Debtor on the Effective Date, the members of the board of directors of each Debtor prior to the Effective Date, in their capacities as such, will have no continuing obligations to the Reorganized Debtors on or after the Effective Date and each such member will be deemed to have resigned or will otherwise cease to be a director of the applicable Debtor on the Effective Date without any further action required on the part of any such Debtor or member.  Commencing on the Effective Date, each of the directors of each of the Reorganized Debtors will serve pursuant to the terms of the applicable organizational documents of such Reorganized Debtor and may be replaced or removed in accordance with such organizational documents.

(c)  Subject to the discretion of the New Board, the Reorganized Debtors will enter into new employment agreements with key executives on a case by case basis.

### 9.  Deemed Execution

On the Effective Date, (i) each Person that receives any portion of the New Equity Interests will be deemed to have executed, without any further action by any party, the Shareholders Agreement,  (ii) each Person that upon receipt of any portion of the New Equity Interests pursuant to the Plan holds ten percent (10%) or more of the total outstanding New Equity Interests as of the Effective Date will be deemed to have executed, without any further action by any party, the Registration Rights Agreement, (iii) each Person that receives any portion of the Take Back Debt will be deemed to have executed, without any further action by any party, the Take Back Debt Agreement, and (iv) each Person that is party to the New Letter of Credit Agreement will be deemed to have executed, without any further action by any party, the Existing L/C Escrow Agreement(s).

### 10.  Management Incentive Plan

After the Effective Date, the New Board will implement the Management Incentive Plan, the terms of which, including eligibility to participate therein, the amount and timing of any award and the vesting conditions of any award will be determined by the New Board in its sole discretion.  Confirmation of the Plan will not constitute the Bankruptcy Court's approval or endorsement of any terms that the New Board may determine.  Any Management Incentive Plan Securities issued pursuant to the Management Incentive Plan will proportionally dilute all the New Equity Interests to be issued in accordance with the Plan.

## 11.    Intercompany Interests

To the extent an Intercompany Interest is not cancelled pursuant to the Plan, on the Effective Date and without the need for any further corporate action or approval of any board of directors, management, or shareholders of any Debtor or Reorganized Debtor, as applicable, such Intercompany Interest will be unaffected by the Plan and continue in place following the Effective Date.

## 12.    Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Debtors or Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Restructuring Transactions under and in connection with the Plan.

## 13.    U.K. Administrators, U.K. Administration, and U.K. Sale Transaction

(a)    Prior to the Effective Date, the directors of Paragon Parent will seek an administration order from the English Court pursuant to paragraph 13 of Schedule B1 of the Insolvency Act 1986 to appoint the U.K. Administrators to implement the U.K. Sale Transaction pursuant to the U.K. Implementation Agreement.  Upon appointment, the U.K. Administrators will assume the management of the affairs, business and property of Paragon Parent with all powers necessary or expedient to do so, including the power to effect the U.K. Sale Transaction pursuant to the U.K. Implementation Agreement.

(b)    U.K. Sale Transaction.  Prior to the Effective Date, Reorganized Paragon will be formed and will enter into the U.K. Implementation Agreement with Paragon Parent and the U.K. Administrators, pursuant to which, and pursuant to the U.K. Administration and the Plan, Reorganized Paragon will, prior to or substantially contemporaneously with the Effective Date, acquire all or substantially all of the Assets of Paragon Parent in consideration for the release in full of the debt outstanding under the Senior Notes, the Term Loan Agreement, and the Revolving Credit Agreement, and Reorganized Paragon will issue New Equity Interests to holders of Allowed Senior Notes Claims and Allowed Secured Lender Unsecured Claims and will enter into the Take Back Debt Agreement, among other documents, with the holders of Allowed Revolver Claims and Allowed Term Loan Claims, as applicable, and will distribute Cash to the holders of Allowed Claims as described in the U.K. Sale Transaction outlined below.  In furtherance of the foregoing and the implementation of the Plan, the following transactions will occur in the following order on or prior to the Effective Date (as indicated below):

(i)    On or prior to the Effective Date and immediately prior to the transactions specified below, the Amended By-Laws and Amended Certificate of Incorporation governing Reorganized Paragon will be in full force and effect and the New Board will serve pursuant to the terms of the applicable new organizational documents of Reorganized Paragon.

(ii)    In accordance with, and subject to the terms of, the treatment sections of the Plan, the following transactions will occur prior to or substantially contemporaneously with the Effective Date:

(a)    In accordance with the terms of the Plan, the U.K. Implementation Agreement, and the U.K. Administration, Paragon Parent will transfer to Reorganized Paragon, all or substantially all of its Assets as provided in the U.K. Implementation Agreement.  After giving effect to the U.K. Sale Transaction, Paragon Parent will have transferred all or substantially all of its Assets to Reorganized Paragon, and Reorganized Paragon will have become the direct or indirect

parent entity, as applicable, of each of the other Reorganized Debtors.  For the avoidance of doubt, all Cash held by Paragon Parent immediately prior to the U.K. Sale Transaction, other than Cash required to be retained in Paragon Parent as the U.K. Administration Reserve, will be available for distribution in accordance with the Plan.

(b)    In consideration for the transfer of all or substantially all of the Assets of Paragon Parent, Reorganized Paragon will issue New Equity Interests to holders of Allowed Senior Notes Claims and Allowed Secured Lender Unsecured Claims pursuant to the Shareholders Agreement and will enter into the Take Back Debt Agreement, among other documents, with the holders of Allowed Revolver Claims and Allowed Term Loan Claims, as applicable, and will distribute Cash to holders of Allowed Claims pursuant to the terms of the Plan and the U.K. Implementation Agreement, in full and final satisfaction and discharge of such Claims.

(c)    In connection with the U.K. Sale Transaction, Paragon Parent will assume and assign to Reorganized Paragon all of its executory contracts and unexpired leases to which it is party that are not specifically designated on the Schedule of Rejected Contracts and Leases. Paragon Parent's assumption and assignment of such executory contracts and unexpired leases will be consistent with the procedures set forth in Sections 8.1 and 8.2 of the Plan, and any requirements to obtain consent in connection with such assumption and assignment will be deemed satisfied by Paragon Parent's compliance with the procedures outlined in Section 8.2 of the Plan.

(c)    Approval of U.K. Sale Transaction.  The Confirmation Order will authorize the U.K. Sale Transaction pursuant to sections 363, 1123(a)(5), 1123(b)(4), 1123(b)(6), 1145, and 1146(a) of the Bankruptcy Code under the terms and conditions of the U.K. Implementation Agreement.  Upon the Confirmation Date, the Debtors will be authorized to take any and all actions necessary to consummate the U.K. Sale Transaction, including, for the avoidance of doubt, commencing the U.K. Administration.

(d)    Sale Free and Clear.  On the closing date of the U.K. Sale Transaction, pursuant to the terms of the U.K. Implementation Agreement and the Confirmation Order, Paragon Parent's Assets will be purchased by and vested in Reorganized Paragon free and clear of all Claims, Parent Interests, Liens, charges, encumbrances, and other interests, other than the liabilities expressly assumed pursuant to the U.K. Implementation Agreement and those Claims, Liens, charges, encumbrances, and other interests expressly provided or assumed pursuant to the Plan or the documents included in the Plan Supplement.

## 14.    Retained Accounts

On or prior to, and after, the Effective Date, the Debtors or Reorganized Debtors, as applicable, may take all actions as may be necessary or appropriate to maintain and/or establish the Retained Accounts.

## 15.    Separability

Notwithstanding the combination of separate plans of reorganization for the Debtors set forth in the Plan for purposes of economy and efficiency, the Plan constitutes a separate chapter 11 plan for each Debtor. Given the integrated nature of the settlement of the Settled Claims, if the Bankruptcy Court does not confirm the Plan with respect to one or more Debtors or Paragon Parent, the Plan may not be confirmed absent the reasonable consent of the Requisite Lenders with respect to any other Debtor that satisfies the confirmation requirements of section 1129 of the Bankruptcy Code.

16.    **Other Settlements of Claims and Controversies**

(a)    Pursuant to section 1123(b)(3)(A) of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Plan Distributions and other benefits provided under the Plan, the provisions of the Plan will constitute a good faith compromise and settlement of all Claims and controversies relating to the rights that a holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any Plan Distribution on account thereof.  The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that all such compromises or settlements are: (i) in the best interest of the Debtors, the Estates, the Reorganized Debtors, and their respective property and stakeholders, and (ii) fair, equitable, and reasonable.

(b)    _Noble Settlement_.  Pursuant to the Noble Settlement Agreement, Noble has agreed to provide, among other things, credit support to Paragon with respect to certain bonding obligations imposed by Mexican Governmental Units in exchange for Paragon's release of all claims and causes of action arising under, relating to, or in connection with the Spin-Off that the Paragon Entities may hold against the Noble Entities.  The Debtors or the Reorganized Debtors, as applicable, will assume, on the Effective Date, the Noble Settlement Agreement.

17.    **Restructuring Expenses**

(a)    On the Effective Date, or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, will pay, without interest or other earnings therefrom, all outstanding Restructuring Expenses billed through the Effective Date, in accordance with the terms of the applicable orders, engagement letters, or other applicable contractual arrangements, but without regard to any notice and objection period as may be contained in such applicable orders, engagement letters, or other applicable arrangements.  To receive payment for unbilled fees and expenses incurred through the Effective Date, all Revolving Lenders' Professionals and Term Lenders' Professionals will estimate their accrued Restructuring Expenses prior to and as of the Effective Date and will deliver such estimates to the Debtors at least five days before the Effective Date; _provided_, that such estimate will not be considered an admission or limitation with respect to the fees and expenses of such Revolving Lenders' Professional or Term Lenders' Professional.  On the Effective Date, all Revolving Lenders' Professionals and Term Lenders' Professionals will submit final bills for all Restructuring Expenses incurred prior to and as of the Effective Date.  On the Effective Date, the Reorganized Debtors will pay the Restructuring Expenses of the Term Lenders' Professionals and the Revolving Lenders' Professionals incurred prior to and as of the Effective Date, and such payments will be made in Cash without any further notice to or action, order, or approval of the Bankruptcy Court.

(b)    On or before the Effective Date, the Debtors will establish the Post-Effective Date Restructuring Expense Retained Amount with Cash in an amount to be agreed upon between the Debtors and the Requisite Lenders.  To receive payment for post-Effective Date Restructuring Expenses, all Revolving Lenders' Professionals and Term Lenders' Professionals will submit a budget setting forth their expected post-Effective Date Restructuring Expenses and will deliver such budget to the Debtors on or before the Effective Date.  From and after the Effective Date, the Reorganized Debtors will pay the Restructuring Expenses of the Term Lenders' Professionals and the Revolving Lenders' Professionals incurred after the Effective Date, and such payments will be made in Cash out of the Post-Effective Date Restructuring Expense Retained Amount and will be paid in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court.

### E.    Distributions

#### 1.    Distributions Generally

The Disbursing Agent will make all Plan Distributions to the appropriate holders of Allowed Claims in accordance with the terms of the Plan; *provided*, that the Debtors or Reorganized Debtors, as applicable, will disburse the New Equity Interests to the Revolving Lenders, the Term Lenders, and the holders of Allowed Senior Notes Claims.

#### 2.    Plan Funding

Plan Distributions of Cash will be funded from the Debtors' and the Reorganized Debtors' Cash Collateral or Unencumbered Cash, as the case may be, in accordance with the terms of the Plan.

#### 3.    No Postpetition Interest on Claims

Except as otherwise specifically provided for in the Plan, including in Sections 4.2 and 4.3 of the Plan, the Confirmation Order, or another order of the Bankruptcy Court or required by the Bankruptcy Code, postpetition interest will not accrue or be paid on any Claims, and no holder of a Claim will be entitled to interest accruing on such Claim on or after the Petition Date.

#### 4.    Date of Distributions

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim will receive the full amount of the distributions that the Plan provides for such Allowed Claims in their applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but will be deemed to have been completed as of the required date.  If and to the extent there are any residual funds remaining in the Retained Accounts, final distributions from the Retained Accounts of such residual amounts will be made in accordance with Section 6.16 of the Plan.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims will be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan or the documents included in the Plan Supplement, holders of Claims will not be entitled to interest, dividends, or accruals on any Plan Distributions.

#### 5.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various lists of holders of Claims in each Class, as maintained by the Debtors or their agents, will be deemed closed, and there will be no further changes in the record holders of any Claims after the Distribution Record Date.  Neither the Debtors, the Reorganized Debtors, nor the Disbursing Agent will have any obligation to recognize any transfer of a Claim occurring after the close of business on the Distribution Record Date.  In addition, with respect to payment of any Cure Amounts or disputes over any Cure Amounts, neither the Debtors, the Reorganized Debtors, nor the Disbursing Agent will have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable executory contract or unexpired lease, even if such non-Debtor party has sold, assigned, or otherwise transferred its Claim for a Cure Amount.

6.      **Disbursing Agent**

All distributions under the Plan will be made by the Disbursing Agent on and after the Effective Date as provided in the Plan.  The Disbursing Agent will not be required to give any bond or surety or other security for the performance of its duties.  The Reorganized Debtors will use all commercially reasonable efforts to provide the Disbursing Agent (if other than the Reorganized Debtors) with the amounts of Claims and the identities and addresses of holders of Claims, in each case, as set forth in the Debtors' or Reorganized Debtors' books and records.  The Reorganized Debtors will cooperate in good faith with the applicable Disbursing Agent (if other than the Reorganized Debtors) to comply with the reporting and withholding requirements outlined in Section 6.18 of the Plan.

7.      **Delivery of Distributions**

The Disbursing Agent will issue or cause to be issued, the applicable consideration under the Plan and, subject to Bankruptcy Rule 9010, will make all distributions to any holder of an Allowed Claim as and when required by the Plan at: (i) the address of such holder on the books and records of the Debtors or their agents or (ii) at the address in any written notice of address change delivered to the Debtors or the Disbursing Agent, including any addresses included on any transfers of Claim filed pursuant to Bankruptcy Rule 3001.  In the event that any distribution to any holder is returned as undeliverable, no distribution or payment to such holder will be made unless and until the Disbursing Agent has been notified of the then-current address of such holder, at which time or as soon thereafter as reasonably practicable such distribution will be made to such holder without interest.

With respect to the New Equity Interests to be distributed to holders of Allowed Senior Notes Claims and holders of Allowed Secured Lender Unsecured Claims, all of the shares of the New Equity Interests will, to the extent such shares are permitted to be held through DTC's book-entry system, be issued in the name of such holder or its nominee(s) in accordance with DTC's book-entry exchange procedures.  To the extent that the New Equity Interests are not eligible for distribution in accordance with DTC's customary practices, Reorganized Paragon will take reasonable actions to cause distributions of the New Equity Interests to holders of Allowed Senior Notes Claims and holders of Allowed Secured Lender Unsecured Claims, including by delivery of one or more certificates representing such shares or by means of book-entry registration on the books of the transfer agent for such New Equity Interests.

8.      **Unclaimed Property**

One year from the later of: (a) the Effective Date and (b) the date that is ten (10) Business Days after the date a Claim is first Allowed, all distributions payable on account of such Claim that are not deliverable and remain unclaimed will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and will revert to the Reorganized Debtors or their successors or assigns, and all claims of any other Entity (including the holder of a Claim in the same Class) to such distribution will be discharged and forever barred.  The Reorganized Debtors and the Disbursing Agent will have no obligation to attempt to locate any holder of an Allowed Claim other than by reviewing the Debtors' books and records and filings with the Bankruptcy Court.

9.      **Satisfaction of Claims**

Unless otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan will be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

### 10. Manner of Payment Under Plan

Except as specifically provided in the Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made under the Plan may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

### 11. Fractional Shares  and Notes and De Minimis Cash Distributions

No fractional New Equity Interests will be distributed.  When any distribution would otherwise result in the issuance of a number of New Equity Interests that is not a whole number, the New Equity Interests subject to such distribution will be rounded to the next higher or lower whole number as follows: (a) fractions equal to or greater than 1/2 will be rounded to the next higher whole number and (b) fractions less than 1/2 will be rounded to the next lower whole number.  The total number of New Equity Interests to be distributed on account of Allowed Senior Notes Claims and Allowed Secured Lender Unsecured Claims will be adjusted as necessary to account for the rounding provided for in the Plan.  No consideration will be provided in lieu of fractional shares that are rounded down.  Neither the Reorganized Debtors nor the Disbursing Agent will have any obligation to make a distribution that is less than one (1) share of New Equity Interests or Fifty Dollars ($50.00) in Cash.  Fractional New Equity Interests that are not distributed in accordance with this section will be returned to, and ownership thereof will vest in, Reorganized Paragon.

### 12. No Distribution in Excess of Amount of Allowed Claim

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim will receive, on account of such Allowed Claim, Plan Distributions in excess of the Allowed amount of such Claim plus any postpetition interest on such Claim, to the extent such interest is permitted by Section 6.3 of the Plan.

### 13. Allocation of Distributions Between Principal and Interest

Except as otherwise provided in the Plan and subject to Section 6.3 of the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim, including any Claim for accrued but unpaid interest.

### 14. Exemption from Securities Laws

The issuance of and the distribution under the Plan of the New Equity Interests will be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  These securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

### 15. Setoffs and Recoupments

Each Debtor or Reorganized Debtor, as applicable, or such Entity's designee, as instructed by such Reorganized Debtor, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy law, offset or recoup against any Allowed Claim and the distributions to be made pursuant to the Plan on

account of such Allowed Claim any and all Claims, rights, and Causes of Action that such Debtor or Reorganized Debtor or its successors may hold against the holder of such Allowed Claim; *provided*, that neither the failure to effect a setoff or recoupment nor the allowance of any Claim under the Plan will constitute a waiver or release by a Debtor or Reorganized Debtor or its successor of any Claims, rights, or Causes of Action that a Reorganized Debtor or its successor or assign may possess against such holder.

## 16.    Release of Retained Funds

(a)    To the extent established with Unencumbered Cash, any Cash remaining in a Retained Account, other than the General Unsecured Claims Reserve and the Class 4 Disputed Claims Reserve, after all applicable distributions or other payments have been made from such Retained Account, will be released therefrom by the Disbursing Agent and treated as Net Distributable Cash for distribution in accordance with the Plan at such dates as may be determined by the Disbursing Agent, but in no event later than the date that is sixty (60) days after all applicable distributions or other payments have been made from such Retained Account.  To the extent established with Cash Collateral, any Cash remaining in a Retained Account, other than the General Unsecured Claims Reserve, after all applicable distributions or other payments have been made from such Retained Account, will be released therefrom by the Disbursing Agent and deemed Cash Collateral and will be distributed in accordance with Section 4.3 of the Plan at such dates as may be determined by the Disbursing Agent, but in no event later than the date that is sixty (60) days after all applicable distributions or other payments have been made from such Retained Account.

(b)    Any Cash remaining in the General Unsecured Claims Reserve after all Disputed General Unsecured Claims have been adjudicated will be released therefrom by the Disbursing Agent and distributed to the holders of all Allowed General Unsecured Claims in accordance with the Plan at such dates as may be determined by the Disbursing Agent, but in no event later than the date that is sixty (60) days after the date the last Disputed General Unsecured Claims is adjudicated.

(c)    Any Cash remaining in the Class 4 Disputed Claims Reserve after the Allowed amount of such Disputed Claims in Class 4 has been adjudicated will be released therefrom by the Disbursing Agent and distributed in accordance with Section 4.4 of the Plan at such dates as may be determined by the Disbursing Agent, but in no event later than the date that is sixty (60) days after the date the last Disputed Claim in Class 4 is adjudicated.

(d)    Any Cash remaining in the U.K. Administration Reserve or held on account of the indemnification obligations owing under the U.K. Indemnification Agreement after all applicable distributions or other payments have been made from such Retained Account will be released as provided in the U.K. Implementation Agreement.

## 17.    Rights and Powers of Disbursing Agent

(a)    <u>Powers of Disbursing Agent</u>.  The Disbursing Agent will be empowered to: (i) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (ii) make all applicable distributions or payments provided for under the Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Disbursing Agent by order of the Bankruptcy Court (including any order issued after the Effective Date) or pursuant to the Plan or (B) as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

(b)    <u>Expenses Incurred on or After the Effective Date</u>.  To the extent the Disbursing Agent is an Entity other than a Debtor or Reorganized Debtor, except as otherwise ordered by the

Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the amount of any reasonable fees and expenses incurred by the Disbursing Agent on or after the Effective Date (including taxes) and any reasonable compensation and expense reimbursement Claims (including for reasonable attorneys' and other professional fees and expenses) made by the Disbursing Agent will be paid in Cash by the Reorganized Debtors.

### 18.    Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Reorganized Debtors and the Disbursing Agent will comply with all applicable withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all distributions under the Plan will be subject to any such withholding or reporting requirements; *provided*, *however*, that the Disbursing Agent will have no reporting or withholding obligations in respect of the distribution of (i) the Cash Collateral to the holders of Allowed Term Loan Secured Claims and the holders of Allowed Revolver Secured Claims pursuant to Section 4.3 of the Plan (ii) the Unencumbered Cash to the holders of Allowed Term Loan Secured Claims and the holders of Allowed Revolver Secured Claims pursuant to Section 4.3 of the Plan, and (iii) the Net Distributable Cash to the holders of Allowed Secured Lender Unsecured Claims and the holders of Allowed Senior Notes Claims pursuant to Section 4.4 of the Plan. In the case of a non-Cash distribution that is subject to withholding, the distributing party may withhold an appropriate portion of such distributed property and sell such withheld property to generate Cash necessary to pay over the withholding tax. Any amounts withheld pursuant to the preceding sentence will be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan.

Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution. The Reorganized Debtors and the Disbursing Agent have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations.

The Reorganized Debtors and the Disbursing Agent may reasonably require, as a condition to receipt of a distribution, that the holder of an Allowed Claim provide any information necessary to allow the distributing party to comply with any such withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority (including, for the avoidance of doubt, an appropriate Form W-9 or (if the holder is a foreign Person) Form W-8, unless such Person is exempt from information reporting requirements under the Internal Revenue Code of 1986, as amended, and so notifies the Reorganized Debtors and the Disbursing Agent). If the Reorganized Debtors or the Disbursing Agent make such a request and the holder fails to comply before the date that is one hundred eighty (180) days after the request is made, the amount of such distribution will irrevocably revert to the applicable Reorganized Debtor and any Claim in respect of such distribution will be discharged and forever barred from assertion against such Reorganized Debtor or its respective property.

### F.    Procedures for Resolving Claims

### 1.    Disputed Claims Generally

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors, as applicable, will have and retain any and all rights and defenses such Debtor has with respect to any Disputed Claim, including the Causes of Action retained pursuant to Section 10.10 of the Plan. Any objections to Claims will be served and filed on or before: (a) the one hundred twentieth (120th) day

following the later of (i) the Effective Date and (ii) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim; or (b) such later date as may be fixed by the Bankruptcy Court.  All Disputed Claims not objected to by the end of such one hundred twenty (120) day period will be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court.

## 2.    Resolution of Disputed Claims

(a)    On and after the Effective Date, the Reorganized Debtors will have the authority to (i) litigate, compromise, settle, otherwise resolve, or withdraw any objections to all Claims against the Debtors and to compromise and settle any such Disputed Claims without any further notice to or action, order, or approval by the Bankruptcy Court or any other party and (ii) administer and adjust the Claims Register to reflect any such settlements or compromises without any further action, order, notice to, or approval by the Bankruptcy Court or any other party.

(b)    Expungement of, or Adjustment to, Paid, Satisfied, or Superseded Claims.  Any Claim that has been paid, satisfied, or superseded, or any Claim that has been amended or superseded, may be adjusted or expunged on the Claims Register by the Reorganized Debtors without a claims objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    Disallowance of Claims.  EXCEPT AS OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM WILL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS SUCH LATE PROOF OF CLAIM IS DEEMED TIMELY FILED BY A FINAL ORDER OF THE BANKRUPTCY COURT ON OR BEFORE THE LATER OF THE CONFIRMATION HEARING AND THE DATE THAT IS FORTY-FIVE (45) DAYS AFTER THE APPLICABLE DEADLINE FOR FILING SUCH PROOFS OF CLAIM.

## 3.    Objections to Fee Claims

Any objections to Fee Claims will be served and filed (a) no later than thirty (30) days after the filing of the final applications for compensation or reimbursement by the applicable Professional Person or (b) such later date as ordered by the Bankruptcy Court.

## 4.    Estimation of Claims

The Debtors or the Reorganized Debtors, as applicable, may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtors had previously objected to or otherwise disputed such Claim or whether the Bankruptcy Court has ruled on any such objection.  The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated will constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Reorganized Debtors may pursue supplementary proceedings to object to the allowance of such Claim.

RLF1 17158271V.1

5.      **Claims Resolution Procedures Cumulative**

All of the objection, estimation, and resolution procedures in the Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with the Plan by any mechanism approved by the Bankruptcy Court.

6.      **No Distributions Pending Allowance**

No payment or distribution provided under the Plan will be made on account of a Disputed Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

7.      **Disputed General Unsecured Claims and Disputed Claims in Class 4**

(a)      A General Unsecured Claims Reserve will be managed by the Disbursing Agent. The General Unsecured Claims Reserve will include the amount of Cash allocable to holders of General Unsecured Claims that are not Allowed on the Effective Date.   The Cash in the General Unsecured Claims Reserve will be allocable to holders of Disputed General Unsecured Claims, based on their Pro Rata share of the General Unsecured Claims Distribution, as if such Disputed General Unsecured Claims were Allowed Claims on the Effective Date, together with all earnings thereon (net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the General Unsecured Claims Reserve).  The Disbursing Agent will hold in the General Unsecured Claims Reserve all interests, payments, and other distributions made on account of, as well as any obligations arising from, property held in the General Unsecured Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such interests, payments, or other distributions will be held for the benefit of holders of Disputed General Unsecured Claims whose Claims are subsequently Allowed against any of the Debtors and any other parties entitled thereto under the Plan. To the extent that a Disputed General Unsecured Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent will distribute to the holder thereof the distribution, if any, of Cash to which such holder is entitled under the Plan out of the General Unsecured Claims Reserve.  No interest will be paid with respect to any Disputed General Unsecured Claim that becomes an Allowed Claim after the Effective Date.

(b)      There will be withheld from the Net Distributable Cash and the New Equity Interests (which withheld New Equity Interests will not be issued by Reorganized Paragon until such time as the respective Disputed Claims are resolved) to be distributed to holders of Allowed Senior Notes Claims and Secured Lender Unsecured Claims an amount of Cash and New Equity Interests that would be distributable to Disputed Claims in Class 4, if any, had such Disputed Claims been Allowed on the Effective Date, together with all earnings thereon (net of any expenses relating thereto, including any taxes imposed thereon or otherwise payable by the Class 4 Disputed Claims Reserve).  The Disbursing Agent will hold in the Class 4 Disputed Claims Reserve all Cash withheld with respect to any Disputed Claims in Class 4 and all interests, payments, and other distributions made on account of, as well as any obligations arising from, property held in the Class 4 Disputed Claims Reserve, to the extent that such property continues to be so held at the time such distributions are made or such obligations arise, and such interests, payments, or other distributions will be held for the benefit of the holders of Disputed Claims in Class 4, if any, pending resolution of the Allowed amount of such Disputed Claims.  To the extent any dividends would have been payable on any withheld New Equity Interests had such New Equity Interests been issued and distributed on the Effective Date, an amount equal to such dividends will be held by the Reorganized Debtors for the benefit of the holders of Disputed Claims in Class 4, if any, pending resolution of the Allowed amount of such Disputed Claims.

46

(c)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any Cash reserved on account of Disputed General Unsecured Claims (i.e., the General Unsecured Claims Reserve) as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including, without limitation, the Debtors, Reorganized Paragon, the Disbursing Agent, and the holders of General Unsecured Claims) will report for tax purposes consistently with such treatment.  The Disbursing Agent will be responsible for payment, out of the Cash in the General Unsecured Claims Reserve held in respect of such Disputed General Unsecured Claims, of any taxes imposed on the General Unsecured Claims Reserve or its assets.

(d)    Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any Cash reserved on account of Disputed Claims in Class 4 (i.e., the Class 4 Disputed Claims Reserve) as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including, without limitation, the Debtors, Reorganized Paragon, the Disbursing Agent, and the holders of Senior Notes Claims and Secured Lender Unsecured Claims) will report for tax purposes consistently with such treatment.  The Disbursing Agent will be responsible for payment, out of the Cash in the Class 4 Disputed Claims Reserve held in respect of such Disputed Claims in Class 4, of any taxes imposed on the Class 4 Disputed Claims Reserve or its assets.

### 8.    Distributions After Allowance

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as practicable after the date on which the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Disbursing Agent will provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest to be paid on account of such Claim unless required by the Bankruptcy Code.

## G.    Executory Contracts and Unexpired Leases

### 1.    Assumption and Rejection of Executory Contracts and Unexpired  Leases

(a)    As of and subject to the occurrence of the Effective Date and the payment of any applicable Cure Amount, all executory contracts and unexpired leases to which the Debtors are party will be deemed assumed except for an executory contract or unexpired lease that (i) has previously been assumed or rejected pursuant to a final order of the Bankruptcy Court, (ii) is specifically designated on the Schedule of Rejected Contracts and Leases filed and served prior to commencement of the Confirmation Hearing, or (iii) is the subject of a separate (A) assumption motion filed by the Debtors or (B) rejection motion filed by the Debtors under section 365 of the Bankruptcy Code before the Confirmation Date. The Debtors reserve the right to modify the treatment of any particular executory contract or unexpired lease pursuant to the Plan.

(b)    Subject to the occurrence of the Effective Date, the payment of any applicable Cure Amount, and the resolution of any Cure Dispute, the entry of the Confirmation Order by the Bankruptcy Court will constitute approval of the rejections, assumptions, and assumptions and assignments provided for in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Unless otherwise indicated or provided in a separate order of the Bankruptcy Court, rejections, assumptions, or assumptions and assignments of executory contracts and unexpired leases pursuant to the

Plan are effective as of the Effective Date. Each executory contract and unexpired lease assumed pursuant to the Plan or by order of the Bankruptcy Court but not assigned to a third party before the Effective Date will vest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as modified by the provisions of the Plan, any order of the Bankruptcy Court authorizing and providing for its assumption, or applicable law.

### 2. Determination of Cure Disputes and Deemed Consent

(a)     With respect to each executory contract or unexpired lease to be assumed or assumed and assigned by the Debtors, unless otherwise determined by the Bankruptcy Court pursuant to a Final Order or agreed to by the parties thereto prior to the Effective Date, the dollar amount required to Cure any defaults of the Debtors existing as of the Confirmation Date will be the Cure Amount set in the Cure Notice. The Cure Amount will be satisfied, under section 365(b)(1) of the Bankruptcy Code, by the Debtors or Reorganized Debtors, as applicable, upon assumption of the relevant executory contract or unexpired lease. Following the Petition Date, the Debtors will have served a notice on parties to executory contracts and unexpired leases to be assumed reflecting the Debtors' intent to assume the contract or lease in connection with the Plan and setting forth the proposed Cure Amount (if any). If a counterparty to any executory contract or unexpired lease that the Debtors intend to assume does not receive such a notice, the proposed Cure Amount for such executory contract or unexpired lease will be deemed to be Zero Dollars ($0). Upon payment in full of the Cure Amount, any and all proofs of Claim based upon an executory contract or unexpired lease that has been assumed in the Chapter 11 Cases or under the Plan will be deemed Disallowed and expunged without any further notice to or action by any party or order of the Bankruptcy Court.

(b)     If there is a dispute regarding (i) any Cure Amount, (ii) the ability of the Debtors to provide adequate assurance of future performance (within the meaning of section 365 of the Bankruptcy Code) under the contract or lease to be assumed, or (iii) any other matter pertaining to assumption or assumption and assignment, such dispute will be heard by the Bankruptcy Court prior to such assumption or assumption and assignment being effective. Any counterparty to an executory contract or unexpired lease that fails to object timely to the notice of the proposed assumption or assumption and assignment of such executory contract or unexpired lease or the relevant Cure Amount within fifteen (15) days of the Debtors' notice of intent to assume or assume and assign, will be deemed to have consented to such assumption or assumption and assignment and the Cure Amount (even if Zero Dollars ($0)), and will be forever barred, estopped, and enjoined from challenging the validity of such assumption or assumption and assignment or the amount of such Cure Amount thereafter.

(c)     In the event that the rejection of an executory contract or unexpired lease under the Plan results in damages to the other party or parties to such contract or lease, any Claim for such damages, if not heretofore evidenced by a timely filed proof of Claim, will be forever barred and will not be enforceable against the Debtors or the Reorganized Debtors, or their respective Estates, properties or interests in property, unless a proof of Claim is filed with the Bankruptcy Court and served upon the Debtors or the Reorganized Debtors, as applicable, no later than thirty (30) days after the later of (i) the Confirmation Date or (ii) the effective date of the rejection of such executory contract or unexpired lease, as set forth on the Schedule of Rejected Contracts and Leases or order of the Bankruptcy Court. The Confirmation Order will constitute the Bankruptcy Court's approval of the rejection of all the leases and contracts identified in the Schedule of Rejected Contracts and Leases.

### 3. Survival of the Debtors' Indemnification and Reimbursement Obligations

Any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, other organizational documents, deeds of

indemnity, or similar contractual agreements to indemnify, directors, officers, agents, and/or employees who serve in such capacity as of or after January 18, 2017, and any other directors or officers as may be agreed upon by and among the Requisite Lenders and the Debtors or the Reorganized Debtors, as applicable with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors will not be discharged, impaired, or otherwise affected by the Plan; *provided*, that the Reorganized Debtors will not indemnify directors or officers of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud as determined by a Final Order.  All such obligations, including any obligations of Paragon Parent, will be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and will continue as obligations of the Reorganized Debtors.  Any claim based on the Debtors' obligations in the Plan will not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.  After the Effective Date, the Reorganized Debtors will not terminate or otherwise reduce the coverage under any directors' and officers' insurance policies (including any "tail policy") in effect as of the Petition Date, and all members, managers, directors, and officers of the Debtors who served in such capacity at any time prior to the Effective Date will be entitled to the full benefits of any such policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date.

### 4.    Compensation and Benefit Plans

Unless otherwise provided in the Plan, all employment and severance policies, and all compensation and benefits plans, policies, and programs of the Debtors applicable to their respective employees, retirees, and non-employee directors, including all savings plans, retirement plans, healthcare plans, disability plans, severance benefit plans, incentive plans, and life and accidental death and dismemberment insurance plans, are deemed to be, and will be treated as, executory contracts under the Plan and, on the Effective Date, will be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code.  For the avoidance of doubt, any awards granted under the Management Incentive Plan will be governed by such plan and will not be subject to any provisions of the foregoing assumed plans, programs, or arrangements.

### 5.    Insurance Policies.

All insurance policies to which any Debtor is a party as of the Effective Date will be deemed to be and treated as executory contracts, will be assumed or assumed and assigned by the applicable Debtor, and will vest in the Reorganized Debtors and continue in full force and effect thereafter in accordance with their respective terms.

### 6.    Reservation of Rights

(a)    Neither the exclusion nor the inclusion by the Debtors of any contract or lease on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any such contract or lease is or is not an executory contract or unexpired lease or that the Debtors or the Reorganized Debtors or their respective affiliates has any liability thereunder.

(b)    Except as otherwise provided in the Plan, or in a previously entered order of the Bankruptcy Court, nothing will waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors or the Reorganized Debtors under any executory or non-executory contract or unexpired or expired lease.

(c)        Nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors, as applicable, under any executory or non-executory contract or unexpired or expired lease.

(d)        If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of its assumption under the Plan, the Debtors or Reorganized Debtors, as applicable, will have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

## H.    Conditions Precedent to the Occurrence of the Effective Date

### 1.    Conditions Precedent to the Effective Date

The Effective Date will not occur unless all of the following conditions precedent have been satisfied or waived in accordance with Section 9.2 of the Plan:

(a)        the Bankruptcy Court has entered the Confirmation Order, which order will not be subject to a stay of execution;

(b)        the Plan Documents are reasonably satisfactory in all respects to the Debtors and the Requisite Lenders;

(c)        all conditions precedent to effectiveness of the Take Back Debt Agreement, the New Letter of Credit Agreement, the Existing L/C Escrow Agreement(s), the U.K. Implementation Agreement, the U.K. Indemnification Agreement, the Registration Rights Agreement, and the Shareholders Agreement will have been satisfied or waived in accordance with the terms of the Plan;

(d)        all Restructuring Expenses payable under the Plan will be paid by the Debtors before or on the Effective Date without any further notice to or action, order, or approval of the Bankruptcy Court in accordance with Section 5.17 of the Plan;

(e)        the calculation of the Cash Flow Adjustment and Net Distributable Cash in accordance with Section 5.7 of the Plan will have been either (i) agreed to by the Debtors and the Requisite Lenders or (ii) determined in accordance with the Cash Flow Adjustment Schedule, if applicable;

(f)        the amount of the Retained Accounts will have been either (i) agreed to by the Debtors and the Requisite Lenders or (ii) determined by the Bankruptcy Court, if applicable;

(g)        the aggregate amount of all Cash payable under the Plan to the holders of Allowed Term Loan Claims and holders of Allowed Revolver Claims pursuant to Sections 4.3 and 4.4 of the Plan will not be less than the Minimum Secured Lender Cash Distribution Amount unless the Requisite Lenders consent to a reduced aggregate amount;

(h)        an order approving the Noble Settlement Agreement will have been entered and not be subject to a stay of execution;

(i)        the U.K. Administration will have been commenced and the U.K. Sale Transaction will have been effectuated in accordance with the U.K. Implementation Agreement; and

(j)      all governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan have been obtained, are not subject to unfulfilled conditions, and are in full force and effect, and all applicable waiting periods have expired without any action having been taken by any competent authority that would restrain, prevent, or otherwise impose materially adverse conditions on such transactions.

## 2.      Waiver of Conditions Precedent

(a)      Each of the conditions precedent to the occurrence of the Effective Date (other than Section 9.1(a) of the Plan) may be waived in writing by the Debtors subject to the written consent of the Requisite Lenders.  If any such condition precedent is waived pursuant to this Section and the Effective Date occurs, each party agreeing to waive such condition precedent will be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied.  If the Plan is confirmed for fewer than all of the Debtors subject to Section 5.15 of the Plan, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

(b)      The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) will be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order will take effect immediately upon its entry.

## 3.      Effect of Failure of a Condition

If the conditions listed in Section 9.1 of the Plan are not satisfied or waived in accordance with Section 9.2 of the Plan on or before July 31, 2017, or by such later date as may be later agreed to by the Requisite Lenders and the Debtors and as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan will be null and void in all respects and nothing contained in the Plan or the Disclosure Statement will (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the holders of Term Loan Claims, the holders of Revolver Claims, or any other Entity.

## I.      Effect of Confirmation

### 1.      Binding Effect

Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Effective Date, on and after the entry of the Confirmation Order, the provisions of the Plan will bind every holder of a Claim against or Interest in any Debtor and inure to the benefit of and be binding on such holder's respective successors and assigns, regardless of whether the Claim or Interest of such holder is impaired under the Plan and whether such holder has accepted the Plan.

### 2.      Vesting of Assets

Except as otherwise provided in the Plan, on and after the Effective Date, all Assets of the Estates, including all claims, rights, and Causes of Action and any property acquired by the Debtors or Reorganized Paragon under or in connection with the Plan or the U.K. Administration, will vest in each respective Reorganized Debtor free and clear of all Claims, Liens, charges, other encumbrances, and Interests.  Subject to the terms of the Plan, on and after the Effective Date, the Reorganized Debtors may operate their businesses and may use, acquire, and dispose of property and prosecute, compromise, or settle any Claims (including any Administrative Expense Claims) and Causes of Action without

supervision of or approval by the Bankruptcy Court and free and clear of any restrictions of the Bankruptcy Code or the Bankruptcy Rules other than restrictions expressly imposed by the Plan or the Confirmation Order.

### 3. Discharge of Claims Against and Interests in the Debtors

Upon the Effective Date and in consideration of the distributions to be made under the Plan, except as otherwise provided in the Plan or in the Confirmation Order, each holder (as well as any trustee or agent on behalf of such holder) of a Claim or Interest and any successor, assign, and affiliate of such holder will be deemed to have forever waived, released, and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Interests, rights, and liabilities that arose prior to the Effective Date.  Except as otherwise provided in the Plan, upon the Effective Date, all such holders of Claims and Interests and their successors, assigns, and affiliates will be forever precluded and enjoined, pursuant to sections 105, 524, and 1141 of the Bankruptcy Code, from prosecuting or asserting any such discharged Claim against or terminated Interest in any Debtor or any Reorganized Debtor.

### 4. Term of Pre-Confirmation Injunctions and Stays

Unless otherwise provided in the Plan, all injunctions and stays arising under or entered during the Chapter 11 Cases, whether under sections 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the date of entry of the Confirmation Order, will remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 5. Plan Injunction

(a) **Except as otherwise provided in the Plan or in the Confirmation Order, as of the entry of the Confirmation Order but subject to the occurrence of the Effective Date, all Entities who have held, hold, or may hold Claims or Interests are, with respect to any such Claim or Interest, permanently enjoined after the entry of the Confirmation Order from: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative, or other forum) against or affecting, directly or indirectly, a Debtor, a Reorganized Debtor, or an Estate or the property of any of the foregoing, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities mentioned in this subsection (i) or any property of any such transferee or successor; (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering in any manner or by any means, whether directly or indirectly, any judgment, award, decree, or order against a Debtor, a Reorganized Debtor, or an Estate or its property, or any direct or indirect transferee of any property of, or direct or indirect successor in interest to, any of the foregoing Entities mentioned in this subsection (ii) or any property of any such transferee or successor; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against a Debtor, a Reorganized Debtor, or an Estate or any of its property, or any direct or indirect transferee of any property of, or successor in interest to, any of the foregoing Entities mentioned in this subsection (iii) or any property of any such transferee or successor; (iv) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan to the full extent permitted by applicable law; and (v) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; *provided*, that nothing contained in the Plan will preclude such Entities who have held, hold, or may hold Claims against or Interests in a Debtor or an Estate from exercising their rights,**

or obtaining benefits, pursuant to and consistent with the terms of the Plan and the Plan Documents.

(b)    **By accepting distributions pursuant to the Plan, each holder of an Allowed Claim or Allowed Interest will be deemed to have affirmatively and specifically consented to be bound by the Plan, including the injunctions set forth in Section 10.5 of the Plan.**

6.    **Releases**

(a)    **Releases by the Debtors.  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan, and the Plan Documents, for good and valuable consideration, the adequacy of which is confirmed by the Plan, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, the Reorganized Debtors, or their Estates, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or thereinafter arising, in law, equity, or otherwise, that the Debtors, the Reorganized Debtors, or their Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Disclosure Statement, and the Plan and related agreements, instruments, and other documents (including the Plan Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, willful misconduct, or gross negligence as determined by a Final Order.**

**"Released Parties" means, collectively, and in each case solely in their capacities as such: (a) the Debtors; (b) the Debtors' non-Debtor affiliates; (c) the Term Lenders; (d) the Revolving Lenders (e) the Revolving Credit Facility Agent; (f) the Term Loan Agent; (g) each of the Global Coordinators, Joint Lead Arrangers, Joint Bookrunners, Senior Managing Agents, and Managing Agents named in the Term Loan Agreement; (h) JPMorgan Chase Bank, N.A., in its capacity as former administrative agent under the Term Loan Agreement; (i) the Disbursing Agent; (j) each of the Syndication Agents, Documentation Agents, Joint Lead Arrangers and Joint Lead Bookrunners named in the Revolving Credit Agreement; (k) each of the Issuing Banks under the Revolving Credit Agreement; (l) the U.K. Administrators; and (m) with respect to each of the foregoing entities, such entities' predecessors, professionals, restructuring advisors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors (other than the Non-Released Party), principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.**

**"Releasing Parties"** means, collectively, and in each case solely in their capacities as such: (a) the holders of all Claims or Interests who vote to accept the Plan; (b) the holders of Claims or Interests that are Unimpaired under the Plan and do not timely object to the releases provided for in the Plan; (c) the holders of Claims or Interests whose vote to accept or reject the Plan is solicited but who do not vote either to accept or to reject the Plan and do not opt out of granting the releases set forth in the Plan; (d) the holders of Claims or Interests who vote to reject the Plan but do not opt out of granting the releases set forth in the Plan; (e) the Revolving Credit Facility Agent; (f) the Term Loan Agent; (g) each of the Global Coordinators, Joint Lead Arrangers, Joint Bookrunners, Senior Managing Agents, and Managing Agents named in the Term Loan Agreement; (h) JPMorgan Chase Bank, N.A., in its capacity as former administrative agent under the Term Loan Agreement; (i) the Disbursing Agent; (j) each of the Syndication Agents, Documentation Agents, Joint Lead Arrangers and Joint Lead Bookrunners named in the Revolving Credit Agreement; (k) each of the Issuing Banks under the Revolving Credit Agreement; and (l) with respect to each of the foregoing entities, such entities' predecessors, professionals, restructuring advisors, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors, principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.

        (b)      **Releases by Holders of Claims and Interests.**  As of the Effective Date, except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, for good and valuable consideration, the adequacy of which is confirmed by the Plan, including the service of the Released Parties to facilitate the reorganization of the Debtors and the implementation of the Restructuring, and except as otherwise provided in the Plan or in the Confirmation Order, the Released Parties are deemed forever released and discharged by the Releasing Parties from any and all claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, and liabilities whatsoever, including any derivative claims, asserted or assertable on behalf of the Debtors, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such holders or their affiliates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the Restructuring, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, the Restructuring Transactions, the Disclosure Statement, and the Plan and related agreements, instruments, and other documents (including the Plan Documents), and the negotiation, formulation, or preparation thereof, the solicitation of votes with respect to the Plan, or any other act or omission, other than Claims or Causes of Action arising out of or related to any act or omission of a Released Party that is a criminal act or constitutes intentional fraud, willful misconduct, or gross negligence as determined by a Final Order.

        (c)      **Releases in the Noble Settlement Agreement.**  As of the Effective Date, the releases in the Noble Settlement Agreement will be granted.

(d)    **Special Provisions for Governmental Units.  Notwithstanding any language to the contrary contained in the Plan, no provision of the Plan will (i) preclude any Governmental Unit from enforcing its police or regulatory powers or (ii) release any non-Debtor from liability in connection with any legal or equitable action or claim brought by any Governmental Unit.**

**7.    Exculpation.**

**To the extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is released and exculpated by the Plan from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, loss, and liability for any claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of any disclosure statements, including the Disclosure Statement, the Restructuring Transactions, any plans of reorganization, including the Plan, and all related agreements, instruments, and other documents (including the Plan Supplement), or the solicitation of votes for, or pursuit of confirmation of any plans of reorganization, including the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration of the Plan or the property to be distributed under the Plan; the issuance of securities under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; except to the extent arising out of or related to any act or omission of an Exculpated Party that is a criminal act or constitutes intentional fraud, willful misconduct, or gross negligence as determined by a Final Order.  This exculpation will be in addition to, and not in limitation of, all other releases, indemnities, exculpations and any other applicable law or rules protecting such Exculpated Parties from liability.**

**"Exculpated Parties" means, collectively, and in each case in their capacities as such: (a) the Debtors; (b) the Disbursing Agent; (c) the U.K. Administrators; (d) Deloitte; (e) any official committee appointed in these cases; (f) the Professional Persons; and (g) with respect to clauses (a) through (e), such entities' predecessors, professionals, successors, assigns, subsidiaries, affiliates, managed accounts and funds, current and former officers and directors (other than the Non-Released Party), principals, shareholders, members, partners, managers, employees, subcontractors, agents, advisory board members, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, fund advisors, and other professionals, and such entities' respective heirs, executors, estates, servants, and nominees, in each case in their capacity as such.**

**8.    Injunction Related to Releases and Exculpation**

**Except for the rights that remain in effect from and after the Effective Date to enforce the Plan and the Plan Documents, the Confirmation Order will permanently enjoin the commencement or prosecution by any Entity, whether directly, derivatively, or otherwise, of any Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, losses, or liabilities released or exculpated pursuant to the Plan.**

**9.    Subordinated Claims**

The allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments thereof under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 510(a), 510(b), or 510(c) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right to reclassify any Allowed

Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## 10.    Retention of Causes of Action and Reservation of Rights

Subject to Sections 10.6, 10.7, and 10.8 of the Plan, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any rights, claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtors had immediately before the Effective Date on behalf of the Estates or of themselves in accordance with any provision of the Bankruptcy Code or any applicable nonbankruptcy law.  Subject to Sections 10.6, 10.7, and 10.8 of the Plan, the Reorganized Debtors will have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

## 11.    Ipso Facto and Similar Provisions Ineffective

Any term of any policy, contract, or other obligation applicable to a Debtor will be void and of no further force or effect with respect to any Debtor to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Entity based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the confirmation or consummation of the Plan, including any change of control that will occur as a result of such consummation; (d) any change of control resulting from the U.K. Sale Transaction; (e) the commencement of the U.K. Administration; or (f) the Restructuring.

## J.    Retention of Jurisdiction

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court will retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases, other than those matters administered in the U.K. Administration, for, among other things, the following purposes:

(a)    to hear and determine applications for the assumption of executory contracts or unexpired leases and any disputes over Cure Amounts resulting therefrom;

(b)    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter in the Chapter 11 Cases pending on or commenced after the entry of the Confirmation Order;

(c)    to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)    to ensure that distributions to holders of Allowed Claims are accomplished as provided in the Plan and the Confirmation Order;

(e)    to consider Claims or the allowance, classification, priority, compromise, estimation, or payment of any Claim, including any Administrative Expense Claim;

(f)     to enter, implement, or enforce such orders as may be appropriate in the event that the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)     to issue and enforce injunctions and releases, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)     to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code to remedy any defect or omission or reconcile any inconsistency in the Plan, the Disclosure Statement, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)     to hear and determine all Fee Claims;

(j)     to resolve disputes concerning Disputed Claims and any retained amounts with respect to Disputed Claims or the administration thereof;

(k)     to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan, the Confirmation Order, any transactions or payments in furtherance of either, or any agreement, instrument, or other document governing or related to any of the foregoing;

(l)     to take any action and issue such orders, including any such action or orders as may be necessary after entry of the Confirmation Order or the occurrence of the Effective Date, as may be necessary to construe, enforce, implement, execute, and consummate the Plan, including any release, exculpation, or injunction provisions set forth in the Plan, or to maintain the integrity of the Plan following the occurrence of the Effective Date;

(m)     to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(n)     to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(o)     to hear and determine any other matters related to the Chapter 11 Cases and not inconsistent with the Bankruptcy Code or title 28 of the United States Code;

(p)     to resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Amount, in each case, for the purpose for determining whether a Claim or Interest is discharged under the Plan or for any other purpose;

(q)     to recover all Assets of the Debtors and property of the Estates, wherever located; and

(r)     to enter a final decree closing each of the Chapter 11 Cases;

*provided*, that, on and after the Effective Date, the Bankruptcy Court will not retain jurisdiction over any matters arising out of or related to the Take Back Debt Agreement, the New Letter of Credit Agreement,

the Existing L/C Escrow Agreement(s), the Registration Rights Agreement, or the Shareholders Agreement.

### K.    Miscellaneous Provisions

**1.    Amendments.**

(a)    Plan Modifications.  Subject to the reasonable consent of the Requisite Lenders, the Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, without additional disclosure pursuant to section 1125 of the Bankruptcy Code, except as otherwise ordered by the Bankruptcy Court. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan and subject to the reasonable consent of the Requisite Lenders, the Debtors may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan will be deemed to have accepted the Plan as amended, modified, or supplemented.

(b)    Certain Technical Amendments.  Prior to the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan without further order or approval of the Bankruptcy Court; *provided*, that such technical adjustments and modifications do not adversely affect the treatment of holders of Allowed Claims or Allowed Interests under the Plan.

**2.    Revocation or Withdrawal of Plan**

Subject to the reasonable consent of the Requisite Lenders, the Debtors reserve the right to revoke or withdraw the Plan prior to the Effective Date as to any or all of the Debtors.  If, with respect to a Debtor, the Plan has been revoked or withdrawn prior to the Effective Date, or if confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of executory contracts or unexpired leases affected by the Plan, and any document or agreement executed pursuant to the Plan will be deemed null and void; and (c) nothing contained in the Plan will (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of such Debtor or any other Person or Entity; or (iii) constitute an admission of any sort by any Debtor or any other Person or Entity.

**3.    Dissolution of Creditors' Committee**

Except to the extent provided in the Plan, upon the Effective Date, the current and former members of the Creditors' Committee, and their respective officers, employees, counsel, advisors, and agents, will be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases; provided, however, that following the Effective Date, the Creditors' Committee will continue in existence and have standing and a right to be heard for the following limited purposes: (a) Claims and/or applications for compensation by Professional Persons; (b) any appeals of the Confirmation Order; (c) any appeals to which the Creditors' Committee is a named party; and (d) any adversary proceedings or contested matters as of the Effective Date to which the Creditors' Committee is a named party.  Following the completion of the Creditors' Committee's remaining duties set forth above, the Creditors' Committee will be dissolved, and the retention or employment of the Creditors' Committee's respective attorneys, accountants, and other agents will terminate.

### 4. Exemption from Certain Transfer Taxes

Pursuant to section 1146 of the Bankruptcy Code, the issuance, transfer, or exchange of any security or other property under the Plan, including, to the fullest extent permitted by applicable law, all sale transactions consummated by the Debtors and approved by the Bankruptcy Court on and after the Confirmation Date through and including the Effective Date, including any transfers effectuated under the Plan, and any assumption, assignment, or sale by the Debtors of their interests in unexpired leases of nonresidential real property or executory contracts pursuant to section 365(a) of the Bankruptcy Code, will constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and will not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

### 5. Payment of Statutory Fees

All fees payable under section 1930 of chapter 123 of title 28 of the United States Code will be paid on the Effective Date, or as soon as practicable thereafter, by the Debtors or Reorganized Debtors.  Quarterly fees owed to the U.S. Trustee will be paid when due in accordance with applicable law and the Debtors and Reorganized Debtors will continue to file reports to show the calculation of such fees for the Debtors' Estates until the Chapter 11 Cases are closed under section 350 of the Bankruptcy Code.  Each and every one of the Debtors will remain obligated to pay quarterly fees to the U.S. Trustee until the earliest of that particular Debtor's case is closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code.

### 6. Severability

Subject to Section 5.15 of the Plan, if, prior to the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors with the reasonable consent of the Requisite Lenders, will have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision will then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation by the Bankruptcy Court, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable pursuant to its terms.

### 7. Governing Law

Except to the extent that the Bankruptcy Code or other federal law is applicable or to the extent that a Plan Document provides otherwise, the rights, duties, and obligations arising under the Plan and the Plan Documents will be governed by, and construed and enforced in accordance with, the internal laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 8. Immediate Binding Effect

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and the Plan Documents will be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Reorganized Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties, and each of their respective successors and assigns.

### 9. Successors and Assigns

The rights, benefits, and obligations of any Entity named or referred to in the Plan will be binding on and will inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each such Entity.

### 10. Entire Agreement

On the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order will supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

### 11. Computing Time

In computing any period of time prescribed or allowed by the Plan, unless otherwise set forth in the Plan or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 will apply.

### 12. Exhibits to Plan

All exhibits, schedules, supplements, and appendices to the Plan (including the Plan Supplement) are incorporated into and are a part of the Plan as if set forth in full in the Plan.

### 13. Notices

All notices, requests, and demands to or upon the Debtors or Reorganized Debtors, as applicable, will be in writing (including by email transmission) and, unless otherwise provided in the Plan, will be deemed to have been duly given or made only when actually delivered, addressed as follows:

> (a)    *If to the Debtors or Reorganized Debtors*:
>
> Paragon Offshore plc
> c/o Paragon Offshore Services LLC
> 3151 Briarpark Drive
> Houston, Texas  77042
> Attn:    Todd Strickler, Senior Vice President of Administration, General Counsel, and Corporate Secretary
> Telephone: (832) 783-4000
> Email:  tstrickler@paragonoffshore.com
>
> *– and –*
>
> Richards, Layton & Finger, P.A.
> One Rodney Square
> 920 North King Street
> Wilmington, Delaware 19801
> Attn:    Mark D. Collins
> Telephone:  (302) 651-7700
> Email:  collins@rlf.com

RLF1 17158271V.1

*– and –*

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:    Gary T. Holtzer
          Stephen A. Youngman
Telephone:  (212) 310-8000
Email:  gary.holtzer@weil.com
          stephen.youngman@weil.com


(b)      *If to the Revolving Credit Facility Agent and/or the Steering Committee of Revolving Lenders:*

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn:    Sandeep Qusba
          Kathrine A. McLendon
Telephone: (212) 455-2000
Email:  squsba@stblaw.com
          kmclendon@stblaw.com


*- and -*

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Attn:    Adam G. Landis
          Kerri K. Mumford
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450
Email:  landis@lrclaw.com
          mumford@lrclaw.com


(c)      *If to the Term Loan Agent and/or the Ad Hoc Committee of Term Lenders:*

Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
Attn: Madlyn Gleich Primoff
          Scott D. Talmadge
          Mark F. Liscio
          Benjamin Mintz
Telephone: (212) 836-8000
Email:  madlyn.primoff@apks.com
          mark.liscio@apks.com
          scott.talmadge@apks.com
          benjamin.mintz@apks.com


*- and –*

61

Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor, P.O. Box 951
Wilmington, Delaware  19899-0951
Attn:    Jeremy W. Ryan
         Ryan M. Murphy
Telephone:  (302) 984-6000
Facsimile: (302) 658-1192
Email:  jryan@potteranderson.com
        rmurphy@potteranderson.com

After the occurrence of the Effective Date, the Reorganized Debtors have authority to send a notice to Entities that to continue to receive documents pursuant to Bankruptcy Rule 2002, such Entities must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002.  After the occurrence of the Effective Date, the Reorganized Debtors are authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to those Entities that have filed such renewed requests.

**14.    Reservation of Rights**

Except as otherwise provided in the Plan, the Plan will be of no force or effect unless the Bankruptcy Court enters the Confirmation Order.  None of the filing of the Plan, any statement or provision of the Plan, or the taking of any action by the Debtors with respect to the Plan will be or will be deemed to be an admission or waiver of any rights of the Debtors with respect to any Claims or Interests prior to the Effective Date.

# VII.
# FINANCIAL INFORMATION AND PROJECTIONS

## A.    Consolidated Condensed Projected Financial Information

The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code (see Section XIII.C hereof), as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor under the Plan.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies the feasibility standard, the Debtors analyzed their ability to satisfy their financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors have prepared financials for 2016 and financial projections (the "**Projections**") for 2017 through 2021 (the "**Projection Period**"), as set forth below.  The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Projections to holders of Claims or other parties in interest after the Confirmation Date, or to include such information in documents required to be filed with the SEC or otherwise make such information public, unless required to do so by the SEC or other regulatory bodies pursuant to the provisions of the Plan.  In connection with the development of the Plan, the Projections were prepared by the Debtors, with the assistance of their advisors, to present the anticipated impact of the Plan.  The Projections assume that the Plan will be implemented in accordance with its stated terms.  The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, oil and natural gas prices, expectations regarding future commodity prices, the level of activity of oil and natural gas exploration, development, and production globally, demand for drilling services, competition and supply of competing rigs, changes in the political environment of the countries in which the Paragon Group operates, regulatory changes, and/or a variety

62

of other factors.  Consequently, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.  The Projections included herein were last updated on January 24, 2017.

The Projections should be read in conjunction with the significant assumptions, qualifications, and notes set forth below.

THE DEBTORS PREPARED THE PROJECTIONS WITH THE ASSISTANCE OF THEIR ADVISORS.  THE DEBTORS DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE SEC.  EXCEPT FOR PURPOSES OF THIS DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THEIR ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.

MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS, AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, ACHIEVING OPERATING EFFICIENCIES, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS, AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, INDUSTRY, REGULATORY, LEGAL, MARKET, AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL.  THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS.  SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT.  MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER.  EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR THIS DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER

THE DATE HEREOF OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTEE OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR.  IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).[5]

**PROJECTED INCOME STATEMENT**

| (US $ in thousands) | 2016E | 2017P | FYE December 31, 2018P | 2019P | 2020P | 2020IP |
|---|---|---|---|---|---|---|
| Revenue | $636,174 | $292,267 | $333,336 | $408,098 | $467,858 | $504,050 |
| Operating Costs | 411,771 | 234,395 | 260,916 | 284,631 | 300,870 | 313,538 |
| Gross Margin | $224,403 | $57,872 | $72,420 | $123,467 | $166,988 | $190,512 |
| *Gross Margin* | *35.3%* | *19.8%* | *21.7%* | *30.3%* | *35.7%* | *37.8%* |
| | | | | | | |
| Depreciation and Amortization | $220,237 | $125,351 | $115,678 | $115,440 | $105,339 | $92,062 |
| G&A | 43,915 | 34,916 | 34,685 | 35,726 | 37,512 | 39,388 |
| Operating Income | ($39,749) | ($102,395) | ($77,943) | ($27,699) | $24,137 | $59,062 |
| | | | | | | |
| Interest Expense and Other, net | 77,821 | 58,832 | 18,071 | 17,574 | 14,025 | 10,783 |
| Income Before Taxes and Non-Recurring Items | ($117,570) | ($161,227) | ($96,014) | ($45,273) | $10,112 | $48,280 |
| | | | | | | |
| Tax Provision | 20,486 | 6,132 | 6,722 | 12,882 | 15,070 | 17,080 |
| Restructuring Expenses & Unusual Events (Includes Gain on Debt Cancellation) | 200,584 | (1,729,885) | -- | -- | -- | -- |
| Net Income | ($338,640) | $1,562,526 | ($102,737) | ($58,155) | ($4,957) | $31,199 |
| | | | | | | |
| RECONCILIATION OF NET INCOME TO ADJ. EBITDA | | | | | | |
| Net Income | ($338,640) | $1,562,526 | ($102,737) | ($58,155) | ($4,957) | $31,199 |
| Tax Provision | 20,486 | 6,132 | 6,722 | 12,882 | 15,070 | 17,080 |
| Interest Expense | 77,821 | 58,832 | 18,071 | 17,574 | 14,025 | 10,783 |
| Depreciation and Amortization | 220,237 | 125,351 | 115,678 | 115,440 | 105,339 | 92,062 |
| Minority Interest | -- | -- | -- | -- | -- | -- |
| Restructuring Expenses & Unusual Events (Includes Gain on Debt Cancellation) | 200,584 | (1,729,885) | -- | -- | -- | -- |
| ADJ. EBITDA | $180,488 | $22,955 | $37,735 | $87,742 | $129,476 | $151,124 |

---

[5] Note:  Projected balance sheet does not reflect fresh-start accounting.  Balances are likely to be adjusted after emergence.

**PROJECTED BALANCE SHEET**

| | | FYE December 31, | | | | | |
|---|---|---|---|---|---|---|---|
| *(US $ in thousands)* | 2016E | July 2017P (Pro Forma) | 2017P | 2018P | 2019P | 2020P | 2021P |
| **ASSETS** | | | | | | | |
| Cash and Cash Equivalents | $892,501 | $201,137 | $189,165 | $107,034 | $83,971 | $65,149 | $139,381 |
| Accounts Receivable | 65,644 | 68,026 | 61,897 | 81,955 | 95,701 | 106,477 | 114,236 |
| Prepaid Expenses and Deposits | 13,659 | 20,220 | 14,279 | 14,275 | 14,271 | 14,267 | 14,263 |
| Taxes Receivable | 33,612 | 33,612 | 33,612 | 33,612 | 33,612 | 33,612 | 33,612 |
| Other Current Assets | 22,128 | 16,707 | 13,588 | 13,588 | 14,645 | 16,541 | 17,890 |
| Current Assets | $1,027,545 | $339,703 | $312,541 | $250,463 | $242,200 | $236,046 | $319,381 |
| | | | | | | | |
| PP&E | $812,772 | $762,225 | $717,604 | $670,794 | $611,396 | $558,447 | $518,875 |
| Other Assets | 83,318 | 62,693 | 52,909 | 51,638 | 50,367 | 21,115 | 21,115 |
| **Total Assets** | $1,923,634 | $1,164,621 | $1,083,054 | $972,896 | $903,963 | $815,608 | $859,371 |
| | | | | | | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | | | | | | |
| Short-Term Debt | $36,237 | $27,207 | $23,614 | $24,224 | $95,937 | $ -- | $ -- |
| Accounts Payable | 61,853 | 40,710 | 32,677 | 40,111 | 41,798 | 46,365 | 48,229 |
| Other Current Liabilities | 136,427 | 62,886 | 55,829 | 59,194 | 63,478 | 63,987 | 66,489 |
| Current Liabilities | $234,517 | $130,802 | $112,120 | $123,528 | $201,213 | $110,352 | $114,719 |
| | | | | | | | |
| Long-Term Debt | 2,320,798 | 85,000 | 87,275 | 93,270 | 100,006 | 107,468 | 115,665 |
| Prospector Capital Leases (Long-Term Portion) | 165,963 | 134,839 | 120,022 | 95,198 | -- | -- | -- |
| Deferred Taxes and Other | 35,396 | 32,826 | 31,853 | 31,853 | 31,853 | 31,853 | 31,853 |
| **Total Liabilities** | $2,756,675 | $383,468 | $351,271 | $343,849 | $333,072 | $249,674 | $262,238 |
| | | | | | | | |
| Shareholders' Equity | (833,041) | 781,153 | 731,783 | 629,046 | 570,892 | 565,934 | 597,134 |
| | | | | | | | |
| **Total Liabilities and Shareholders' Equity** | $1,923,634 | $1,164,621 | $1,083,054 | $972,896 | $903,963 | $815,608 | $859,371 |

**PROJECTED CASH FLOW STATEMENT**

| | FYE December 31, | | | | | |
|---|---|---|---|---|---|---|
| *(US $ in thousands)* | 2016E | 2017P | 2018P | 2019P | 2020P | 2021P |
| **OPERATING ACTIVITIES** | | | | | | |
| Net Income | ($338,640) | $1,562,526 | ($102,737) | ($58,155) | ($4,957) | $31,199 |
| Depreciation and Amortization | 220,237 | 125,351 | 115,678 | 115,440 | 105,339 | 92,062 |
| Loss on Impairment | 129,915 | -- | -- | -- | -- | -- |
| (Gain) on Disposal of Assets | (5,878) | -- | -- | -- | -- | -- |
| (Gain)/Loss on Repurchase of Senior Notes & Cancellation of Interest | -- | (1,797,505) | -- | -- | -- | -- |
| Deferred Income Taxes | 24,009 | -- | -- | -- | -- | -- |
| Changes in Working Capital & Other | 201,903 | (45,684) | (1,250) | (83) | 924 | 3,460 |
| Total Operating Activities | $231,546 | ($155,313) | $11,691 | $57,203 | $101,306 | $126,722 |
| | | | | | | |
| **INVESTING ACTIVITIES** | | | | | | |
| Capital Expenditures | ($43,405) | ($30,184) | ($68,868) | ($56,043) | ($52,390) | ($52,490) |
| Proceeds from Sale of Assets | -- | -- | -- | -- | -- | -- |
| Cash From in Other Investing Activities | -- | -- | -- | -- | -- | -- |
| Total Investing Activities | ($43,405) | ($30,184) | ($68,868) | ($56,043) | ($52,390) | ($52,490) |
| | | | | | | |
| **FINANCING ACTIVITIES** | | | | | | |
| Change in Debt | $600 | ($465,036) | $ -- | $ -- | $28,617 | $ -- |
| Sale Leaseback Principal Amortization | (72,810) | (52,804) | (24,955) | (24,224) | (96,355) | -- |
| Total Financing Activities | ($72,210) | ($517,840) | ($24,955) | ($24,224) | ($67,737) | $ -- |
| | | | | | | |
| **Total Change in Cash** | $115,931 | ($703,336) | ($82,131) | ($23,063) | ($18,822) | $74,232 |

## B.    Assumptions to the Projections

### 1.    Overview

The Projections are based on the New Business Plan developed by the Debtors' management with the assistance of their advisors. The New Business Plan aims to maximize optionality and value by increasing the runway for the reorganized company until a market turnaround. In order to achieve this goal, the New Business Plan envisions a smaller reorganized company, with fewer assets than previously proposed, lower fixed costs and significantly less debt than previously proposed. As a result, the reorganized company will be nearly cash-flow neutral on an operating basis. The dayrate and rig utilization

assumptions included in the New Business Plan have been reviewed and are supported by IHS, an independent provider of data, research and analysis on the oil and gas sector.

### 2.    General Assumptions

*Overview*.  Paragon Parent, along with its Debtor and non-Debtor subsidiaries, contracts standard and high specification offshore drilling rigs on a dayrate basis to leading national, international, and independent oil and gas companies.  Historically, the Debtors principally operated in Mexico, Brazil, the North Sea, Africa, the Middle East, and India. The Projections assume go-forward operations are limited to core markets including the North Sea, the Middle East and India, with some additional activity in Mexico.

*Presentation*.  The Projections are presented on a consolidated basis, including estimates of operating results for Debtor and non-Debtor entities, combined.

*Methodology*.  In developing the Projections, the Debtors reviewed their fleet's current contracted status and made an assessment of whether or not these contracts were likely to continue and an assessment of future speculative contracts.  The forecast was developed on an individual rig basis and the Debtors evaluated the likelihood of each of their rigs being utilized over the forecast period.

*Plan Consummation*.  The Projections assume that the Plan will be confirmed or consummated on or about July 31, 2017.

### 3.    Assumptions With Respect to the Projected Income Statement

*Revenues*.  In the Projections, revenues are forecasted by rig based on expected dayrates, utilization and operating efficiency for existing contracts and future speculative contracts.

*Operating Costs*.  Operating costs are projected based on historical daily regional operating costs (adjusted for cost reduction efforts) and expected utilization of each rig based on current contracts and expectations regarding future speculative contracts.

*General and Administrative*.  General and administrative costs ("**G&A**") are primarily comprised of labor costs and other expenses associated with the Debtors' corporate overhead.  The amount of G&A is based on historical G&A costs, adjusted for cost reduction efforts.

*Depreciation and Amortization*.  Depreciation and amortization reflects the anticipated depreciation and amortization of the existing fleet, based on current net book values.

*Interest Expense*.  Interest expense post-emergence is forecasted based on the proposed Take Back Debt, as more fully described in the Plan and the exhibits thereto, as well as the Prospector Leases, including fees on Existing Letters of Credit.

*Income Tax (Expense) Benefit*.  Income tax is estimated based on the jurisdictional mix of Debtors' projected revenue.

*Restructuring Expenses*.  Restructuring Expenses include costs related to the recapitalization process, including but not limited to professional fees, claims administration and other items.  Estimated amounts are based on the terms of contracts and historical precedent.

4.    **Assumptions with Respect to the Projected Balance Sheet and Projected Statement of Cash Flows**

*Working Capital*.  Working capital assumptions are based on historical days sales outstanding and historical days payable as well as historical levels of prepaid and other current assets and current liabilities.

*Pro Forma Adjustments Related to Emergence*.  The July 2017 Balance Sheet included in the Projections presents a pro forma view of July 2017, assuming the effect of certain adjustments related to the Debtors' emergence from bankruptcy in accordance with the terms of the Plan.  These adjustments primarily relate to the paydown and cancellation/equitization of the Debtors' existing indebtedness, as well as the issuance of the Take Back Debt. The pro forma balance sheet has not been adjusted to reflect fresh-start accounting; pro forma balances for certain assets, such as shareholders' equity and PP&E, and certain liabilities will likely be adjusted upon emergence.

*Capital Expenditures*.  Projections for capital expenditures were prepared with consideration of the needs of Debtor's fixed assets.  Capital expenditures primarily relate to sustaining capital needs to maintain each rig in proper working condition as well as capital required for customer related upgrades and other shipyard projects and repairs, including the requirements of special periodic surveys on each rig.  Capital expenditures also include capitalized corporate expenditures such as certain information technology expenditures required to maintain Debtors' information technology equipment and software.

*Optional and Mandatory Prepayments of Indebtedness*.  Forecast debt repayments and subsequent debt balances reflect the mandatory prepayments and amortization payments required under the Prospector Leases, as well as the Debtor's estimates of prepayments of indebtedness it will make during the course of the Projection Period.

# VIII.
# VALUATION ANALYSIS

A.    **Estimated Reorganization Valuation of the Debtors**

The Debtors have been advised by Lazard Frères & Co. LLC ("**Lazard**") with respect to the reorganization value of the Reorganized Debtors on a going concern basis. Solely for purposes of the Plan, the estimated range of a reorganization value of the Reorganized Debtors (the "**Enterprise Value**") was assumed to be approximately $550 million to $675 million (with a midpoint estimate of approximately $613 million) as of an assumed Effective Date of July 31, 2017.  The valuation analysis herein is based on information as of the date of the Disclosure Statement and is based on the Projections for the Projection Period.  For purposes of this valuation, it has been assumed that no material changes that would affect value occur between the date of the Disclosure Statement and the assumed Effective Date.  Lazard's estimate of a range of Enterprise Values does not constitute an opinion as to fairness from a financial point of view of the consideration to be received under the Plan or of the terms and provisions of the Plan.

THE ASSUMED RANGE OF THE ENTERPRISE VALUE, AS OF AN ASSUMED EFFECTIVE DATE OF JULY 31, 2017, REFLECTS WORK PERFORMED BY LAZARD ON THE BASIS OF INFORMATION IN RESPECT OF THE BUSINESS AND ASSETS OF THE DEBTORS AVAILABLE TO LAZARD AS OF FEBRUARY 2, 2017.  IT SHOULD BE UNDERSTOOD THAT, ALTHOUGH SUBSEQUENT DEVELOPMENTS MAY AFFECT LAZARD'S CONCLUSIONS, LAZARD DOES NOT HAVE ANY OBLIGATION TO UPDATE, REVISE OR REAFFIRM ITS ESTIMATE.

Based upon the assumed combined range of the Enterprise Value of the Reorganized Debtors of between $550 million and $675 million and assumed adjusted net debt of $90 million (assuming a pro forma debt balance of $249 million less cash balance of $201 million less $29 million of restricted cash at Prospector and plus $70 million of operational cash burn through the August 2019 liquidity low point in the Projections), Lazard has employed an imputed estimate of the range of equity value for the Reorganized Debtors (the "**Equity Value**") between approximately $450 million and $575 million, with a midpoint estimate of $513 million.

The assumed range of the Enterprise Value was based on the Projections for the Projection Period, as set forth previously.

LAZARD DID NOT INDEPENDENTLY VERIFY THE PROJECTIONS IN CONNECTION WITH LAZARD'S ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE, AND NO INDEPENDENT VALUATIONS OR APPRAISALS OF THE DEBTORS WERE SOUGHT OR OBTAINED IN CONNECTION HEREWITH.  ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DO NOT PURPORT TO BE APPRAISALS OR NECESSARILY REFLECT THE VALUES THAT MAY BE REALIZED IF ASSETS ARE SOLD AS A GOING CONCERN, IN LIQUIDATION, OR OTHERWISE.  IN THE CASE OF THE REORGANIZED DEBTORS, THE ESTIMATES OF THE ENTERPRISE VALUE PREPARED BY LAZARD REPRESENT THE HYPOTHETICAL ENTERPRISE VALUE OF THE REORGANIZED DEBTORS.  SUCH ESTIMATES WERE DEVELOPED SOLELY FOR PURPOSES OF THE FORMULATION OF THE PLAN AND THE ANALYSIS OF IMPLIED RELATIVE RECOVERIES TO CREDITORS THEREUNDER.  SUCH ESTIMATES REFLECT COMPUTATIONS OF THE RANGE OF THE ESTIMATED ENTERPRISE VALUE OF THE REORGANIZED DEBTORS THROUGH THE APPLICATION OF VARIOUS VALUATION TECHNIQUES AND DO NOT PURPORT TO REFLECT OR CONSTITUTE APPRAISALS, LIQUIDATION VALUES, OR ESTIMATES OF THE ACTUAL MARKET VALUE THAT MAY BE REALIZED THROUGH THE SALE OF ANY SECURITIES TO BE ISSUED PURSUANT TO THE PLAN, WHICH MAY BE SIGNIFICANTLY DIFFERENT THAN THE AMOUNTS SET FORTH HEREIN.

THE VALUE OF AN OPERATING BUSINESS IS SUBJECT TO NUMEROUS UNCERTAINTIES AND CONTINGENCIES WHICH ARE DIFFICULT TO PREDICT AND WILL FLUCTUATE WITH CHANGES IN FACTORS AFFECTING THE FINANCIAL CONDITION AND PROSPECTS OF SUCH A BUSINESS.  AS A RESULT, THE ESTIMATE OF THE RANGE OF THE REORGANIZATION ENTERPRISE VALUE OF THE REORGANIZED DEBTORS SET FORTH HEREIN IS NOT NECESSARILY INDICATIVE OF ACTUAL OUTCOMES, WHICH MAY BE SIGNIFICANTLY MORE OR LESS FAVORABLE THAN THOSE SET FORTH HEREIN. BECAUSE SUCH ESTIMATES ARE INHERENTLY SUBJECT TO UNCERTAINTIES, NEITHER THE DEBTORS, LAZARD, NOR ANY OTHER PERSON ASSUMES RESPONSIBILITY FOR THEIR ACCURACY. IN ADDITION, THE VALUATION OF NEWLY ISSUED SECURITIES IS SUBJECT TO ADDITIONAL UNCERTAINTIES AND CONTINGENCIES, ALL OF WHICH ARE DIFFICULT TO PREDICT.  ACTUAL MARKET PRICES OF SUCH SECURITIES AT ISSUANCE WILL DEPEND UPON, AMONG OTHER THINGS, PREVAILING INTEREST RATES, CONDITIONS IN THE FINANCIAL MARKETS, THE ANTICIPATED INITIAL SECURITIES HOLDINGS OF PREPETITION CREDITORS, SOME OF WHICH MAY PREFER TO LIQUIDATE THEIR INVESTMENT RATHER THAN HOLD IT ON A LONG-TERM BASIS, AND OTHER FACTORS WHICH GENERALLY INFLUENCE THE PRICES OF SECURITIES.

Lazard assumed that the Projections were reasonably prepared in good faith and on a basis reflecting the Debtors' most accurate currently available estimates and judgments as to the future operating and

financial performance of the Reorganized Debtors. The estimated Enterprise Value and Equity Value ranges assume the Reorganized Debtors will achieve their Projections in all material respects, including revenue growth, EBITDA margins, and cash flows as projected. If the business performs at levels below or above those set forth in the Projections, such performance may have a materially negative or positive impact, respectively, on Enterprise Value and Equity Value. In estimating the Enterprise Value, Lazard: (a) reviewed certain historical financial information of the Debtors for recent years and interim periods, which is limited; (b) reviewed certain internal financial and operating data of the Debtors, including the Projections; (c) discussed the Debtors' operations and future prospects with the senior management team and third-party advisors; (d) reviewed certain publicly available financial data for, and considered the market value of, public companies that Lazard deemed generally relevant in analyzing the value of the Reorganized Debtors; (e) considered certain economic and industry information relevant to the operating businesses; and (f) conducted such other studies, analyses, inquiries and investigations as it deemed appropriate. Lazard assumed and relied on the accuracy and completeness of all financial and other information furnished to it by the Debtors' management as well as publicly available information.

The estimated Enterprise Value and Equity Value do not constitute a recommendation to any holder of Allowed Claims as to how such person should vote or otherwise act with respect to the Plan. Lazard has not been asked to and does not express any view as to what the trading value of the Reorganized Debtors' securities would be on issuance at any time. The estimated Enterprise Value and Equity Value of the Reorganized Debtors set forth herein does not constitute an opinion as to fairness from a financial point of view to any person of the consideration to be received by such person under the Plan or of the terms and provisions of the Plan.

Based on the Debtors' and their tax professionals' tax analysis, the Reorganized Debtors do not expect to have significant tax attributes following the reorganization. Lazard did not estimate the value of any tax attributes nor did it estimate the impact of any cancellation of indebtedness income on the Reorganized Debtors' projections. Any changes to the assumptions on the availability of tax attributes or the impact of cancellation of indebtedness income on the Reorganized Debtors' projections could materially impact Lazard's valuation analysis.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY LAZARD REPRESENT ESTIMATED VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE EQUITY VALUE OF REORGANIZED DEBTORS ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST-REORGANIZATION MARKET TRADING VALUE.  ANY SUCH TRADING VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE EQUITY VALUE RANGE FOR THE REORGANIZED DEBTORS ASSOCIATED WITH LAZARD'S VALUATION ANALYSIS.

LAZARD IS ACTING AS INVESTMENT BANKER TO THE COMPANY, AND WILL NOT BE RESPONSIBLE FOR AND WILL NOT PROVIDE ANY TAX, ACCOUNTING, ACTUARIAL, LEGAL OR OTHER SPECIALIST ADVICE.

## IX.
## TRANSFER RESTRICTIONS AND CONSEQUENCES
## UNDER FEDERAL SECURITIES LAWS

The issuance of and the distribution under the Plan of the New Equity Interests will be exempt from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code.  These securities may be resold without registration

under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code.  In addition, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash or property.  Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (a) purchases a claim with a view to distribution of any security to be received in exchange for the claim, (b) offers to sell securities issued under a plan for the holders of such securities, (c) offers to buy securities issued under a plan from persons receiving such securities, if the offer to buy is made with a view to distribution or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which includes control persons of the issuer.

Notwithstanding the foregoing, control person underwriters may be able to sell securities without registration pursuant to the resale limitations of Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations, notice and manner of sale requirements, and certain other conditions.  Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144.

In any case, recipients of new securities issued under the Plan are advised to consult with their own legal advisers as to the availability of any such exemption from registration under state law in any given instance and as to any applicable requirements or conditions to such availability.

*Listing*.  After the consummation of the Plan, the Debtors may list the New Equity Interests on the New York Stock Exchange or NASDAQ.  In the event that the Debtors seek such a listing, no assurances can be given that the Debtors will be successful in obtaining such listing.

*Legends.*  To the extent certificated, certificates evidencing the New Equity Interests held by holders of 10% or more of the New Equity Interests will bear a legend substantially in the form below:

[THE ORDINARY SHARES] REPRESENTED BY THIS CERTIFICATE HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER THE SECURITIES LAWS OF ANY STATE OR OTHER JURISDICTION AND MAY NOT BE SOLD, OFFERED FOR SALE OR OTHERWISE TRANSFERRED UNLESS REGISTERED OR QUALIFIED UNDER SUCH ACT AND APPLICABLE STATE SECURITIES LAWS OR UNLESS PARAGON OFFSHORE PLC RECEIVES AN OPINION OF COUNSEL REASONABLY SATISFACTORY TO IT THAT SUCH REGISTRATION OR QUALIFICATION IS NOT REQUIRED.

## X.
## CERTAIN TAX CONSEQUENCES OF THE PLAN

### A.    Certain U.S. Federal Income Tax Consequences of the Plan

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims.  This discussion does not

address the U.S. federal income tax consequences to holders of Claims who are unimpaired or deemed to reject the Plan.

The discussion of U.S. federal income tax consequences below is based on the Internal Revenue Code of 1986, as amended (the "**U.S. Tax Code**"), U.S. Treasury regulations, judicial authorities, published positions of the IRS, and other applicable authorities, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations (possibly with retroactive effect). The U.S. federal income tax consequences of the contemplated transactions are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the contemplated transactions.

This summary does not address foreign, state, or local tax consequences of the contemplated transactions or the effect of the "Medicare" tax on net investment income, nor does it purport to address the U.S. federal income tax consequences of the transactions to special classes of taxpayers (*e.g.*, non-U.S. taxpayers, small business investment companies, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax, and persons whose Claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, this discussion does not address the Foreign Account Tax Compliance Act or U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any Take Back Debt or New Equity Interests in the secondary market.

This discussion assumes that the Revolver Secured Claims, Term Loan Secured Claims, Senior Notes Claims, Secured Lender Unsecured Claims, General Unsecured Claims, Take Back Debt and New Equity Interests are held as "capital assets" (generally, property held for investment) within the meaning of section 1221 of the U.S. Tax Code and, unless otherwise indicated below, that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form.

The following summary of certain U.S. federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon your individual circumstances. You are urged to consult your tax advisor for the U.S. federal, state, local and other tax consequences applicable under the Plan.

### 1.    Consequences to the Debtors

Only one of the Debtors, Paragon Offshore Holdings US Inc., a Delaware corporation and the common parent of a U.S. tax consolidated group ("**Paragon US Group**"), is required to file a U.S. federal income tax return. Paragon Offshore Drilling LLC, a Delaware limited liability company, is wholly-owned by Paragon Offshore Holdings US Inc. and is a disregarded entity for U.S. federal income tax purposes. Paragon Leonard Jones LLC and Paragon Drilling Services 7 LLC are each a Delaware limited liability company wholly-owned directly or indirectly by a foreign debtor entity, and are disregarded entities for U.S. federal income tax purposes, with no U.S. operations.

Section 382 of the U.S. Tax Code generally applies an annual limitation to the utilization of pre-existing net operating loss carryforwards and other tax attributes of a corporation that undergoes a more than 50% change (directly or indirectly) in its stock ownership over a three-year testing period. It is expected that an ownership change of the Paragon US Group will occur as a result of the implementation of the

Plan.  The Debtors do not expect that, as of the Effective Date, the Paragon US Group will have a material amount of net operating loss carryforwards, although it is possible that the Paragon US Group could have a net unrealized built-in loss (such that a portion of future deductions would be subject to limitation if an ownership change were to occur).  However, based on existing IRS guidance, the Debtors do not believe that, as of the Effective Date, the amount of net unrealized built-in loss would be material.  Nevertheless, there is no assurance that the IRS would not take a contrary position.  The Paragon US Group is not otherwise expected to have any material adverse U.S. federal income tax consequences as a result of the implementation of the Plan.

## 2.    Consequences to U.S. Holders of Certain Claims

This summary discusses the U.S. federal income tax consequences to holders of Revolver Secured Claims, Term Loan Secured Claims, Senior Notes Claims, Secured Lender Unsecured Claims and General Unsecured Claims who are U.S. Holders and does not discuss tax consequences for those who are not U.S. Holders.  As used herein, the term "**U.S. Holder**" means a beneficial owner of Revolver Secured Claims, Term  Loan Secured Claims, Senior Notes Claims, Secured Lender Unsecured Claims, General Unsecured Claims, Take Back Debt or New Equity Interests that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if (i) (A) a court within the United States is able to exercise primary jurisdiction over its administration and (B) one or more U.S. persons have authority to control all of its substantial decisions, or (ii) if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Revolver Secured Claims, Term Loan Secured Claims, Senior Notes Claims, Secured Lender Unsecured Claims, General Unsecured Claims, Take Back Debt or New Equity Interests, the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership.  If you are a partner in such a partnership holding any of such instruments, you are urged to consult your tax advisor.

The U.S. federal income tax consequences of the Plan to U.S. Holders of Revolver Secured Claims, Term Loan Secured Claims, Senior Notes Claims or Secured Lender Unsecured Claims depends in part on whether such Claims and/or the Take Back Debt would be treated as "securities" for U.S. federal income tax purposes. The term "security" is not defined in the U.S. Tax Code or in the U.S. Treasury regulations issued thereunder and has not been clearly defined by judicial decisions. The determination of whether a particular debt obligation constitutes a "security" depends on an overall evaluation of the nature of the debt, including whether the holder of such debt obligation is subject to a material level of entrepreneurial risk and whether a continuing proprietary interest is intended or not. One of the most significant factors considered in determining whether a particular debt obligation is a "security" is its original term. In general, debt obligations issued with a weighted average maturity at issuance of less than five (5) years do not constitute "securities," whereas debt obligations with a weighted average maturity at issuance of ten (10) years or more constitute "securities."  Additionally, the IRS has ruled that new debt instruments with

short-term maturity issued in exchange for and bearing the same terms (other than interest rate) as "securities" should also be classified as "securities" for this purpose since the new debt represented a continuation of the holder's investment in the corporation in substantially the same form. Each holder of Revolver Secured Claims, Term Loan Secured Claims, Senior Notes Claims and Secured Lender Unsecured Claims is urged to consult its tax advisor regarding the appropriate status for U.S. federal income tax purposes of its Claims.

Given that the weighted average maturity at issuance of the debt obligations under the Term Loan Agreement were approximately seven (7) years, and the weighted average maturity at issuance of the debt obligations under the Senior Notes were at least seven (7) years, the Debtors assume for purposes of this discussion that the Term Loan Secured Claims, Term Loan Unsecured Claims and Senior Notes Claims constitute "securities" for U.S. federal income tax purposes. Additionally, the Debtors assume for purposes of this discussion that the Revolver Secured Claims and Revolver Unsecured Claims do not constitute "securities." The Take Back Debt will have a maturity of five (5) years. Accordingly, the following discussion describes the tax consequences to U.S. Holders of Revolver Secured Claims and Term Loan Secured Claims based on the alternative classification of the Take Back Debt as "securities" and not as "securities."

(a)    Treatment of Revolver Secured Claims and Revolver Unsecured Claims

Pursuant to the Plan, and in accordance with the U.K. Sale Transaction, holders of Revolver Secured Claims (a Class 3 Claim) will receive a cash payment and Take Back Debt, and holders of Revolver Unsecured Claims (a Class 4 Claim) will receive a cash payment and New Equity Interests, in each case, in full satisfaction of their Allowed Revolver Claims. In determining the U.S. federal income tax consequences to U.S. Holders of Revolver Secured Claims and Revolver Unsecured Claims, a U.S. Holder of a debt obligation under the Revolving Credit Agreement will be treated as receiving cash, Take Back Debt and New Equity Interests collectively in satisfaction of the entirety of such debt obligation. The remainder of this discussion describes the tax treatment of the exchange accordingly.

As discussed above, the Revolver Secured Claims and Revolver Unsecured Claims are, for purposes of this discussion, not treated as "securities" of Paragon Parent for U.S. federal income tax purposes, and so the receipt by a U.S. Holder of cash, Take Back Debt and/or New Equity Interests in exchange for its debt obligation under the Revolving Credit Agreement will be a fully taxable transaction to such U.S. Holder. Accordingly, in general, a U.S. Holder of a debt obligation under the Revolving Credit Agreement will recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the amount of any cash and the aggregate fair market value of any Take Back Debt and any New Equity Interests received in satisfaction of its debt obligation under the Revolving Credit Agreement (other than any consideration received in respect of such debt obligation for accrued but unpaid interest or accrued but unpaid original issue discount ("**OID**"), if any), and (ii) the U.S. Holder's adjusted tax basis in its debt obligation under the Revolving Credit Agreement immediately prior to the exchange. *See* 2.g.— "Character of Gain or Loss," below. A U.S. Holder of such a Claim will have interest income to the extent of any consideration allocable to accrued but unpaid interest not previously included in income. *See* 2.f.— "Distributions in Discharge of Accrued Interest or OID," below.

A U.S. Holder's tax basis in any Take Back Debt and any New Equity Interests received in respect of its debt obligation under the Revolving Credit Agreement on the Effective Date generally will equal their fair market value. The U.S. Holder's holding period in any Take Back Debt and any New Equity Interests generally will begin on the day following the Effective Date.

In the event of the subsequent disallowance of any Disputed Claims in Class 4 after the Effective Date, a U.S. Holder of a previously Allowed Revolver Unsecured Claim may receive additional distributions in

respect of its Revolver Unsecured Claim.  In such instance, the imputed interest provisions of the U.S. Tax Code may apply to treat a portion of such additional distributions as imputed interest.  In addition, it is possible that any loss realized by a U.S. Holder in respect of its debt obligation under the Revolving Credit Agreement may be deferred until all Disputed Claims in Class 4 are resolved (*i.e.*, until the U.S. Holder has received its final distribution).  Alternatively, a U.S. Holder may recognize additional gain or otherwise be subject to the possible application of the "installment method" of reporting with respect to any gain realized.  You are urged to consult your tax advisor regarding the possibility for deferral, and the potential application (and ability to elect out) of the "installment method" of reporting any gain realized in respect of your debt obligation under the Revolving Credit Agreement.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any cash reserved on account of Disputed Claims in Class 4 (*i.e.*, the Class 4 Disputed Claims Reserve) as "disputed ownership funds" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including, without limitation, the Debtors, Reorganized Paragon, the Disbursing Agent and the holders of Senior Notes Claims and Secured Lender Unsecured Claims) will be required to report for tax purposes consistently with such treatment. Accordingly, the Class 4 Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of the Class 4 Disputed Claims Reserve will be taxable to such entity.  Any distributions from Class 4 Disputed Claims Reserve to holders of debt obligations under the Revolving Credit Agreement will be treated for U.S. federal income tax purposes as if received directly from the Debtors on the original debt obligations under the Revolving Credit Agreement. The Disbursing Agent will be responsible for payment, out of the cash in the Class 4 Disputed Claims Reserve, of any taxes imposed on the Class 4 Disputed Claims Reserve.

(b)    Treatment of Term Loan Secured Claims, Term Loan Unsecured Claims and Senior Notes Claims

Pursuant to the Plan, and in accordance with the U.K. Sale Transaction, holders of Term Loan Secured Claims (a Class 3 Claim) will receive a cash payment and Take Back Debt, and holders of Senior Notes Claims (a Class 4 Claim) and Term Loan Unsecured Claims (a Class 4 Claim) will receive a cash payment and New Equity Interests, in each case, in full satisfaction of their Allowed Term Loan Claims or Senior Notes Claims, as applicable.  In determining the U.S. federal income tax consequences to U.S. Holders of Term Loan Secured Claims and Term Loan Unsecured Claims, a U.S. Holder of a debt obligation under the Term Loan Agreement will be treated as receiving cash, Take Back Debt and New Equity Interests collectively in satisfaction of the entirety of such debt obligation. The remainder of this discussion describes the tax treatment of the exchange accordingly.

Pursuant to the U.K. Sale Transaction, Reorganized Paragon will acquire all or substantially all of the Assets of Paragon Parent in consideration for distributing, on behalf of, and at the direction of, Paragon Parent, Take Back Debt and New Equity Interests to holders of certain Allowed Claims. Such distribution, together with the cash to be distributed by Paragon Parent, will be in full and final satisfaction and discharge of such Claims in accordance with the treatment section of the Plan.

Reorganized Paragon will be treated as a corporation for U.S. federal income tax purposes and, thus, the New Equity Interests will be treated as "stock" of Reorganized Paragon for U.S. federal income tax purposes.  As discussed above, the debt obligations under the Term Loan Agreement and Senior Notes Claims are treated for purposes of this discussion as "securities" of Paragon Parent for U.S. federal income tax purposes.  Accordingly, the Debtors expect (and the rest of this discussion assumes) that the U.K. Sale Transaction and distribution of cash, Take Back Debt and New Equity Interests to holders of

debt obligations under the Term Loan Agreement and Senior Notes Claims, as applicable, will be treated generally as a "reorganization" pursuant to Section 368 of the U.S. Tax Code.

The classification of an exchange as a "reorganization" for U.S. federal income tax purposes generally serves to defer the recognition of any gain or loss by the U.S. Holder. However, a U.S. Holder generally is still required to recognize any gain to the extent the holder receives "boot" in the reorganization exchange, i.e., consideration other than stock or "securities" of the exchanging company. Accordingly, a U.S. Holder of a debt obligation under the Term Loan Agreement or a Senior Notes Claim generally will not recognize any loss upon the exchange.  A U.S. Holder will recognize any realized gain to the extent of the amount of cash and, if the Take Back Debt is not considered "securities" for this purpose, the aggregate fair market value as of the Effective Date of the Take Back Debt (namely, the "boot"), as applicable, received by the U.S. Holder in the exchange in respect of its Senior Notes Claim or its debt obligation under the Term Loan Agreement or Senior Notes Claim. Such realized gain will be in an amount equal to the excess, if any, of (i) the sum of the amount of any cash and the aggregate fair market value of the Take Back Debt and the New Equity Interests, as applicable, received in satisfaction of its debt obligation under the Term Loan Agreement or its Senior Notes Claim (other than any consideration received in respect of accrued but unpaid interest and possibly accrued but unpaid OID), over (ii) the U.S. Holder's adjusted tax basis, as applicable, in its debt obligation under the Term Loan Agreement or its Senior Notes Claim (other than any tax basis attributable to accrued but unpaid interest and possibly accrued but unpaid OID). *See* 2.g.— "Character of Gain or Loss," and 2.f.— "Distributions in Discharge of Accrued Interest or OID," below.

In addition, even though the exchange may otherwise be a "reorganization," a U.S. Holder will have taxable interest income to the extent of any consideration allocable to accrued but unpaid interest or OID not previously included in income. *See* 2.f.— "Distributions in Discharge of Accrued Interest or OID," below.

In a "reorganization" exchange, a U.S. Holder's aggregate tax basis in the Take Back Debt (if the Take Back Debt constitutes "securities") and the New Equity Interests received will equal such holder's aggregate adjusted tax basis in the debt obligations under the Term Loan Agreement exchanged therefor, increased by any gain or interest income recognized in the exchange and decreased by the amount of boot received in the exchange. Such aggregate tax basis presumably should be allocated among the Take Back Debt (if the Take Back Debt constitutes "securities") and the New Equity Interests received in accordance with their relative fair market values.  If the Take Back Debt does not constitute "securities," then a U.S. Holder's tax basis in the Take Back Debt received should equal its fair market value.

A U.S. Holder's holding period in New Equity Interests received will include its holding period in the debt obligations under the Term Loan Agreement or in the Senior Notes Claims exchanged therefor, except to the extent received in respect of accrued but unpaid interest (which New Equity Interests will have a holding period beginning the day following the Effective Date). If the Take Back Debt is considered a "security" for this purpose, a U.S. Holder's holding period in the Take Back Debt received will include its holding period in the debt obligations under the Term Loan Agreement exchanged therefor, except to the extent received in respect of accrued but unpaid interest (which New Equity Interests will have a holding period beginning the day following the Effective Date). If the Take Back Debt is not considered a "security" for this purpose, a U.S. Holder's holding period in the Take Back Debt received generally will begin on the day following the Effective Date.

In the event of the subsequent disallowance of any Disputed Claims in Class 4 after the Effective Date, a U.S. Holder of a previously Allowed Senior Notes Claim or Term Loan Unsecured Claim may receive additional distributions in respect of its Claim.  In such instance, the imputed interest provisions of the U.S. Tax Code may apply to treat a portion of such additional distributions as imputed interest.  In

addition, a U.S. Holder of a Senior Notes Claim or a debt obligation under the Term Loan Agreement may recognize additional gain or otherwise be subject to the possible application of the "installment method" of reporting with respect to any gain realized.  You are urged to consult your tax advisor regarding the possibility for deferral, and the potential application (and ability to elect out) of the "installment method" of reporting any gain realized in respect of your Senior Notes Claim or debt obligation under the Term Loan Agreement.

As discussed above, subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any cash reserved on account of Disputed Claims in Class 4 (*i.e.*, the Class 4 Disputed Claims Reserve) as "disputed ownership funds" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes.  All parties (including, without limitation, the Debtors, Reorganized Paragon, the Disbursing Agent and the holders of Senior Notes Claims and Secured Lender Unsecured Claims) will be required to report for tax purposes consistently with such treatment.  Accordingly, the Class 4 Disputed Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of the Class 4 Disputed Claims Reserve will be taxable to such entity.  Any distributions from Class 4 Disputed Claims Reserve to holders of Senior Notes Claims or debt obligations under the Term Loan Agreement will be treated for U.S. federal income tax purposes as if received directly from the Debtors on the original Senior Notes Claims or debt obligations under the Term Loan Agreement, as applicable. The Disbursing Agent will be responsible for payment, out of the cash in the Class 4 Disputed Claims Reserve, of any taxes imposed on the Class 4 Disputed Claims Reserve.

(c)    Ownership of the Take Back Debt

**(A)  Payments of Stated Interest in Cash on the Take Back Debt**.  Interest on the Take Back Debt will be payable in kind or in cash at the election of Reorganized Paragon at a rate of LIBOR plus 6% per annum, except that not less than 1% per annum must be paid in cash. Cash payments in respect of the 1% per annum portion of the stated interest that is payable only in cash on the Take Back Debt generally should be taxable to a U.S. Holder as ordinary interest income at the time such payments are accrued or are received (in accordance with the U.S. Holder's regular method of tax accounting), whereas the remaining interest generally should be treated as described in the following section.

**(B)  Accrual of Original Issue Discount on the Take Back Debt.**  The Take Back Debt will be treated as issued with OID.  A debt instrument generally has OID if its "stated redemption price at maturity" exceeds its "issue price" by more than a *de minimis* amount.

The "issue price" of a debt instrument generally depends on whether such debt instrument or the property for which it is exchanged is considered traded on an "established market" as determined for U.S. federal income tax purposes.  However, a debt instrument is not treated as traded on an established market if the outstanding stated principal amount of the issue that includes the debt instrument does not exceed U.S. $100 million. Thus, the Take Back Debt itself will not be treated as traded on an established market. In addition, the Debtors expect that the Take Back Debt (and New Equity Interests) will be treated as issued by Reorganized Paragon in consideration for Reorganized Paragon's acquisition of all or substantially all of the Assets of Paragon Parent (even though issued in a reorganization pursuant to Section 368(a) of the U.S. Tax Code, as described above), and distributed by Reorganized Paragon on behalf of, and at the direction of, Paragon Parent.  Thus, the property for which the Take Back Debt will be issued (the Assets of Paragon Parent) would not be traded on an established market, even though such Take Back Debt will be immediately distributed to holders of Revolver Secured Claims or Term Loan Secured Claims, which claims might be considered traded on an established market.  Accordingly, the Debtors believe that that

the issue price of the Take Back Debt should be their stated principal amount. However, there can be no assurance that the IRS or a court will not take a different view.

The "stated redemption price at maturity" of the Take Back Debt for this purpose would include all principal and interest payable over the term of the Take Back Debt, other than "qualified stated interest," *i.e.,* stated interest that is unconditionally payable at least annually at a constant rate in cash or property (other than debt of the issuer).  Interest on the Take Back Debt will be payable in kind or in cash at the election of Reorganized Paragon at a rate of LIBOR plus 6% per annum, except that not less than 1% per annum must be paid in cash. The 1% per annum portion of the interest that is payable only in cash on the Take Back Debt should be considered qualified stated interest for this purpose, and the remaining interest should not be considered qualified stated interest for this purpose.

A U.S. Holder of Take Back Debt generally will be required to include OID in gross income as it accrues over the term of the loan in accordance with a constant yield-to-maturity method, regardless of whether the U.S. Holder is a cash or accrual method taxpayer, and regardless of whether and when the U.S. Holder receives cash payments of interest on the obligation.  Accordingly, a U.S. Holder could be treated as receiving interest income in advance of a corresponding receipt of cash.  Any OID that a U.S. Holder includes in income will increase the U.S. Holder's adjusted tax basis in the Take Back Debt.  A U.S. Holder generally will not be required to include separately in income cash payments (other than in respect of qualified stated interest) received on the Take Back Debt; instead, such payments will reduce the U.S. Holder's adjusted tax basis in the Take Back Debt by the amount of the payment.

The amount of OID includible in income for a taxable year by a U.S. Holder generally equals the sum of the daily portions of OID that accrue on the Take Back Debt for each day during the taxable year on which such U.S. Holder holds the Take Back Debt, whether reporting on the cash or accrual basis of accounting for U.S. federal income tax purposes.  The daily portion is determined by allocating to each day of an accrual period (generally, the period between interest payments or compounding dates) a pro rata portion of the OID allocable to such accrual period.  The amount of OID that will accrue during an accrual period is the product of the "adjusted issue price" of the Take Back Debt at the beginning of the accrual period multiplied by the yield to maturity of the Take Back Debt less the amount of any qualified stated interest allocable to such accrual period.  The "adjusted issue price" of a Take Back Debt at the beginning of an accrual period will equal its issue price, increased by the aggregate amount of OID that has accrued on the Take Back Debt in all prior accrual periods, and decreased by any payments made during all prior accrual periods on the Take Back Debt other than qualified stated interest.

The amount of OID includible in a U.S. Holder's gross income with respect to the Take Back Debt will be reduced if the Take Back Debt is acquired at an "acquisition premium" or with "bond premium," as discussed below.

The rules regarding the determination of issue price and OID are complex, and the OID rules described above may not apply in all cases.  Accordingly, each U.S. Holder of Revolver Secured Claims or Term Loan Secured Claims is urged to consult its tax advisor regarding the possible application of the OID rules to the Take Back Debt.

    **(C)  Accrual of Market Discount on the Take Back Debt.**  Any U.S. Holder that has a tax basis in the Take Back Debt received that is less than its issue price (as described above) generally will be subject to the "market discount" rules of the U.S. Tax Code (unless such difference is less than a *de minimis* amount).  Under the market discount rules, a U.S. Holder is required to treat any principal payment on, or any gain recognized on the sale, exchange, retirement or other taxable disposition of, the Take Back Debt as ordinary income to the extent of the market discount that has not previously been included in income and is treated as having accrued on the Take Back Debt at the time of such payment or

disposition.  A U.S. Holder could be required to defer the deduction of a portion of the interest expense on any indebtedness incurred or maintained to purchase or to carry a market discount note, unless an election is made to include all market discount in income as it accrues.  Such an election would apply to all notes and other bonds acquired by the U.S. Holder on or after the first day of the first taxable year to which such election applies, and may not be revoked without the consent of the IRS.

Any market discount will be considered to accrue on a straight-line basis during the period from the date of acquisition of such Take Back Debt to the maturity date of such Take Back Debt, unless the U.S. Holder irrevocably elects to compute the accrual on a constant yield basis.  This election can be made on a loan-by-loan basis. *See* 2.g.—"Character of Gain or Loss," below regarding the carry-over of accrued market discount to the Take Back Debt (if the Take Back Debt constitutes "securities") in the case of a "reorganization" exchange.

   **(D)  Acquisition and Bond Premium**.  A U.S. Holder will be treated as having "acquisition premium" in the Take Back Debt if the U.S. Holder's tax basis in the Take Back Debt is greater than the issue price of the Take Back Debt (as described above), but is less than or equal to the "stated redemption price at maturity" of the Take Back Debt.  If the Take Back Debt has acquisition premium, the amount of any OID includible in its gross income in any taxable year with respect to the Take Back Debt generally will be reduced by an allocable portion of the acquisition premium (generally determined by multiplying the annual OID accrual with respect to the Take Back Debt by a fraction, the numerator of which is the amount of the acquisition premium, and the denominator of which is the total OID).

If a U.S. Holder has a tax basis in the Take Back Debt that exceeds the "stated redemption price at maturity" of the Take Back Debt, the Take Back Debt will be treated as having "bond premium" and the U.S. Holder generally will not include any of the OID in income.  A U.S. Holder may elect to amortize any bond premium over the period from its acquisition of the Take Back Debt to the maturity of the Take Back Debt, in which case the U.S. Holder should have an ordinary deduction (and a corresponding reduction in tax basis in the Take Back Debt for purposes of computing gain or loss) in the amount of such bond premium upon the sale or other disposition of the Take Back Debt, including the repayment of principal.  If such an election to amortize bond premium is not made, a U.S. Holder will receive a tax benefit from the premium only in computing such U.S. Holder's gain or loss upon the sale or other taxable disposition of the Take Back Debt, including the repayment of principal.

An election to amortize bond premium will apply to amortizable bond premium on all notes and other bonds the interest on which is includible in the U.S. Holder's gross income and that are held at, or acquired after, the beginning of the U.S. Holder's taxable year as to which the election is made.  The election may be revoked only with the consent of the IRS.

   (d)    Ownership of New Equity Interests

   **(A)  General Treatment.**  The following discussion is qualified in part by the discussion in the next section regarding the possible treatment of Reorganized Paragon as a passive foreign investment company ("PFIC") or a controlled foreign corporation ("CFC").

Distributions on New Equity Interests.  In general, any cash distributions with respect to the New Equity Interests (including any amounts withheld in respect of taxes thereon) will be treated as a taxable dividend to the extent paid out of Reorganized Paragon's current or accumulated earnings and profits as determined under U.S. federal income tax principles ("earnings and profits"), and will be includible by the U.S. Holder as ordinary income when received.  To the extent the amount of any distribution exceeds available earnings and profits with respect to such distribution, the excess will be applied against and will reduce the U.S. Holder's adjusted tax basis (on a dollar-for-dollar basis) in respect of the New Equity

Interests as to which the distribution was made, but not below zero.  Any remaining excess will be treated as gain from the sale or exchange of New Equity Interests, with the consequences discussed below (*see* "Disposition of New Equity Interests," below).  The Debtors do not expect that Reorganized Paragon will keep record of its earnings and profits in accordance with U.S. federal income tax principles.  Therefore, U.S. Holders should expect that a cash distribution on New Equity Interests will generally be treated as a dividend.

Any such taxable dividends received by a corporate U.S. Holder will not be eligible for the "dividends received deduction."  Any such taxable dividends will be eligible for reduced rates of taxation as "qualified dividend income" for non-corporate U.S. Holders if they are received at a time when (i) the New Equity Interests are readily tradable on an established securities market in the United States (including, *e.g.*, the NYSE or NASDAQ) or (ii) Reorganized Paragon is eligible for the benefits of a comprehensive income tax treaty with the United States which the Secretary of the U.S. Treasury has determined is satisfactory and which includes an exchange of information program (including, *e.g.*, as of the date hereof, the Convention between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland for the Avoidance of Double Taxation and the Prevention of Fiscal Evasion with respect to Taxes on Income and Capital Gains).  Otherwise, such taxable dividends will not be eligible for reduced rates of taxation as "qualified dividend income."

The Debtors may seek listing of the New Equity Interests on the NYSE or NASDAQ upon consummation of the Plan (*see* XI.D.1.—"Market for Securities," hereof).  However, no assurance can be given that the Debtors will be successful with any such listing or that Reorganized Paragon will qualify for the benefits of a comprehensive income tax treaty as described above.  Accordingly, each non-corporate U.S. Holder is urged to consult its tax advisor regarding whether taxable dividends received by such U.S. Holder will be eligible for qualified dividend income treatment.

Disposition of New Equity Interests.  Unless a nonrecognition provision applies, a U.S. Holder generally will recognize capital gain or loss upon the sale or exchange of New Equity Interests in an amount equal to the difference between (i) the U.S. Holder's adjusted tax basis in its New Equity Interests held and (ii) the sum of the cash and the fair market value of any property received from such disposition.  Any such gain or loss generally will be long-term if the U.S. Holder's holding period for its New Equity Interests held is more than one year at that time.  A reduced tax rate on long-term capital gain generally will apply to non-corporate U.S. Holders.  The deductibility of capital losses is subject to significant limitations.

Notwithstanding the foregoing, assuming (as expected) that the U.K. Sale Transaction and distribution of cash, the Take Back Debt and New Equity Interests to holders of debt obligations under the Term Loan Agreement and of the Senior Notes Claims, as applicable, will be treated generally as a "reorganization" pursuant to Section 368 of the U.S. Tax Code, any gain recognized by a U.S. Holder upon a subsequent taxable disposition of the New Equity Interests (or any stock or property received for such New Equity Interests in a later tax-free exchange) received in exchange for a Senior Notes Claim or Secured Lender Unsecured Claim will be treated as ordinary income for U.S. federal income tax purposes to the extent of (i) any ordinary loss deductions incurred upon exchange or previously as a result of a U.S. Holder's write-down of the Claim, decreased by any income (other than interest income) recognized by the U.S. Holder upon exchange of the Claim, (ii) with respect to a cash-basis U.S. Holder and in addition to clause (i) above, any amounts which would have been included in its gross income if the U.S. Holder's Claim had been satisfied in full but which was not included by reason of the cash method of accounting and (iii) any accrued market discount  carried over to the New Equity Interests. *See* 2.g.—"Character of Gain or Loss," below regarding the carry-over of accrued market discount to the New Equity Interests in the case of a "reorganization" exchange.

**(B)  Possible Treatment of Reorganized Paragon as a Passive Foreign Investment Company or Controlled Foreign Corporation.**  Reorganized Paragon or any of its foreign corporate subsidiaries may be classified as a PFIC for U.S. federal income tax purposes.  In general, a foreign corporation will be classified as a PFIC if (i) 75% or more of its gross income in a taxable year, including its pro rata share of the gross income of any company treated as a corporation for U.S. federal income tax purposes, U.S. or foreign, in which the foreign corporation is considered to own, directly or indirectly, 25% or more of the shares by value, is passive income, or (ii) at least 50% of its assets in a taxable year, averaged quarterly over the year and ordinarily determined based on fair market value and including its pro rata share of the assets of any company treated as a corporation for U.S. federal income tax purposes, U.S. or foreign, in which the foreign corporation is considered to own, directly or indirectly, 25% or more of the shares by value, produce, or are held for the production of, passive income.  Passive income for this purpose generally includes, among other items, interest, dividends, royalties, rents and annuities.  The Debtors do not expect that, as of the Effective Date, Reorganized Paragon or any of its subsidiaries will constitute a PFIC for U.S. federal income tax purposes.  There can be no assurance, however, that the IRS or a court will agree or that Reorganized Paragon or one of its subsidiaries will not be or later become a PFIC.  Each U.S. Holders is urged to consult its tax advisor regarding whether Reorganized Paragon or any of its subsidiaries will constitute a PFIC for U.S. federal income tax purposes and, if so, the U.S. federal, state, local, and foreign tax consequences of holding New Equity Interests.

Reorganized Paragon or any of its foreign corporate subsidiaries may be classified as a CFC for U.S. federal income tax purposes.  In general, a foreign corporation will be classified as a CFC if more than 50% of the shares of the corporation, measured by reference to combined voting power or value, is owned (directly, indirectly or by attribution) by "U.S. Shareholders."  A "U.S. Shareholder," for this purpose, is any U.S. person that possesses (directly, indirectly or by attribution) 10% or more of the combined voting power (generally the right to vote for directors of the corporation) of all classes of shares of a foreign corporation.  The Debtors do not expect that, as of the Effective Date, Reorganized Paragon or any of its subsidiaries will constitute a CFC for U.S. federal income tax purposes.  There can be no assurance, however, that Reorganized Paragon or one of its subsidiaries will not be or later become a CFC.  Each U.S. Holder is urged to consult its tax advisor regarding whether Reorganized Paragon or any of its subsidiaries will constitute a CFC for U.S. federal income tax purposes and, if so, the U.S. federal, state, local, and foreign tax consequences of holding New Equity Interests.

Distributions on and Disposition of New Equity Interests if Reorganized Paragon is a PFIC.  Under the PFIC rules, if Reorganized Paragon were a PFIC for any taxable year during which a U.S. Holder holds New Equity Interests, Reorganized Paragon would continue to be treated as a PFIC with respect to such U.S. Holder for all succeeding years during which the U.S. Holder holds the New Equity Interests unless (i) Reorganized Paragon ceases to be a PFIC and (ii) the U.S. Holder makes a "deemed sale" election under the PFIC rules.  In general, if Reorganized Paragon is a PFIC for any taxable year during which a U.S. Holder holds New Equity Interests, any gain recognized by the U.S. Holder on a sale or other disposition of New Equity Interests, as well as the amount of an "excess distribution" (defined below) received by such U.S. Holder, would be allocated ratably over the U.S. Holder's holding period for the New Equity Interests.  The amounts allocated to the taxable year of the sale or other disposition (or the taxable year of receipt, in the case of an excess distribution) and to any year before Reorganized Paragon became a PFIC would be taxed as ordinary income.  The amounts allocated to each other taxable year would be subject to tax at the highest rate in effect for individuals or corporations, as appropriate, for that taxable year, and an interest charge would be imposed.  For purposes of these rules, an excess distribution is the amount by which any distribution received by a U.S. Holder on its New Equity Interests in a taxable year exceeds 125% of the average of the annual distributions on the New Equity Interests received during the preceding three years or the U.S. Holder's holding period, whichever is shorter.  Certain elections may be available that would result in alternative treatments (such as mark-to-market treatment) of the New

Equity Interests.  The Debtors do not intend to make available the information necessary for U.S. Holders to make a "qualified electing fund" election with respect to their New Equity Interests.

The rules relating to PFICs are complex.  Each U.S. Holder is urged to consult its tax advisor regarding whether Reorganized Paragon will constitute a PFIC and, if so, the U.S. federal, state, local, and foreign tax consequences of holding the New Equity Interests.

Deemed Dividends and Actual Distributions on New Equity Interests if Reorganized Paragon is a Controlled Foreign Corporation.  If Reorganized Paragon is treated as a CFC for U.S. federal income tax purposes, a U.S. Shareholder of Reorganized Paragon would be treated, subject to certain exceptions, as receiving a deemed dividend at the end of the taxable year from Reorganized Paragon in an amount equal to that person's pro rata share of the "Subpart F income" of Reorganized Paragon to the extent of Reorganized Paragon's earnings and profits, as determined under U.S. federal income tax principles.  Such deemed dividend would be treated as income from sources within the United States for U.S. foreign tax credit limitation purposes to the extent that it is attributable to income of Reorganized Paragon from sources within the United States.  Among other items, and subject to certain exceptions, "Subpart F income" includes dividends, interest, annuities, gains from the sale or exchange of shares and securities, certain gains from commodities transactions, certain types of insurance income and income from certain transactions with related parties.  If a CFC's Subpart F income exceeds 70% of its gross income for a taxable year, the entire amount of the CFC's income for such taxable year will be treated as Subpart F income.

Any actual distributions made by Reorganized Paragon to a U.S. Holder will be taxable in the manner described in the preceding section "General Treatment," to the extent that such amounts have not previously been included in income as a deemed dividend by such U.S. Holder.

The rules relating to CFCs are complex.  Each U.S. Holder is urged to consult its tax advisor regarding whether Reorganized Paragon will constitute a CFC and, if so, the U.S. federal, state, local, and foreign tax consequences of holding New Equity Interests.

(e)    Treatment of General Unsecured Claims

Pursuant to the Plan, in full satisfaction of their Allowed Claims, holders of General Unsecured Claims will receive a cash payment.  Accordingly, in general, a U.S. Holder of a General Unsecured Claims will recognize gain or loss in an amount equal to the difference, if any, between (i) the amount of cash received in satisfaction of its Claims (other than any consideration received in respect of a Claim for accrued but unpaid interest), and (ii) the U.S. Holder's adjusted tax basis in its Claims (other than any tax basis attributable to accrued but unpaid interest). *See* 2.f.— "Distributions in Discharge of Accrued Interest or OID" and 2.g.— "Character of Gain or Loss," below.

In the event of the subsequent disallowance of any Disputed General Unsecured Claim after the Effective Date, a U.S. Holder of a previously Allowed General Unsecured Claim may receive additional distributions in respect of its Claim.  In such instance, the imputed interest provisions of the U.S. Tax Code may apply to treat a portion of such additional distributions as imputed interest.  In addition, it is possible that any loss realized by a U.S. Holder may be deferred until all Disputed General Unsecured Claims are resolved (*i.e.*, until the U.S. Holder has received its final distribution).  Alternatively, a U.S. Holder may recognize additional gain or otherwise be subject to the possible application of the "installment method" of reporting with respect to any gain realized.  You are urged to consult your tax advisor regarding the possibility for deferral, and the potential application (and ability to elect out) of the "installment method" of reporting any gain realized in respect of your Claims.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent will (i) treat any cash reserved on account of Disputed General Unsecured Claims (*i.e.*, the General Unsecured Claims Reserve) as "disputed ownership funds" governed by Treasury Regulation section 1.468B-9, and (ii) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including, without limitation, the Debtors, Reorganized Paragon, the Disbursing Agent and the holders of General Unsecured Claims) will be required to report for tax purposes consistently with such treatment. Accordingly, the General Unsecured Claims Reserve will be a separate taxable entity for U.S. federal income tax purposes, and all interest and earnings of the General Unsecured Claims Reserve will be taxable to such entity. Any distributions from the General Unsecured Claims Reserve to holders of Allowed General Unsecured Claims (including to previously Allowed General Unsecured Claims in the event a Disputed Claim is disallowed) will be treated for U.S. federal income tax purposes as if received directly from the Debtors on the original Allowed General Unsecured Claims. The Disbursing Agent will be responsible for payment, out of the cash in the General Unsecured Claims Reserve, of any taxes imposed on the General Unsecured Claims Reserve.

(f)    Distributions in Discharge of Accrued Interest or OID

In general, to the extent that any exchange consideration received pursuant to the Plan (whether cash, stock or other property) by a U.S. Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the U.S. Holder as interest income (if not previously included in the U.S. Holder's gross income). Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or amortized OID was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a U.S. Holder of a "security" of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Accordingly, it is also unclear whether, by analogy, a U.S. Holder of a Claim that does not constitute a "security" would be required to recognize a capital loss, rather than an ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution will be allocated first to the principal amount (as determined for U.S. federal income tax purposes) of the Claim  and then to accrued but unpaid interest. *See* Section 6.13 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

(g)    Character of Gain or Loss

Generally, the gain or loss recognized by a U.S. Holder with respect to a Claim will be a capital gain or loss unless the Claim was acquired at a market discount, and depending on whether and the extent to which the U.S. Holder previously claimed a bad debt deduction. Any such capital gain or loss generally will be long-term if the U.S. Holder's holding period in the Claim is more than one year.

A U.S. Holder that purchased its Claims from a prior holder at a "market discount" (relative to the principal amount of the Claims at the time of acquisition) may be subject to the market discount rules of the U.S. Tax Code. In general, a debt instrument is considered to have been acquired with "market discount" if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its revised issue price (generally, the

aggregate amount of OID accrued on a holder's debt instrument prior to such U.S. Holder's acquisition of the debt instrument), in each case, by at least a *de minimis* amount.  Under these rules, any gain recognized on the exchange of Claims (other than in respect of a Claim for accrued but unpaid interest) generally will be treated as ordinary income to the extent of the market discount accrued (on a straight line basis or, at the election of the U.S. Holder, on a constant yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued.  If a U.S. Holder did not elect to include market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

In the case of an exchange of debt obligations under the Term Loan Agreement or the Senior Notes Claims that qualifies as a "reorganization" exchange, the U.S. Tax Code indicates that any accrued market discount in respect of the debt obligations under the Term Loan Agreement or the Senior Notes Claims should not be currently includible in income under Treasury regulations to be issued.  Rather, such accrued market discount should carry over to any nonrecognition property received in exchange therefor (*i.e.*, to the Take Back Debt, if applicable, and if such Take Back Debt constitutes "securities," and to the New Equity Interests received in the exchange).  Any gain recognized by a U.S. Holder upon a subsequent disposition of such Take Back Debt (if applicable, and if such Take Back Debt constitutes "securities") or New Equity Interests would be treated as ordinary income to the extent of any accrued market discount not previously included in income.  To date, specific Treasury regulations implementing this rule have not been issued.

(h)    Information Reporting and Backup Withholding

Payments of interest (including accruals of OID, if any) or dividends and any other reportable payments, including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement or other disposition of the Take Back Debt or New Equity Interests, generally will be subject to information reporting and may be subject to "backup withholding" (currently at a rate of 28%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding.  Backup withholding is not an additional tax.  Any amounts deducted and withheld generally will be allowed as a credit against or refund of that recipient's U.S. federal income tax liability, provided that appropriate proof is timely provided under rules established by the IRS.  Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner.  Backup withholding generally will not apply with respect to payments made to exempt recipients, such as corporations and financial institutions.   You are urged to consult your tax advisor regarding your qualification for exemption from backup withholding and information reporting and the procedures for obtaining such an exemption.

U.S. Treasury regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds.  You are urged to consult your tax advisor regarding these U.S. Treasury regulations and whether the contemplated transactions under the Plan would be subject to these U.S. Treasury regulations and require disclosure on your tax return.

The foregoing summary has been provided for informational purposes only.  Each U.S. Holder is urged to consult its tax advisor concerning the U.S. federal, state, local, and other tax consequences applicable under the Plan.

### B.    Certain U.K. Tax Consequences of the Plan

#### 1.    Releases of Debt

(a)    Applicable Law

A release, partial release or cancellation of indebtedness (a "**Release**") can give rise to a taxable receipt for a United Kingdom taxpayer debtor (here, Paragon Parent) in certain circumstances, including where the indebtedness to be subject to a Release constitutes a "loan relationship" (very broadly, a transaction under which one party has lent money and the other party has incurred a money debt) of the debtor. Credits and debits (in layman's terms, these can be broadly equated with the concepts of taxable income and tax deductions, although technically the concepts are not wholly equivalent) arising for a company in respect of its loan relationships are generally taxed in accordance with generally accepted accounting treatment. A Release would normally give rise to the recognition of a credit for accounting purposes in the accounts of the debtor company and, accordingly, a taxable credit in accordance with the UK's loan relationship legislation. However, this potential occasion of UK tax charge is subject to certain exceptions. In the following, the UK Corporation Tax Act 2009 is referred to as the Taxes Act.

(b)    Application to the Plan

The Taxes Act provides an exception for a Release that is not (i) a deemed release ("**Deemed Release**"), which arises where creditor rights are acquired for a consideration which is less than the carrying value of the corresponding liability in the debtor's accounts by a company which is or becomes connected to a debtor or (ii) a release of relevant rights, which are rights acquired by a company prior to November 18, 2015 and which would, but for the application of certain exceptions, have given rise to a Deemed Release when acquired. This exception only applies where: (a) the release takes place in an accounting period for which an amortized cost basis of accounting is used in respect of that relationship; and (b) immediately before the release, it is reasonable to assume that, without the release, there would be a material risk that the company would become unable to pay its debts over the next 12 months. We are informed that Paragon accounts for its debtor relationships on an amortized cost basis. The Debtors' chapter 11 filing is, in our view, strong evidence that it is reasonable to assume that there is a material risk that the Debtors would, without the Releases of the debt obligations of Paragon Parent, become unable to pay their debts as they fall due at some point within the next 12 months. On this basis, no taxable credit should arise to Paragon Parent under UK tax law in respect of the Releases of its debt obligations. Notwithstanding the above, no assurance can be given that Her Majesty's Revenue and Customs ("**HMRC**") will accept that the circumstances necessary to rely on this exception apply in relation to such Releases such that the exception is available.

In addition, the Plan is likely to be a "statutory insolvency arrangement", in which case a Release of the debt obligations of Paragon Parent should fall within another of the exceptions to the potential UK tax charge, preventing a taxable credit arising for UK tax purposes. This is because it is an arrangement or compromise which is similar in effect to a scheme of arrangement under the Companies Act 2006 or a voluntary arrangement under the Insolvency Act 1986 (two of several types of procedure cited in the relevant "statutory insolvency arrangement" definition). An additional similarity to a scheme of arrangement is that it is a court-approved procedure. Notwithstanding the above, no assurance can be given that HMRC will agree that the Plan qualifies as an overseas equivalent of a UK "statutory insolvency arrangement."

Of the remaining relevant exceptions under the Taxes Act, Paragon Parent would likely not be able to take advantage of the exception under the Taxes Act which applies to Releases that are the consequence of the making of a mandatory reduction instrument or a third country instrument or the exercise of a

84

stabilisation power under Part I of the UK's Banking Act 2009. There is an additional exception which applies to Releases taking place in a period where the debtor company is in an insolvency procedure (e.g., an "insolvent liquidation" or "insolvent administration," as described in the Taxes Act), but, it may be that the Debtors do not fall within the technical definition of "insolvent" for the purposes of the UK's insolvency legislation; if they are not, the exception would not be available. There is also an exception under the Taxes Act where a release of debt is in consideration of shares forming part of the ordinary share capital of the debtor company. However, any equity to be issued pursuant to the Plan is to be issued in Reorganized Paragon, and Reorganized Paragon will be a newly incorporated company, Reorganized Paragon will not be the "debtor" under the loans in question, and as a result, any such issue of equity will not meet the conditions required to fall under this exception.

The foregoing summary has been provided for informational purposes only. Each holder of Claims is urged to consult its tax advisor concerning the U.K. and other tax consequences applicable under the Plan.

### 2.    Other Tax Consequences of the U.K. Sale Transaction

#### (a)    Tax Charges on Paragon Parent

Pursuant to the U.K. Sale Transaction (as set out in the Plan), Paragon Parent will sell all of its Assets to Reorganized Paragon in exchange for the release of certain debts. To the extent that the consideration apportioned to a specific asset of Paragon Parent exceeds the amount for which Paragon Parent acquired that asset, Paragon Parent may, to the extent that it does not have losses against which to offset any such profit, and there are no reliefs or exemptions available, incur a charge to tax in respect of such asset.

#### (b)    Degrouping Charges

Under U.K. tax law, where a capital asset has been transferred within a group on a no gain/no loss basis, and a company (the "**Degrouping Company**") which acquired the asset pursuant to such a transfer subsequently leaves the group within six years of such transfer (and the transferor does not leave the group together with the transferee), a charge to corporation tax on chargeable gains may arise to the Degrouping Company (or, in certain circumstances, to the parent company which is disposing of its shareholding in such a Degrouping Company) (a "**Degrouping Charge**").

The sale of the assets from Paragon Parent to Reorganized Paragon may trigger such Degrouping Charges for Paragon Parent, and/or to Reorganized Paragon.

#### (c)    Stamp Taxes

Pursuant to the U.K. Sale Transaction (as detailed in the Plan), Paragon Parent will sell all of its Assets to Reorganized Paragon. Depending on the nature of those assets, certain UK stamp and/or other transfer taxes may apply to such sale, although such taxes are usually for the account of the buyer.

## XI.
## <u>CERTAIN RISK FACTORS TO BE CONSIDERED</u>

Prior to voting to accept or reject the Plan, holders of Claims and Interests should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation. Documents filed with the SEC may contain important risk factors that differ from those discussed below, and such risk factors are incorporated as if fully set forth herein and are a part of this Disclosure

Statement.  Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov.

### A.  <u>Certain Bankruptcy Law Considerations</u>

#### 1.  General

While the Debtors believe that the Chapter 11 Cases will be of short duration and will not be materially disruptive to their businesses, the Debtors cannot be certain that this will be the case.  Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed.  Even if confirmed on a timely basis, bankruptcy proceedings to confirm the Plan could have an adverse effect on the Debtors' business.  Among other things, it is possible that bankruptcy proceedings could adversely affect the Debtors' relationships with their key customers and employees.  The proceedings will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### 2.  Risk of Non-Confirmation of the Plan

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes.  Moreover, the Debtors can make no assurances that they will receive the requisite acceptances to confirm the Plan, and even if all voting classes voted in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization.

Specific challenges to the confirmability of the Plan may include, but are not limited to:

- The Plan and Plan Settlement resolve all claims between the Debtors, Secured Lenders, the Term Loan Agent, and the Revolving Credit Facility Agent in an integrated settlement.  If the Plan Settlement is not approved in its entirety, including, but not limited to, the Settled Adequate Protection Claim, the issue of the Liens asserted by the Secured Lenders on Unencumbered Cash, would be re-opened, along with other matters that are being settled.  Consequently, litigation may ensue among the Debtors, the Secured Lenders, the holders of Senior Notes Claims, and/or the Creditors' Committee over the amount of the Debtors' Unencumbered Cash, among other things.  Absent a settlement between the Secured Lenders, the Term Loan Agent, the Revolving Credit Facility Agent and the Debtors over the amount of Unencumbered Cash, it is unlikely that the Plan will be confirmed.

- Pursuant to the Final Cash Collateral Order, in exchange for the continued use of the Cash Collateral, the Debtors provided the holders of the Revolver Claims and the holders of the Term Loan Claims with, among other things, first priority replacement liens on the Debtors' unencumbered property and junior replacement liens on certain of the Debtors' encumbered property as adequate protection for any diminution in value of their respective interests in the Collateral securing the Revolving Loans under the Revolving Credit Agreement and the Term Loans.  The Debtors, the Requisite Lenders, the Term Loan Agent, and the Revolving Credit Facility Agent have agreed to settle the Secured Lenders' adequate protection claim at not less

than $352,000,000.  The treatment of Claims and Interests contemplated by the Plan is premised upon the Bankruptcy Court's approval of the Settled Adequate Protection Claim.

However, the Debtors anticipate that holders of the Senior Notes Claims and/or the Creditors' Committee will object to the amount of the Settled Adequate Protection Claim.  These objectors will likely argue that the actual diminution in the Collateral securing the Revolver Claims and the Term Loan Claims is less than the Debtors' and Secured Lenders' calculation and, as a result, the Secured Lenders' Settled Adequate Protection Claim is too high.  The calculation of the diminution in the Secured Lenders' Collateral can include, among other things, the value of the Debtors' rigs, including the increase and reduction of cash flows from contracts associated with those rigs.

As discussed in Section IV.C herein, the Debtors believe that the Plan Settlement with the Secured Lenders contemplated by the Plan – including the Settled Adequate Protection Claim – is fair, reasonable, and in the best interest of the Debtors' estates.  However, if the Bankruptcy Court does not approve the Settled Adequate Protection Claim, it is unlikely that the Plan will be confirmed.

- With respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."  This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

Holders of Senior Notes Claims and/or the Creditors' Committee may object to confirmation of the Plan on the grounds that the plan does not satisfy the best interests test.  However, the Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis (as defined below) attached hereto as **Exhibit D**.

- Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization.  Holders of the Senior Notes Claims and/or the Creditors' Committee may object to the feasibility of the Plan.  However, the Debtors' go-forward New Business Plan, pursuant to which the Debtors will reduce cash burn, right-size their asset base, and increase their runway until a market turnaround, has been carefully formulated and has been independently verified by the Debtors' financial advisors.  The New Business Plan also incorporates feedback on the feasibility of the Second Amended Plan that the Debtors received from the Bankruptcy Court in the Confirmation Decision.

Based upon the New Business Plan, the Debtors have prepared the Projections provided in Section VII hereof.  Based upon such Projections, the Debtors believe they will have sufficient

resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.

### 3.    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions listed in Section 9.1 of the Plan – including, but not limited to:  (i) that the aggregate amount of all Cash payable under the Plan to the holders of Allowed Term Loan Claims and holders of Allowed Revolver Claims pursuant to Sections 4.3 and 4.4 of the Plan will not be less than the Minimum Secured Lender Cash Distribution Amount unless the Requisite Lenders consent to a reduced aggregate amount; and (ii) that the U.K. Administration will have been commenced and the U.K. Sale Transaction will have been effectuated in accordance with the U.K. Implementation Agreement – are not satisfied or waived in accordance with Section 9.2 of the Plan on or before June 15, 2017, or by such later date as agreed to by the Requisite Lenders and the Debtors and as set forth by the Debtors in a notice filed with the Bankruptcy Court prior to the expiration of such period, the Plan will be null and void in all respects, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.

Although the Debtors anticipate that the application to the English Court for the appointment of the U.K. Administrators will take place on or following the Confirmation Date, the appointment of the U.K. Administrators remains subject to the discretion of the English Court, which will have to determine that (among other things) the conditions for administration have been satisfied.  If the English Court declines to grant an order appointing the U.K. Administrators, it will not be possible to implement the U.K. Sale Transaction in accordance with Section 5.13 of the Plan, and the conditions to the Effective Date (listed in Section 9.1 of the Plan) will not be satisfied.

### 4.    Risks Relating to Mediation

As discussed above, in an effort to reach a global settlement in these cases, the Debtors, the Term Loan Agent, the Revolving Credit Facility Agent, and the Creditors' Committee agreed to mediate certain issues relating to the Plan and Plan Settlement, including, among others, the Settled Claims and the Noble Settlement Agreement.  If the Mediation is successful, and a global settlement is achieved, the Plan may be amended to reflect such settlement.  However, there is also a risk that Mediation will be unsuccessful and the Creditors' Committee, and others, may file and prosecute objections to confirmation of the Plan.

### 5.    Risks Relating to Makewhole Premium

The Senior Notes Indenture Trustee has asserted that holders of Senior Notes Claims are entitled to a makewhole premium pursuant to the Senior Notes Indenture.  The Debtors dispute that they owe any makewhole premium.  However, if the Bankruptcy Court determines that the Debtors do owe a makewhole premium, recoveries to holders of Claims in Classes 4 and 5 may be different than projected.

### 6.    Conversion into Chapter 7 Cases

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  See Section XIII hereof, as well as the Liquidation Analysis attached hereto as

**Exhibit D**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

### 7.    Market Volatility

The Debtors acknowledge that the value of their business is subject to many uncertainties and contingencies which are difficult to predict and will fluctuate with changes in factors affecting the financial condition and prospects of their business.  In the future, the Debtors may, but are not required to, revise their Projections to reflect recent market developments, including volatility in commodity prices, corresponding behavior of producers and additional information from customers.

### B.    Additional Factors Affecting the Value of the Reorganized Debtors

#### 1.    Claims Could Be More than Projected

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could cause the value of distributions to be reduced substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' Projections and feasibility analysis, and the variation may be material.

#### 2.    Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains (i) estimates and assumptions which might ultimately prove to be incorrect and (ii) contains projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### C.    Risks Relating to the Debtors' Business and Financial Condition

#### 1.    Risks Associated with the Debtors' Business and Industry

The risks associated with the Debtors' business and industry are more fully described in the Debtors' SEC filings, including Form 10-K for the fiscal year ended December 31, 2015, filed with the SEC on March 11, 2016.  The risks associated with the Debtors' business and industry described in the Debtors' SEC filings include, but are not limited to, the following:

- Significant decline in the worldwide demand for drilling services;

- Highly competitive and cyclical nature of the contract drilling industry;

- Worldwide oversupply of jackup rigs and floaters;

- Comparative disadvantage of standard specification rigs to high specification rigs;

- Need for capital upgrades and refurbishment;

- Limited ability to obtain financing and pursue business opportunities because of debt level;

- Credit risk relating to nonperformance by customers;

- Risks relating to operating in international locations;

- Maintenance costs of both operating and idle rigs;

- No assurance that current backlog of drilling contracts will be ultimately realized;

- Loss of major tax dispute (or successful tax challenge) could result in higher tax rates; and

- Losses related to sold, idle, or scrapped rigs.

### 2.    Post-Effective Date Indebtedness

Following the Effective Date, the Reorganized Debtors will have outstanding secured indebtedness of $85 million, pursuant to the Take Back Debt Agreement. In addition, approximately $68 million of Existing Letters of Credit will continue in effect under the New Letter of Credit Agreement.  The Reorganized Debtors' ability to service their debt obligations will depend on, among other things, their future operating performance, which depends partly on economic, financial, competitive, and other factors beyond the Reorganized Debtors' control.  The Reorganized Debtors may not be able to generate sufficient cash from operations to meet their debt service obligations as well as fund necessary capital expenditures and investments in sales and marketing.  In addition, if the Reorganized Debtors need to refinance their debt, obtain additional financing, or sell assets or equity, they may not be able to do so on commercially reasonable terms, if at all.

### 3.    Risks Related to Foreign Customers and Creditors

The Debtors' customers may not be subject to the jurisdiction of U.S. courts and may attempt to terminate their contracts with the Debtors or take actions against the Debtors' assets in contravention of U.S. bankruptcy law or orders of the Bankruptcy Court.  Any such termination or renegotiation of contracts and unfavorable costs increases or loss of revenue could have a material adverse impact on the Debtors' financial condition and results of operations.

### 4.    Risks Relating to the Debtors' Relationship with Noble

#### (a)    The Noble Settlement Agreement

One of the conditions precedent to the effectiveness of the Plan is the approval of the Noble Settlement Agreement.  As discussed above, pursuant to the Original Plan, the Noble Settlement Agreement would have become effective upon the effective date of the Debtors' plan of reorganization if such plan were substantially similar to the Debtors' Original Plan.  The Plan contemplates that the Noble Settlement Agreement will become effective upon the effective date of the Plan.  In light of the differences between the Original Plan and the New Plan, the Debtors intend to discuss this requirement with Noble.  The Noble Settlement Agreement provides that Noble may unilaterally terminate the Noble Settlement Agreement only if: (i) the Debtors file a plan of reorganization with the Bankruptcy Court that does not incorporate the terms and conditions of the Noble Settlement Agreement, (ii) the Debtors file a motion before the Bankruptcy Court to terminate their obligations under the Noble Settlement Agreement, or (iii) the release of claims by the Debtors in favor of Noble, as detailed below, is deemed invalid or unenforceable.  If the Noble Settlement Agreement is terminated, or the Plan is deemed not to be substantially similar to the Original Plan, it is likely that this condition precedent to the effectiveness of the Plan will not be satisfied.  Like any other condition precedent to the effectiveness of the Plan, if the

90

condition precedent requiring approval of the Noble Settlement is not satisfied or waived in writing by the Debtors subject to the written consent of the Requisite Lenders, in accordance with Section 9.2 of the Plan, it is unlikely that the Plan will be confirmed.

        (b)    Indemnification and Contribution Claims

In connection with the Spin-Off described in Section II, Paragon Parent and Noble entered into the Master Separation Agreement.  Among other things, the Master Separation Agreement contains indemnification and contribution obligations designed to make Paragon Parent financially responsible for substantially all liabilities that may exist relating to Paragon's business activities, whether incurred prior to or after the Spin-Off.

As explained in Section VI.D.16, the Paragon Group and certain of its creditors may have certain claims against Noble arising under, relating to, or in connection with the Spin-Off.  The Noble Settlement Agreement is intended to address and settle these claims in exchange for direct bonding related to certain of the Debtors' potential tax liabilities in Mexico.  To the extent the Noble Settlement Agreement is not consummated, the Debtors, or a representative of their estates appointed pursuant to section 1123(b)(3)(b) of the Bankruptcy Code, may prosecute the Company's claims against Noble.  To the extent the Debtors or their representative succeed in such actions, Paragon Parent may in turn face contractual indemnification and contribution claims under the Master Separation Agreement.  Although the Debtors will defend themselves against these claims to the fullest extent, there is no guarantee that they will be able to successfully do so.  Any amounts which the Debtors would be required to transfer to Noble in connection with these claims would proportionally deplete the value available to the Debtors' creditors.

        (c)    Tax Claims

In addition to the potential liabilities described in Section V, Paragon Parent could face other future liabilities under the Tax Sharing Agreement.  Although Paragon Parent cannot quantify the amount of these liabilities, they could have a material adverse effect on the Debtors.

### D.   **Factors Relating to Securities to Be Issued Under the Plan, Generally**

#### 1.   **Market for Securities**

Since receipt of the Suspension Notice, Paragon Parent's ordinary shares have been trading on the over the counter markets.  Reorganized Paragon may seek to list the New Equity Interests on the NYSE or NASDAQ upon consummation of the Plan.  In the event that Reorganized Paragon seeks such listing, no assurance can be given that Reorganized Paragon will be successful with such listing.  If Reorganized Paragon does not seek such listing or is not successful with such listing, an active trading market for the New Equity Interests may not be developed or maintained in the future or, even if developed, may not be liquid.  If an active trading market is not developed and maintained or such trading market is not liquid, holders of New Equity Interests may be unable to sell their New Equity Interests at their fair market value or at all. Consequently, holders of the New Equity Interests may bear certain risks associated with holding securities for an indefinite period of time, including, but not limited to, the risk that the New Equity Interests will lose some or all of their value.  No assurance can be given that the liquidity of any trading market may develop, that the holders of New Equity Interests will be able to sell their New Equity Interests or on the price at which holders would be able to sell their New Equity Interests.

2.    **Potential Dilution**

The ownership percentage represented by the New Equity Interests distributed on the Effective Date under the Plan will be subject to dilution from the equity issued in connection with the Management Incentive Plan and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.

In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Equity Interests issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

3.    **Reorganized Paragon Will be a Holding Company**

Paragon Parent is a holding company, and as such, it conducts its operations through, most of its assets are owned by, and its operating income and cash flow are generated by, its subsidiaries.  Upon the Effective Date, Reorganized Paragon will remain a holding company.  Therefore, Reorganized Paragon will be dependent upon cash flows from its subsidiaries to meet its debt service and related obligations.  Contractual provisions or laws, as well as its subsidiaries' financial conditions and operating requirements, may limit Reorganized Paragon's ability to obtain, from such subsidiaries, the cash required to meet such debt service or related obligations.  Applicable tax laws may also subject such payments to further taxation.  The inability to obtain cash from its subsidiaries may limit Reorganized Paragon's ability to meet its debt service and related obligations even though there may be sufficient resources on a consolidated basis to satisfy such obligations.

4.    **Compliance with Terms of the Take Back Debt Agreement**

The Plan provides that the Revolving Credit Agreement and Term Loan Agreement will be amended and restated into a single Take Back Debt Agreement on the terms and conditions set forth in the Take Back Debt Term Sheet attached to the Plan as **Exhibit B**.  The Debtors will also enter into the New Letter of Credit Agreement pursuant to which Existing Letters of Credit will remain outstanding.  The Debtors believe that they will have sufficient cash flow to make all required interest payments on the Take Back Debt Agreement and comply with their obligations under the New Letter of Credit Agreement.

E.    **Risks Related to an Investment in the New Equity Interests**

1.    **Equity Interests Subordinated to the Reorganized Debtors' Indebtedness**

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Equity Interests would rank below all debt claims against the Reorganized Debtors.  As a result, holders of the New Equity Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' obligations to their debt holders have been satisfied.

2.    **Implied Valuation of New Equity Interests Not Intended to Represent the Trading Value of the New Equity Interests**

The valuation of the Reorganized Debtors is not intended to represent the trading value of the New Equity Interests in public or private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict.  Actual market prices of such securities at issuance will depend upon, among other things: (1) prevailing interest rates; (2) conditions in the financial markets; (3) the anticipated initial securities holdings of prepetition creditors, some of whom may prefer to liquidate their

investment rather than hold it on a long-term basis; and (4) other factors that generally influence the prices of securities. The actual market price of the New Equity Interests is likely to be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market price of the New Equity Interests to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and should not be construed as reflecting, values that will be attained for the New Equity Interests in the public or private markets.

### 3. No Intention to Pay Dividends

Reorganized Paragon does not anticipate paying any dividends on the New Equity Interests as it expects to retain any future cash flows for debt reduction and to support its operations. As a result, the success of an investment in the New Equity Interests will depend entirely upon any future appreciation in the value of the New Equity Interests. There is, however, no guarantee that the New Equity Interests will appreciate in value or even maintain their initial value. In addition, under the Take Back Debt Agreement, Reorganized Paragon will be restricted from paying cash dividends.

### F. Additional Factors

### 1. Debtors Could Withdraw Plan

Subject to the terms of, and without prejudice to, the rights of the Steering Committee of Revolving Lenders and the Ad Hoc Committee of Term Lenders, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### 2. Debtors Have No Duty to Update

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### 3. No Representations Outside this Disclosure Statement Are Authorized

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to accept or reject the Plan.

### 4. No Legal or Tax Advice Is Provided by this Disclosure Statement

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.

This Disclosure Statement is not legal advice to you. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

93

5.      **No Admission Made**

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

6.      **Certain Tax Consequences**

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Section X hereof.

### XII.
### VOTING PROCEDURES AND REQUIREMENTS

A.      **Parties Entitled to Vote**

Under the Bankruptcy Code, only holders of certain claims or interests in "impaired" classes are entitled to vote on a plan.  Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan.  If a claim or interest is not impaired by the plan, the Bankruptcy Code deems the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the claims that cast ballots for acceptance or rejection of the plan.

The claims in the following classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 3 – Revolver Secured Claims and Term Loan Secured Claims

- Class 4 – Senior Notes Claims and Secured Lender Unsecured Claims

- Class 5 – General Unsecured Claims

B.      **Voting Deadline**

Before voting to accept or reject the Plan, each holder of an Allowed Revolver Secured Claim or Term Loan Secured Claims, an Allowed Senior Notes Claim or Secured Lender Unsecured Claim, or an Allowed General Unsecured Claim as of the Record Voting Date (as defined below) (an "**Eligible**

Holder") should carefully review the Plan attached hereto as **Exhibit A**.  All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan.

Ballots (the "**Ballots**") will be provided for holders of voting claims as of Tuesday, March 14, 2017 (the "**Record Voting Date**") to vote to accept or reject the Plan.  Because all other Classes are either Unimpaired or Impaired and deemed to either accept or reject the Plan, only Classes 3, 4, and 5 are entitled to vote.

Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Record Voting Date for voting purposes, and the applicable standards for tabulating Ballots.

The Debtors have engaged Kurtzman Carson Consultants ("**KCC**") as their voting agent (the "**Voting Agent**") to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **IN ORDER FOR YOUR VOTE TO BE COUNTED, YOUR VOTE MUST BE RECEIVED BY THE VOTING AGENT AT THE ADDRESS SET FORTH BELOW ON OR BEFORE THE VOTING DEADLINE OF 5:00 P.M., PREVAILING EASTERN TIME, ON TUESDAY, MAY 19, 2017, UNLESS EXTENDED BY THE DEBTORS.  IF YOU HOLD YOUR SENIOR NOTES CLAIMS THROUGH A NOMINEE, PLEASE FOLLOW THE INSTRUCTIONS PROVIDED BY YOUR NOMINEE FOR RETURNING YOUR VOTING INSTRUCTIONS.  UNLESS OTHERWISE INSTRUCTED, PLEASE RETURN YOUR BENEFICIAL HOLDER BALLOT TO YOUR NOMINEE OR YOUR VOTE WILL NOT BE COUNTED.**

Delivery of a Ballot by facsimile, e-mail or any other electronic means will not be accepted.  Ballots must be returned by the Voting Deadline with an original signed copy to:

By First Class Mail, Overnight Courier or Personal Delivery:

> Paragon Ballot Processing
> c/o Kurtzman Carson Consultants LLC
> 2335 Alaska Avenue
> El Segundo, CA 90245

FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT MUST BE ACTUALLY RECEIVED BY THE SOLICITATION AGENT NO LATER THAN TUESDAY MAY 19, 2017 AT 5:00 P.M. (PREVAILING EASTERN TIME).

ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN OR INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.  **THE DEBTORS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE VOTING AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS.**  THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN. AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.

### C.    **Voting Procedures**

The Debtors are providing copies of this Disclosure Statement (including all exhibits and appendices) and related materials and a Ballot (collectively, a "**Solicitation Package**") to record holders of the Revolver

Secured Claims and Term Loan Secured Claims, Senior Notes Claims and Secured Lender Unsecured Claims, and General Unsecured Claims.

The Debtors will not send Solicitation Packages to creditors that have Claims that have already been paid or otherwise satisfied in full; *provided*, *however*, that if any such creditor would be entitled to receive a Solicitation Package for any other reason, then the Debtors will send such creditor a Solicitation Package.

With respect to Ballots that will be sent to holders of the Senior Notes Claims entitled to vote on the Plan in Class 4 (Senior Notes Claims and Secured Lender Unsecured Claims), the Debtors will deliver Ballots to record holders of such Claims, including, without limitation, representatives such as brokers, banks, commercial banks, trust companies, dealers, or other agents or nominees (collectively, the "**Nominees**"). Once the Record Voting Date has passed, the Debtors will cause to be distributed, to each Nominee, reasonably sufficient numbers of Solicitation Packages, including a Master Ballot (as hereinafter defined) and sufficient Beneficial Ballots (the "**Beneficial Ballots**"), to distribute via first class mail to the beneficial holders of the Senior Notes Claims as of the Record Voting Date for whom such Nominee acts (collectively, the "**Beneficial Holders**").

Such Nominees will, upon receipt of the Solicitation Packages, promptly distribute such Solicitation Packages to Beneficial Holders (including Beneficial Ballots) using one of the following two (2) methods (to be selected by the Nominee) within five (5) business days of receipt of the Solicitation Packages:

      (a)    Pre-Validated Ballots

The Nominee may "pre-validate" a Beneficial Ballot by (i) signing the Beneficial Ballot and indicating on the Beneficial Ballot the name of the Nominee and DTC Participant Number, (ii) the amount and the account number of the Senior Notes Claims held by the Nominee for the Beneficial Holder, and (iii) forwarding such Beneficial Ballot, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope addressed to, and provided by, KCC, and other materials requested to be forwarded, to the Beneficial Holder for voting. The Beneficial Holder must then complete the information requested in Item 2, Item 3, and Item 4 of the Beneficial Ballot, and return the Beneficial Ballot directly to KCC in the pre-addressed, postage-paid return envelope so that it is RECEIVED by KCC on or before the Voting Deadline. A list of the Beneficial Holders to whom "pre-validated" Beneficial Ballots were delivered should be maintained by Nominees for inspection for at least one (1) year from the Voting Deadline.

      (b)    Master Ballots

If the Nominee elects not to pre-validate Beneficial Ballots, the Nominee may obtain the votes of Beneficial Holders by forwarding to the Beneficial Holders the unsigned Beneficial Ballots, together with the Disclosure Statement, a pre-addressed, postage-paid return envelope provided by, and addressed to, the Nominee, and other materials requested to be forwarded. Each such Beneficial Holder must then indicate his, her, or its vote on the Beneficial Ballot, complete the information requested on the Beneficial Ballot, review the certifications contained on the Beneficial Ballot, execute the Beneficial Ballot, and return the Beneficial Ballot to the Nominee. After collecting the Beneficial Ballots, the Nominee should, in turn, complete a master ballot (the "**Master Ballot**") compiling the votes and other information from the Beneficial Ballots, execute the Master Ballot, and deliver the Master Ballot to KCC so that it is RECEIVED by KCC on or before the Voting Deadline. All Beneficial Ballots returned by Beneficial Holders should either be forwarded to KCC (along with the Master Ballot) or retained by Nominees for inspection for at least one (1) year from the Voting Deadline. EACH NOMINEE SHOULD ADVISE ITS BENEFICIAL HOLDERS TO RETURN THEIR BENEFICIAL BALLOTS TO THE NOMINEE BY A DATE CALCULATED BY THE NOMINEE TO ALLOW IT TO PREPARE AND RETURN THE

MASTER BALLOT TO KCC SO THAT IT IS RECEIVED BY KCC ON OR BEFORE THE VOTING DEADLINE.

**2.    Miscellaneous**

All Ballots must be signed by the holder of record of a Revolver Secured Claims, a Term Loan Secured Claim, a Senior Notes Claim, a Secured Lender Unsecured Claim, or a General Unsecured Claims, as applicable, or any person who has obtained a properly completed Ballot proxy from the record holder of a Revolver Secured Claim, a Term Loan Secured Claim, a Senior Notes Claim, a Secured Lender Unsecured Claim, or a General Unsecured Claim, as applicable, on such date.  For purposes of voting to accept or reject the Plan, the Eligible Holders of the Senior Notes Claims will be deemed to be the "holders" of the claims represented by such Senior Notes.  If you return more than one Ballot voting different Revolver Secured Claims or Term Loan Secured Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  If you return more than one Ballot voting different Senior Notes Claims, Secured Lender Unsecured Claims, or General Unsecured Claims, the Ballots are not voted in the same manner, and you do not correct this before the Voting Deadline, those Ballots will not be counted.  An otherwise properly executed Ballot (other than a Master Ballot) that attempts to partially accept and partially reject the Plan will likewise not be counted.  If you cast more than one Ballot voting the same Claim(s) before the Voting Deadline, the last valid Ballot received on or before the Voting Deadline will be deemed to reflect your intent, and thus, to supersede any prior Ballot.  If you cast Ballots received by KCC on the same day, but which are voted inconsistently, such Ballots will not be counted.

The Ballots provided to Eligible Holders will reflect the principal amount of such Eligible Holder's Claim; however, when tabulating votes, the Voting Agent may adjust the amount of such Eligible Holder's Claim by multiplying the principal amount by a factor that reflects all amounts accrued between the Record Voting Date and the Petition Date including, without limitation, interest.

Except as provided below, unless the Ballot is timely submitted to the Voting Agent before the Voting Deadline together with any other documents required by such Ballot, the Debtors may, in their sole discretion, reject such Ballot as invalid, and therefore decline to utilize it in connection with seeking confirmation of the Plan.

**3.    Fiduciaries And Other Representatives**

If a Beneficial Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such person should indicate such capacity when signing and, if requested, must submit proper evidence satisfactory to the Debtors of authority to so act.  Authorized signatories should submit the separate Beneficial Ballot of each Eligible Holder for whom they are voting.

UNLESS THE BALLOT OR THE MASTER BALLOT IS SUBMITTED TO THE VOTING AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN; PROVIDED, HOWEVER, THAT THE DEBTORS RESERVE THE RIGHT, IN THEIR SOLE DISCRETION, TO REQUEST THE BANKRUPTCY COURT TO ALLOW SUCH BALLOT TO BE COUNTED.

4.    **Agreements Upon Furnishing Ballots**

The delivery of an accepting Ballot pursuant to one of the procedures set forth above will constitute the agreement of the creditor with respect to such Ballot to accept (i) all of the terms of, and conditions to, this Solicitation; and (ii) the terms of the Plan including the injunction, releases, and exculpations set forth in Sections 10.5, 10.6, 10.7, and 10.8 therein.  All parties in interest retain their right to object to confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

5.    **Change of Vote**

Any party who has previously submitted to the Voting Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change its vote by submitting to the Voting Agent prior to the Voting Deadline a subsequent, properly completed Ballot for acceptance or rejection of the Plan.

D.    **Waivers of Defects, Irregularities, etc.**

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawals of Ballots will be determined by the Voting Agent and/or the Debtors, as applicable, in their sole discretion, which determination will be final and binding.  The Debtors reserve the right to reject any and all Ballots submitted by any of their respective creditors not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, as applicable, be unlawful.  The Debtors further reserve their respective rights to waive any defects or irregularities or conditions of delivery as to any particular Ballot by any of their creditors.  The interpretation (including the Ballot and the respective instructions thereto) by the applicable Debtor, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determines.  Neither the Debtors nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived.  Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

**XIII.**
**CONFIRMATION OF THE PLAN**

A.    **Confirmation Hearing**

Pursuant to sections 1128 and 1129 of the Bankruptcy Code, the Bankruptcy Court has scheduled a hearing to consider confirmation of the Plan (the "**Confirmation Hearing**").  The Confirmation Hearing has been scheduled to be heard on **June 5, 2017** at **10:00 a.m.** (Prevailing Eastern Time) in Courtroom 6 of the United States Bankruptcy Court for the District of Delaware, located at 824 N. Market Street, Wilmington, Delaware 19801.  The Confirmation Hearing may be adjourned from time-to-time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

In addition, the Bankruptcy Court has set the deadline to object to the confirmation of the Plan as **May 19, 2017** at **5:00 p.m.** (Prevailing Eastern Time) (the "**Objection Deadline**").  Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Objections and responses to the Plan, if any, must be served and filed as to be received on or before the Objection Deadline in the manner described in Section XIII.B of this Disclosure Statement.  For the avoidance of

doubt, an objection to the Plan filed with the Bankruptcy Court will not be considered a vote to reject the Plan.

**B.**     **Objections To Confirmation**

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Local Rules, must set forth the name of the objector, the nature and amount of Claims held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court, with a copy to the chambers of the United States Bankruptcy Judge appointed to the Chapter 11 Cases, together with proof of service thereof, and served upon the following parties, including such other parties as the Bankruptcy Court may order:

(a)     *The Debtors and Counsel to the Debtors*:

Paragon Offshore plc
c/o Paragon Offshore Services LLC
3151 Briarpark Drive
Houston, Texas  77042
Attn:     Todd Strickler – Senior Vice President of Administration, General Counsel and Corporate Secretary
Telephone: (832) 783-4000
Email:  tstrickler@paragonoffshore.com

– *and* –

Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Attn:    Mark D. Collins
Telephone:  (302) 651-7700
Email:  collins@rlf.com

– *and* –

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York  10153
Attn:    Gary T. Holtzer
           Stephen A. Youngman
Telephone:  (212) 310-8000
Email:  gary.holtzer@weil.com
           stephen.youngman@weil.com

(b)    *The United States Trustee:*

Office of the U.S .Trustee for the District of Delaware
944 King Street, Suite 2207, Lockbox 35
Wilmington, Delaware 19899-0035
Attn:  Benjamin Hackman
Telephone:  (302) 573-6493
Email:  Benjamin.A.Hackman@usdoj.gov

(c)    *The Revolving Credit Facility Agent and/or the Steering Committee of Revolving Lenders:*

Simpson Thacher & Bartlett LLP
425 Lexington Avenue
New York, New York 10017
Attn:    Sandeep Qusba
        Kathrine A. McLendon
Telephone: (212) 455-2000
Email:  squsba@stblaw.com
        kmclendon@stblaw.com

*- and –*

Landis Rath & Cobb LLP
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Attn:    Adam G. Landis
        Kerri K. Mumford
Telephone:  (302) 467-4400
Facsimile:  (302) 467-4450
Email:  landis@lrclaw.com
        mumford@lrclaw.com

(d)    *The Term Loan Agent and/or the Ad Hoc Committee of Term Lenders:*

Arnold & Porter Kaye Scholer LLP
250 West 55th Street
New York, New York 10019
Attn:    Madlyn Gleich Primoff
        Mark F. Liscio
        Scott Talmadge
        Benjamin Mintz
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
Email:  madlyn.primoff@apks.com
        mark.liscio@apks.com
        scott.talmadge@apks.com
        benjamin.mintz@apks.com

*- and –*

RLF1 17158271V.1

Potter Anderson & Corroon LLP
1313 North Market Street, 6th Floor, P.O. Box 951
Wilmington, Delaware  19899-0951
Attn:    Jeremy W. Ryan
            Ryan M. Murphy
Telephone:  (302) 984-6000
Facsimile: (302) 658-1192
Email:  jryan@potteranderson.com
            rmurphy@potteranderson.com

    (d)    *The Creditors' Committee:*

Paul, Weiss, Rifkind, Wharton & Garrison LLP
1285 Avenue of the Americas
New York, New York 10019
Attn:    Brian S. Hermann
Telephone:  (212) 373-3000
Facsimile:  (212) 373-3545
Email:  bhermann@paulweiss.com

*- and –*

Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street,
Wilmington, Delaware 19801
Attn:    Pauline K. Morgan
Telephone:  (302) 571-6707
Facsimile:  (302) 576-3318
Email:  pmorgan@ycst.com

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

    **C.**    **Requirements for Confirmation of the Plan**

        **1.**    **Requirements of Section 1129(a) of the Bankruptcy Code**

            (a)    General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied including, without limitation, whether:

        (i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

        (ii)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

        (iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

101

(iv)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(v)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in a Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(vi)    with respect to each Class of Claims or Interests, each holder of an impaired Claim or impaired equity interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim or equity interest, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims either accepted the Plan or is not impaired under the Plan;

(viii)    except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that administrative expenses and priority Claims, other than priority tax Claims, will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred cash payments over a period not exceeding five years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix)    at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(xi)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the

Plan provides for the payment of all such fees on the Effective Date of the Plan.

(b)    Best Interests Test

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either (i) accept the plan or (ii) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the debtors were liquidated under chapter 7 of the Bankruptcy Code. This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

The Debtors believe that under the Plan all holders of impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on (i) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of impaired Claims and Interests and (ii) the Liquidation Analysis attached hereto as **Exhibit D**.

The Debtors believe that any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors. The Liquidation Analysis provided in **Exhibit D** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

(c)    Feasibility

Also as noted above, section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared the Projections provided in Section VII hereof. Based upon such Projections, the Debtors believe they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization. Moreover, Section XI hereof sets forth certain risk factors that could impact the feasibility of the Plan.

(d)    Equitable Distribution of Voting Power

On or before the Effective Date, pursuant to and only to the extent required by section 1123(a)(6) of the Bankruptcy Code, the organizational documents for the Debtors will be amended as necessary to satisfy the provisions of the Bankruptcy Code and will include, among other things, pursuant to section 1123(a)(6) of the Bankruptcy Code, (i) a provision prohibiting the issuance of non-voting equity

103

securities and (ii) a provision setting forth an appropriate distribution of voting power among classes of equity securities possessing voting power.

### 2.    Additional Requirements for Non-Consensual Confirmation

In the event that any impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if, as to each impaired Class of Claims or Interests that has not accepted the Plan, the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such Classes of Claims or Interests, pursuant to section 1129(b) of the Bankruptcy Code.  Both of these requirements are in addition to other requirements established by case law interpreting the statutory requirements.

(a)    Unfair Discrimination Test

The "unfair discrimination" test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting Class are treated in a manner consistent with the treatment of other Classes whose legal rights are substantially similar to those of the dissenting Class and if no Class of Claims or Interests receives more than it legally is entitled to receive for its Claims or Interests.  This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

The Debtors believe the Plan satisfies the "unfair discrimination" test.  Claims of equal priority are receiving comparable treatment and such treatment is fair under the circumstances.

(b)    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to dissenting classes, the test sets different standards depending on the type of claims in such class.  The Debtors believe that the Plan satisfies the "fair and equitable" test as further explained below.

(i)    Secured Creditors

The Bankruptcy Code provides that each holder of an impaired secured claim either (i) retains its liens on the property to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date, of at least the allowed amount of such claim, or (ii) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale or (iii) receives the "indubitable equivalent" of its allowed secured claim.

Settled Claims comprising Revolver Secured Claims and Term Loan Secured Claims (Class 3) will be Allowed.  On the Effective Date, each holder of an Allowed Revolver Secured Claim or an Allowed Term Loan Secured Claim will receive, in full and final satisfaction, compromise, settlement, release and discharge of, in exchange for and on account of such Allowed Revolver Secured Claim or Allowed Term Loan Secured Claims, as applicable: its Pro Rata share of (i) Cash Collateral, (ii) Unencumbered Cash in an amount equal to the Settled Adequate Protection Claim, and (iii) the Take Back Debt.  For the avoidance of doubt, the Existing Letters of Credit will continue to remain outstanding, pursuant to and subject to the terms of the Existing L/C Escrow Agreement(s) and the New Letter of Credit Agreement.

Accordingly, the Plan meets the "fair and equitable" test with respect to secured creditors.

(ii)    Unsecured Creditors

The Bankruptcy Code provides that either (i) each holder of an impaired unsecured claim receives or retains under the plan of reorganization, property of a value equal to the amount of its allowed claim or (ii) the holders of claims and equity interests that are junior to the claims of the dissenting class will not receive any property under the plan of reorganization.

For purposes of treatment in Class 4, (i) Settled Claims comprising Term Loan Unsecured Claims will be Allowed in the aggregate principal amount of approximately Six Hundred Forty-Two Million Dollars ($642,000,000) and (ii) Settled Claims comprising Revolver Unsecured Claims will be Allowed in the aggregate principal amount of approximately Seven Hundred Seventy-Seven Million Dollars ($777,000,000).  On the Effective Date, each holder of an Allowed Senior Notes Claim or an Allowed Secured Lender Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release and discharge of, in exchange for and on account of such Allowed Claim, its Pro Rata share of (i) the Net Distributable Cash and (ii) the New Equity Interests (subject to dilution by the Management Incentive Plan Securities).  Distributions received under the Plan by holders of Allowed Senior Notes Claims will be subject to the rights of the Senior Notes Indenture Trustee to payment of fees, expenses, indemnification obligations, and Liens, including any charging lien, securing such right to payment under the Senior Notes Indenture.  The Senior Notes Indenture Trustee's exercise of its charging lien will occur before any distributions are made to holders of Allowed Senior Notes Claims.  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the Class 4 Disputed Claims Reserve and will withhold New Equity Interests in respect of Disputed Claims in Class 4, if any, in accordance with Section 7.7 of the Plan.  Any amounts remaining after payment of all Disputed Claims in Class 4 will be distributed as provided in Sections 6.16 and 7.7 of the Plan.

Except to the extent that a holder of an Allowed General Unsecured Claim (Class 5) and the Debtors or Reorganized Debtors, as applicable, agree to a less favorable treatment, on the later of the Effective Date and the date on which such General Unsecured Claim becomes an Allowed Claim, or, in each case, as soon thereafter as is reasonably practicable, each holder of an Allowed General Unsecured Claim will receive, in full and final satisfaction, compromise, settlement, release and discharge of, in exchange for, and on account of such holder's rights with respect to and under such Allowed General Unsecured Claim its Pro Rata share of the General Unsecured Claims Distribution, subject to Section 7.7 of the Plan.  On and after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, will maintain the General Unsecured Claims Reserve in Cash.  Distributions from the General Unsecured Claims Reserve will be available for General Unsecured Claims that are not Allowed Claims as of the Effective Date but become Allowed Claims thereafter. Any amounts remaining after payment of all Allowed General Unsecured Claims will be distributed as provided in Sections 6.16 and 7.7 of the Plan.

Accordingly, the Plan meets the "fair and equitable" test with respect to unsecured creditors.

(iii)    Equity Interests

With respect to a class of equity interests, the Bankruptcy Code requires that either (i) each holder of an equity interest will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock, or (ii) the holders of equity interests that are junior to any dissenting class of equity interests will not receive any property under the plan of reorganization.  Pursuant to the Plan, after giving effect to the Restructuring Transactions, all Parent Interests will be deemed valueless and will not receive any distribution under the Plan.  Parent Interests will be treated in accordance with the U.K. Administration. Accordingly, the Plan meets the "fair and equitable" test with respect to Parent Interests.

RLF1 17158271V.1

## XIV.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors have evaluated several alternatives to the Plan.  After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan.  If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative plan of reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.      Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan.  Such a plan might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of its assets.  The Debtors, however, submit that the Plan, as described herein, enables their creditors to realize the most value under the circumstances.

### B.      Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and a hearing, authorization to sell their assets under section 363 of the Bankruptcy Code.  Holders of Revolver Claims or Term Loan Claims would be entitled to credit bid on any property to which their security interest is attached, and to offset their Claims against the purchase price of the property.  In addition, the security interests in the Debtors' assets held by holders of Revolver Claims or Term Loan Claims would attach to the proceeds of any sale of the Debtors' assets.  After these Claims are satisfied, the remaining funds could be used to pay holders of other Claims in Classes 4 and 5.  Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for holders of Claims than the Plan.

### C.      Liquidation Under Chapter 7 or Applicable Non-Bankruptcy Law

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code.  The effect a chapter 7 liquidation would have on the recovery of holders of allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit D**.

As noted in Section XIII.C of this Disclosure Statement, the Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of the delay resulting from the conversion of the cases and the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required to become familiar with the many legal and factual issues in the Debtors' Chapter 11 Cases.

## XV.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3, 4, and 5 to vote in favor thereof.

Dated:  March 10, 2017
        Houston, Texas

*[The balance of this page has been intentionally left blank.]*

**PARAGON OFFSHORE PLC**
**PARAGON INTERNATIONAL FINANCE**
    **COMPANY**
**PARAGON OFFSHORE FINANCE COMPANY**
**PARAGON OFFSHORE LEASING**
    **(SWITZERLAND) GMBH**
**PARAGON OFFSHORE CONTRACTING   GMBH**
**PARAGON HOLDING NCS 2 S.Á R.L.**
**PARAGON OFFSHORE (LUXEMBOURG)**
    **S.Á R.L.**
**PARAGON OFFSHORE LEASING**
    **(LUXEMBOURG) S.Á R.L.**
**PARAGON OFFSHORE INTERNATIONAL**
    **LTD.**
**PARAGON DUCHESS LTD.**
**PARAGON (MIDDLE EAST) LIMITED**
**PARAGON ASSET COMPANY LTD.**
**PARAGON ASSET (ME) LTD.**
**PARAGON HOLDING SCS 2 LTD.**
**PARAGON FDR HOLDINGS LTD.**
**PARAGON HOLDING SCS 1 LTD.**
**PARAGON OFFSHORE (NORTH SEA) LTD.**
**PARAGON ASSET (UK) LTD.**
**PARAGON OFFSHORE HOLDINGS US INC.**
**PARAGON DRILLING SERVICES 7 LLC**
**PARAGON OFFSHORE DRILLING LLC**
**PARAGON LEONARD JONES LLC**
**PARAGON OFFSHORE DO BRASIL LTDA.**
**PARAGON OFFSHORE (NEDERLAND) B.V.**
**PGN OFFSHORE DRILLING (MALAYSIA)**
    **SDN. BHD.**
**PARAGON OFFSHORE (LABUAN) PTE. LTD.**


By:_____
     Name:  Dean E. Taylor
     Title:   Interim President and Chief Executive
               Officer