# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| PARAGON OFFSHORE PLC, *et al.*,[1] | Case No. 16-10386 (CSS) <br> Jointly Administered |
| Debtors. | Hearing Date: June 16, 2017 @ 11:00 a.m. ET |
| | Re: Dkt. No. 1605 |

## OBJECTION OF NOBLE CORPORATION PLC TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION, PURSUANT TO BANKRUPTCY RULE 2004, FOR AN ORDER DIRECTING PRODUCTION FROM NOBLE CORPORATION PLC

Noble Corporation plc ("Noble") submits its objection to the Motion of Official Committee of Unsecured Creditors (the "Committee"), pursuant to Bankruptcy Rule 2004, for an Order Directing Production from Noble (the "Motion").[2]

---

[1] The "Debtors" in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: Paragon Offshore plc (6017) ("Paragon"); Paragon Offshore Finance Company (6632); Paragon International Finance Company (8126); Paragon Offshore Holdings US Inc. (1960); Paragon Offshore Drilling LLC (4541); Paragon FDR Holdings Ltd. (4731); Paragon Duchess Ltd.; Paragon Offshore (Luxembourg) S.a r.l. (5897); PGN Offshore Drilling (Malaysia) Sdn. Bhd. (9238); Paragon Offshore (Labuan) Pte. Ltd. (3505); Paragon Holding SCS 2 Ltd. (4108); Paragon Asset Company Ltd. (2832); Paragon Holding SCS 1 Ltd. (4004); Paragon Offshore Leasing (Luxembourg) S.a r.l. (5936); Paragon Drilling Services 7 LLC (7882); Paragon Offshore Leasing (Switzerland) GmbH (0669); Paragon Offshore do Brasil Ltda.; Paragon Asset (ME) Ltd. (8362); Paragon Asset (UK) Ltd.; Paragon Offshore International Ltd. (6103); Paragon Offshore (North Sea) Ltd.; Paragon (Middle East) Limited (0667); Paragon Holding NCS 2 S.a r.l. (5447); Paragon Leonard Jones LLC (8826); Paragon Offshore (Nederland) B.V.; and Paragon Offshore Contracting GmbH (2832). The Debtors' mailing address is 3151 Briarpark Drive, Suite 700, Houston, Texas 77042.

[2] In submitting this Objection, Noble does not consent to the entry of final orders or judgments by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## INTRODUCTION

1. Ignoring the history of what has transpired in this proceeding to date,[3] the Committee sent Noble a sweeping set of document requests on May 26 (the "May 26 Requests")—which was largely duplicative of the set of document requests the Committee propounded in March (the "March 3 Requests"). To make matters worse, in the days after May 26, the Committee refused to provide to Noble even the most basic information that would have allowed the parties to have a meaningful meet and confer regarding a supplemental document production. The good news is that in its Motion, the Committee has now provided much of the information that Noble originally requested—creating a basis for the parties to meet and confer now on the scope and details of any further production by Noble.

2. By way of background, the Committee's March 3 Requests related to potential claims against Noble and the Noble Settlement. In response, Noble's counsel engaged in an extensive meet-and-confer process with the Committee's then-counsel, the Paul Weiss firm, during which they negotiated the scope of Noble's production. Noble ultimately reviewed over 720,000 pages and produced almost 280,000 pages.

3. The May 26 Requests, served by the Committee's new counsel, also seek documents concerning potential claims against Noble and the Noble Settlement. The Committee's new law firm had not reviewed Noble's prior document production before sending the May 26 Requests—and admits in the Motion that it still has not completed that review. Likewise, the Committee made no attempt to reduce the overlap between the

---

[3] Several months ago, the Committee asked the Court to reopen the challenge period for the cash collateral order. In rejecting that request, the Court stated that "we can't ignore the history" of what had already happened in the proceeding. (ECF No. 1147, 2/21/17 Tr. at 32–33.)

2

two sets of Requests despite Noble's request that it do so.  In fact, as the Committee now implicitly concedes, there is *substantial* overlap.

4. In order to maximize the efficiency of a meet-and-confer process on the May 26 Requests, Noble simply asked the Committee to explain what new (or additional) documents it was seeking, in light of Noble's significant prior production; a production that was not only *very recent and extensive*, but concerned the *same issues*.

5. Rather than work collaboratively with Noble to make discovery as efficient as possible, the Committee filed the Motion.  Only in its Motion did the Committee provide the information that Noble had requested in order to engage in a meaningful meet and confer.  Thus, the Committee now has identified 8 requests—out of the 44 categories in the May 26 Requests—that "relate to subject matter that is completely absent from the March 3 Requests." (Motion ¶ 43.)  The Committee also articulated (for the first time) the aspects of Noble's prior production with which it takes issue—namely the document custodians and date range.  Now that the Committee has explained the issues for discussion and more clearly identified the additional documents it seeks—which is all Noble had asked for—the parties can have a useful meet and confer, with an eye toward obviating the need for Friday's hearing.

6. Given the foregoing, it may well be unnecessary to debate whether the Committee may engage in the "fishing expedition" that it admittedly seeks under the auspices of Rule 2004 at this stage of the proceeding. (Motion ¶ 32.)  The fundamental purpose of Rule 2004 is to permit parties to "discover[] assets, examin[e] transactions, and determin[e] whether wrongdoing has occurred." *In re Wash. Mut., Inc.*, 408 B.R. 45, 50 (Bankr. D. Del. 2009) (citation omitted).  Here, however, the Committee has already

determined that, in its view, wrongdoing occurred; indeed, it announced that the Litigation Trust "*will pursue* the estate's claims against Noble." (6/7/17 Afternoon Tr. at 36 (emphasis added).) Having already reached that conclusion, any additional discovery by the Committee should be pursuant to the Federal Rules of Civil Procedure governing adversary proceedings.

7. Even if additional document discovery under Rule 2004 were proper, the Committee has failed to carry its burden of showing good cause. The Committee appears to argue that because the stated *purpose* of its March 3 Requests was to determine whether the Noble Settlement was appropriate, the substance of Noble's extensive recent production is irrelevant. But that makes no sense: What matters is the documents the Committee received, not why it received them. Most of the documents produced by Noble related to events surrounding the Spin-Off of Paragon. The claims that the Committee claims to be "investigating" relate to the very same Spin-Off. While the Committee made no attempt to demonstrate why any additional production is necessary, the Committee's May 26 Requests as drafted would impose enormous burdens on Noble, potentially including the obligation to *re-review* tens of thousands of documents that it already reviewed in response to the March 3 Requests.

8. In these circumstances, the Court should deny the Motion.[4]

---

[4] In submitting this Objection, Noble does not waive and expressly reserves all rights to object to the specific requests in the May 26 Requests and seek judicial relief as necessary. *See* Order Granting Motion Authorizing Examinations, *In re Anderson News, LLC*, No. 09-10695-CSS (Bankr. D. Del. Apr. 20, 2010), ECF No. 314 (Sontchi, J.) (granting discovery "subject to (a) all parties having reserved their rights to seek further orders of this Court to limit, expand or otherwise address disputes that may arise with respect to specific requests directed to any party to be examined that are not resolved by agreement of the Movants and such party; and (b) to the right of non-debtors to object in accordance with applicable law to any subpoena that may be served").

# FACTUAL BACKGROUND

### A. In 2014, Noble spun off Paragon to maximize the value of its standard and high-spec fleets

9. The basic background facts are well known to this Court. In 2013, Noble decided to separate its standard specification drilling units into a new company, Paragon, in order to streamline the business to maximize value for all relevant constituencies. Among other things, such a separation would enhance each company's ability to make business and operational decisions in the best interests of its particular business, to allocate capital and corporate resources with a focus on achieving its strategic priorities, and would enable the financial markets and investors to evaluate each company more effectively.

10. Noble engaged Houlihan Lokey to provide a solvency opinion before completing the transaction. Houlihan Lokey concluded that Paragon was solvent and that the fair market value of Paragon's assets were worth substantially more than its liabilities. The market clearly shared that view. Paragon's market capitalization remained at hundreds of millions of dollars for months following the Spin-Off.[5]

11. Houlihan also concluded that Paragon was adequately capitalized for the business in which it was to engage, and had the ability to pay its debts as they became due. Among the factors Houlihan considered in reaching its conclusion were that, at the time of the Spin-Off, Paragon had an established customer base, with a contract backlog of over $2.6 billion as of March 31, 2014. Paragon also had access to an $800 million line of credit and had $200 million in cash on its balance sheet. Again, the market was

---

[5] *See* Historical Stock Price and Market Cap Data for Paragon Offshore PLC (PGNPQ), Seeking Alpha (June 12, 2017), https://seekingalpha.com/symbol/PGNPQ/chart.

similarly confident in Paragon, as evidenced by its ability to tap the capital markets for financing in order to acquire Prospector Offshore three months after the Spin-Off.[6] Paragon's CEO, Randy Stilley, was enthusiastic about its prospects:

> If you look at the historical utilization of our fleet of rigs, it is much better than the rest of the industry. And if you go back since 2011, it's been significantly better than the rest of the industry for jackups and for floaters. . . . A lot of times these same rigs have kept working for the same customers over and over and over. And there's no reason to expect that that's going to change anytime in the near future.[7]

Mr. Strickler likewise "believed the Noble Spin-off was a sound business deal and a great opportunity." (*See* Decl. of Todd Strickler, Sept. 12, 2016, ¶ 31 (ECF No. 716).)

12. Unfortunately, the offshore drilling business is heavily dependent on commodity prices, and those prices declined in an unanticipated fashion in the following months. And when producers in Saudi Arabia announced their decision not to reduce output in November 2014, oil prices entered an historic freefall, creating a host of challenges for Paragon and other offshore drillers. All of this came as a surprise to many in the industry, including Paragon. As Mr. Strickler testified, Paragon "did not and could not have predicted the biggest drivers—including the drop in oil prices post Spin-off—that led Paragon into bankruptcy." (*See id.*)

13. By August 2015, Paragon recognized that reorganization was a possibility. As part of that process, Paragon and its creditors began evaluating possible fraudulent transfer claims against Noble. (*Id.*) As Mr. Strickler explained, Paragon's advisors

---

[6] *See* Paragon Offshore Announces Acquisition of a Majority Stake in Prospector Offshore, Paragon Offshore (Nov. 17, 2014), http://www.paragonoffshore.com/investors-relations/investor-news/investor-news-details/2014/Paragon-Offshore-Announces-Acquisition-Of-A-Majority-Stake-In-Prospector-Offshore/default.aspx.

[7] *See* Randy Stilley Transcript, Bloomberg CEO Energy-Power Conference at 2 (attached as Exhibit 1).

6

performed "[a]n extremely high level of diligence" on the Noble Settlement. (6/7/17 Morning Tr. at 87.) Mr. Strickler concluded that it would be "difficult to prove any form of fraudulent conveyance" and the Debtors' financial advisor, Lazard, confirmed that "at a minimum, any claims against Noble were going to be very difficult to successfully assert." (Decl. of Todd Strickler, ¶ 40.) On February 12, 2016, Noble and Paragon announced a settlement agreement (the "Noble Settlement Agreement") in which Paragon would release Noble from all claims relating to the Spin-Off in return for, among other things, Noble providing the bonding capability Paragon needed to challenge certain Mexican tax assessments.[8]

### B. In March 2017, the Committee served broad document requests on Noble concerning possible claims against Noble and the Noble Settlement

14. In February 2017, the Committee challenged the Noble Settlement as "stale," arguing that the justifications for the settlement "may no longer exist."[9] The Committee then set out to determine whether the Noble Settlement was in the best interests of the estates. By that time, the Committee had access to Paragon's due diligence on the Noble Settlement. (6/7/17 Morning Tr. at 87–88.) The Committee apparently concluded that it needed additional information to analyze the strength of any claims that the estates might have had against Noble. Accordingly, on March 3, 2017, the Paul Weiss firm served the March 3 Requests on the Committee's behalf. (*See* UCC

---

[8] *See* Noble Corporation plc Announces Settlement with Paragon Offshore plc, PR Newswire (Feb. 12, 2016), http://www.prnewswire.com/news-releases/noble-corporation-plc-announces-settlement-with-paragon-offshore-plc-300219438.html.

[9] The Official Committee of Unsecured Creditors' Objection to the Debtors' Fourth Motion to Extend Exclusive Periods Pursuant to Section 1121(d) of the Bankruptcy Code, Feb. 8, 2017 (ECF No. 1097) at 3.

7

Ex. B.)[10]  Those 54 requests spanned a wide range of topics, including: (a) Noble's strategy and efforts to separate Paragon from Noble; (b) projections, assumptions, and forecasts about Paragon and its assets; (c) valuation of the assets included in the Spin-Off; (d) impairment analyses and discussions; (e) communications concerning the Tax Sharing and Master Separation Agreements; (f) the post-Spin viability of Paragon; and (g) issues related to the Mexican and Brazilian business. (*Id.*)

15. After receiving the March 3 Requests, Noble contacted the Committee's legal counsel to schedule a meet and confer. (*See* UCC Ex. D at 1.) Noble and the Committee conducted the meet and confer on March 9, and Noble followed up the next day with a letter detailing its proposed discovery plan. (*See* UCC Ex. D.) Noble and the Committee then proceeded to negotiate the scope of Noble's review and production. The Committee did not challenge many of Noble's proposed custodians, date ranges, or narrowing of topics. In other instances, as the Committee admits in its Motion, Noble accommodated the Committee's suggestions (*e.g.*, that Noble add a custodian, broaden its date range for certain requests, and run additional word searches). (UCC Ex. F at 2–6; UCC Ex. H at 2; Motion at 12 nn.14–15.) The Committee also agreed to narrow several of its requests. (UCC Ex. E at 2–5.)

16. On April 3, 2017, Noble sent the Committee another letter concerning the scope of Noble's review and production. By this point, the parties had reached agreement on the custodians. They had also largely agreed on the appropriate date range, with the remaining dispute concerning only 3 of the 54 requests. The primary remaining dispute was whether Noble should run additional search terms. (*Compare* UCC Ex. F at

---

[10] Exhibits attached to the Committee's Motion are identified as "UCC Ex. _."

8

2–6 *with* UCC Ex. G at 2 and UCC Ex. H at 2–4.) The Committee never responded to Noble's April 3 letter during the following 18 days, when the Noble Settlement remained part of the plan of reorganization.

17. In the end, Noble reviewed over 720,000 pages that met the search parameters. These documents included emails from eight members of Noble's senior management, including its CEO, CFO, Executive Vice President, Controller, and the heads of Tax and Marketing. (*See* UCC Ex. F at 2.) Noble ultimately produced almost 280,000 pages by the end of March. (*See* UCC Ex. H at 1.) This was a very substantial production by any standard.

    C.    ***After*** **the creditors and Debtors decided to bring claims against Noble, the Committee sent its proposed Rule 2004 requests to Noble**

18. The Debtors and creditors continued to bargain over the final terms of the plan of reorganization during April. At that time, the question was "whether the Noble settlement would be pursued or whether there would be Noble litigation." (6/7/17 Morning Tr. at 8.) The creditors and Debtors chose litigation. On April 21, 2017, the Debtors filed the fourth proposed plan of reorganization, which excluded the Noble Settlement.[11] And the fifth amended plan that Debtors proposed on May 2 called for a litigation trust "for the sole purpose of prosecuting the Noble Claims."[12]

19. On May 26, 2017, the Committee, through its new outside counsel at Jones Day, sent Noble the May 26 Requests. (*See* UCC Ex. J; UCC Ex. C.) Notably, the Committee served the May 26 Requests a mere *three days after* the Committee's former counsel at Paul Weiss requested, and Noble granted, permission to share Noble's

---

[11]   *See* Blackline of Revised Plan, Apr. 21, 2017 (ECF 1389-1).

[12]   Amended Chapter 11 Plan, May 2, 2017, 31 (ECF No. 1445).

9

production with Jones Day.  (*See* 5/23/17 W. Hampton email, attached as Exhibit 2.)
Most of the 44 requests substantially overlapped with those in the March 3 Requests.
(*Compare generally* UCC Ex. C *with* UCC Ex. B.)  Examples of this duplication include:

| May 26 Request | March 3 Request |
| --- | --- |
| RFP 5: "All Documents Relating To the Spin-Off . . . ."  (UCC Ex. C at 13–14.) | RFP 1: "All documents concerning the reasons for the Spin-Off, its merits or demerits, or the viability of Paragon after the Spin-Off . . . ." (UCC Ex. B at 1–2.) |
| RFP 12: "All Documents Concerning the Valuation of Noble's Assets . . . ."  (UCC Ex. C at 14.) | RFP 6: "All documents concerning the value of Paragon at the time of the Spin-Off . . . ."  (UCC Ex. B at 2.)<br><br>RFP 9: "All documents concerning the valuation of assets, individually or collectively, that were included in the Spin-Off."  (UCC Ex. B. at 2.) |
| RFP 2: "All Communications between Noble and any third party concerning any plan to sell any of Noble's Assets."  (UCC Ex. C at 13.) | RFP 4: "All documents concerning communications, if any, between the Debtors, Noble Entities, and/or parties interested in acquiring Paragon or any assets in the Paragon Fleet created after January 1, 2013."  (UCC Ex. B at 2.)<br><br>RFP 13: "All documents concerning the proposed sale in late 2011 and early 2012 of certain of the assets that were later included in the Spin-Off and concerning the reasons that potential asset sale was not consummated."  (UCC Ex. B at 3.) |

20. Even more problematic, many of the May 26 Requests are broader than the March 3 Requests on similar topics.  For instance, the March 3 Requests asked for documents on discrete aspects of the Spin-Off, while the May 26 Requests ask for "all documents" relating to the Spin-Off.  If Noble was forced to produce documents in response to the May 26 Requests, it likely would have to review tens of thousands of previously-reviewed documents to determine if they are responsive to the Committee's revamped discovery requests.

21. In light of this history, Noble requested that the Committee "determine what, if any, additional discovery it legitimately needs above and beyond Noble's already fulsome production." (UCC Ex. K at 1.)

22. The Committee refused this common sense solution on June 2, and instead threatened to file a Rule 2004 motion. (UCC Ex. L at 1.) The Committee further suggested that "to the extent Noble is able to provide written certification that it has produced all non-privileged documents responsive to any of the Committee's proposed requests, Noble will not be required to produce any additional documents in response to such requests." (*Id.*) This proposal ignores the practicalities of the discovery process. As a practical matter, litigants are rarely in a position to certify that they have produced every single document that might be responsive to a particular request. That is why parties negotiate the scope of a production—as Noble and the Committee did in March.

23. Noble responded to the Committee the next day, explaining that it had neither refused to meet and confer nor refused to produce documents in response to an appropriate Rule 2004 request. (UCC Ex. M at 1.) Noble again noted the "direct[] overlap" between the Committee's two sets of requests. (*Id.* at 1–2.) Noble also offered to provide written certification that it had "conducted a good faith and reasonable review of the documents that met the search parameters specified in Noble's earlier correspondence with the Committee regarding the March 3 Request and [had] produced all non-privileged documents it [had] identified that were responsive to that request" if the Committee's counsel would certify that it was unable to assert what it considered viable claims against Noble based on the documents that had already been produced. (*Id.* at 2.)

24. The Committee responded by filing the Motion.

## ARGUMENT

### I. Because the Committee Already Has Decided to Sue Noble, it Should No Longer Engage in a Rule 2004 Fishing Expedition

25. The Committee has unequivocally announced that the Litigation Trust will file suit against Noble. In the Motion, the Committee stated that "the Litigation Trust *will pursue* the Noble Claims." (Motion ¶ 3 (emphasis added).) At the confirmation hearing, the Committee's counsel reiterated that the Litigation Trust "*will pursue* the estate's claims against Noble." (6/7/17 Afternoon Tr. 36:8–9 (emphasis added).) The Committee does not assert that it needs this new discovery to determine *whether* to bring claims. Indeed, it explicitly refused to say that it cannot assert viable claims against Noble based on the voluminous discovery it has taken to date, or that it needs additional discovery to do that. (*Compare* UCC Ex. M at 2 *with* UCC Ex. N at 1.) Accordingly, the only question is *when* the Litigation Trust will decide, as a strategic matter, to sue Noble.

26. Given these circumstances, the Committee should not be permitted to utilize Rule 2004 as a means to bypass the normal protections of civil litigation. As this Court has noted, "[t]he primary concern of courts is the use of Rule 2004 examinations to circumvent the safeguards and protections of the Federal Rules of Civil Procedure." *In re Wash. Mut., Inc.*, 408 B.R. 45, 51 (Bankr. D. Del. 2009). For instance, once a party has brought claims, it cannot use Rule 2004 to seek discovery relating to those claims. *See*, *e.g.*, *id.* at 50–51.

27. In that same vein, the Federal Rules of Civil Procedure should apply once a party has decided that it will file suit.[13] As explained by Collier on Bankruptcy:

> If an adversary proceeding or contested matter is pending or *is likely to be filed, it is improper for one of the parties to use a Rule 2004 examination* as a substitute for, or in addition to, discovery pursuant to Rule 26 *et seq.* of the Civil Rules or to circumvent the rule's procedural protections provided to the parties and witnesses.

10 Collier on Bankruptcy ¶ 7026.01 (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2010) (emphasis added); *see also In re GHR Energy Corp.*, 35 B.R. 534, 538 (Bankr. D. Mass. 1983); *In re Recoton Corp.*, 307 B.R. 751, 756 (Bankr. S.D.N.Y. 2004) (allowing Rule 2004 examination where the Committee "state[d] unequivocally and convincingly that it ha[d] *not* decided whether or not to pursue litigation") (emphasis added).

28. In *GHR Energy*, for instance, the court found that because the proposed examiners were "in a position to file an action against certain of the individuals and entities if they so ch[o]se," they were "attempting to use Rule 2004 to circumvent the procedural safeguards provided a litigant by the Federal Rules of Civil Procedure." 35 B.R. at 538. Consequently, the court did not permit the Rule 2004 examination. *Id.* That same logic applies here. Any other ruling would encourage parties to engage in gamesmanship by delaying the actual filing of a lawsuit until they had completed the fishing expedition permitted under Rule 2004.

29. This case highlights the problems with such tactics. The Committee apparently has already received a substantial document production from Debtors concerning potential claims against Noble, but has not shared it with Noble. If

---

[13] The fact that the Litigation Trust itself will be bringing any claims does not change the analysis. The Committee will control the Litigation Trust Committee, and the Committee envisions that its special counsel Jones Day will be the Litigation Trust's counsel. (Motion ¶ 3–4.) For all practical purposes, the Committee is acting for the Litigation Trust at this stage.

unchecked, the Committee could theoretically spend the next eight months pursuing discovery from Noble and potentially others. It is fundamentally unfair for the Committee to engage in a Rule 2004 fishing expedition for claims that it intends to bring when Noble has no right to seek discovery of its own.

30. The fact that the Committee will consider a settlement does not alter this analysis. The Committee does not identify a single category of additional documents that the Litigation Trust needs to prepare for settlement negotiations—nor can it, given that its special counsel has not even finished reviewing Noble's production. (*See* Motion ¶ 44.)

## II. In Any Event, the Committee Has Not Established Good Cause for a Rule 2004 Examination

### A. Courts only permit Rule 2004 examination upon a showing of good cause

31. As this Court has emphasized, "parties do not have an absolute right to Rule 2004 examinations—the granting of a Rule 2004 examination is dependent on the discretion of the court." *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 626 (Bankr. D. Del. 2016). The Committee bears the burden of showing that good cause exists. *See id.* at 627.

32. In determining whether Rule 2004 discovery is appropriate, the Court must balance "the competing interests of the parties, weighing the relevance of and necessity of the information sought by examination." *Id.* at 626 (citation omitted). Good cause exists if the proposed examination "is necessary to establish the claim of the party seeking the examination, or if denial of such request would cause the examiner undue hardship or injustice." *Id.* at 627 (citation omitted).

33. Accordingly, Rule 2004 does not give a party the unfettered right to seek whatever documents it wants—as the Committee's Motion implies. Rather, the Court

must balance the needs of the party seeking discovery with the burdens of the party resisting it. *See*, *e.g.*, *In re Texaco Inc.*, 79 B.R. 551, 553 (Bankr. S.D.N.Y. 1987) ("[T]he scope of the examination [under Rule 2004] is not limitless; the examination should not be so broad as to be more disruptive and costly to the [proposed examinee] than beneficial to the [proposed examiner]."); *In re SunEdison, Inc.*, 562 B.R. 243, 250 (Bankr. S.D.N.Y. 2017) ("Rule 2004[, like Federal Rule of Civil Procedure 26,] has . . . the spirit of proportionality . . . consistent with the historic concerns regarding the burden on the producing party and is relevant to the determination of cause.").

### B. The Committee did not explain why its second wave of discovery is necessary

34. The Committee makes no effort to carry its burden here. It merely asserts that it needs the Rule 2004 discovery "to inquire into whether, and to what extent, claims exist against Noble in connection with the spin-off." (Motion ¶ 37.) But the Committee already has announced that the Litigation Trust *will* pursue claims against Noble, and it steadfastly refuses to state that it cannot bring these claims without additional discovery from Noble; clearly, it does not need Rule 2004 discovery.

35. Moreover, the Committee's conclusory statement that it needs discovery is not enough. (*Id.*) The Committee must explain why it needs this particular discovery in addition to the almost 280,000 pages of documents that Noble already produced. (*See id.* ¶ 24.) The Committee does not dispute that there is substantial overlap between the two requests; it has only identified eight of the May 26 Requests as *not* overlapping with the March 3 Requests. (*Id.* ¶ 43.) As to the remaining 36 requests, the Committee does not identify a single category of information that it needs in order to determine whether the Litigation Trust has a claim against Noble.

36. Unable to marshal the facts to satisfy its burden of showing good cause, the Committee resorts to rewriting the history surrounding the March 3 Requests. For instance, the Committee complains that Noble "unilaterally determined" to limit its searches to seven custodians (*id.* ¶ 42), while omitting the fact that the number of custodians was the result of the meet-and-confer process between Noble and the Committee's previous counsel, and that, in fact, Noble added the one additional custodian that the Committee requested. (UCC Ex. D at 2; UCC Ex. F at 2.) Likewise, it complains that Noble used a date range of January 1, 2013 through October 4, 2014 (Motion ¶ 42), yet glosses over the fact that it *agreed to* this date range for almost every request. (*Compare* UCC Ex. F at 2–5, *with* UCC Ex. G at 2.)

### C. The burden the Committee seeks to impose on Noble substantially outweighs any marginal benefit to the Committee

37. The Committee's repeated assurances that it "is not seeking reproduction of documents that have already been produced" is no solution. (UCC Ex. N at 1, 2.) Because the Committee has expanded the scope of many of its original requests, the Committee effectively is demanding that Noble re-review tens of thousands of documents that Noble already reviewed and determined were nonresponsive. Any benefit to the Committee would likely be nominal and is greatly outweighed by the cost and burden on Noble.

38. Moreover, forcing Noble to go through the May 26 Requests to decide what else it might need to produce in order to satisfy the Committee is a fool's errand. The Committee chose to serve duplicative discovery requests without first reviewing Noble's production. (*See* Motion ¶ 44.) Noble should not bear the costs of the Committee's corner-cutting.

39. Finally, the Committee's argument that the statute of limitations expires in eight months is a red herring. (*Id.* ¶ 45.) The Committee already has decided to sue Noble and does not need additional information to make a decision before the limitations period runs. And the Committee does not assert that it needs more discovery so it can craft an appropriate complaint; indeed, it explicitly refused to do so.

**III.     If Any Rule 2004 Discovery Is Appropriate, the Committee Should First Tailor Discovery in Light of Noble's Prior Production**

40. If the Court concludes that Rule 2004 discovery is appropriate on this record, then it should order the Committee to first review the production Noble already made; determine whether there are any categories of documents that the Committee believes should be produced; and, if so, send Noble a document request for those additional categories of documents.

**CONCLUSION**

Based on the statements and explanations in the Committee's Motion, Noble will contact the Committee to meet and confer, in an attempt to obviate the need for a hearing on the Motion. However, if that process is not successful, the Court should in its discretion find that Rule 2004 discovery is improper at this stage, because the Committee already has decided that the Litigation Trust will sue Noble. Even if some amount of Rule 2004 discovery does take place, the Committee should first review Noble's previous production and narrow its document requests.

17

Dated: June 12, 2017
Wilmington, Delaware

                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                     */s/ Anthony W. Clark*
                    Anthony W. Clark (ID: 2051)
                    Stephen J. Della Penna (ID: 6103)
                    Skadden, Arps, Slate, Meagher & Flom LLP
                    One Rodney Square
                    P.O. Box 636
                    Wilmington, Delaware 19899-0636
                    Telephone: (302) 651-3000
                    Facsimile: (302) 651-3001

                    - and -

                    George A. Zimmerman *(pro hac vice pending)*
                    Lauren E. Aguiar *(pro hac vice pending)*
                    Four Times Square
                    New York, New York 10036-6522
                    Telephone: (212) 735-3000
                    Facsimile: (212) 735-2000

                    *Counsel for Noble Corporation plc*