## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| _____ | ) | |
| In re: | ) | Chapter 11 |
| | ) | Case No. 16-10386 (CSS) |
| PARAGON OFFSHORE PLC, et al., | ) | |
| | ) | Jointly Administered |
| Debtors.[1] | ) | |
| | ) | |
| _____ | ) | |

### OBJECTION OF MICHAEL R. HAMMERSLEY TO THE DEBTORS' MOTION FOR SANCTIONS

Michael R. Hammersley, a *pro se* shareholder of Paragon Offshore, plc., et al. ("Debtors"), hereby respectfully submits this Objection ("Objection") of Michael R. Hammersley to the *Debtors' Motion for Sanctions Against Michael R. Hammersley* (Docket Entry No. 2048 in Bankr. Case No. 16-10386) ("Sanctions Motion") and respectfully represents as follows:

---

[1] The Debtor in this chapter 11 case is, Paragon Offshore, plc. The Debtor mailing address is 3151 Briarpark Drive, Suite 700, Houston, Texas 77042. Neville Barry Kahn and David Philip Soden, each of Deloitte LLP, are the joint administrators of Paragon Offshore plc (in administration) (the "Joint Administrators"). The affairs, business and property of Paragon Offshore plc (in administration) are managed by the Joint Administrators.

## PRELIMINARY STATEMENT

First and foremost, it is necessary to state that the act of requesting the appointment of an official equity committee **is not** the same thing as directly litigating the underlying issues that an official equity committee would address upon such an appointment. In other words, Mr. Hammersley filed the *Motion Of Michael R. Hammersley For The Appointment Of An Official Equity Committee* (Docket Entry No. 157 in Bankr. Case No. 17-11572) ("Prospector Equity Committee Motion"), so that a central counsel, more familiar with the complexities of cross-border insolvencies could advocate for all shareholders. In support of the Prospector Equity Committee Motion, Mr. Hammersley stated that certain unresolved issues needed to be addressed before these proceedings should be allowed to continue. When the Court denied that Motion and refused to rule on several unidentified matters that the Court believed would be "advisory opinions," Mr. Hammersley was left to his own devices to proceed *pro se* and only then, directly litigate the issues brought forward in the Motion for an Equity Committee through the filing of the *Motion of Michael R. Hammersley To Revoke the Modification Order* (Docket Entry No. 2000, in Bankr. Case No. 16-10386) as well as the *Supplement to the Motion of Michael R. Hammersley to Revoke the Modification Order* (Docket Entry No. 2021 in Bankr. Case No. 16-10386) and the *Reply Of Michael R. Hammersley To The Debtors' Objection To The Motion Of Michael R. Hammersley To Revoke The Modification Order* (Docket Entry No. 2039 in Bankr. Case No. 16-10386) (together the "Motion to Revoke").

Contrary to the Debtors' assertions, the relief sought by the Motion to Revoke was for the underlying matters described in *Order (I) Authorizing Modification Of The Debtors' Fifth Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Pursuant To Section 1127(B) Of The Bankruptcy Code And (Ii) Determining That Further Disclosure And Resolicitation Of*

2

*Votes Are Not Required Pursuant To Section 1127(C) Of The Bankruptcy Code* (Docket Entry No. 1775 in Bankr. Case No. 16-10386) ("Modification Order") to be adjudicated in the courts of England and Wales **as ordered by this Court on June 7, 2017.** Such a request is not only incredibly reasonable, the binding terms of the U.K. Implementation Agreement (both the modified and original versions) require it. U.K. Implementation Agreement ¶ 17.3 even goes so far as to state that the Modification Order can be made ineffective altogether by a judgment from the courts of England and Wales, "[the Parties]….irrevocably agree[s] that a judgment in respect of any such suit, action or proceedings and/or dispute brought in the courts of England shall be conclusive and binding upon it and may be enforced in the courts of any other jurisdiction." Simply put, Mr. Hammersley brought a fundamental breach of the binding terms of the U.K. Implementation Agreement to the attention of the Court, pointed out that the enforceability of the Modification Order is questionable, and asked the court to "fashion a remedy that does not upset the confirmed plan" so that the matters could be addressed in the proper jurisdiction. The application of Rule 9011 is not relevant for this sort of good-faith conduct.

Despite the Debtors' assertions to the contrary, and as demonstrated below, the timeframe between this Court's denial of the Prospector Equity Committee Motion and the filing of Mr. Hammersley's Motion to Revoke was simply a coincidence produced by the strict 180-day deadline found in 11 U.S. Code § 1144. For example, this Court's *Findings Of Fact, Conclusions Of Law, And Order Confirming The Fifth Joint Chapter 11 Plan Of Paragon Offshore Plc And Its Affiliated Debtors* (Docket Entry No. 1592 in Bankr. Case No. 16-10386) ("First Confirmation Order") was entered on June 7, 2017. Pursuant to 11 U.S.C. § 1144, the Shareholders had until December 4, 2017, to file the Motion to Revoke, which is exactly 180 days after June 7, 2017. The aforementioned deadline, thus, was statutorily prescribed **before** the Court's scheduling of the

November 30, 2017 conference that pertained to the Prospector Equity Committee Motion. Accordingly, the Court's ruling after November 30, 2017, coincided with pre-set deadline. Simply put, the filing of the Motion to Revoke was coincidental and not intended to undermine this Court's authority and there is no other reason that such a short timeframe between the filings exist. Again, contrary to the Debtors' assertions, this filing was not made in an attempt to ignore this Court's Order denying Prospector Equity Committee Motion. Inclusively, the Motion to Revoke did not renew the request for the appointment of an equity committee which, as the Court stated at the November 30, 2017 hearing, was "the only issue" before it.

Notwithstanding this coincidental timeframe, Debtors are attempting to silence Mr. Hammersley by framing the filing of the Motion to Revoke as Mr. Hammersley's insubordination and unwillingness to acknowledge this Court's ruling – all to try and prevent him from seeking the redress that he is legally recognized. Mr. Hammersley's right as a citizen of the United States of America to petition the government for a redress of grievances is completely protected by the First Amendment to the United States Constitution, which states that "Congress shall make no law….prohibiting the free exercise thereof; or abridging the freedom of speech….**or the right of the people….to petition the government for a redress of grievances.**" *U.S. Const. amend. I.* Every filing initiated by Mr. Hammersley in these proceedings has been and continues to be a petition to the government for a redress of grievances and is protected by the First Amendment to the United States Constitution.

That being said, Mr. Hammersley recognizes that there are limitations to this federally protected freedom within the context of litigation, such as Rule 9011 of the Bankruptcy Code. However, it is clear that the Motion for Sanctions is grounded in retribution for Mr. Hammersley's assertion of his rights described in the First Amendment to the United States Constitution, which

is improper for obvious reasons. *See e.g. Boussom v. City of Elkhart*, 567 F. Supp. 1382, 1387 (N.D. Ind. 1983) ("Retribution" as used in this context is a term of art. It is unnecessary to show a retaliatory intent. **It is sufficient that a plaintiff show only that conduct protected under the First Amendment was a substantial factor in producing adverse consequences for the plaintiff.**"). (emphasis added) So, because Mr. Hammersley is protected by the First Amendment to the United States Constitution, and because the Debtors' Motion for Sanctions which, if granted would result in "an order enjoining Mr. Hammersley from filing any complaint, motion, objection, pleading, or **notice of appeal** in the this [sic] case or the Prospector Cases without prior Court approval to ensure that Mr. Hammersley's conduct does not continue" (Motion for Sanctions ¶ 44) (emphasis added), the requested relief would result in an adverse consequence of Mr. Hammersley engaging in conduct that **is protected by the First Amendment of the United States Constitution** and the Motion for Sanctions must be denied.

Lastly, Michael R. Hammersley and members of the Unofficial Equity Committee, particularly Mr. Stephan Anderson, have added hundreds of millions of dollars in value to the estate that directly benefited the creditors through the investigation into Noble Corporation. It cannot be overlooked that the Debtors' and their counsel were unreasonably opposed to suing Noble for constructive fraudulent transfer. Despite the Debtors' assertions "that it would be very difficult to prove that the Debtors did not receive reasonably equivalent value"[2] the market disagrees. Upon information and belief, as recently as January 10, 2018, the Litigation Trust Interests were trading at $257 million. As discussed below, the complaint filed by the Paragon Litigation Trust, largely encompasses the same issues as described in "The Noble Pursuit"

---

[2] *See ¶40 Declaration Of Todd D. Strickler In Support Of Approval Of The Noble Settlement Agreement Pursuant To Bankruptcy Rule 9019* (Docket Entry No. 716 in Bankr. Case No. 16-10386) ("Strickler Declaration").

presentation. It should not be forgotten that the Shareholders were the first to truly investigate these issues and subsequently publish their findings to the Court.

However, as an offering of the proverbial "olive branch," Mr. Hammersley represents that he does not intend to file additional motions in this matter (Bankr. Case No. 16-10386) aside from: (i) a Motion for Stay Pending Appeal of the *Order Denying Motion of Michael R. Hammersley to Revoke the Order (I) Authorizing Modification of the Debtors' Fifth Joint Plan of Reorganization Under Chapter 11 of the Bankruptcy Code Pursuant to Section 1127(b) of the Bankruptcy Code and (II) Determining That Further Disclosure and Resolicitation of Votes Are Not Required Pursuant to Section 1127(c) of the Bankruptcy Code* (Docket Entry No. 2047 in Bankr. Case No. 16-10386) ("Order Denying Revocation"); (ii) a Notice of Appeal of the Order Denying Revocation, and if the Sanctions Motion is granted; (iii) a Motion for Stay Pending Appeal of the Debtors' Motion for Sanctions Against Michael R. Hammersley as well as; and (iv) a Notice of Appeal of the Debtors' Motion for Sanctions Against Michael R. Hammersley. **However, this compromise does not include a limitation on filing additional proceedings in Bankr. Case No. 17-11572 or any filings in the courts of England and Wales or the courts of Luxembourg, as the matter regarding Prospector is still undecided and additional proceedings may become necessary depending on the manner that Bankr. Case No. 17-11572 continues.** Irrespective, Mr. Hammersley also represents that he does not intend on making additional filings in Bankr. Case No. 17-11572 at present since no additional factors warranting such filings exists.

## ARGUMENT

**A.     The modifications made to the original Fifth Amended Plan in July 2017 brought forth a material change in factual circumstances that would have led any reasonable person to believe that the modifications were induced by fraud.**

It is important to point out that these proceedings have deviated in such a violent manner from the First Confirmation Order that the change of context alone warranted the Motion to Revoke. However, because all other parties in interest have benefitted from the Modification Order at the direct expense of the Lessors[3] and Shareholders, there is simply no one left (in this matter) to bring these issues to light. The Debtors' argument for sanctions is more or less based on a criticism of the number of filings that Mr. Hammersley has submitted in these proceedings and finalized with a statement that Mr. Hammersley has not fulfilled his duty to investigate:

> As discussed further below, given all that has come before, it was objectively unreasonable to file the Motion to Revoke because, inter alia, Mr. Hammersley (i) fails to advance any plausible legal arguments, (ii) fails to assert any facts to support of a showing of actual fraud (as required to obtain relief under section 1144 of the Bankruptcy Code), and (iii) demonstrates a disregard for his duty to investigate the factual and legal allegations contained in the motion.

(Motion for Sanctions ¶¶ 33 and 39).

The Debtors' contention that Mr. Hammersley "fails to advance any plausible legal arguments" and "demonstrates a disregard for his duty to investigate the factual and legal allegations contained in the motion" is without merit. In fact, nothing could be further from the truth. Despite the fact that Mr. Hammersley is a *pro se* litigant and at a significant disadvantage, Mr. Hammersley has utilized every resource available to him in order to test the strength of his arguments. The record in these proceedings show that 11 U.S.C § 1144 was and is relevant here pursuant to precedential case law. For example, *In Re Kostoglou*, 73 B.R. 596, 599 (Bankr. N.D.

---

[3]Prospector One Corporation and Prospector Five Corporation, Marshall Islands registered-entities owned by SinoEnergy Capital Management, Ltd. in their capacity as creditors of Paragon Offshore, plc. ("Lessors").

Ohio 1987) the court stated that "[a]s a matter of law, we think that [§ 1144] encompasses any action in a bankruptcy proceeding by which a party obtains confirmation of a Plan by deceptive practices with a deceptive intent." The Motion to Revoke then outlined three deceptive practices that the Debtors' utilized in inducing the Modification Order and also demonstrated that revoking the Modification Order pursuant to 11 U.S. Code § 1144 would not upset the First Confirmation Order. Whether Debtor agrees, or not, on the conclusion is a separate analysis as to whether or not the filing is made in good-faith and substantiated on plausible arguments, which Mr. Hammersley believes they are. Particularly so, in light of the thousands of modifications made in July 2017 to the Fifth Amended Plan. These modifications, which altered the course of the litigation previously represented to the shareholders and the Court, merited the filing of new motions and writings that brought new facts and law not considered by this Court.

First, the terms of the First Confirmation Order ¶ OO. *Retention of Jurisdiction* stated that this Court did not retain have jurisdiction over "matters arising out of or related to the U.K. Implementation Agreement…..U.K. Sale Agreement." *In Matter of Petrowax P.A., Inc.,* 200 B.R. 538, 542 (Bankr. D. Del. 1996) ("For this court to have subject matter jurisdiction over a claim, as a threshold matter, the plan must retain subject matter jurisdiction over that type of claim. *See, e.g., MAI Systems v. C.U. Technologies (In re MAI),*178 B.R. 50, 53 n. 2. (Bankr.D.Del. 1995).").

A reasonable person would conclude that a Court would not intentionally act beyond its subject-matter jurisdiction or violate its own confirmation order, which acts as a binding contract on all parties in interest. As such, it was reasonable to conclude that an element of deceptive intent in procuring the Modification Order occurred and it is reasonable to conclude that the Modification Order is unenforceable because the original Fifth Amended Plan said one thing but the modified Fifth Amended Plan purported to do something else; this type of conduct would lead any

reasonable stakeholder to foreseeably raise issues given the change in course previously represented by the Debtor: *See In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 362 (E.D. Pa. 1996) ("Confirmed bankruptcy plans of reorganization are binding contracts that must be interpreted in accordance with applicable contract law."); *In Re Ampace Corp.*, 279 B.R. 145, 153 (Bankr. D. Del. 2002).

Second, Debtors' utilized deceptive valuation practices which resulted in an undervaluation of assets by nearly $300 million. $300 million was the purported value designated by the Debtors' own valuation to the asset in question; Paragon Parent's intercompany interest in Prospector Offshore Drilling. Thus, it was reasonable to assume that significant misrepresentations were made to the Court in connection with obtaining the First Confirmation Order. However, because as stated above, this Court does not have subject-matter jurisdiction over the enforcement of the Modification Order, it was reasonable to seek revocation of the Modification Order, which would have the effect of only distributing the amounts that were listed under the First Confirmation Order and the additional value could be distributed pursuant to a decision of the courts of England and Wales. *See In Re Kostoglou*, 73 B.R. 596, 599 (Bankr. N.D. Ohio 1987) ("We think that misrepresentations made to a bankruptcy court concerning the value of property owned by a debtor is the type of 'fraud' contemplated by Congress in enacting Sec. 1144."). Importantly, the ability to conclude that fraud was committed with respect to the valuation could not be shown until after several filings made by Debtor.[4]

---

[4] In addition, the lack of an equity committee that had the knowledge and resources to help the shareholders also complicated the ability to show the problem with the valuation in the first place. Had the Court initially appointed an equity committee, it would have been very likely that the problem with the valuation would have been presented to the Court well in advance of the approval of the original Fifth Amended Plan. Of course, the Court – in its discretion – opted not to do so, which the shareholders presently accept. Nevertheless, the point is the same: had the shareholders not been "thrown to the wolves," the ability to contest the valuation and apparent fraud would have been litigated earlier.

Third, given that 11 U.S.C. 1127 requires that any plan modifications be in compliance with Title 11 of the U.S. Code and the Joint Administrators have not complied with the recognition requirements for participation by foreign representatives, a reasonable person would conclude that a court would not knowingly confirm a modified plan that was not in compliance with the Bankruptcy Code and that an element of deceptive intent in procuring the Modification Order occurred. Further, because such recognition was not granted prior to the Debtors' seeking plan modifications, it was – and still is – reasonable to believe that the Modification Order should be revoked upon request by a party in interest.

Each of the three deceptive practices found in the Motion to Revoke had rendered the revocation of a confirmation order (or denial of the ability to proceed by a foreign representative) in other cases with circumstances that were similar. These cases were cited in the Motion to Revoke and it was reasonable to believe that the Motion to Revoke would be and should have been successful.

### 1.    Mr. Hammersley Made a Substantial Investigation and Reasonable Inquiry into the Utilization of 11 U.S.C.§ 1144 in this Situation

In order to facilitate his research process, Mr. Hammersley decided to use the resources available and provided by lawyers who are currently employed by Weil, Gotshal, and Manges as associates and partners (or were previously employed as partners). In fact, a majority of the arguments and strategies (such as the proper use of § 1144 of the Bankruptcy Code) presented in these proceedings by Mr. Hammersley were derived from the analysis and conclusions of Weil, Gotshal, and Manges lawyers.[5] Mr. Hammersley: (1) read the full opinions of the particular cases cited by the Weil, Gotshal, and Manges lawyers; (2) determined if they were relevant, and (3) applied those opinions to the specific facts of these proceedings. Unless the Debtors' counsel

---

[5] 1. https://business-finance-restructuring.weil.com/ 2. https://eurorestructuring.weil.com/

intends to make the argument that: (i) Weil, Gotshal, and Manges actively publishes legal analysis that they know to be implausible; (ii) that the only conclusive textbook on the subject of cross border insolvency which is written by a current partner of Weil, Gotshal, and Manges and a former partner of Weil, Gotshal, and Manages both of whom are considered to be experts on the subject of cross-border insolvencies in the U.S. and U.K.,[6] is an implausible work of fiction; and (iii) that the hundreds of cases cited by Mr. Hammersley in support of his positions were all wrongly decided, the Debtors' assertion that Mr. Hammersley "fails to advance any plausible legal arguments" is incorrect.

Litigators, especially *pro se* litigators, should not be expected to forward bullet-proof arguments that the court or debtor will necessarily agree with; this is not expected out of anybody, even represented parties. Rather, the question is whether a good-faith inquiry was made to raise several issues that had legal and factual merit. Mr. Hammersley respectfully contends that the arguments raised by him in the Motion to Revoke are made in good-faith, particularly because of the cramming of *thousands* of changes made by Debtor in July 2017 in a way to subvert the very problems that Mr. Hammersley noted would arise (for example, the failure to obtain SinoEnergy and the Shareholder's consent in the United Kingdom and how that made the original Fifth Amended Plan doomed to fail).

**2.    The Available Precedent on the Issues Addressed in the Motion to Revoke is Thin, which Implies that Mr. Hammersley Reasonably Believed that the Matters Raised in his Motion to Revoke were Made in Good-Faith**

It cannot be overlooked that bankruptcy law is complex and the caselaw surrounding the issues presented by Mr. Hammersley, who is proceeding *pro se*, that pertain to the cross-border nature of this case is thin. Judge Robert Gerber took note of this (twice) in his Decision and Order

---

[6] *See* Christopher Mallon, Shai Y. Waisman & Ray C. Schrock, *The law and practice of restructuring in the UK and US* (2017) (2nd Ed.) .

for Recognition and Cross Motion for Dismissal ("Decision") *In re Creative Finance Ltd. (In Liquidation) (In re Creative)*, No. 14-10358, 2016 WL 156299 (Bankr. S.D.N.Y. Jan. 13, 2016), stating that:

> **The case presents two issues as to which the underlying caselaw law is thin.** First, are chapter 15's statutory requirements for recognition of a foreign main proceeding satisfied when—by the debtors' design—the foreign representative's activities before his chapter 15 filing have been so minimal that the Court cannot find that the Debtors' "Center of Main Interests" ("COMI") ever changed from the nation(s) where the Debtors actually did business to the different nation in which the foreign representative was appointed? And second, must a U.S. Bankruptcy Court tolerate debtor bad faith in a chapter 15 case that a U.S. court would never tolerate in a case under any other chapter of the Code?

Judge Gerber ultimately denied the foreign representative, a British Virgin Islands liquidator, recognition due to the fact that the liquidator was attempting to utilize the United States Bankruptcy Court in bad faith – through the abuse of the automatic stay. Judge Gerber stated that the Debtors' use of the liquidation proceeding **as a device to thwart the rights** of the Debtors' creditors was **"the most blatant effort to hinder, delay and defraud a creditor this Court has ever seen."** (Id.) (emphasis added). Particularly relevant here is the identical assertion made by the Lessors in the Limited Objection that "[t]he sole impetus for the **Debtors' commencement of the bankruptcy cases was to thwart the Lessors' exercise of remedies under the Leases** and influence the Debtors' leverage in the two-party dispute concerning the Leases."[7] The Lessors have also threatened to seek dismissal of the Prospector Bankruptcy "for cause" because of Debtor's explanation, which is an admission by Debtor that it abusing the "automatic stay" provision afforded by the Bankruptcy Code to thwart Lessors from undertaking actions that would otherwise correspond in law.

---

[7] *See Limited Objection And Reservation Of Rights Of Prospector One Corporation And Prospector Five Corporation To Debtors' Motion For Entry Of An Order Extending The Exclusive Periods Pursuant To Section 1121(D) Of The Bankruptcy Code* (Docket Entry No. 0261 in Bankr. Case No. 17-11572).

Furthermore, Judge Gerber's Decision *In re Creative* was the inspiration for Mr. Hammersley's Motion to Revoke because the Decision was entered after Judge Gerber witnessed a BVI liquidator complete actions that mirror actions of the Debtors' in these proceedings post entry of the First Confirmation Order on June 7, 2017. For example, had recognition been sought by the Joint Administrators, Judge Gerber demonstrates that this Court should have denied recognition:

> Likewise, the Court does not need to decide what it would have done with the egregious bad faith it finds here if recognition—especially as a foreign main proceeding—had to be granted. **But the Court observes that in chapter 15, as in chapter 11, U.S. courts need not tolerate debtor bad faith**….. **For example, although recognition as a foreign main proceeding, if granted, would make section 362 of the Code applicable to any assets in the United States**, [*See* section 1520(a)(1)] relief from the stay could thereafter be granted "for cause." [*See* section 362(d)(1), **a subsection of section 362 of the Code, which becomes applicable after recognition under section 1520(a)(1)]** And under extensive caselaw, **bad faith filing is a well-established basis for finding such "cause."** Though it is unnecessary to address the problem now, <u>**the Court is confident that U.S. courts and injured creditors, here and abroad, can be protected from such debtor bad faith**</u>.

*In re Creative, p.4* (emphasis added).

Given that the preceding steps to the Prospector Bankruptcy were initiated in the Modification Motion, a reasonable person would conclude that the Modification Order was also a product of bad faith. As such, Mr. Hammersley's belief that this Court would come to the same conclusion that Judge Gerber did *In re Creative* and revoke the Modification Order was entirely reasonable. For example, this Court stated that "I only get in trouble when I follow Judge Drain; **I never get in trouble when I follow Judge Gerber.**" (*See* Transcript for the Hearing on Confirmation of the Fifth Amended Plan ("<u>Confirmation Hearing Transcript</u>") Hearing Tr. at 149:3-4).

Thus, the support offered by Judge Gerber's _In re Creative_ Decision juxtaposed with the lack of case law, presented Mr. Hammersley, a pro se litigator, with an analysis that was applicable to these proceedings. Accordingly, a reasonable person would conclude that the Modification Order was a cloaked attempt by the Debtors' to fraudulently induce this Court to grant a foreign representative authority that should not have been granted, and that the actions taken by the Debtors' are similar to the BVI liquidator _In re Creative_ which Judge Gerber held were a "blatant effort to hinder, delay, and defraud a creditor" (in addition to the other matters described in the Motion to Revoke which constitute fraud). However, and as Judge Gerber recognized twice, finding comparable cases for the **exact issues** that have occurred in these proceedings is incredibly difficult (although _In re Creative_ is considerably close to the instant matter). As such, **a reasonable inquiry had been completed prior** to filing the Motion to Revoke in this matter and Mr. Hammersley used the "limited precedent" available to him to render the conclusions that he reached in his Motion to Revoke. Whether Debtor agrees with the conclusion is a separate issue as to whether sanctions are merited for purported failure to investigate, which Mr. Hammersley clearly did. It is simply unreasonable to argue otherwise.

In addition, the very act of finding cases to cite demonstrates an investigation in and of itself. It cannot be seriously argued that an application of knowledge of the U.S. Bankruptcy Code, the Insolvency Act of 1986, and various case law rulings are innate and present in all individuals. Simply put, without Mr. Hammersley completing his "duty to investigate the factual and legal allegations contained in the motion" (Motion for Sanctions ¶ 33) Mr. Hammersley could not have known about the cases (domestic and foreign) and statutes (domestic and foreign) cited supporting his position regarding the issues described in the Motion to Revoke. Without possessing "plausible legal arguments" (Motion for Sanctions ¶ 33) that were successful in prior cases, Mr. Hammersley

would not have argued valuation fraud, due process violations, or that the order entered by a court that lacks subject-matter jurisdiction and is, thus, void and unenforceable. Chiefly, Mr. Hammersley's research indicates that the aforementioned contentions have served as reasons to revoke a final order pursuant to § 1144 of the Bankruptcy Code and constitute the type of fraud contemplated in said section. Thus, a reasonable litigator, particularly one proceeding *pro se*, would have reasonably believed that his arguments were meritorious and did not warrant the imposition of sanctions.

So, although Mr. Hammersley pondered and contemplated the arguments that were drafted into the Motion to Revoke beforehand, the preparation of these arguments was made out of an abundance of caution to ensure that the filing was timely made on December 4, 2017, and in case an official equity committee was not appointed. Further, Mr. Hammersley incorporated statements on the record from the Motion to Appoint an Equity Committee into the Motion to Revoke and utilized entirely new case law, new facts, and new evidence in order to support his findings. Moreover, Mr. Hammersley addressed issues that had not been previously litigated or addressed by the Court, such as the applicability of the absolute priority rule to Prospector. The arguments brought forth in the Motion to Revoke point to the need for the Modification Order to be vacated and decided in the courts of England and Wales, which is what the original Fifth Amended Plan contemplated. Further, bringing these issues to the Court's attention can hardly be considered a sanction able offense.

3. **The Deadline to file the Motion to Revoke is Statutorily Established and was Already in Place Before the Scheduling of the November 30, 2017 hearing in Bankruptcy Case No. 17-11572.**

Given the drastic change in circumstance that occurred between the entry of the confirmation order on June 7, 2017, the modifications made to the plan on July 18, 2017, followed

by the second chapter 11 filing that involved: different assets, different entities, different creditors, and different parties, it is completely reasonable that Mr. Hammersley sought the appointment of an Equity Committee. In addition, given that such equity committee was not appointed, it is completely reasonable for Mr. Hammersley to have filed the Motion to Revoke within the timetable **prescribed by federal law**. Given that 11 U.S. Code 1144 has a very strict deadline that is rarely, if ever, deferred from. Mr. Hammersley, consequently, was against a very hard deadline that could not be extended and had to work feverously to preserve his rights and those of the shareholders. *See e.g. In Matter of Genesis Health Ventures, Inc*, 324 B.R. 510, 512 (Bankr. D. Del. 2005)("The defendants jointly move to dismiss the plaintiffs' complaint in its entirety because it is time-barred under section 1144".... "The defendants' motion is granted, and the complaint is dismissed in its entirety" because the 180-day deadline to file a motion to revoke pursuant to § 1144 had passed and the complaint was time-barred despite allegations of fraud); *In Re Vencor, Inc.* 284 B.R. 79, 83 (Bankr. D. Del. 2002)("Section 1144 provides that a party requesting revocation of an order confirming a chapter 11 plan must file its request within 180 days of entry of that order. 11 U.S.C. § 1144. **This deadline is strictly enforced.**" *See, e.g., Dale C. Eckert Corp. v. Orange Tree Assoc., Ltd. (In re Orange Tree Assoc., Ltd.*), 961 F.2d 1445, 1447 (9th Cir. 1992); *In re Longardner Assoc.*, 855 F.2d 455, 460 (7th Cir. 1988); *680 Fifth Ave. Assoc. v. EGI Co. Servs., Inc. (In re 680 Fifth Ave. Assoc.*), 209 B.R. 314, 322-23 (Bankr. S.D.N.Y. 1997)); *In Re Coffee Cupboard, Inc.*, 119 B.R. 14, 19 (E.D.N.Y. 1990) ("The 180 day time limit in Section 1144 has been strictly enforced by the courts, *see e.g., Matter of Newport Harbor Assoc.,* 589 F.2d 20 (1st Cir. 1978), even to the extent of enforcing it in those cases where the alleged fraud of the debtor is not discovered until after the limitations period. *See Matter of Medical Analytics, Inc.,* 410 F. Supp. 922 (S.D.N Y 1975), *affirmed* 532 F.2d 879 (2d Cir. 1986) (per curiam).").

Applying this context to these proceedings and considering that Mr. Hammersley has lost every single motion or objection filed and heard by this Court, Mr. Hammersley chose to err on the side of caution and apply the 180-day deadline to the entry of the First Confirmation Order. Further, because the Debtors' counsel contends that the plan modifications were "minor" and that they were purported to be "annexed as Exhibit A to the Findings of Fact, Conclusions of Law and Order Confirming the Fifth Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors (Docket No. 1614) (the "Confirmation Order")"[8] Mr. Hammersley utilized June 7, 2017, as the date from which to initiate the 180-day requisite of 11 U.S. Code 1144. It is entirely possible that if Mr. Hammersley had chosen to utilize July 17, 2017 as the date to initiate the 180 day count, that the Motion to Revoke would have been time barred simply because it appears that this Court believes that the modifications were in fact minor. In other words, the filing of the Motion to Revoke was made because of material changes to the Fifth Amended Plan and the statutorily imposed deadline arising from § 1144; the amount of time between this Court's denial of the Motion for the Appointment of an Equity Committee and the filing of the Motion to Revoke is not grounded in anything other than a strict application of the limitations described in § 1144 in order to ensure that this matter could be heard.

**B.**    **It is Untrue that the Motion to Revoke Propounds Arguments that the Court Rejected or that it Failed to Raise New Arguments.**

It is unrealistic to state that these issues could have already been litigated in the context of § 1144 of the Bankruptcy Code. It is simply not possible that Mr. Hammersley could have brought forth these arguments in the context presented prior to doing so in the Motion for the Appointment

---

[8] *See Order (I) Authorizing Modification Of The Debtors' Fifth Joint Plan Of Reorganization Under Chapter 11 Of The Bankruptcy Code Pursuant To Section 1127(B) Of The Bankruptcy Code And (Ii) Determining That Further Disclosure And Resolicitation Of Votes Are Not Required Pursuant To Section 1127(C) Of The Bankruptcy Code* (Docket Entry No. 1760 in Bankr. Case No. 1760) ("Modification Order").

of an Equity Committee in Bankr. Case No. 17-11572. Further, it was not until after the Fifth Amended Plan failed and needed to be modified that the circumstances surrounding the filing of the Motion to Appoint an Equity Committee and Motion to Revoke became relevant. Had the Fifth Amended Plan not failed, Mr. Hammersley would not have filed any additional motions in the United States at all. For example, this litigation should have been foreseeable after this Court's representations on March 27, 2017 recognizing that the shareholders had the ability to address their particular issues in the U.K. stating that the shareholders "clearly have standing here and can be heard on any of these issues" (*See* Transcript for the Hearing on the Motion for the Appointment of an Official Equity Committee on March 27, 2017 ("<u>Equity Committee Transcript</u>") at 71:14-25; 72:1).[9] With a statement like this from the Court, it is reasonable that Mr. Hammersley and the Shareholders would have seen the modifications pushed through in July 2017 within a week to have been objectionable. Importantly, Debtor should have foreseen the litigation arising from the Shareholders arising from these modifications, particularly after the multiple representations to this Court – and the Shareholders – that they U.K. proceedings would afford the shareholders their day in court with respect to Prospector.

It is contradictory for Debtor to convolute the entire motion practice before and after July 2017. It is evident from the course of this litigation that the filings made before July 2017 were always thwarted by the expectation that the issue concerning Prospector would be litigated in the United Kingdom. Again, Mr. Hammersley respectfully asks the Court to compare the original Fifth Amended Plan with the modified Fifth Amended Plan and its supplements: it is evident that

---

[9] To be clear, the structure of the original Fifth Amended Plan also would have led any reasonable person to corroborate this belief as: (1) it was devoid of any particular mention of Prospector (even mentioning as an "excluded asset"); and (2) containing a detailed structure concerning the U.K. Implementation that was consistent with the Court's March 2017 statements that the shareholders would have their day in court in the United Kingdom.

Prospector was never included in the original Fifth Amended Plan and that the modifications were made to bypass the need to litigate these matters in the U.K., which this Court expressly held would not be under its jurisdiction. Consequently, it is contradictory to convolute the motion practice before July 2017 with the motion practice that arose after July 2017, particularly when the issue of Prospector had not been litigated and Mr. Hammersley was denied his ability to seek relief – directly related to those issues under application of the law of England and Wales. For example, at the November 30, 2017 hearing, this Court stated;

> Whether the assets of Prospector were restricted or unrestricted and outside or inside the ability of the creditors to attach, the reality is that once the value of those entities works its way up the equity chain, it gets to PLC and the value of the equity in those entities, even if those entities' assets aren't available, but the equity in those entities is available and part of the assets of PLC that were subject to the previous bankruptcy." (*See* Transcript for the Hearing on the Motion for the Appointment of an Official Equity Committee on November 30, 2017.

("Prospector Equity Committee Transcript") Hearing Tr. at 23:19-25 and 24:1).

However, according to the Sale-Leaseback and the Pledge Agreement, as well as the governing law of England and Wales and Luxembourg (as demonstrated in the Motion to Revoke), the equity in the Prospector entities is **not available**. According to the laws of England and Wales the equity in the Prospector entities cannot be transferred until the Sale-Leaseback has been completely paid off and the lien over the Prospector shares has been released. Also, relevant under English law is the designation of an unrestricted subsidiary. Under English law **a parent entity (domestic or foreign) of a limited company cannot be held liable for the debts of that subsidiary upon its insolvency unless it has contractually agreed to accept liability**. Contractually, the Prospector entities refused to accept liability for the restricted subsidiaries. The restricted subsidiary creditors also lack a "fixed charge" over the Prospector entities altogether. So, pursuant to English law, Paragon Parent is entitled to retain the interest in the Prospector

entities in but pursuant to U.S. law, apparently, Paragon Parent is not entitled to do so. None of these issues had been litigated prior to July 2017, nor did the Court allow them to be litigated afterwards notwithstanding the Shareholders' attempt to do so. Furthermore, the modifications made material changes that bring forth the reasonable belief that fraud was committed and that this Court is not imbued with the jurisdictional power to approve the Management Agreement and affect Prospector.

Relevant here is Judge Cardamone's stated belief in *In Re Maxwell Communication Corporation PLC (In re Maxwell)*, 93 F.3d 1036, 1049 (2d Cir. 1996), that a conflict of law is apparent between the Bankruptcy Code and English law and this Court should have given consideration to English law. *See e.g. In Re Maxwell Communication Corporation PLC (In re Maxwell)*, 93 F.3d 1036, 1049 (2d Cir. 1996)("International comity comes into play only when there is a true conflict between American law and that of a foreign jurisdiction….We believe there is a true conflict necessitating the application of comity principles to ascertain the compass of the Code.") (holding that there is indeed conflict between the Bankruptcy Code and English law).

Nevertheless, English law has not been applied by this Court in these proceedings at all, despite all parties agreeing and this Court ordered that English law would govern anything to do with the U.K. Implementation Agreement. In other words, because the application of English law (which was ordered by this Court to be the governing law) is less favorable to New Paragon, the fact that New Paragon attempted to return to the U.S. Bankruptcy Court, demonstrates that it is completely reasonable to conclude that improper forum shopping occurred in connection with the inducement of the Modification Order from this Court. As such, it is completely reasonable for Mr. Hammersley to bring these issues to light and seek revocation of the Modification Order pursuant to section 1144 of the Bankruptcy Code.

Moreover, this Court has also openly stated and indicated a level of discomfort with the turn of events in these proceedings after the modifications made in July 2017. For example, on the First Day Hearings in the Prospector Bankruptcy in Bankr. Case No. 17-11572 this Court stated:

> [THE COURT]: Okay. There are some things in this order that I would normally not approve; however, given that it's such a -- sort of, I would call it a "unique" case -- and really, we'll see, of course, how things play out, but really, almost a two-party case, if not just a two-party case, and that this is consensual, I will sign the order, even though it has some provisions that I would normally strike like a limitation on what can be raised, in the event that there's a default, and we end up in an automatic stay hearing. **So, just for the record, it is based on the unique facts of this case and should not be held against me in a court of law or otherwise**, or cited to me as a new standard because it's not; it's because of the unique facts of this case.

(*See* First Day Hearing Transcript in Bankr. Case No. 17-11572, 20:15-19).

A reasonable person, therefore, would conclude that the Court's unexplained apprehension was a signal that the Court was not particularly fond of the situation that it found itself in and that stakeholders should object or exercise other remedies available to them (i.e. utilize § 1144).

### 1. New Evidence was Presented to the Court in the Motion to Revoke

The full amount of data and information supporting the Motion to Revoke was not in existence until after the November 30, 2017 denial. For example, it just so happened that the Lessors in Bankruptcy Case No. 17-11572 happened to file their *Limited Objection And Reservation Of Rights Of Prospector One Corporation And Prospector Five Corporation To Debtors' Motion For Entry Of An Order Extending The Exclusive Periods Pursuant To Section 1121(D) Of The Bankruptcy Code* (Docket Entry 261 in Bankr. Case No. 17-11572) on December 8, 2017, which was in agreement with one of Mr. Hammersley's main points that this Court did not have jurisdiction over the Prospector entities.

Second, it just so happened that New Paragon filed their Quarterly Report on December 10, 2017 which demonstrated that the actual Reorganization Value of Paragon Parent was $903

million, after $515 million of cash distributions for a minimum total distribution to creditors of $1.4 billion vs. the alleged $1.1 billion. This factor supported Mr. Hammersley's demonstration that Lazard produced a second "U.K. only valuation" which was closer and more accurate than the valuations disclosed in the United States.

Lastly, it just so happened that the Joint Administrators filed their six-month progress report which reflected that the U.K. Administration was now purportedly given "main proceedings" status despite not returning to the courts of England and Wales for the necessary approval to open "main proceedings". This factor supported Mr. Hammersley's demonstration that the U.K. Administrators are deriving their "authority" to transfer Prospector through the United States Bankruptcy Court – which by its own binding order, lacks subject matter jurisdiction.

The standard for determining whether a pleading is well grounded in fact for Rule 11 purposes is, according to *Hillsborough County v. A & E Road Oiling Service, Inc.*, 160 F.R.D. 655, 659 (M.D. Fla. 1995), "objectively reasonable under the circumstances." A filing meets this requirement if there is some evidentiary basis for the position taken at the time the pleading is signed. Even if the factual assertions in a paper are later disproven or are insufficient to survive a summary judgment motion, the paper is not sanction-able. Whether or not there is factual support can shift as parties learn new information. In this situation, there was factual evidence to support all of the positions taken in the Motion to Revoke and these positions became even stronger as additional evidence provided by third parties (including New Paragon) came to light.

**2.    The Court Refused to Give any Guidance or Rule on any Other Issues Aside from the Appointment of an Equity Committee on November 30, 2017.**

Just because a party brought forth a material issue to the Court's attention does not mean that the party litigated the issue. For example, if the Court decides not to expressly address the issues and expressly refuses to do so (as stated at the November 30, 2017 hearing), then it cannot

be said that these are issues were litigated. The particular problem with Debtor's argument is that this Court made an affirmative statement that it would refuse to address the questions raised by the Shareholders. In fact, this Court declined to discuss any issue aside from the requirements for an equity committee on November 30, 2017:

> [THE COURT]: I'm not going to accept your invitation to make a series of advisory opinion rulings that are in front of me. There's one issue in front of me, whether to appoint an equity committee, and I'll make that based on the facts and law, but I'm not going for -- I decline your invitation to make a series of rulings.
>
> [MR. HAMMERSLEY]: Okay. I'm simply trying to reserve and preserve my rights.
>
> [THE COURT]: So, certainly. Go right ahead. Read your list. That's more than accurate, but I'm not going to -- fine -- but I'm not going to respond.
>
> (*See* Transcript for the Hearing on the Motion for the Appointment of an Official Equity Committee on November 30, 2017 ("Prospector Equity Committee Transcript") Hearing Tr. at 20:8-18).

The Court's expressions clearly indicate that it would refuse to rule on what it considered a number of "advisory opinions" because the only question before it was whether the appointment of an equity committee was merited. A review of the November 30, 2017 transcript reveals that the Court did not touch upon the vast majority of the points raised by the Shareholders' in their Motion to Appoint an Equity Committee. Furthermore, the Court did not write an opinion and order that addressed the Shareholders' concerns. Accordingly, any reasonable person, particularly one proceeding *pro se*, would believe that the Court's refusal to address these issues because of the limited context of the hearing (i.e., the sole equity committee request) would mean that several of these issues could be brought forth at a subsequent proceeding. In other words, just because this Court did not feel that the appointment of an Equity Committee was warranted does not mean that any other issue was decided on November 30, 2017. *See e.g. In Matter of Newport Harbor Assoc.*, 589 F.2d at 24 (although the First Circuit dismissed a motion to revoke confirmation on the

grounds that it was not filed within the 180 days period, the First Circuit made the following comments: **Our opinion should not be read to suggest that the debtors or other creditors who may have been injured by fraud are necessarily without other remedies in other forums** . . . It would appear that the doctrines of res judicata and collateral estoppel would not bar such an action, at least where **the alleged fraud could not have been asserted in the bankruptcy proceedings, the underlying factual claims were not actually adjudicated**, and the relief sought would not upset the confirmed plan of arrangement."

The decision *In Re Coffee Cupboard Inc.* is particularly relevant because the remedy sought by Mr. Hammersley was to have the Modification Order revoked so that the matter could be heard in the courts of England and Wales – as prescribed by the First Confirmation Order. In other words, neither Mr. Hammersley nor the Shareholders sought to derail the entire bankruptcy proceeding; rather, they sought a limited remedy in the Motion to Revoke, which would have kept the original Fifth Amended Plan (why would the Court show apprehension to revert back to a plan that, presumably from the Court's endorsement of the original plan, was a viable plan?). If we consider that not all of the evidence that supported the claims by Mr. Hammersley was in existence during the bankruptcy proceedings and that the Court did not find Mr. Hammersley's claims credible during the bankruptcy proceedings, these matters had not been actually adjudicated and the alleged fraud could not have been asserted in the bankruptcy proceedings in the manner presented in the Motion to Revoke, especially before the July 2017 modifications. *See e.g. In Re Coffee Cupboard, Inc.*, 119 B.R. 14, 19 (E.D.N.Y. 1990) ("An application of the test set forth in *Matter of Newport Harbor Associates* strongly suggests that a showing of fraud in the present case, is not time-barred by Section 1112(b)'s reference to Section 1144. As debtor never produced the subpoenaed

documents, **and as a full hearing was never conducted on the issue of fraud, the underlying factual claims were never actually adjudicated"**) (emphasis added).

Before the decision to move for the appointment of an equity committee, the 180-day statutory deadline was in place to move pursuant to § 1144. Consequently, the arguments that would be raised pursuant to § 1144 would be filed in accordance with this section and within this timeline. Just because a number of issues overlapped does not mean that Michael R. Hammersley ignored the Court's order. Inclusively, the Motion to Revoke did not re-seek the appointment of an equity committee, which, as the Court expressed at the November 30, 2017 hearing, was the only issue before it. Accordingly, Debtor's statements that Michael R. Hammersley filed the Motion to Revoke in defiance of the Court's November 30, 2017 Order is incorrect and it should have been particularly foreseeable that the shareholders, who are proceeding *pro se* and without the benefit of central counsel, would raise concerns from the modifications made in July 2017 and without having been notified.

3.   **This Court Refused to Caution or Warn Mr. Hammersley on November 30, 2017, which led Mr. Hammersley to Believe that he was Able to Proceed Despite this Court's Denial of the Equity Committee Motion**

Contrary to the Debtors' assertions, the record clearly shows that no warning or caution was given to Mr. Hammersley on November 30, 2017:

> So, for those reasons, I'm going to deny the motion with prejudice and I will -- **I'm not going to caution Mr. Hammersley**, **but these issues have been decided and you certainly are free to take further action**, but taking action that's going to cause the debtors to incur costs, there is a risk that they'll seek sanctions and if they seek those sanctions, there's a risk I'll award them. So, act at your own behest, and that's pretty much where we come out.

(*See* Prospector Equity Committee Transcript Hearing Tr. at 25:6-13).

So, because this Court **did not** caution Mr. Hammersley, it was reasonable to believe that although this Court did not believe that the underlying issues set forward in the Equity Committee

Transcript warranted the appointment of an Official Equity Committee, Mr. Hammersley would still be able to pursue litigating those issues on his own.

**C.      Debtor's Proposed Sanctions are not Warranted Against Michael R. Hammersley and would Equate to Prior Restraint of Speech, which is Unconstitutional**

In sum, Debtor moves this Court to enjoin "Mr. Hammersley from filing any complaint, motion, objection, pleading, or notice of appeal in this case or the Prospector Cases without prior Court approval to ensure that Mr. Hammersley's conduct does not continue" and that "Mr. Hammersley's behavior in this case at the Prospector Cases is a prototypical example of the circumstances under which the relief request is appropriate and necessary." (Motion for Sanctions ¶¶ 45 and 47).

Debtor's request is tantamount to a classic example of prior restraint on speech, which is generally presumed unconstitutional. *Alexander v. United States*, 509 U.S. 544, 550 (1993). The term "prior restraint" describes "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander*, 509 U.S. at 550 (citing M. Nimmer, Nimmer on Freedom of Speech § 4.03, p. 4-14 (1984)). "Temporary restraining orders and permanents injunctions – i.e., curt orders that actually forbid speech activities – are classic examples of prior restraints." *Alexander*, 509 U.S. at 550. It is axiomatic that the ability to petition the courts, including appellate courts, for redress is a right protected by the first amendment. *See e.g.*, *Borough of Duryea, Pa. v. Guarnieri*, 564 U.S. 379, 386, 131 S. Ct. 2488, 180 L. Ed. 2d 408 (2011)("[T]he Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."); *California Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 92 S. Ct. 609, 30 L. Ed. 2d 642 (1972) ("[T]he right to petition extends to all departments of the Government. The right of access to the courts is indeed but one aspect of the right of petition.").

Michael R. Hammersley has a right to access of courts that all individuals enjoy; his conduct of filing two motions after significant and material changes were made to the original Fifth Amended Plan in July 2017 that had a direct effect on the Shareholders' rights and purported progression of litigation in the United Kingdom (as admitted by the Court) does not mean that he has engaged in vexatious and abusive litigation. To the contrary, the lack of an equity committee and the willingness of Mr. Hammersley to try and avail the Shareholders' rights has served as the only element of hope for a number of shareholders that were initially promised retention of Reorganized Paragon but were then defrauded by Debtor. (*See* joinder motions filed by other *pro se* shareholders at Docket Entries Nos. 161; 165; 166; 167; 168; 169; 170; 171; 172; 174; 175; 179; 186; 187; 188; 189; 190; 191; 192; 193; 195; 196; 197; 204; 205; 206; 215; 216; 217; 218; 219; 220; 225; 227; and 230 in Bankruptcy Case No. 17-11572). Thus, to limit the form and manner in which Mr. Hammersley could litigate would be a violation of his First Amendment rights as this Court's order would be the equivalent of prior restraint. Chiefly, Mr. Hammersley has not engaged in abusive litigation practices as **only two motions** have been filed since the significant modifications were made by Debtor; these actions were reasonable, particularly after the Court's express refusal to rule on a number of issues at the November 30, 2017 hearing because the Court believe it would constitute "advisory opinions" within the context of an equity committee motion request. It was, therefore, reasonable for Michael R. Hammersley to believe that he could raise these issues in the context of a section 1144 claim.

    1.    **Debtor's request for "Other Appropriate Relief" is Unwarranted as Mr. Hammersley's work concerning the Noble litigation added *millions* of dollars to the estate of Paragon Parent**

Debtor's request that "[i]n addition to the relief request above, the Debtor requests that the Court grant such other and further relief that the Court deems appropriate, including any monetary

damages that the Court may order after holding a hearing on this Motion." (Motion for Sanctions ¶ 48). Considering that the Debtors' proposed a deficient Fifth Amended Plan that had to suffer thousands of changes, the Debtors' themselves should have foreseen additional litigation by the shareholders and Lessors concerning this drastic change of course. Thus, it would be unreasonable to conclude that the Debtors' should not incur in costs related to choosing the divergence in path. In other words, if the Fifth Amended Plan had not failed in the manner that it did, neither this Court, nor the Debtors' would have dealt with Mr. Hammersley in any additional matters (aside from proceedings in the courts of England and Wales). However, because the Fifth Amended Plan did fail and the change in circumstances did occur, and because the Debtors' returned to this Court instead of the courts of England and Wales, it is unreasonable to not allow for Mr. Hammersley to participate in asserting his rights and attempt to conserve Paragon Parent's interest in Prospector.

Lastly, Michael R. Hammersley was responsible for raising the topic of the Noble lawsuit that has presently added hundreds of millions of dollars to the creditors by publishing the Noble Pursuit presentation to the court docket. *See Omnibus Reply Of The Unofficial Equity Committee Of The Shareholders Of Paragon Offshore, Plc. To The Objections Regarding The Entry Of An Order Appointing An Official Equity Committee And Proposed Order For The Appointment Of An Official Equity Committee* (Docket Entry No. 1285 in Bankr. Case No. 16-10386).

Through Mr. Hammersley's joint investigation with other members of the Unofficial Equity Committee and facilitation of the subsequent publication of those findings, Mr. Hammersley alleged that Noble may have committed constructive fraudulent transfer. Upon review of the *[Revised Redacted] Complaint* ("Fraudulent Transfer Complaint") (Docket Entry No. 5 in Adv. Proc. No. 17-51882) filed by the Paragon Litigation Trust, ¶ 150 states that "Paragon Finance received less than a reasonably equivalent value in exchange for its obligations under the

Intercompany Notes and the Note Payments." This means that Noble committed constructive fraudulent transfer. Additional sections of the Fraudulent Transfer Complaint show that the Paragon Litigation Trust is seeking 100% recovery of unsecured bonds and the secured term loans, or a total of about $1.6B. Again, in addition to the $1.5B of proceeds ($900 million in reorganization value + $515 million in cash + $85 million in Take Back Debt) already distributed to the creditors, there is a substantial likelihood that the creditors will receive over 100% of their allowed claims while the Shareholders were left out of any recovery altogether and despite English law providing for Paragon Parent's retention of its intercompany interest in Prospector. The documents that were subpoenaed demonstrate that the assertions of the shareholders, including Michael R. Hammersley, brought to this Court were incredibly accurate and that as a result, significant amount of value will be distributed to the creditors.

This has directly benefitted the Creditors through the creation of the Litigation Trust Interests. As a reminder to this Court, the Debtors' and their counsel staunchly opposed setting aside the previous Noble settlements. However, given that the Litigation Trust Interests are currently trading at $257 million, Mr. Hammersley has had a direct impact in creating hundreds of millions of dollars of value for the benefit of the Debtors' and the restricted subsidiary creditors. In addition, Mr. Hammersley has volunteered thousands of hours of his own time (free of charge) and brought forward a number of issues that would have otherwise gone unnoticed altogether. Accordingly, any litigation instigated by Michael R. Hammersley, or the Shareholders, ***pales*** in comparison to the net benefit that this Court and this bankruptcy proceeding have obtained from Mr. Hammersley's involvement. Further, the evidence presented by Mr. Hammersley also shows that roughly $600 million in value (Litigation Trust Interests and $300 million in reorganization value) was improperly excluded by the Debtors' and approved by this Court. Had the concerns of

the Shareholders been taking seriously the first time around, it is likely that the Fifth Amended Plan would not have been approved in the first place which would have saved all parties in interest millions of dollars and an incredible amount of time. For all of the reasons stated herein, no sanctions are warranted against Michael R. Hammersley and the Debtors' Sanction Motion must be denied.

Dated: January 23, 2018

/s/ Michael R. Hammersley
P.O. Box 5161
Greensboro, North Carolina 27435
Telephone: (336) 209-3559
Facsimile: (336) 283-7654
michael@brightleafadv.com


*Pro se Shareholder*