IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PARAGON OFFSHORE PLC, et al., | : | Case No.: 16-10386 (CSS) |
| | : | |
| Debtors. | : | |
| | : | |
| PARAGON LITIGATION TRUST | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No.: 17-51882(CSS) |
| | : | |
| NOBLE CORPORATION PLC, NOBLE | : | |
| CORPORATION HOLDINGS LTD, | : | |
| NOBLE HOLDING INTERNATIONAL | : | |
| (LUXEMBOURG) S.A.R.I., NOBLE | : | |
| FDR HOLDINGS LIMITED, ASHLEY | : | |
| ALMANZA, JULIE H. EDWARDS, | : | |
| GORDON T. HALL, JON A. | : | |
| MARSHALL, JAMES A MACLENNAN, | : | |
| MARY P. RICCIARDELLO, JULIE J. | : | |
| ROBERTSON, AND DAVID | : | |
| WILLIAMS, | : | |
| | : | |
| Defendants. | : | |

## OPINION[1]

| | |
|---|---|
| **SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP** | **YOUNG, CONAWAY STARGATT & TAYLOR, LLP** |
| Anthony W. Clark | Pauline K. Morgan |
| Stephen J. Della Penna | Joel A. Waite |
| One Rodney Square | Jaime Luton Chapman |
| P.O. Box 636 | Michael S. Neiburg |

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Civ. P. 52(a)(3), adopted by Fed. R. Bankr. P. 7052. Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Wilmington, DE  19899-0636
    -and-
George A. Zimmerman (Argued)
Lauren E. Aguiar
Four Times Square
New York, NY  10036-6522
    -and-
Wallis M. Hampton
1000 Louisiana Street, Suite 6800
Houston, TX  77002-5026

Counsel for the Defendants

1000 North King Street
Wilmington, DE  19801
    -and-
**JONES DAY**
Bruce Bennett
James O. Johnston
555 South Flower Street, 50th Floor
Los Angeles, CA  90071
    -and
Gregory M. Shumaker
David S. Torborg (Argued)
51 Louisiana Avenue, N.W.
Washington, DC  20001
    -and-
Jennifer L. Del Medico
Genna L. Ghaul
250 Vesey Street
New York, New York  10281

Counsel to Paragon Litigation Trust

Date: August 6, 2018

Sontchi, C.J. _____

# INTRODUCTION[2]

Before the Court is Defendants' *Motion to Dismiss in Favor of Arbitration and to Stay the Proceedings* over certain claims that allegedly occurred as part of the Spin-Off of Paragon and Noble.

There can be no question that there is a strong, indeed overwhelming, federal policy in favor of arbitration.  The Supreme Court has repeatedly said so, as recently as a few months ago.[3]  Yet even the federal policy in favor of arbitration has its limits.  This is such a case.  Here certain officers and directors of parties to a contract containing a broad Arbitration Provision seek to require the Trust to pursue through arbitration its breach of fiduciary duty claims against those officers and directors—who are not signatories to the contract containing the Arbitration Provision.  Indeed, these Paragon and Noble Directors are *expressly excluded* from the Arbitration Provision and included in another part of the same contract.  Where fiduciaries are so expressly removed from a contract's Arbitration Provision, the Court declines to extend the policy in favor of arbitration to include these fiduciaries of the related entities.

At the same time, the Trust's claim for unjust enrichment against the Corporate Defendants that signed the relevant Agreements must proceed through arbitration.  The arbitration of the unjust enrichment claim will proceed concurrently with the litigation in this Court with no stay of either proceeding being granted.

---

[2] Undefined terms used in the Introduction have the meaning set forth below.

[3] *See Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1621 (2018).

## JURISDICTION & VENUE

The Court has jurisdiction over the Motion pursuant to 28 U.S.C. § 1334 as a non-core proceeding under § 157(c)(1).  Venue is also proper before the United States Bankruptcy Court for the District of Delaware under 28 U.S.C. §§ 1408 and 1409.  The Court has the judicial authority to enter a final order.

## STATEMENT OF FACTS

### A.    Procedural Background

On February 14, 2016, Paragon Offshore plc ("Paragon") and affiliated entities (collectively with Paragon, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code.  The Court subsequently entered an order for the joint administration of these cases.[4]

On June 7, 2017, the Court entered an order confirming the *Fifth Joint Chapter 11 Plan of Paragon Offshore plc and its Affiliated Debtors* (the "Plan").  Among other things, the Plan created the Paragon Litigation Trust (the "Trust"), which was to pursue certain "Noble Claims" as defined under the Plan.[5]

The Trust went on to commence this adversary proceeding in December 2017 by filing a complaint (the "Complaint") alleging certain claims, all of which arose out of the 2014 spin-off of Paragon from Noble Corporation plc ("Noble").[6]  The Complaint

---

[4] Del. Bankr.  No.  16-10386, D.I.  69**.**

[5] *See* Del.  Bankr.  No.  16-10386, D.I.  1614, 1614-1 § 5.7, 1796-1.

[6] Adv. Pro. No. 17-51882, D.I. 2. All references to the docket, cited as "D.I." *infra*, refer to this adversary proceeding unless otherwise stated.

encompasses claims against Noble, Paragon Directors, and Noble Directors (each defined *infra* and, together, the "Defendants").

On February 15, 2018, Defendants filed their *Motion to Dismiss in Favor of Arbitration and to Stay the Proceeding* (the "Motion") and a supporting brief.[7]  The Trust filed a brief in opposition in March, and Defendant filed its reply in May.[8]  The Court held oral argument on the Motion on June 1, 2018.[9]  The issue is now fully briefed and ripe for review.

## B.  Factual Background

### i.    Counts Sought in Motion for Arbitration

The dispute described in the Complaint centers on alleged misconduct associated with the corporate spin-off of Debtors from Noble (the "Spin-Off").  In particular, Counts VI-VIII of the Complaint, alleging claims of (1) breach of fiduciary duty by two former Paragon Directors, (2) aiding and abetting breach of fiduciary duty against certain current and former Noble Directors, and (3) unjust enrichment against the Corporate Defendants. The Complaint also contains counts of actual and constructive fraudulent transfer and recharacterization of debt as equity against the Corporate Defendants.

---

[7] D.I. 23-24.

[8] D.I. 38, 44.

[9] *See generally* D.I. 66.

The Motion asks the Court to dismiss these claims in favor of arbitration, while staying remaining issues. The Court reviews the facts alleged for each of these claims in further detail below.

### a. Count VI: Breach of Fiduciary Duties

In Count VI, the Complaint alleges that Defendants James A. MacLennan ("MacLennan") and Julie J. Robertson ("Robertson," together with MacLennan the "Paragon Directors") breached fiduciary duties of loyalty, care, good faith, and candor they owed to Paragon, and thus caused Paragon to suffer significant damages.

The Complaint alleges that MacLennan served as Noble's Chief Financial Officer until February 2016, and simultaneously served as the sole member of Paragon's board of directors from Paragon's inception until July 31, 2014, the date of the Spin-Off. Robertson is also alleged to have been a member of Paragon's board of directors from shortly before the Spin-Off through 2016, while simultaneously serving as Noble's Executive Vice President.

### b. Count VII: Aiding and Abetting Breach of Fiduciary Duties

In Count VII, the Complaint alleges that David Williams ("Williams") was Chairman of Noble's board of directors, as well as Noble's President and Chief Executive Officer. Ashley Almanza, Michael A. Cawley, Lawrence J. Chazen, Julie H. Edwards, Gordon T. Hall, Jon. A. Marshall, and Mary Ricciardello are all alleged to have been

additional members of Noble's board of directors (together with Williams, the "Noble Directors").[10]

The Trust alleges that the Noble Directors knew that MacLennan and Robertson owed fiduciary duties to Paragon, and aided in breaching those duties in the context of the Spin-Off.

### c. Count VIII: Unjust Enrichment

In Count VIII, the Trust alleges that Noble, Noble Corporation Holdings Ltd., Noble Corporation, Noble Holding International (Luxembourg) S.á.r.l. ("NHIL 1"), Noble Holding International (Luxembourg NHIL) S.á.r.l. ("NHIL 2"), and Noble FDR Holdings Limited (together, the "Corporate Defendants") unjustly received value from certain note payments from the Spin-Off made directly to Defendants NHIL 1, NHIL 2, and Noble FDR Holdings Limited.

The Trust further alleges that Noble Corporation Holdings Ltd., NHIL 1, NHIL 2, and Noble FDR Holdings Limited are all wholly-owned subsidiaries of Noble and mediate transferees of and/or entities for whose benefit the note payments were made. While the Corporate Defendants were unjustly enriched, the Trust alleges that Paragon and its subsidiaries were unjustly deprived of cash, credit, and other things of value.

---

[10] Ashley Almanza filed a separate motion to dismiss claims against her in this adversary proceeding. After filing, the parties later agreed to dismiss claims against her. *See* D.I. 42.

### ii.    The Agreements and Arbitration Provision

The Complaint alleges that the Spin-Off was "governed by five agreements, each dates as of July 31, 2014, between Noble and Paragon and on behalf of their respective subsidiaries or 'Groups' (the 'Noble Group' and 'Paragon Group') …"[11]    The five agreements referenced in the Complaint and by Defendants in support of their Motion include the Master Separation Agreement ("MSA"),  Tax Sharing Agreement, Transition Services Agreement, Brazilian Transition Services Agreement, and Employee Matters Agreement (together with the MSA, the "Agreements").[12]

The MSA was entered into by Corporate Defendant Noble Corporation, a Cayman Islands company, and Paragon, a company organized under the laws of England and Wales, for themselves and as representatives of the larger Noble and Paragon Groups.[13] The term "Party" or "Parties" in the MSA refers to either of the signatory entities to the MSA. The "Noble Group," as defined by the MSA, includes the following:

> Parent [Noble], all Persons that are Subsidiaries of Affiliates of Parent other than a member of the Paragon Group on the Distribution Date and each Person that becomes a Subsidiary of Parent after the Distribution Date.  For purposes of Section 6.12, Noble Group shall include directors and officers of the Noble Group.[14]

The definition for the "Paragon Group" similarly tracks the definition *supra*:

---

[11] D.I. 1 (*Complaint*), ¶ 111.

[12] *Id*.

[13] *See* D.I. 25, Exh. A (MSA). The other four Agreements are entered by and between various entities that encompass the Noble and Paragon Groups in the MSA.

[14] *Id*. at § 1.1.

"Paragon Group" means Paragon and all Persons that are Subsidiaries of Paragon on the Distribution Date, including the Subsidiaries set forth in Exhibit 21 to the Form 10, and each Person that becomes a Subsidiary of Paragon after the Distribution Date.  For purposes of Section 6.12, Paragon Group shall include directors and officers of the Paragon Group.[15]

The Agreements further incorporate an arbitration provision extensively set out in

Article V of the MSA (the "Arbitration Provision").[16]  The Arbitration Provision states, in

relevant part:

5.1 **Agreement to Arbitrate.** Except as otherwise specifically provided in any Ancillary Agreement, the procedures for discussion, negotiation and arbitration set forth in this Article V shall apply to any dispute, controversy or claim (whether sounding in contract, tort or otherwise) that arises out of or relates to, this Agreement or any Ancillary Agreement, any alleged breach hereof or thereof, or the transactions contemplated hereby or thereby (including all actions taken in furtherance of the transactions contemplated hereby or thereby on or prior to the date hereof), the construction, interpretation, enforcement or validity hereof or thereof (a "Dispute").  Each Party agrees on behalf of itself and each member of its respective Group that the procedures set forth in this Article V shall be the sole and exclusive remedy in connection with any Dispute and irrevocably waives any right to commence any Action in or before any Governmental Authority, except (i) as expressly provided in Section 5.7(b), (ii) to the extent provided for under the Federal Arbitration Act and (iii) as required by applicable Law.  Each Party on behalf of itself and each member of its respective Group irrevocably waives any right to any trial by jury with respect to any Dispute to which this Section 5.1 applies.  As used in the following provisions of this Article V, any reference to "party" or "parties" shall mean and refer to a party or parties involved in a Dispute.

…

5.3 **Demand for Arbitration.** Any Dispute that has not been resolved within 45 days after delivery of an Escalation Notice shall be resolved by final and binding arbitration pursuant to the then current Commercial Arbitration

---

[15] *Id.*

[16] *See, e.g., id.* at Art. V; Exh B. (*Tax Sharing Agreement*), § 8.20; Exh. C (*Employee Matters Agreement*), § 10.6; Exh. D (*Transition Services Agreement*), § 11.3; Exh. E (*Transition Services Agreement for Brazil*), § 11.3(B). Incorporation of the Arbitration Provision into the Employee Matters and Transition Services Agreements incorrectly reference Art. VI of the MSA, but each Agreement seeks to incorporate the Dispute resolution provisions of the MSA as established in Art. V.

Rules (the "AAA Rules") of the American Arbitration Association ("AAA"), except as modified by the provisions of this Article V.

…

5.6 **Discovery and Certain Other Matters.** … (b) The arbitrators shall have full power and authority to determine issues of arbitrability …

…

5.9 **Law Governing Arbitration Procedures.** The interpretation of the provision of the Article V, only insofar as they relate to the agreement to arbitrate and any procedures pursuant thereto, shall be governed by the Federal Arbitration Act and other applicable U.S. federal Law.  In all other respects, the interpretation of this Agreement shall be governed as set forth in Section 7.2.[17]

Section 7.2, as invoked in the Arbitration Provision *supra*, is the "Governing Law" provision for the rest of the MSA, applying New York state law "without regard to principles of conflicts of laws thereof that would result in the application of the laws of any other jurisdiction."[18]

### iii.    *Debtors' Chapter 11 Filings and Plan Confirmation*

In February 2016, Paragon and the other affiliated Debtors filed petitions for chapter 11, and by June 2017 the Court had entered an order confirming the Debtors' Plan.[19]  Among other things, the Plan references the Spin-Off by way of certain "Noble Claims" as to be pursued by the Trust.[20]  The Noble Claims include claims "arising under, relating to or in connection with the Spin-Off, against the Noble Entities, and their

---

[17] D.I. 25, Exh. A (MSA), §§ 5.1, 5.3, 5.6(b), 5.9.

[18] *Id.* at § 7.2.

[19] *See* Del. Bankr. No. 16-10386, D.I. 1614, 1614-1 § 5.7, 1796-1.

[20] *See id.*, D.I. 1796-1 § 2.4.

respective officers and directors."[21]  Referring to the jurisdiction of the adjudication of the

Noble Claims, the Plan states:

> … the Bankruptcy Court shall retain exclusive jurisdiction, pursuant to 28 U.S.C. §§ 1334 and 157, over all matters arising in or related to the Chapter 11 Cases, other than those matters administered in the U.K. Administration, for, among other things, the following purposes: …  (r) to adjudicate the Noble Claims to the fullest extent permitted by law …[22]

The Plan further provides the Trust with "all rights in respect of the Noble Claims as set

forth in Section 5.7 of the Plan … subject to the Noble Entities' applicable rights and

defenses against the Litigation Trust with respect to the Noble Claims."[23]  As expanded

further in section 5.7, the Plan states:

> (a) On the Effective Date, the Debtors and the Estates shall preserve and transfer to the Litigation Trust the Noble Claims … *provided, however* that the Noble Entities shall retain any and all rights and defenses against the Litigation Trust with respect to the Noble Claims …
>
> (e) … For the avoidance of doubt, the Noble Entities shall retain any and all rights and defenses against the Litigation Trust with respect to the Noble Claims …[24]

In confirming the Plan, the Court entered an order (the "Confirmation Order") that

contains language regarding the Noble Claims that parallels the language in the Plan:

>  … *provided, however*, that the Litigation Trust shall have all rights in respect of the Noble Claims as set forth in Section 5.7 of the Plan, including without limitation, full power, authority, and standing to investigate … or otherwise resolve the Noble Claims subject to the Noble Entities' applicable rights and defenses against the Litigation Trust with respect to the Noble Claims.[25]

---

[21] *Id.*, D.I. 1614-1 § 1.1.

[22] *Id.* at § 11.1(r); *see also id.* at ¶ 45 (*Confirmation Order*).

[23] *Id.* at § 10.10.

[24] *Id.* at §§ 5.7(a), (e).

[25] *Id.* at ¶ 33.

## LEGAL DISCUSSION

### A.  Standard of Review

#### i.    Treatment of Motion

Defendants seek dismissal of certain counts in the Complaint on the grounds that the Trust has failed to state a claim for which relief can be granted, and further seeks to stay any remaining litigation in the Court pending arbitration.  Defendants stylize their Motion as one for dismissal "in favor of arbitration and to stay the proceedings," but stated in oral argument that the Motion in fact seeks "to compel arbitration."[26]

The Court first declines to review the Defendants' request to dismiss Counts VI-VIII.  The Motion, as stated in the Arbitration Provision, is governed by the Federal Arbitration Act ("FAA") and applicable federal law.[27]  Under the FAA, "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court … for an order directing that such arbitration proceed in the manner provided for in such agreement."[28]  However, the "plain language of [FAA] § 3 affords a [ ] court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration."[29]  The Court thus "lack[s] discretion to dismiss, rather than stay, a case under § 3 where the parties have

---

[26] *See* D.I. 23.

[27] D.I. 25, Exh A. *Master Separation Agreement*, Art. 5 § 9 ("The interpretation of the provisions of this Article V, only insofar as they relate to the agreement to arbitration and any procedures pursuant thereto, shall be governed by the Federal Arbitration Act and other applicable U.S. federal Law.").

[28] 9 U.S.C. § 4.

[29] *Lloyd v. HOVENSA, LLC*, 369 F.3d 263, 269 (3d Cir. 2004).

requested a stay and not a dismissal."[30]   The Courts review *infra* is thus limited to questions of compelling arbitration and staying any remaining proceedings.

Next, the Court must determine what standard of review to apply to the Defendants' Motion.  A motion seeking to compel arbitration is reviewed under either a motion-to-dismiss or summary-judgment standard.[31]   A motion-to-dismiss standard applies "when it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'"[32]   In contrast, a summary-judgment standard will apply "if matters beyond the pleadings are considered."[33]   This includes where "the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue," at which point the parties are entitled to discovery and a later motion reviewed under the summary-judgment standard.[34]

Defendants' Motion centers on an Arbitration Provision contained within certain Agreements directly mentioned in the Complaint.  The initial Complaint goes so far as to allege the Agreements "effectuat[ed] the Spin-Off," and the "Spin-Off was governed by"

---

[30] *Devon Robotics, LLC v. DeViedma*, 798 F.3d 136, 143 (3d Cir. 2015) (citing *Lloyd*, 369 F.3d at 269).

[31] *Yeransian v. Markel Corp.*, No. 16-808-GMS, 2017 WL 33225987, *3 (D. Del. July 31, 2017) (citations omitted).

[32] *Guidotti v. Legal Helpers Debt Resolution, L.C.C.*, 716 F.3d 764, 776 (3d Cir. 2013) (quoting *Somerset Consulting, LLC v. United Capital Lenders, LLC*, 832 F.Supp.2d 474, 482 (E.D. Pa. 2011).

[33] *Nationwide Ins. Co. of Columbus, Ohio v. Patterson*, 953 F.2d 44, 45 (3d Cir. 1991).

[34] *Yeransian*, 2017 WL 33225987, at *3 (quoting *Guidotti*, 716 F.3d at 776) (internal quotations omitted).

the Agreements.[35]  The Trust contends that these references do not establish reliance on the Agreements as they are "administrative documents … unnecessary for the establishment of the Trust's claims."[36]  But the law does not require such a stringent take on documents actually mentioned in the underlying complaint. "[A] document integral to or *explicitly relied upon in the complaint* may be considered without converting the motion to dismiss into one for summary judgment."[37]  The Complaint here clearly makes use of the Agreements, and for the Trust to argue now that their use is "beyond the pleadings" proves too much.

Given the above, the Court reviews the Motion *infra* under the Rule 12(b)(6) motion-to-dismiss standard.

### ii.    *Rule 12(b)(6) Motion to Dismiss Standard*

A motion, brought under Fed. R. Civ. P. 12(b)(6), tests the sufficiency of factual allegations pleaded in the Plaintiff's complaint.[38]  With the Supreme Court's decisions in *Twombly* and *Iqbal*,[39] "pleading standards have seemingly shifted from simple notice

---

[35] D.I. 1, ¶¶ 87, 111.

[36] D.I. 23, p. 3.

[37] *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)) (internal quotations omitted).

[38] *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) ("The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist."); Fed. R. Bankr. P. 7012(b), *incorporating* Fed. R. Civ. P. 12(b)(6) in adversary proceedings.

[39] *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).

pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[40]

In *Iqbal*, the Supreme Court makes clear that the *Twombly* "facial plausibility" pleading requirement applies to all civil suits in federal courts.[41] "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" are insufficient to survive a motion to dismiss.[42] Rather, "all civil complaints must now set out sufficient factual matter to show that the claim is facially plausible."[43] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[44] Determining whether a complaint is "facially plausible" is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense.[45] But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged, but not effectively shown, that the pleader is entitled to relief."[46]

---

[40] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[41] *See Fowler*, 578 F.3d at 210.

[42] *Iqbal*, 556 U.S. at 678. *See also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) ("[A] court need not credit a plaintiff's 'bald assertions' or 'legal conclusions' when deciding a motion to dismiss." (quotations omitted)); *Bartow v. Cambridge Springs SCI*, 285 Fed. Appx. 862, 863 (3d Cir. 2008) ("While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions." (quotations omitted)).

[43] *Fowler*, 578 F.3d at 210 (internal quotations omitted).

[44] *Iqbal*, 556 U.S. at 678.

[45] *Id*. at 679.

[46] *Id*. (citations and internal quotations omitted).

After *Iqbal*, the Third Circuit has instructed courts to "conduct a two-part analysis. First, the factual and legal elements of a claim should be separated. The [court] must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."[47] The court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim for relief."[48] The Third Circuit has further instructed that "[s]ome claims will demand relatively more factual detail to satisfy this standard, while others require less."[49]

## B. Motion to Compel Arbitration

Defendants seek to compel arbitration on Counts VI-VIII of the Complaint and stay the remaining litigation in favor of said arbitration.

The FAA provides that arbitration agreements "shall be valid irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."[50] As long as the arbitration agreement is enforceable to the same extent as other contracts, "federal law presumptively favors the enforcement of arbitration

---

[47] *Fowler*, 578 F.3d at 210-11; *Iqbal*, 556 U.S. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004). The court may also consider documents attached as exhibits to the complaint, any documents incorporated into the complaint by reference, and matters of the public record. *In re Fruehauf Trail Corp.*, 250 B.R. 168, 183 (Bankr. D. Del. 2000) (citing *PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993)); *see also Sands*, 502 F.3d at 268. Yet "if the allegations of [the] complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint." *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005) (quoting *Coastal Power Prod. Co.*, 13 F. Supp. 2d 495, 497 (S.D.N.Y. 1998)).

[48] *Fowler*, 578 F.3d at 211 (internal quotations omitted).

[49] *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 361 (3d Cir. 2010).

[50] 9 U.S.C. § 2.

agreements."[51]   A lower federal court maintains the power to stay a proceeding if it determines that an issue falls under an applicable arbitration clause.[52]  And to the extent an arbitration clause is applied to a debtor-derivative, non-core matter, "the bankruptcy court does not have the authority to deny enforcement of the arbitration …"[53]

"The strong federal policy favoring arbitration, however, does not lead automatically to the submission of a dispute to arbitration upon the demand of a party to the dispute."[54]  Only parties that have entered into a valid agreement can be forced to arbitrate.[55] As such, "before compelling arbitration pursuant to the [FAA] … a court must determine that (1) an enforceable agreement to arbitrate exists, and (2) the particular dispute falls within the scope of that agreement."[56]   Or rather, as the Third Circuit clarified in *Puleo*:

> … a question of arbitrability arises only in two circumstances—first, when there is a threshold dispute over whether the parties have a valid arbitration agreement at all, and, second, when the parties are in dispute as to "whether a concededly binding arbitration clause applies to a certain type of controversy.[57]

---

[51] *Harris v. Green Tree Financial Corp.*, 183 F.3d 173, 178 (3d Cir. 1999).

[52] *See id.* § 3.

[53] *In re APF Co.*, 264 B.R. 344, 361-62 (Bankr. D. Del. 2001) (citing *Hays and Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 885 F.2d 1149, 1155-57 (3d Cir. 1989)).

[54] *Century Indem. Co. v. Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 523 (3d Cir. 2009).

[55] *See PaineWebber Inc. v. Hartmann*, 921 F.2d 507, 511 (3d Cir. 1990), *overruled on other grounds by Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 85 (2002).

[56] *Kirleis v. Dickie, McCamey & Chilcote, P.C.*, 560 f.3D 156, 160 (3d Cir. 2009) (citations omitted); *see* 31 Moore's Federal Practice § 906.02[4][a] (2018).

[57] *Puleo v. Chase Bank USA, N.A.*, 605 F.3d 172, 178 (3d Cir. 2010) (internal quotations omitted) (quoting *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452 (2003)) (citations omitted).

A court must answer these questions of arbitrability absent "clear and unmistakable" evidence providing otherwise.[58]

### i.  Jurisdiction of the Plan as it Relates to the Arbitration Provision

As a threshold matter, the Trust argues several points relating to the jurisdiction of the Court under the Plan, Confirmation Order, and bankruptcy process that must be addressed before assessing question of arbitrability.[59]

Specifically, the Trust argues that the Plan and Confirmation Order confer to the Court "exclusive jurisdiction" to "adjudicate the Noble Claims," superseding the otherwise applicable Arbitration Provision.  The Trust points to the following language in the Plan to make its case:

> [T]he Bankruptcy Court shall retain exclusive jurisdiction … over all matters arising in or related to the Chapter 11 Case … to adjudicate the Noble Claims to the fullest extent permitted by law …[60]

Similar language can be found within the Confirmation Order.[61]  The Trust takes this passage to mean that the Court has exclusive jurisdiction over all possible legal claims between the Trust and Noble, and consequently must override any contractual right to arbitration that predates Plan confirmation.[62]

---

[58] *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 945 (1995).

[59] *Cf. Puleo*, 605 F.3d at 178 (finding that questions of arbitrability are limited to those disputes involving the existence of valid arbitration provision and its scope).

[60] Del. Bankr. No. 16-10386, D.I. 1614-1, § 11.1(r).

[61] *Id*. at ¶ 45 (*Confirmation Order*).

[62] Defendants interpret the Trust to be arguing that the Plan and Confirmation Order gives this Court authority to enter *final judgments* on all Noble Claims. The Defendants argue that this is impossible under *Stern v. Marshall*. However, the adjudication of the Noble Claims is not before the Court at this time. Instead, as discussed earlier, this Court is only concerned with who can arbitrate issues of arbitrability and what, if any, claims can be compelled to go to arbitration. D.I. 38, pp. 11-13; D.I. 44, pp. 6-7.

The Court finds this view unpersuasive, however, because it does not seriously consider what it means for the adjudication to occur "to the fullest extent permitted *by law*." The Court cannot expand the scope of the Noble Claims to extend beyond the rights of the parties. The Plan clearly states that the "Noble Entities … retain any and all rights and defenses against the Litigation Trust with respect to the Noble Claims …"[63] Such a reservation of rights and defenses surely also includes affirmative defenses, including arbitration pursuant to Fed. R. Civ. P. 8(c)(1), made applicable to this proceeding by way of Fed. R. Bankr. P. 7008.

The Court thus finds that its "exclusive jurisdiction" requires the consideration of any affirmative arbitration defense when it is otherwise made available under the contractual rights of the parties. Furthermore, the Plan itself preserves the affirmative defenses of the Defendants, and the Court finds no reason to create discord with the language of the Plan in now denying one of those reserved legal rights.

Indeed, the Trust's related argument that the Arbitration Provision was extinguished as part of the rejection of the MSA in the bankruptcy proceedings supports the logic herein. For the rejection of an executory contract is only "a breach of a contract, and *the terms of the contract still control the relationship of the parties*."[64] In other words, the Court cannot now erase the contractual obligations the parties have agreed to under the Agreements, at least as it relates to the Arbitration Provision.

---

[63] D.I. 25-1, § 5.7(b).

[64] *In Re Smurfit-Stone Container Corp.*, 2010 WL 5489905 (Bkrtcy.D.Del.) (emphasis added); *In re Flagstaff Realty Assocs.*, 60 F.3d 1031, 1034 (3d Cir. 1995) (similar).

The Court concludes, then, that none of the language in the Plan or Confirmation Order, nor any actions taken within the bankruptcy, affect the enforcement of the Arbitration Provision.  As a result, the Court now turns to whether the "parties have submitted a particular dispute to arbitration, *i.e.*, the *question of arbitrability*" and who must decide such issues.[65]

### ii.    Choice of Law

Before assessing the contractual issues of arbitrability, the Court must first determine what law applies to such an analysis.

The parties' submissions initially appear to maintain no coherent view on what law controls, flipping between New York and Delaware state law, as well as federal law from the Second and Third Circuits.[66]  At least initially, it appeared as if a choice of law problem may occur.[67]  However, both Defendants and the Trust eventually stated, expressly, that the proper state law to apply was that of the State of New York.[68]  While

---

[65] *Howsam*, 537 U.S. at 83 (internal quotations omitted) (quoting *AT&T Tech., Inc. v. Comm'n Workers*, 475 U.S. 643, 649 (1986)).

[66] Defendants' opening brief cites to Delaware and New York state law in its discussion of arbitrability, as well as federal law, particularly from the Second and Third Circuits. The Trust professes in its answer that New York law applies, as stated within the MSA, but nonetheless cites to Delaware and certain out-of-circuit federal cases. The Defendants' reply seems to backtrack on its earlier application of Delaware law, agreeing that New York law should be applied throughout. Finally, at oral argument, the Defendants clarified that New York was applicable, but the Trust's counsel provided a limited overview of applicable Delaware cases. *See, e.g.*, D.I. 24 at 10-11; D.I. 38 at 22-23; and D.I. 66 at 7.

[67] Nevertheless, in their initial response, the Trust argues that "the rule advanced by the Defendants [to determine enforcement of an arbitration agreement by non-signatories] has been explicitly rejected in New York …" D.I. 38, pp. 21-22.

[68] D.I. 38, p. 22 (noting that while the Defendant's opening brief cites Delaware cases, New York law applies); D.I. 44 (Defendant's reply maintains that New York state law applies to both the arbitration of arbitrability issue and the scope of the arbitration issue); D.I. 66, Hr'g Tr. 6:5 (conceding that New York state law applied to the review of who decides questions of arbitrability).

both parties continued to cite Delaware cases,[69] the parties did so under the belief that other cited caselaw would generate the same result as New York law.[70]

Furthermore, for its part, the Arbitration Provision applies FAA and applicable federal law to "[t]he interpretation of the provisions of this [Arbitration Provision] Article V, only insofar as they relate to the agreement to arbitrate and any procedures thereto … [and i]n all other respects, the interpretation of this Agreement shall be governed as set forth in Section 7.2." Section 7.2 applies New York state law regardless of what a choice-of-law analysis might hold.[71]

"When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally … should apply ordinary state-law principles that govern the formation of contracts."[72]  More specifically, as the Supreme Court noted in *Arthur Andersen*, "[s]tate law … is applicable to determine which contracts are binding under §

---

[69] *See also* D.I. 66, Hr'g Tr. (the Trust cites to *Carter*, a Delaware Chancery case, and claims it applies the same test as other courts); *id.* at 52:15-53:24 (arguing that Delaware cases do not apply a heightened sufficiency standard, but merely apply the standard to a fiduciary duty claim).

[70] *See, e.g., id.* at Hr'g Tr. 14: 7-10 (Defendants arguing that "under the Delaware and Second Circuit and Court of Appeals law, there is not only relational sufficiency, there is a virtually identity in interest."); *id.* at 50:7-21 (noting the Defendants cite to Delaware case "notwithstanding the fact that they now claim that New York law applies … [and] that is not the test that is applied in either Delaware or certainly not New York … If the court reviews those decisions it will see that in each and every one of those decisions the court made an analysis of relational sufficiency …")

[71] D.I. 25, Exh A., §§ 5.9, 7.2.

[72] *First Options*, 514 U.S. at 944 (1995); *accord Century Indem. Co. v Certain Underwriters at Lloyd's, London*, 584 F.3d 513, 524 (3d Cir. 2009) (quoting *First Options*, 514 U.S.at 944) (citing *Perry v. Thomas*, 482 U.S. 483, 492 n.9 (1987)).

2 and enforceable under § 3 *if* that law arose to govern issues concerning the validity, revocability, and enforceability of contracts generally."[73]

The question left for the Court to decide is exactly *which* state law is applicable given the late consensus of the parties, the application of federal and state law under the MSA, and the continued percolation of Delaware cases. In a situation where parties agree as to the choice of law, courts in the Third Circuit have generally allowed such agreements to go undisturbed.[74] "Because the parties appear to be in agreement on this issue, we will assume, without deciding" that New York state law is applicable in reviewing the enforceability of the Arbitration Provision, akin to other arbitration provisions in our circuit.[75]

Regardless, the Court is content with the view that an application of federal and Delaware law would likely generate a similar result to New York law, which further weighs against a more robust choice-of-law analysis.[76]  Where, as here, the parties have

_____

[73] *Arthur Andersen LLP v. Carlisle*, 556 U.S 624, 630-31 (2009) (emphasis in original) (internal quotations omitted) (quoting *Perry v. Thomas*, 482 U.S. 483, 493, n.9 (1987)) (citations omitted); *see also General Elec Co. v. Deutz AG*, 270 F.3d 144, 154 (3d Cir. 2001) (holding that even in international arbitrations where federal law may be applicable, state law must be used to decide issues of arbitrability).

[74] *See USA Mach. Corp. v. CSC, Ltd.*, 184 F.3d 257, 263 (3d Cir. 1999); *see also USG Ins. Services, Inc. v. Bacon*, 2016 WL 6901332, *6 (W.D. Pa. Nov. 22, 2016) ("Where the parties agree on the substantive state law that applies, however, a court may assume—without deciding—that that state's substantive law applies."); *Booth v. BMO Harris Bank, N.A.*, 2014 WL 3952945, *4 n.4 (Aug. 11, 2014).

[75] *USA Mach. Corp.* 184 F.3d at 263.

[76] *White v. Sunoco, Inc.*, 870 F.3d 257, 263-64 (3d Cir. 2017) (holding that where the laws of two jurisdictions lead to the same result, "there is no actual conflict and [the court] should avoid the choice-of-law question."); *see also Flintkote Co. v. Aviva PLC*, 769 F.3d 215, 220 n.5 (applying Delaware law over Florida law when there was no "appreciable conflict of laws"); *Unique Tech., Inc. v. Micro-Stamping Corp.*, 2004 WL 250731, *7 n.14 (E.D. Pa. Feb. 25, 2004) ("Because the Court's resolution is reached by applying principles of contract construction common to both states, it is unnecessary to engage in a choice of law analysis.")

agreed to resolve a private dispute under certain law, and where the application of either federal or state law is non-determinative, the Third Circuit allows the application of the state law called upon by the parties in interest.[77]

### iii.    Clear and Unmistakable Evidence to Arbitrate Arbitrability

The Court now turns to the question of *who* may review questions of arbitrability. "Although an arbitration may resolve procedural issues and the merits of a dispute, an arbitrator may not ordinarily resolve the question of whether he or she has jurisdiction to arbitrate, or the scope of that arbitration."[78]  Questions to be determined by the court also include "whose claims an arbitrator is authorized to decide."[79]

A court may not send questions of arbitrability to an arbitrator unless there is "clear and unmistakable evidence that the parties intended to arbitrate questions concerning the validity of the arbitration agreement."[80]  Parties that wish to demonstrate an intent to arbitrate arbitrability face a substantial burden, where "silence or ambiguity on the 'who should decide arbitrability' point must be resolved in favor of judicial

---

[77] *See General Elec.*, 270 F.3d at 155 (citing *Assicurazioni Generali, S.P.A. v. Clover*, 195 F.3d 161, 164-65 (3d Cir. 1999) ("In any event, the question of whether federal or state law applies is not a determinative factor at this point. Neither party urges the application of federal law to the interpretation of the agreement; they have limited their choices … In general, we respect the choices of law that parties agree upon to resolve their private dispute.").

[78] *Neal v. Asta Funding, Inc.*, Civ. Nos. 13-6981 (KM) (MAH), 14-2495 (KM) (MAH), 14-3932 (KM (MAH) 2016 WL 3566960 (citing *Puleo* at 183).

[79] *Opalinski v. Robert Half Intern. Inc.*, 761 F.3d 326, 332 (2014) (citing *First Options*, 514 U.S. at 941-42 and *John Wiley & Sons, Inc. v. Livingston*, 376 U.S. 543, 546-47 (1964)).

[80] *Puleo*, 605 F.3d at 188 (citing *First Options*, 514 U.S. at 945).

resolution."[81]   Otherwise, parties may be compelled to arbitrate matters they had not

consented to arbitrate.[82]

Defendants begin by asking the Court to enforce certain language within the

Arbitration Provision, which they argue amounts to a "delegation provision" for issues

of arbitrability:

> [T]he procedures for discussion, negotiation and arbitration set forth in this
> Article V shall apply to any dispute, controversy or claim (whether
> sounding in contract, tort or otherwise) that arises out of or relates to, this
> Agreement or any Ancillary Agreement, any alleged breach hereof or
> thereof, or the transactions contemplated hereby or . . . the construction,
> interpretation, **enforcement or validity** hereof or thereof (a "Dispute").[83]

Defendants contend that the delegation provision above shows, by itself, a clear and

unmistakable intent to arbitrate issues of arbitrability among parties to the Arbitration

Provision.   Regardless, Defendants further argue that the Arbitration Provision's

incorporation of the American Arbitration Rules (the "AAA Rules") is clear and

unmistakable evidence of the same.   The Trust disputes this noting that the Third Circuit

has refused to extend the doctrine that the incorporation of AAA Rules constitutes clear

and unmistakable evidence in the context of class arbitrations and thereby would not

extend it in a bilateral arbitration agreement.

In *Chesapeake*, the Third Circuit noted that "[v]irtually every circuit to have

considered the issue has determined that incorporation of the [AAA] arbitration rules

---

[81] *Allstate Ins. Co. v. Toll Bros., Inc.*, 171 F.Supp.3d 417, 426 (E.D. Pa. 2016) (internal quotations omitted) (quoting *Puleo*, 605 F.3d at 187-88).

[82] *First Options*, 514 U.S. at 945.

[83] D.I. 25, Exh. A, § 5.1 (emphasis added).

constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability."[84]  The Third Circuit, nevertheless, created an exception to this rule for class arbitrations because the "whole notion of class arbitration implicates a particular set of concerns that are absent in the bilateral context."[85]  The clear language of the AAA Rules, as well as the clear language in other, analogous arbitration rules, have continued to be upheld by circuit courts since *Chesapeake*.[86]

This Court, like other lower courts in the Third Circuit, agrees that the AAA Rules demonstrate "clear and unmistakable evidence" that the Paragon and Noble Groups intended to arbitrate questions of arbitrability.[87]  The Third Circuit's carve-out for class actions in *Chesapeake* has no bearing here as this is squarely a bilateral agreement, and other exemptions (such as for unsophisticated parties and narrow arbitration language) are also inapplicable to the current case.[88]  The Arbitration Provision broadly applies to

---

[84] *Chesapeake Appalachia, LLC v. Scout Petroleum, LLC*, 809 F.3d 746, 763-64 (3d Cir. 2016), 763-64 (*citing Oracle Am., Inc. v. Myriad Grp. A.G.*, 724 F.3d 1069, 1074 (9th Cir. 2013) (*Petrofac, Inc. v. DynMcDermott Petroleum Operations Co.*, 687 F.3d 671, 675 (5th Cir. 2012); *Fallo v. High–Tech Inst.*, 559 F.3d 874, 878 (8th Cir. 2009); *Qualcomm Inc. v. Nokia Corp.*, 466 F.3d 1366, 1373 (Fed. Cir. 2006); *Terminix Int'l Co. v. Palmer Ranch LP*, 432 F.3d 1327, 1332 (11th Cir. 2005); *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 208 (2d Cir. 2005))).

[85] *Chesapeake*, 809 F.3d at 759.

[86] *Simply Wireless, Inc. v. T-Mobile US, Inc.*, 877 F.3d 522, 527-28 (same for JAMS Rule 11(b) which is substantively identical to the AAA); (*Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1283-84 (same for JAMS and AAA).

[87] *Insurance Newsnet.com, Inc. v. Pardine*, 2011 WL 3423081 at *3 (M.D. Pa. 2011); *Way Services, Inc. v. Adecco North America, LLC*, 2007 WL 1775393 at *3 (2007 (E.D. Pa. 2007).

[88] *See Allstate Insurance Co. v. Toll Brothers, Inc.*, 171 F.Supp.3d 417, n.11 (E.D. Pa. 2016) (finding AAA Rules not to be clear evidence of an intent to arbitrate questions of arbitrability when involving unsophisticated parties); *Turi v. Main St. Adoption Serv. LLP*, 633 F.3d 496, 506-07 (6th Cir. 2011) (determining that if the scope of the arbitration agreement is too narrow, then the incorporation of AAA rules is not "clear and unmistakable" evidence that the parties intended to arbitrate issues of arbitrability).

the sophisticated parties in the Agreements, provided that the parties fall within the Arbitration Provision's purview.

The Court need not consider whether the delegation provision by itself is sufficient evidence to establish the arbitration of arbitrability under *First Options* given the clearness of the AAA Rules. Yet, suffice it to say, that the incorporation of such language, which expressly considers the "enforcement or validity" of the Agreements, supports the reach of the AAA Rules into the realm of arbitrability.[89] At least as concerns the language in the Arbitration Provision, parties bound by that section of the MSA have agreed to arbitrate issues of arbitrability.

### a. Enforceability of Arbitration Provision by Defendants

Yet even where express contractual language exists to show an intent to arbitrate questions of arbitrability, the Court must consider whether the "parties" at issue fall within the scope of the delegation language.[90] The Trust contends that at least the non-signatory Defendants fall outside the Arbitration Provision and cannot compel Paragon, a signatory to the Agreements and representative of the larger Paragon Group, to arbitrate.

---

[89] The Trust suggests that limitations within the language of the Arbitration Provision, particularly in section 5.6(b), must consequently limit any delegation of questions of arbitrability. However, as stated *supra*, the Court need not reach this issue given the incorporation of the AAA Rules. It is merely enough to note that the Arbitration Provision does, to some extent, expressly reserve questions of "enforcement or validity" to the arbitrator and expressly provides "arbitrators … [with] full power and authority to determine issues of arbitrability" under the AAA Rules. D.I. 25, § 5.3, 5.6.

[90] It is only presumed that questions of arbitrability should be arbitrated when such a delegation binds "the parties" involved. If the binding nature of the parties is unclear, then the Court must review whether the parties are subject to the arbitration of arbitrability. *See Howsam*, 537 U.S. at 83 ("… unless the *parties* clearly and unmistakably provide otherwise.").

From the analysis *supra* on the language in the Arbitration Provision, it is clear that the MSA will apply at least to signatories of the Agreements, and to Corporate Defendants represented by the signatories.  A review of the definitional section of the MSA shows that Paragon, representing the Paragon Group, and Noble Corporation, representing the Noble Group, are bound by the Arbitration Provision.[91]  The Court, therefore, finds that any questions of arbitrability relating to these parties should be left to the arbitrator to decide.

The Court now must grapple with the treatment of non-signatory Defendants, the Paragon and Noble Directors.  "A non-signatory to a contract may bind a signatory to arbitrate a dispute when traditional principles of state law allow a contract to be enforced by or against nonparties to the contract through assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel."[92]  "In the wake of *Arthur Anderson* … we must expressly consider whether the relevant state contract law recognizes the particular principle as a ground for enforcing contracts [by or] against third parties."[93]  However, "just because a signatory has agreed to arbitrate issues of arbitrability with another party does not mean that it must arbitrate with any non-signatory."[94]

---

[91] *Id.* at § 1.1.

[92] *Torres v. CleanNet USA*, 90 F. Supp. 3d 369, 379 (E.D. Pa. 2015) (citing *Arthur Anderson*).

[93] *Id.* (citing *Flintkote Co. v. Aviva PLC*, 769 F3d 215, 220 (3d Cir. 2014)).

[94] *Contec Corp.*, 398 F.3d at 209.

The Court once again looks to New York law in reviewing the circumstances under which non-signatories may enforce arbitration against signatories, particularly on questions of arbitrability.[95]  New York courts are clear about the circumstances under which non-signatories may enforce arbitration against signatories.  The general rule was first developed in the New York Court of Appeals by *Waldron v. Goddess* in 1984, reaffirmed as a "long standing rule" by the same court in 2008, and affirmed by the Appellate Division as recently as July of this year.[96]  The rule states that an agreement to arbitrate must be "clear, explicit, and unequivocal" and may not be made through "implication or subtlety".[97]

---

[95] *Id.* ("New York law, which follows the same standard as federal law with respect to who determines arbitrability: generally, it is a question for the court unless there is 'a 'clear and unmistakable' agreement to arbitrate arbitrability.'") (*quoting Shaw Group Inc. v. Triplefine Intern.*, 322 F.3d 115, 121 (2d Cir. 2003)).

[96] *Waldron v. Goddess* 461 N.E.2d 273, 275 (N.Y. 1984) [internal quotations and citations omitted]:

> It is settled that a party will not be compelled to arbitrate and, thereby, to surrender the right to resort to the courts, absent evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes. The agreement must be clear, explicit and unequivocal and must not depend upon implication or subtlety.

*Fiveco, Inc. v. Haber*, 11 N.Y.3d 140, 144 (2008) [internal quotations and citations omitted]:

> This Court's "long-standing rule" is that an arbitration clause in a written agreement is enforceable ... when it is evident that the parties intended to be bound by the contract. Indeed, it is well settled that [a] party to an agreement may not be compelled to arbitrate its dispute with another unless the evidence establishes the parties' 'clear, explicit and unequivocal' agreement to arbitrate.

*Giffone v. Berlerro Grp., LLC*, No. 2016-11449, 2018 WL 3450633, at *1 (N.Y. App. Div. July 18, 2018) [internal quotations and citations omitted]:

> A party to an agreement will not be compelled to arbitrate and, thereby, surrender the right to resort to courts in the absence of evidence affirmatively establishing that the parties expressly agreed to arbitrate the dispute at hand "The agreement [to arbitrate] must be clear, explicit and unequivocal[,] and must not depend upon implication or subtlety."

[97] *Waldron*, 461 N.E.2d at 275.

28

Only two potential exceptions to this rule can be identified under these cases. The first exception, the doctrine of assumption, was adopted by the Court of Appeals three years before the *Waldron* ruling, but it remains unclear whether it is still applicable.  The second exception is an application of the first exception, the doctrine of assignment of the agreement. Both exceptions are inapplicable to the case at hand.[98]

The *Waldron* line of cases seem to refute the Defendants' contention that equitable estoppel would be applied by New York courts.  Indeed, the Supreme Court, Appellate Division, First Department strongly suggests that the doctrine of equitable estoppel is a theory *unavailable* to non-signatories in New York by stating that, "*even if the doctrine of equitable estoppel were in theory available in this jurisdiction* to enable a nonsignatory to compel signatories to an arbitration agreement to arbitrate, it would not avail…"[99]

The Court thus finds no reason to believe that New York state courts would apply equitable estoppel to the issue at hand.  Nevertheless, taking *Rosenbach* at its word, the

---

[98] *Vann v. Kreindler, Relkin & Goldberg*, 54 N.Y.2d 936, 938 (N.Y. 1981) [internal quotations and citations omitted]:

> It is undisputed that the 1972 agreement contained a broad and unequivocal arbitration provision. By treating that agreement as continuing in force after the dissolution of the original partnership, the members of the successor partnership demonstrated their intention to be governed by that agreement's arbitration clause. Since the parties agreed to arbitration, it follows that all further issues concerning plaintiff's claim are for the arbitrator to resolve.

[99] *Rosenbach v. Diversified Grp., Inc.*, 39 A.D.3d 271 (N.Y. App. Div. 2007) (emphasis added):

> Defendant … cannot compel plaintiffs to arbitrate claims arising out of the allegedly fraudulent tax shelters at issue … [as it] is not a signatory to the Global Fund operating agreement containing the arbitration provision upon which it relies and, even if the doctrine of equitable estoppel were in theory available in this jurisdiction to enable a nonsignatory to compel signatories to an arbitration agreement to arbitrate, it would not avail … in this matter since plaintiffs' claims against … are not "founded in and intertwined" with the operating agreement.

Court still considers whether the doctrine of equitable estoppel could be applicable, if it did apply.

For such an analysis, the Court turns to the Second Circuit's opinion in *Contec*, which purports to apply New York law as it might relate to the use of equitable estoppel by non-signatories against signatories.[100]  In *Contec*, the court found that non-signatories could compel a signatory to arbitrate where the question of arbitrability was itself subject to arbitration.[101]  The court applied a two-part test to determine whether the court or the arbitrator may determine issues of arbitrability in this context.

> In order to decide whether arbitration of arbitrability is appropriate, a court must first determine whether the parties have a sufficient relationship to each other and to the rights created under the agreement.

> Having determined that a sufficient relationship exists between the parties, we must now address the more precise question presented here: whether a **non-signatory** can compel a signatory to arbitrate under an agreement where the question of arbitrability is itself subject to arbitration … We therefore conclude that as a signatory to a contract containing an arbitration clause and incorporating by reference the AAA Rules, **Remote Solution cannot now disown its agreed-to obligation to arbitrate** *all* **disputes**, including the question of arbitrability.[102]

More recently, the Second Circuit has clarified the above language from *Contec* to require two elements of (1) an "undisputed relationship between" signatory and non-signatory, and (2) "the parties continued conduct of themselves as subject to the agreement regardless of change in corporate form…" to allow a non-signatory to compel

---

[100] *Contec Corp. v. Remote Solution Co.*, 398 F.3d 205, 209 (2d Cir. 2005).

[101] *Id*. at 209-10.

[102] *Id*. at 209, 211 (emphasis added).

a signatory to arbitrate[103]   In addition to these factors, the *BNP Paribas* court found that "[w]here, as here, the arbitration clause does not clearly vest any right to invoke arbitration in a non-party … it does not afford [the non-party] the right to have arbitrators rather than a court determine the arbitrability of its dispute."[104]

Finally, Defendants cite to *Lapina*, a 2015 case from the Southern District of New York that interprets *Contec*. The *Lapina* court held that,

> … where a party seeking to avoid arbitration is a signatory to an arbitration agreement which incorporates rules that delegate arbitrability questions to the arbitrator, a court need not reach the issue of whether a non-signatory may compel arbitration, because that is an issue properly resolved by the arbitrator.[105]

The Court reviews the totality of this case law to mean that there is no room for the interpretation that the Paragon and Noble Directors can compel the signatory, Paragon, to arbitration.

Partially, this is because there is no room for the equitable estoppel principle that the Defendants rely upon.  It is also, in part, because there is no "evidence which affirmatively establishes that the parties expressly agreed to arbitrate their disputes," and to the extent there is such evidence, it is implied.  In fact, as the Court will show below, there is clear evidence that the parties expressly *ruled out* arbitrating their disputes.

---

[103] *The Republic of Iraq v. BNP Paribas*, 472 F. Appx.11, 13 (2d Cir. 2012) (interpreting *Contec*).

[104] *Id.*

[105] *Lapina v. Men Women N.Y. Model Management Inc.*, 86 F. Supp. 3d. 277, 284 (S.D.N.Y. 2015) (emphasis added). The Defendants also cite to *Washington v. William Morris Endeavor Entertainment, LLC*, No. 10 Civ. 9647(PKC)(JCF) 2011 WL 3251504 but this case is contrary to the Second Circuit's *BNP Paribas* opinion. To the extent that it is not contrary, the case is inapplicable for the reasons set forth in the analysis *infra*.

Furthermore, to the extent that there are exceptions to these well-established principles, they apply only to the assignation or assumption of contracts and not to the case at hand.

Inasmuch as the Second Circuit is applying correct New York law, the case before this Court is highly distinguishable from *Contec* and *Lapina* and shares more similarity to *BNP Paribas*. This is partly due to the nature of the "non-signatories" at issue. These non-signatories have been expressly excluded from the Arbitration Provision, and it would be inequitable to allow such expressly excluded non-signatories to compel a signatory party to arbitrate. This case can be further distinguished from *Contec* and *Lapina* because "the arbitration clause does not clearly vest any right to invoke arbitration in a non-party." And even if the Arbitration Provision did vest some rights to invoke arbitration in a non-party, the Paragon and Noble Directors are excluded from that class of persons.[106]

The directors and officers of the Noble and Paragon Groups, including the Noble and Paragon Directors, are *expressly* excluded from being party to the Arbitration Provision. Applying the traditional contractual review tool of *expressio unius*, the Court finds that the Noble and Paragon Directors were specifically excluded from the MSA except as to Section 6.12.[107] Section 6.12 does not tie, in any way, to the Arbitration

---

[106] D.I. 25, Exh. A, § 5.1. ("Each **Party** agrees on behalf of itself and each member of its respective Group that the procedures set forth in this Article V shall be the sole and exclusive remedy in connection with any Dispute … [e]ach **Party** on behalf of itself **and each member of its respective Group** irrevocably waives any right to any trial by jury with respect to any Dispute to which this Section 5.1 applies.")

[107] *See generally* Glen Blanks, New York Contract Law § 10.13 [West's N.Y. Prac. Series 2018].

Provision in § 5 of the MSA.  Furthermore, the Arbitration Provision does not vest clearly a "right to invoke arbitration in a non-party . . ." which is required by *BNP Paribas*.[108]

While the Court finds that the signatory Defendants are parties to the clear and express language regarding the arbitration of arbitrability in the Arbitration Provision, this conclusion cannot extend to the non-signatory Defendants, i.e. the Paragon and Noble Directors.

The conclusion to exclude the non-signatory Defendants not only prevents the Court from sending questions of arbitrability regarding the non-signatory Defendants to the arbitrator, but prevents enforcement of the Arbitration Provision by the non-signatory Defendants *at all*.  Thus, any further analysis on the Motion to compel arbitration can only continue as to Count VIII against the Corporate Defendants, which continues to be reviewed in the analysis *infra*.

### b. Unconscionability

Even though it is now established that the Corporate Defendants have agreed to arbitrate arbitrability pursuant to the Arbitration Provision, the Court must still consider whether the delegation language is unconscionable.[109]  If the delegation provision in the Arbitration Provision is found to be unconscionable, the Court must continue its analysis of the arbitrability of claims independently.

---

[108] *BNP Paribas*, 472 F.Appx. at 13.

[109] *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010)

An arbitration agreement may be "invalidated by 'generally applicable contract defenses, such as fraud, duress, or unconscionability.'"[110]  The Trust argues a form of unconscionability tied to Paragon's alleged forced acceptance of the Spin-Off. Defendants respond that the required state law elements for unconscionability are not met.[111]

Where questions of arbitrability belong to the arbitrator, courts may only determine a challenge of unconscionability that is directed specifically at an arbitration provision.[112]  The Supreme Court in *Rent-A-Center* found that "[a] party's challenge to another provision of the contract, or to the contract as a whole, does not prevent a court from enforcing a specific agreement to arbitrate . . . [since] an arbitration provision is severable from the remainder of the contract."[113]  As applied in the context of challenging questions of arbitrability, the Third Circuit recently concluded,

> A party contesting the enforceability of a delegation clause must challenge the delegation provision specifically. …  To do so, the party must at least reference the provision in its opposition to a motion to compel arbitration. … [C]ontesting the validity of an arbitration agreement as a whole, without specifically disputing the delegation clause contained therein, is not sufficient to challenge the delegation provision.  Without a specific challenge to a delegation provision, the court must treat that provision as valid and enforce it according to FAA § 4.[114]

---

[110] *Id.* at 68 (*quoting Doctor's Associates, Inc. v. Casarotto,* 517 U.S. 681, 687 (1996)).

[111] D.I. 44 at 11 n.15 (*citing Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 10 (1988); *Saizhang Guan v. Uber Techs., Inc.,* 236 F. Supp. 3d 711, 729 (E.D.N.Y. 2017).

[112] *Id.* at 70.

[113] *Rent-A-Center,* 561 U.S. at 70-71.

[114] *MacDonald,* 883 F.3d at 226-27 (internal quotations omitted) (quoting *Rent-A-Center,* 561 U.S. at 70-75) (internal citations omitted)).

The Trust does, in fact, dispute the delegation language in the Arbitration Provision by claiming that Paragon had no capacity to agree "that any disputes as to arbitrability or the scope of issues and/or parties subject to arbitration must be decided by the arbitration panel."[115]  Because the Trust has provided a specific challenge to the delegation provision, the Court must address the unconscionability challenge on substantive state law grounds.

Under New York law, a delegation provision in an arbitration agreement will only prove to be unconscionable when the challenging party proves "both substantive and procedural aspects … [as] decided by the court against the background of the contract's commercial setting, purpose, and effect."[116]  The Court must thus review the facts contained in the Complaint for both procedural and substantive unconscionability elements as it pertains to the Arbitration Provision.

The Court first "examine[s] the contract formation process for a lack of meaningful choice" in order to determine procedural unconscionability.[117]  Claims of procedural unconscionability "are judged by whether the party seeking to enforce the contract has used high pressure tactics or deceptive language in the contract and whether there is inequality of bargaining power between the parties."[118]  Accepting the Complaint's well-pleaded facts as true, the Trust sufficiently alleges that Noble "absolutely and completely

---

[115] D.I. 38 at 16-17.

[116] *Sablosky v. Edward S. Gordon Co., Inc.*, 535 N.E.2d 643, 647 (N.Y. 1989).

[117] *In re Lawrence*, 23 N.E.3d 965, 976 (N.Y. 2014).

[118] *Sablosky*, 535 N.E.2d at 647.

dominated Paragon at all times through execution of the MSA," the other Agreements, and the Arbitration Provision.[119]  Indeed, even the Defendants suggest the elements of procedural unconscionability have likely been met in this case.[120]

But the Trust must also allege sufficient facts to establish a finding of substantive unconscionability.   A determination of substantive unconscionability consists of "whether one or more key terms are unreasonably unfavorable to one party … which is so grossly unreasonable or unconscionable in the light of the mores and business practices of the time and place as to be unenforceable according to its literal terms."[121] While the Complaint alleges that the terms of the Spin-Off are generally unreasonable — indeed, it cites to several specific instances where that might be the case — no allegations attack the substantive terms of the *arbitration*, let alone the delegation language.[122]  The Court, following *MacDonald*, may only review the unconscionability defense as it pertains specifically to the delegation language in the Arbitration Provision.   Here, no such challenge to the substantive terms of the Arbitration Provision has occurred, let alone the delegation provision.  As such, the Court finds there are not sufficient facts for the Trust to prove substantive unconscionability.

---

[119] D.I. 38, p. 25; *see* D.I. 1, ¶¶ 81-87 (alleging that all but one member of the Paragon team consisted of Noble employees and were tied to Noble achieving the Spin-Off, consequently leaving Paragon with no control or say of the Spin-Off transactions).

[120] *See* D.I. 44, p. 11, n.15.

[121] *In re Lawrence*, 23 N.E.3d at 976 (internal quotations) (citations omitted).

[122] *See* D.I. 1, ¶ 87 (challenging the Agreements on substantive terms regarding the assumption of liabilities, the allocation of corporate opportunities, debt insurance costs, and a lack of representations and warranties, among other things).

Given that the Trust cannot prove one of the two elements of a New York unconscionability claim, any defense resisting arbitration resting on unconscionability fails at this stage.

***

In sum, the Arbitration Provision contains "clear and express" evidence that questions of arbitrability are to be decided by an arbitrator when it comes to the signatory parties, including the Corporate Defendants.  However, the Arbitration Provision does not encompass non-signatories who are expressly excluded from the arbitration and delegation language, as is the case with the Noble and Paragon Directors.  As a result, these directly-excluded non-signatories cannot compel arbitration against the signatory, Paragon, at all.

As to the Corporate Defendants, the Court must consider what questions are left for its review at this stage.  The Supreme Court has not "spelled out the next steps for a court when it finds clear and unmistakable intent to arbitrate arbitrability."[123]  Yet most circuits, including the Third Circuit, support the view that courts "must allow an arbitrator to decide issues of arbitrability in the first instance."[124]  The fundamental issue in questions of arbitrability is the clear and express language delegating such responsibility to the arbitrator. In such a case, whether or not the claims relate in some

---

[123] *Belnap v. Iasis Healthcare*, 844 F.3d 1272, 1286 (10th Cir. 2017).

[124] *Id.; see, e.g., Puleo*, 605 F.3d at 178-79 (internal quotations omitted) (citations omitted) ("Only when there is a question regarding whether the parties should be arbitrating at all is a question of arbitrability raised for the court to resolve. … Such questions of arbitrability are presumptively committed to the Court, unless the parties have clearly and unmistakably agreed that the arbitrator should decide the issues of arbitrability.")

sense to the arbitration contract is precisely the type of question that the parties agree to send to arbitration.

However, the Court acknowledges that certain cases have considered tenuous connections to the scope of an arbitration agreement, before sending deciding on the issue of arbitrability. Indeed, a circuit split has developed on whether such questions of scope belong at this early stage of arbitration review.[125]

But in this case, at least for the claim of unjust enrichment against the Corporate Defendants, there is little doubt that a connection could plausibly exist between the claim and the broad language of the Arbitration Provision. As stated earlier, the Complaint pleads sufficient facts to place certain financial and substantive contractual terms at issue.[126] Furthermore, as recently as a few weeks ago, the Third Circuit concluded that broad arbitration language can incorporate "threshold issues of contract interpretation" and whether a matter falls within that scope.[127] As such, it appears evident that Count VIII, which is among signatories, could plausibly fall within the bounds of "any dispute … that arises out of or relates to, th[ese] Agreement[s] … or the transactions contemplated hereby … including all actions taken in further of the transactions contemplated … on or prior to the date hereof …"[128] As such, Claim VIII satisfies either position in the circuit

---

[125] *See Belnap*, 844 F.3d at 1286-93 (citations omitted) (compiling cases and rejecting the views of the Fifth, Sixth, and Federal Circuits, while accepting the consensus of the First, Second, Fourth, Eighth, Ninth, Eleventh, and D.C. Circuits).

[126] D.I. 1, ¶ 87.

[127] *FBI Wind Down, Inc. v. Heritage Home Group, LLC (In re FBI Wind Down, Inc.)*, No. 17-2315, *5 (3d Cir. July 27, 2018).

[128] D.I. 25, Exh. A., § 5.1.

split and requires no further assessment on the merits before allowing the arbitrator to conduct its review.

The Court thus grants the Motion to compel arbitration as to Count VIII against the Corporate Defendants, but denies the Motion for the remaining two counts.  While the Defendants raise a litany of other arguments regarding the Arbitration Provision's scope, those questions are inapplicable to the Noble and Paragon Directors, who are entirely outside the scope of the Arbitration Provision.  Furthermore, any questions on the arbitrability of certain claims as they relate to the Corporate Defendants must be left for the arbitrator to decide.[129]

## C.  Stay of Remaining Claims

With the Court sending Count VIII of the Complaint to arbitration, the final question remains whether or not the Court should stay litigation in favor of arbitration, or, vice-versa, to stay the arbitration pending adjudication of the associated claims in this Court.

It is important to note that the allegations in the Complaint regarding Count VIII clearly tie back to the alleged non-arbitrable fraudulent transfer claims.  The fraudulent transfers concern certain obligations and payments surrounding notes to which Paragon was connected.[130]  Similarly, the Complaint's count for unjust enrichment against the

---

[129] The Trust contends, for instance, that the claims at issue in the Motion cannot fit within the Arbitration Provision because they involve conduct before the signing of the Arbitration Provision. Because this is a question of what kinds of claims are arbitrable under the Arbitration Provision, it is one of arbitrability for the arbitrator to decide.

[130] D.I. 1, ¶¶ 164-76.

Corporate Defendants centers on "Note Payments … unjustly retained."[131] Notably, the damages requested in this count amount to "restitution in the amount of the Note Payments, together with interest …"[132]  There is no doubt, then, that Count VIII revolves around the same conduct and facts as the constructive fraudulent transfer action.  Both the facts underlying the claim, as well as the damages sought, rely on the same factual predicate as the fraudulent transfer allegations.

It is true that when a claim is referred to arbitration, "the Court has authority to stay an arbitration where appropriate."[133]  Under section 105 of the Bankruptcy Code, the Court has authority to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."[134]  Such powers extend to enjoining proceedings in other fora against non-debtors, at least as it is "necessary to carry out the provisions of the Bankruptcy Code."[135]

However, within the Third Circuit, the ability to stay arbitrable claims is limited. Not only do most stays of non-core matters tenuously connect to the estate or other rights in the Bankruptcy Code,[136] but the Circuit has expressly criticized the use of collateral

---

[131] *Id.*

[132] *Id.*

[133] *In re Residential Capital, LLC*, 563 B.R. 756, 774 (Bankr. S.D.N.Y.  2016).

[134] 11 U.S.C. § 105(a).

[135] *In re Catholic Diocese of Wilmington, Inc.*, 484 B.R. 629, 638 (D. Del. 2012) (internal quotations omitted) (citations omitted).

[136] *See In re APF Co.*, 264 B.R. 344, 364 (finding that where arbitration "seriously jeopardizes Bankruptcy Code objectives" action against the proceeding is allowable).

estoppel and "inefficiencies resulting from bifurcated proceedings" as reasons for staying arbitration proceedings.[137]

The Third Circuit has also noted that preserving the federal interest in non-arbitrable bankruptcy matters can be done without subjecting an arbitration proceeding to a stay, at least partially because "the formulation of collateral-estoppel rules affords adequate protection to that interest."[138]  Ultimately, "arbitration proceedings will not necessarily have a preclusive effect on subsequent federal-court proceedings … since the court may directly and effectively protect federal interests by determining the preclusive effect to be given to an arbitration proceeding."[139]  Furthermore, the Supreme Court in *Dean Witter* noted that risks of collateral estoppel or preclusive effect from an arbitration proceeding are "significantly less well settled than the lower court[s] … might suggest, and that the consequences of this misconception has been the formulation of unnecessarily contorted procedures."[140]

Supreme Court law clearly stipulates that, normally, the FAA "requires piecemeal resolution when necessary to give effect to an arbitration agreement."[141]  Furthermore, a court must compel arbitration "even where the result would be the possibly inefficient

---

[137] In comparison, New York federal courts have applied a looser standard of reviewing arbitration stays in favor of bankruptcy proceedings. The Third Circuit's language in *Hays*, however, severely undercuts the underpinning of the lax S.D.N.Y. standard. *See Residential Capital, LLC*, 563 B.R. at 774-75.

[138] *Hays*, 885 F.2d at 1158.

[139] *Id*. (citing *McDonald v. City of West Branch, Michigan*, 466 U.S. 284 (1984)).

[140] *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 223 (1985).

[141] *Id*. at 221.

maintenance of separate proceeding in different forums."[142]  As a result, the Court finds no means to grant the Trust's request to stay the arbitration of Claim VIII pending resolution of the litigation.

The only remaining question is whether the Court will stay the non-arbitrable claims in favor of arbitration, or allow both proceedings to run concurrently.

Defendants effectively contend that because the claims tie to the same factual predicate as the underlying fraudulent transfer proceeding, a stay of the litigation in favor of arbitration is appropriate in this instance.  However, as explained in detail *supra*, the Arbitration Provision only applies to *one* of the three counts which the Defendants' initially sought under the Motion.  In this sense, the claims that predominate are clearly those that remain in this Court.  While "factually intertwined" claims may benefit from a stay of litigation, that one element alone does not suffice to require a stay.[143]

The Court declines to allow for a stay of the claims remaining in this Court given that Count VIII does not "have some [e]ffect on the non-arbitrable claims."[144] The cases which the Defendants' rely on for granting a stay on non-arbitrable claims arise under situations where the arbitrable issues materially affect the disposition of non-arbitrable claims.  Hence, in *EXDS*, the Delaware Bankruptcy Court issued a stay of non-arbitrable litigation claims where the arbitrable claims could "contribute to the resolution of the

---

[142] *Id.* at 217.

[143] *Lepera v. ITT Corp.*, 1997 WL 535165, *8 (E.D. Pa. Aug. 12, 1997) (citations omitted).

[144] *Id.* (citations omitted).

issues raised by the fraudulent conveyance claim."[145] Notably, five of the six substantive claims in *EXDS* were sent to arbitration. A stay was thus appropriate because, as in *In re Hagerstown*, the "claims [were] contractual in nature."[146]

In contrast, Count VIII does not present a critical and predominate part of the proceedings in the Complaint. While Count VIII arguably requires a contractual review, it merely relates back to the allegations and relief sought within the fraudulent conveyance claim. In fact, the very heart of the Complaint stems from the fraudulent conveyance as opposed to being "alternative theories of disaffirmance."[147] Nor is the fraudulent conveyance claim contingent upon the Trust succeeding on its unjust enrichment claim alone.[148] Ultimately, the Court sees the no reason to delay litigation of the majority of the claims pending the resolution of one associated claim, particularly given the more limited collateral estoppel problems established by the results of arbitration.

The logic above requires the Court to deny both parties' requests for stays and to allow the litigation and arbitration to run concurrently.[149] In doing so, the Court acts to "rigorously enforce agreements to arbitrate, even if the result is 'piecemeal' litigation …"[150] To the extent any collateral estoppel issue may affect the bankruptcy court's

---

[145] *In re EXDS, Inc.*, 316 B.R. 817, 826 (Bankr. D. Del. 2004).

[146] *In re Hagerstown Fiber L.P.*, 277 B.R. 181, 208 (Bankr. S.D.N.Y. 2002).

[147] *Id.*

[148] *Cf. In re Flemings Cos.*, 325 B.R. 687 (Bankr. D. Del. 2005).

[149] *See also Pipia v. Rauscher Pierce Refsnes, Inc.*, 714 F.Supp. 501, 503 (D. Kan. 1989).

[150] *Dean Witter*, 470 U.S. at 1242-43.

43

federal interests, it retains the ability to review such an effect from the arbitration judgment at a future date.

## CONCLUSION

The Court will, consequently, GRANT the Motion to compel arbitration for Claim VIII, which applies to the Corporate Defendants, and DENY the Motion for Claims VI-VII, which would allow the non-signatory Defendants to compel arbitration outside the enforceable scope of the Arbitration Provision.  Furthermore, the Court declines to stay either the litigation or arbitration, allowing both to run concurrently.  An Order will be issued.