IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| PARAGON OFFSHORE PLC, et al., | : | Case No.: 16-10386 (CSS) |
| | : | |
| Debtors. | : | |
| | : | |
| PARAGON LITIGATION TRUST | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Proc. No.: 17-51882(CSS) |
| | : | |
| NOBLE CORPORATION PLC, NOBLE | : | |
| CORPORATION HOLDINGS LTD, | : | |
| NOBLE HOLDING INTERNATIONAL | : | |
| (LUXEMBOURG) S.A.R.I., NOBLE | : | |
| FDR HOLDINGS LIMITED, ASHLEY | : | |
| ALMANZA, JULIE H. EDWARDS, | : | |
| GORDON T. HALL, JON A. | : | |
| MARSHALL, JAMES A MACLENNAN, | : | |
| MARY P. RICCIARDELLO, JULIE J. | : | |
| ROBERTSON, AND DAVID | : | |
| WILLIAMS, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## OPINION[1]

| | |
|---|---|
| **SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP** | **YOUNG, CONAWAY STARGATT & TAYLOR, LLP** |
| Anthony W. Clark | Pauline K. Morgan |
| Mark McDermott (Argued) | Joel A. Waite |
| One Rodney Square | Jaime Luton Chapman |
| P.O. Box 636 | Michael S. Neiburg |
| Wilmington, DE  19899-0636 | 1000 North King Street |

---

[1] This Opinion constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

-and-
George A. Zimmerman
Lauren E. Aguiar
Four Times Square
New York, NY  10036-6522
          -and-
Wallis M. Hampton
1000 Louisiana Street, Suite 6800
Houston, TX  77002-5026

Counsel for the Defendants

Wilmington, DE  19801
-and-
**JONES DAY**
Bruce Bennett
James O. Johnston
555 South Flower Street, 50th Floor
Los Angeles, CA  90071
          -and
Gregory M. Shumaker
David S. Torborg
51 Louisiana Avenue, N.W.
Washington, DC  20001
          -and-
Jennifer L. Del Medico
Genna L. Ghaul
250 Vesey Street
New York, New York  10281

KIRKLAND & ELLIS LLP
Jeffrey Zeiger
David Zott (Argued)
300 North LaSalle
Chicago, IL  60654

Counsel to Paragon Litigation Trust

Date: March 11, 2019

Sontchi, CJ._____

## INTRODUCTION

The Bankruptcy Code has its origins in the Constitution itself. Article I authorizes Congress to pass "uniform laws on the subject of bankruptcies."[2] As Madison observed, "[t]he power of establishing uniform laws of bankruptcy is so intimately connected with the regulation of commerce…that the expediency of it seems not likely to be drawn into

[2] U.S. Const., Art. I, § 8, cl. 4.

2

question."[3] The uniform laws of bankruptcy remain, though, subordinate to the Constitution, and in enacting such laws, Congress must abide by another of the Constitution's clear directives:

> The judicial power of the United States shall be vested in one supreme court and in such inferior courts as the Congress may from time to time ordain and establish. The judges shall hold their offices during good behavior….
>
> […]
>
> The judicial power shall extend to all cases, in law and equity, arising under…the laws of the United States….[4]

Bankruptcy judges only hold office for fourteen years, no matter how good their behavior may be. And because bankruptcy judges do not have life tenure, they may not wield the judicial power of the United States.[5] These facts necessarily limit the ability of Congress to entrust adjudicative authority to bankruptcy courts. As a result, certain claims—commonly referred to as *Stern* claims— "may not be adjudicated to final judgment by [a] bankruptcy court" even though the Bankruptcy Code directs otherwise.[6] Instead, the Supreme Court instructs a bankruptcy court that is faced with a *Stern* claim to "hear the proceeding and submit proposed findings of fact and conclusions of law to the district court for de novo review and entry of judgment."[7]

Determining which claims may not be finally adjudicated by this Court without

---

[3] The Federalist No. 42, p. 285 (N.Y. Heritage Press 1945).

[4] U.S. Const., Article III, §§ 1-2.

[5] 28 U.S.C. § 152(a)(1).

[6] *Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 35 (2014) (citing 11 U.S.C. § 157(c)).

[7] *Executive Benefits*, 573 U.S. at 36.

running afoul of Article III is no simple task. The constitutional limits that Article III places on Congress' ability to grant authority to bankruptcy judges have been described—if not completely demarcated—in a handful of important opinions. In *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.*,[8] a plurality of that Court deemed the Bankruptcy Act of 1978 to have impermissibly vested "most, if not all, of the 'essential attributes of the judicial power'" in the bankruptcy courts.[9] The general principle to emerge from that plurality was that "Art. III bars Congress from establishing legislative courts to exercise jurisdiction over all matters related to those arising under the bankruptcy laws."[10]

In response to *Northern Pipeline*, Congress passed the Bankruptcy Amendments and Federal Judgeship Act of 1984 (commonly referred to as "the **1984 Amendments**").[11] That act created the familiar statutory distinction between "core" and "non-core" matters, allowing bankruptcy courts to continue to enter final orders in "core" matters and to submit findings of fact and conclusions of law in "non-core" matters. (Bankruptcy practitioners are, undoubtedly, already aware that the 1984 Amendments were codified in part at 28 U.S.C. §§ 157 and 158.)

The Supreme Court would go on to address the Article III issues raised by the 1984 Amendments in two important opinions, issued twenty-two years apart. In 1989, with

---

[8] *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.,* 458 U.S. 50 (1982)(plurality opinion).

[9] *Id.* at 87.

[10] *Id.* at 76.

[11] *In re United Missouri Bank of Kansas City, N.A.*, 901 F.2d 1449, 1453 (8th Cir. 1990).

*Granfinanciera, S.A. v. Nordberg*,[12] the Supreme Court—although ruling on a 7th Amendment issue—addressed the judicial power question at some length, setting the stage for *Stern v. Marshall*.[13] That 2011 opinion discussed *Granfinanciera* at length (and gave us "*Stern* claims.") After considering what Justice Scalia called a "sheer surfeit of factors,"[14] Chief Justice Roberts ultimately concluded that by the 1984 Amendments Congress had exceeded its authority in "one isolated respect."[15] For, while those Amendments permit the Bankruptcy Court to "enter a final judgment on [] state law counterclaim[s] that [are] not resolved in the process of ruling on a creditor's proof of claim," Article III of the Constitution does not.[16]

* * *

*Granfinanciera* and *Stern* are, of course, binding on this Court, but determining the exact scope and proper *application* of those opinions is not easy work. In his *Northern Pipeline* concurrence, then-Justice Rehnquist observed that "[t]he cases dealing with the authority of Congress to create courts other than by use of its power under Art. III do not admit of easy synthesis."[17] That observation rings true today. As aptly summarized by Hart & Weschler's, "[f]ew observers would view the Supreme Court's shifting decisions in this area as having provided a coherent approach to the general question of the

---

[12] *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989).

[13] *Stern v. Marshall*, 564 U.S. 462 (2011).

[14] *Id*. at 504 (Scalia, J., concurring in part and concurring in judgment).

[15] *Stern v. Marshall*, 564 U.S. at 503.

[16] *Id*.

[17] *Northern Pipeline*, 458 U.S. at 91 (Rehnquist, J., concurring in part and concurring in judgment).

constitutionality of non-Article III adjudication."[18] Nevertheless, this Court must approach this issue, while taking into account both the dictates of Congress and the guidance provided by the Supreme Court: Are bankruptcy courts in violation of Article III of the United States Constitution when they enter final judgment on core fraudulent transfer claims brought against non-claimant defendants? The best answer that this Court can provide to that question is "no." Bankruptcy courts, having been granted the authority to do so by Congress, may enter final judgments in *all* core fraudulent transfer claims.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction to consider this motion under 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## PROCEDURAL HISTORY

A.    **The Original Bankruptcy**

On February 14, 2016, Paragon Offshore plc and certain of its affiliates (hereinafter "**Debtors**" or "**Paragon**") filed voluntary petitions under chapter 11 of the Bankruptcy Code.[19] On April 19, 2016, Debtors filed their second plan (the "**Failed Plan**"). [20] Debtors subsequently filed a number of modifications, amendments, and supplements to the

---

[18] Hart and Wechsler's The Federal Courts and the Federal System 388-389 (7th Edition 2015) (hereinafter "Hart & Weschler's").

[19] [Docket No. 1].

[20] "Second Amended Joint Chapter 11 Plan of Paragon Offshore PLC and its Affiliated Debtors" [Docket No. 318].

Failed Plan. One such plan supplement, filed on May 20, 2016, included a settlement agreement between Noble Corporation plc ("**Noble**")—a defendant in this action—and Paragon Offshore plc (the "**Settlement Agreement**").[21]

The Settlement Agreement provided for broad releases in favor of Noble and affiliated parties. Provided that certain conditions were met, Paragon agreed to provide "releases in favor of the Noble Releasees" which were defined as "Noble and each of its Affiliates" as well as their "respective current and former principals, officers, directors, managers, general partners, employees, agents, parent companies, subsidiaries, affiliates, attorneys, accountants, predecessors, successors, assigns, heirs, administrators, executors, supervisors, and representatives of any kind and nature." These releases were to effectuate the release of the "Noble Releasees" from a wide variety of potential claims, including claims that "Paragon or any of its Affiliates has or might claim…in any way arising out of, relating to, or in connection with any matter relating to the Spin-Off" including "any fraudulent transfer or similar claims arising under section 548 of the Bankruptcy Code or any similar state or foreign statute."[22] The Settlement Agreement included language that would prevent these releases from taking effect unless certain conditions were either met or waived.[23]

Ultimately, on November 15, 2016, this Court denied confirmation of the Failed

---

[21] [Docket No. 399, Exhibit D at 6].

[22] Settlement Agreement §2.1(a) [Docket No. 399, Exhibit D at 8].

[23] Settlement Agreement §6.2(a) [Docket No. 399, Exhibit D at 16].

Plan, finding that it was not feasible.[24] On May 2, 2017, a fifth plan was filed by the Debtor, which did not incorporate the Settlement Agreement,[25] and after some modification, on June 7, 2017, that plan was confirmed ("**the Confirmed Plan**").[26] The Confirmed Plan created a successor to the Debtor, the Paragon Litigation Trust ("**Plaintiffs**," "the **Paragon Litigation Trust**," or "**Respondent**"), and distributed interests in that trust to creditors. Pursuant to the Confirmed Plan, the right to pursue certain claims, including fraudulent transfer claims, was transferred from the Debtors to the Paragon Litigation Trust. Noble provided input into the formation of that plan, but the record does not reflect that they objected at any point to that plan's inclusion of language granting this Court exclusive jurisdiction to "adjudicate" claims by the Trust "to the fullest extent permitted by law."

**B.    The Adversary Proceeding and the Motion to Determine**

This adversary proceeding was initiated by the Paragon Litigation Trust, which filed a complaint in this Court on December 15, 2017 ("**the Complaint**"). The Complaint names a number of Defendants ("**Defendants**" or "**Movant**"), including Noble Corporation plc, the counterparty to the Settlement Agreement.

On September 20, 2018, the Defendants filed the instant motion and a related memorandum of law (collectively, the "**Motion to Determine**"), seeking an order determining that this court may only enter proposed findings of fact and conclusions of

---

[24] "Findings of Fact and Conclusions of Law Denying Confirmation of The Amended Joint Chapter 11 Plan of Paragon Offshore Plc and Its Affiliated Debtors" [Docket No. 890].

[25] [Docket No. 1459].

[26] "Findings of Fact, Conclusions of Law And Order Confirming The Fifth Joint Chapter 11 Plan Of Paragon Offshore Plc And Its Affiliated Debtors" [Docket No. 1614, Exhibit A].

law with respect to Counts I through VIII of the complaint.[27] They argue that Counts VI-VIII are non-core matters, and that, therefore, 28 U.S.C. § 157 requires that this Court enter proposed findings of fact and conclusions of law with regards to those Counts. Counts I-V are characterized by both parties as fraudulent transfer claims and, therefore, as statutory core matters.[28] Counts VI and VII are indisputably non-core claims. The parties dispute whether Count VIII, a state law claim for unjust enrichment, is a core or non-core claim.

More importantly, the Defendants argue that Counts I-V are *Stern* claims. In other words, they argue that Counts I-V are statutorily core matters, but that this Court may not constitutionally enter final orders in those matters. In support of this assertion, they cite *Granfinanciera*[29] and, of course, *Stern v. Marshall*.[30] They argue that that these Supreme Court precedents demand the conclusion that this Court lacks power to issue final orders when a debtor (or a successor-in-interest to a debtor) files a fraudulent transfer claim against a party that has not filed a claim in the underlying bankruptcy case.

On October 26, 2018, Paragon Litigation Trust responded with an objection to the Motion to Determine ("the **Objection**").[31] The Objection addresses the *Stern* issue,

---

[27] "Motion Pursuant to Bankruptcy Rule 7016(b) and 11 U.S.C. § 157(b)(3) **[sic]** for an Order Determining That This Court May Only Enter Proposed Findings of Fact and Conclusions of Law With Respect to Counts I Through VIII of the Complaint" (hereinafter "the Motion to Determine") [Adv. Docket No. 94]; "Memorandum of Law" [Adv. Docket No. 95].

[28] [Adv. Docket No 95 at 6].

[29] *Granfinanciera* 492 U.S. at 33.

[30] *Stern v. Marshall*, 564 U.S. at 462.

[31] [Adv. Docket No. 103].

asserting that Counts I-V are core and that this Court may enter final orders. In the alternative, the Objection contends that, even if Counts I-V are *Stern* claims, that the Movants have consented to this Court's entry of final orders. While the parties have not consented explicitly, the Objection argues that Movants have consented implicitly, focusing on two facts in particular: first, the Debtor's entry into the Settlement Agreement, which required this Court's approval of that Agreement as a condition precedent to certain obligations, and second, the Debtor's failure to object to this Court's entry of final orders during the confirmation process for the Failed Plan.

On November 9, 2018, the Movants filed a reply in further support of the Motion to Determine.[32] On January 29, 2019, this Court heard oral argument from the parties and took the matter under advisement.

## ANALYSIS

### A.    Unjust Enrichment Claim Is Non-Core

The Court first turns to question of whether Count VIII is core or non-core. It is a claim for unjust enrichment, based on the factual predicate laid out to support the fraudulent transfer claims made by Plaintiffs. In this circuit, *Halper v. Halper* provides the standard for determining whether a proceeding is "core":

> To determine whether a proceeding is a "core" proceeding, courts of this Circuit must consult two sources. First, a court must consult § 157(b). Although § 157(b) does not precisely define "core" proceedings, it nonetheless provides an illustrative list of proceedings that may be considered "core." *See id*. § 157(b)(2)(A)-(O). Second, the court must apply this court's test for a "core" proceeding. Under that test, "a proceeding is core [1] if it invokes a substantive right provided by title

---

[32] [Adv. Docket No. 114].

11 or [2] if it is a proceeding, that by its nature, could arise only in the context of a bankruptcy case."[33]

Unjust enrichment claims are not included in the "illustrative" list in § 157(b).[34] Nor does the unjust enrichment claim at issue here "invoke a substantive right under the Bankruptcy Code"; nor could it "only arise within a bankruptcy context."[35] Respondents point to the fact that the unjust enrichment claim "seeks recovery of the same transfers alleged to be fraudulent." That may be the case. However, while the Plaintiffs may, by their unjust enrichment claim, seek the remedy that would be provided by a successful fraudulent transfer claim, state law unjust enrichment actions are distinct from fraudulent transfer actions under the Bankruptcy Code. In Delaware, unjust enrichment claims can, and do, arise outside of a "bankruptcy context."[36] Given that, Count VIII of the complaint for unjust enrichment is non-core.

## B.    Defendants Have Not Consented to This Court's Final Adjudication of Any Aspect of the Complaint

The Court next turns to the issue of consent, because if both parties have, as Respondent asserts, consented to this Court's entry of final orders on all counts, this

---

[33] *Halper v. Halper*, 164 F.3d 830, 836 (3d Cir. 1999), *see also In re LTC Holdings, Inc.*, 587 B.R. 25, 36 (Bankr. D. Del. 2018) ("As the Third Circuit delineated in *Halper*, core proceeding[s] are those matters listed under 28 U.S.C. § 157(b), as well as proceedings that either (1) invoke a substantive right under the Bankruptcy Code or (2) could only arise within a bankruptcy context.").

[34] The Third Circuit noted in *In re Exide Technologies* that an unjust enrichment claim does not "fall neatly into the list of core proceedings" under 11 U.S.C. § 157 and that, "on its face" it does not invoke a substantive right under the Bankruptcy Code. *In re Exide Techs.*, 544 F.3d 196, 207 (3d Cir. 2008).

[35] *In re LTC Holdings, Inc.*, 587 B.R. at 36.

[36] See, e.g., *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999) (finding that an attorney-in-fact was unjustly enriched when she gratuitously transferred funds to family members and ordering restitution be paid to the successor-in-interest of the party who suffered a loss as a result of that unjust enrichment).

Court would not need to reach the Article III issue raised by Movants. Given that, the Court turns first to the issue of consent under *Wellness*[37] and *In re Tribune Media*,[38] finding that the standards set for implied consent by those precedents have not been met.

Respondents argue that Movants have implicitly consented to this Court's entry of final orders. Parties may consent to the entry of final orders by a bankruptcy judge, even if they have the constitutional right to an Article III tribunal, [39] and their consent need not be express.[40] When determining whether parties have implicitly consented, the "key inquiry is whether 'the litigant or counsel was made aware of the need for consent and the right to refuse it, and still voluntarily appeared to try the case' before the" bankruptcy judge.[41] Allowing consent to be implied by the actions of the parties has the effect of "increasing judicial efficiency[,] and checking gamesmanship."[42]

The parties, in their briefs and at oral argument, discussed a number of facts that might tend to lead to a finding of implied consent. The Court has considered all such facts presented by the parties, and finds that Noble's actions do not constitute implied consent to this Court's authority to enter final orders. In addition to that finding, the Court writes specifically to address two potential factual bases for implied consent: Noble's entry into the Settlement Agreement with Paragon; and Noble's failure to object to certain

---

[37] *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932 (2015).

[38] *In re Tribune Media Co.*, 902 F.3d 384 (3d Cir. 2018).

[39] *Wellness*, 135 S. Ct. at 1944–45 (2015).

[40] *Id*. at 1947-48.

[41] *Id*. at 1948 (quoting *Roell v. Withrow*, 538 U.S. 580, 588 (2003)).

[42] *In re Tribune Media*, 902 F.3d at 395 (quoting *Wellness,* 135 S.Ct. at 1948).

jurisdictional language in the Confirmed Plan.

The Settlement Agreement entered into by Noble and Paragon provided for a release of all of Noble's liability "in any way arising out of, relating to, or in connection with any matter relating to the Spin-Off," and explicitly included releases of "any fraudulent transfer or similar claims arising under section 548 of the Bankruptcy Code or any similar state or foreign statute."[43] The Settlement Agreement included conditions precedent to the effectiveness of the releases provided to the "Noble Releasees" pursuant to that agreement. Two of those conditions precedent turned on this Court's action: "[t]he Bankruptcy Court shall have entered an order approving this Agreement (including, without limitation, the Confirmation Order), which order shall not be subject to a stay of execution;"[44] and "[a]ll conditions precedent to the 'Effective Date' as defined in the Paragon Plan shall have been satisfied or waived in accordance with the terms of the Paragon Plan."[45]

Applying the *Wellness* standard to the instant facts, the Court finds that one of the Defendants' entry into the Settlement Agreement does not, in this circumstance, constitute implied consent under the standard set by *Wellness* and *In re Tribune Media*. It is true that one of the Defendants agreed to allow this Court to determine that the Settlement Agreement met the standards of § 1123(b)(3)(A) and Bankruptcy Rule 9019. However, that act does not necessarily constitute consent to this Court's later

---

[43] Settlement Agreement §2.1(a) [Docket No. 399, Exhibit D at 8].

[44] Settlement Agreement §6.2(a) [Docket No. 399, Exhibit D at 17].

[45] *Id.*

13

adjudication of certain issues that were included in, but not the sole subject of, the Agreement. While respondent cites three cases that seem to hold the opposite, those cases are easily distinguishable from the facts here.[46]

In addition to the Settlement Agreement, another factual basis forwarded by Plaintiffs in support of a finding of implied consent is the failure of Noble to object to certain jurisdictional provisions in the Confirmed Plan, even though Noble could be said to have been an active participant in the formation and confirmation of the Confirmed Plan. The specific provision pointed to by the Plaintiffs in the Confirmed Plan states that this Court retains "exclusive jurisdiction" over the Noble Claims "to the fullest extent permitted by law."[47] The Court finds that the Movants' failure to object to the Confirmed Plan's jurisdictional provisions does not constitute consent to this Court's entry of final orders under the *Wellness* standard.

A failure to object to a plan provision providing for this Court's continued jurisdiction does not constitute waiver of a party's right to have claims heard by an Article III tribunal. As described by the Supreme Court in *Stern*, 28 U.S.C. §§ 157(b)(1) and (c)(1)

---

[46] The first such case, *In re Bartock*, holds that entry into a settlement agreement and submission of a stipulated order pursuant to that agreement constitutes consent to a bankruptcy court's later interpretation of that settlement agreement. *In re Bartock*, 398 B.R. 135, 161 (Bankr. W.D. Pa. 2008). In the next cited by Respondents, *In re G.S.F. Corp.*, parties' mutual consent to a stipulated order was used as definitive evidence that those parties consented to the final entry of that same stipulated order. *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991). The last case cited by Respondents, *Fed'n of Puerto Rican Organizations of Brownsville, Inc. v. Howe*, found consent because the judicial power issue was not raised until one—previously consenting—party was held in contempt of a stipulated order. There is, then, no precedent to support the idea that entering into a Settlement Agreement in the context of a plan, before the commencement of any adversary proceeding, necessarily constitutes consent to the Court's final orders.

[47] "Fifth Joint Chapter 11 Plan of Paragon Offshore PLC and its Affiliated Debtors" [Case No. 16-10386, Docket No. 1614, Exhibit A. at § 11.1(r)].

"allocate[] the authority to enter final judgment between the bankruptcy court and the district court. That allocation does not implicate questions of subject matter jurisdiction."[48]

## C.    Core Fraudulent Conveyance Claims Are Not *Stern* Claims

The Court now turns to the Article III issue raised by the Movants: whether this Court may enter final judgment on core fraudulent transfer claims when those claims are brought against non-claimant defendants by a successor-in-interest to the debtor. Before continuing to a detailed analysis of *Granfinanciera* and *Stern*, it is important to clarify what, exactly, the movants are requesting: a determination that a federal statute is, in part, unconstitutional. After all, this Court's authority to enter final orders in core bankruptcy matters stems directly from Congress' 1984 Amendments to the Bankruptcy Code. Enacted after *Marathon*, these amendments were codified, in part, in 28 U.S.C. §§ 157 and 158.[49] Read together, 28 U.S.C. §§ 157 and 158 direct bankruptcy courts to enter "final…orders" in "core proceedings," which final orders shall be subject to appellate review by either the appropriate District Court or by a duly appointed Bankruptcy Appellate Panel.[50] Core proceedings include "proceedings to determine, avoid, or recover

---

[48] *Stern v. Marshall*, 564 U.S. at 462 (citing 28 U.S.C. §§ 157(b)(1), (c)(1)).

[49] Lawrence P. King, Jurisdiction and Procedure Under the Bankruptcy Amendments of 1984, 38 Vand. L. Rev. 675, 679; 709 (1985) (describing the history, context, and codification of the 1984 Amendments).

[50] In 28 U.S.C. § 157, Congress directs that "Bankruptcy judges may hear and determine…all core proceedings arising under title 11, or arising in a case under title 11…and may enter appropriate orders and judgments, subject to review" provided for by 28 U.S.C. § 158. The review provided for by 28 U.S.C. § 158 is—unless a BAP is appointed—that "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees…of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title." 28 U.S.C. § 158 (a).

fraudulent conveyances."[51]

Asking this Court to find that bankruptcy judges may not enter final orders in a subset of fraudulent conveyance actions is, then, asking this Court to declare that a portion of 28 U.S.C. § 157 is unconstitutional as written. The general principle of judicial restraint weighs heavily against such a declaration: "[f]ederal statutes are presumed constitutional."[52] "Every legislative act is to be presumed to be a constitutional exercise of legislative power until the contrary is clearly established…."[53] However, if the Supreme Court has, as Movants argue, already ruled on the constitutionality of 28 U.S.C. § 157(b)(1) as it is applied to fraudulent transfer actions against parties who have not filed a claim against the estate, this Court would, of course, be bound by such a ruling.[54]

With those principles in mind, the Court now turns to the pivotal question: what, exactly, is compelled by *Granfinanciera* and its close cousin, *Stern v. Marshall*, the two Supreme Court cases touching on this issue?[55]

---

[51] 28 U.S.C. § 157 (b)(2)(H).

[52] *Koslow v. Commonwealth of Pennsylvania*, 302 F.3d 161, 175 (3d Cir. 2002) (citing *Reno v. Condon*, 528 U.S. 141, 147 (2000); *Union Pac. R.R. Co. v. United States*, 99 U.S. (9 Otto) 700, 718 (1878)).

[53] *Close v. Glenwood Cemetery*, 107 U.S. 466 (1883).

[54] "The Supreme Court itself has admonished lower courts to follow its directly applicable precedent…" *United States v. Singletary*, 268 F.3d 196, 205 (3d Cir. 2001); *see also Maldonado v. Houstoun*, 157 F.3d 179, 190 (3d Cir. 1998) (holding that "[b]ecause [Supreme Court cases] *Shapiro* and *Maricopa County* have never been overruled by the Court… they dictate the result of this case…"); *United States v. Extreme Assocs., Inc.*, 431 F.3d 150, 156 (3d Cir. 2005) (holding that "even where a lower court's analytical position has merit, the obligation to follow applicable Supreme Court precedent is in no way abrogated…").

[55] The 3rd Circuit has not extended the holding of *Granfinanciera* from the jury trial right to the Article III issue at question here. Nor are any of their cases directly on point. There are two 3rd Circuit cases which address *Granfinanciera* in depth. In *Beard v. Braunstein*, the 3rd Circuit cites *Granfinanciera* for the premise that the right to a jury trial does not rely on the statutory distinction between core and non-core matters. *Beard v. Braunstein*, 914 F.2d 434, 437 (3d Cir. 1990). In *In re Pasquariello*, the 3rd Circuit denied a petition for mandamus based on the alleged violation of a non-creditor's right to a jury trial that occurred when a bankruptcy court heard a fraudulent transfer claim. *In re Pasquariello*, 16 F.3d 525, 530-31 (3d Cir. 1994)

*i.* Granfinanciera*: Closely Related, but Not Binding*

Movants argue that this Court, as a non-Article III tribunal, may not enter final orders regarding core fraudulent transfer claims that are brought against a party that has not filed a claim in the underlying bankruptcy case. In support of this argument, Movants rely heavily on the 1989 Supreme Court case *Granfinanciera*, which, they argue, was "affirmed" in 2011 by *Stern v. Marshall*.[56] The facts in *Granfinanciera* are closely analogous to the facts here. As in this case, a party with no claim against a bankruptcy estate was haled into bankruptcy court to defend against a fraudulent transfer claim.[57] Its ultimate holding was that "a person who has not submitted a claim against a bankruptcy estate has a right to a jury trial when sued by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer."[58]

Although the facts of *Granfinanciera* are closely analogous to the facts here, they are not identical. *Granfinanciera*—an opinion which the leading federal courts casebook calls "particularly confusing"—was not issued in an Article III case.[59] Instead, the issue squarely before the Supreme Court was the extent of the 7th Amendment right to a jury trial, and whether such a right could be limited by the so-called "public rights

---

(citing *Granfinanciera* generally). The *Pasquariello* court held that mandamus, an extraordinary remedy, was not warranted because the issue in that case was a fraudulent transfer of real property, not of cash as in *Granfinanciera*. *In re Pasquariello*, 16 F.3d at 530-31.

[56] Motion to Determine [Adv. Docket No. 94 at 6].

[57] *Granfinanciera*, 492 U.S. at 36.

[58] *Id.*

[59] Hart & Weschler's at 383 ("This 1989 decision was actually about whether there is a right to a jury trial…").

exception."[60] This exception, which has a long and complex history in the Supreme Court, had been shaped by that court in 7th Amendment cases.[61] However, the "public rights exception" had also surfaced from time to time in bankruptcy—most recently, the familiar Article III problem of Bankruptcy Courts' non-Article-III authority had been addressed by the Court in *Marathon v. Northern Pipeline*.[62]

The *Granfinanciera* Court addressed the extent of the "public rights exception" in the wake of Congress' post-*Marathon* amendments to the Bankruptcy Code.[63] Instead of addressing the Article III implications of those amendments' distinctions between core and non-core matters, the opinion answered another question: were non-claimant defendants entitled to a 7th Amendment "right of trial by jury" in core fraudulent transfer actions?[64] Or did those fraudulent transfer actions fall within the "public rights exception," allowing them to be tried without a jury?[65] To answer this question, the *Granfinanciera* Court considered both 7th Amendment and Article III precedents, stating that "we…rely on our decisions exploring the restrictions Article III places on Congress' choice of adjudicative bodies…to determine whether petitioners are entitled to a jury trial."[66] This is because "if a statutory cause of action is legal in nature, the [Seventh

[60] *Granfinanciera*, 492 U.S. at 51.

[61] *Id*. at 53-55.

[62] *Id*. at 54. *See also Northern Pipeline* 458 U.S. at 67–70 (Brennan, J.) (plurality).

[63] *Granfinanciera*, 492 U.S. at 50.

[64] *Id*.

[65] *Id*. at 50-51.

[66] *Id*. at 53.

Amendment question] requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal."[67] The Court then went on to cite Article III case law on the "public rights exception" to bolster its ultimate conclusion about the scope of the exception in the 7th Amendment context.[68]

If the "public rights exception" is, in fact, identical in both the 7th Amendment and Article III contexts, it seems only natural to read *Granfinanciera*'s conclusion as applying to *both* the 7th Amendment question *and* to the contemporary Article III question: whether "a person who has not submitted a claim against a bankruptcy estate has the right to" a final determination by an Article III tribunal "when sued by the trustee in bankruptcy to recover an allegedly fraudulent monetary transfer."[69] Movants argue that such a reading is not only plausible, but compelled by both *Granfinanciera* and the 2011 opinion in *Stern v. Marshall*, which references and describes *Granfinanciera* at length. Although this is, admittedly, a difficult question, the Court does not agree.

*Granfinanciera* alone does not require this Court to find that 28 U.S.C. § 157(b)(2) is in violation of Article III of the Constitution. That opinion mentions the current statutory scheme — in which bankruptcy courts enter final opinions in some matters and proposed findings of fact and conclusions of law in others — and specifically *avoids* determining that

---

[67] *Id.*

[68] *Id.* at 55-56 ("Although the issue admits of some debate, a bankruptcy trustee's right to recover a fraudulent conveyance under 11 U.S.C. § 548(a)(2) seems to us more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions.").

[69] *Id.* at 36.

this division of labor between bankruptcy courts and District Courts is unconstitutional. The meat of that Court's 7th Amendment analysis begins with a declaration that "[t]he sole issue before us is whether the Seventh Amendment confers on petitioners a right to a jury trial in the face of Congress' decision to allow a non-Article III tribunal to adjudicate the claims against them."[70] Then, in conclusion, when stating its holding on the "sole issue" before it, that Court took pains to declare that it did not "express any view as to whether…Article III allows jury trials in [fraudulent conveyance] actions to be held before non-Article III bankruptcy judges subject to the oversight provided by the district courts pursuant to the 1984 Amendments. We leave [that] issue[] for future decisions."[71]

This reservation by the Supreme Court explicitly references the Article III issue before this Court today. When the Supreme Court refused to weigh in on the constitutionality of "the oversight provided by the district courts pursuant to the 1984 Amendments,"[72] they were refusing to weigh in on the Article III constitutionality of the statutory scheme that was codified, *inter alia*, in the familiar directives of 28 U.S.C. §§ 157 and 158.[73] In those sections of the U.S. Code, Congress deems certain matters "core" and certain matters "non-core," and grants this Court the power to issue final orders in "core" matters, subject to appellate review by the District Court:

> The district courts of the United States shall have jurisdiction to hear **appeals from *final* judgments, orders, and**

---

[70] *Id.* at 50.

[71] *Id.* at 64.

[72] *Id.*

[73] King, *supra* note 50, at 679; 709 (describing the history, context, and codification of the 1984 Amendments).

> **decrees…of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title.**[74]

Reading *Granfinanciera* in the context of the 1984 Amendments clarifies that the *Granfinanciera* Court intentionally and explicitly refrained from extending its opinion to the constitutionality of the entry of final orders by bankruptcy courts pursuant to 28 U.S.C. §§ 157-58—the very issue before this Court today.[75]

*ii. Interpreting* Stern v. Marshall: *Describing Without Deciding*

The story does not end with *Granfinanciera*, of course. The question remains whether *Stern*'s discussion of *Granfinanciera* has the result of extending *Granfinanciera*'s holding to the Article III context in a way that binds this Court today. After all, *Stern* was very much an Article III case, and it discusses the *Granfinanciera* holding at length.[76] The best answer seems to be that *Stern*, like *Granfinanciera*, does not bind lower courts on issues that were not directly before it. As this Court has previously noted, *Stern*, by its own lights, should be read narrowly; while its rhetoric may have been, at points,

---

[74] 28 U.S.C. § 158(a) (emphasis added).

[75] The 2nd Circuit issued a decision compatible with this analysis, although that decision was issued before *Stern*:

> …§ 157(b)…gives bankruptcy judges the authority to conduct trials and issue final orders in core proceedings. *Granfinanciera* teaches that such proceedings, if legal in nature, are subject to the Seventh Amendment, *but that opinion does not alter Congress' intent that they be heard by a bankruptcy court with authority to issue final orders.*

*In re Ben Cooper, Inc.*, 896 F.2d 1394, 1402 (2d Cir.), *vacated sub nom. Ins. Co. of State of Pa. v. Ben Cooper, Inc.*, 498 U.S. 964 (1990), and opinion reinstated, 924 F.2d 36 (2d Cir. 1991) (emphasis added). *See also* Hart & Weschler's at 383 n.2 ("Justice Brennan noted two questions to be decided upon remand…whether it is consistent with…Article III, for non-Article III bankruptcy judges to conduct jury trials, subject to the oversight of federal district courts"). That "oversight" is appellate review by a District Court.

[76] *Stern v. Marshall*, at 487; 492; 492 n.7; 499.

21

sweeping, its ultimate holding was not.[77] And, although it did discuss fraudulent conveyance actions, *Stern also* included a crystal-clear statement that "Congress, *in one isolated respect*, exceeded" its Article III power when passing the 1984 Amendments — and that "isolated" issue is not the issue before this Court today.[78]

Furthermore, a close look at the text of *Stern* itself shows that while *Stern* characterizes (perhaps mischaracterizes) the *Granfinanciera* opinion repeatedly, it does not seem to rely on that opinion for its ultimate, narrow conclusion. Admittedly, the reasoning in *Stern* is not particularly direct. (In fact, Justice Scalia's concurrence in that case lists "seven different reasons given in the Court's opinion for concluding that an Article III judge was required to adjudicate this lawsuit" and notes that "[t]he multifactors relied upon today seem to have entered our jurisprudence almost randomly."[79]) It is also true that the 9th Circuit, [80] as well as multiple district courts,[81] have

---

[77] *In re USDigital, Inc.*, 461 B.R. at 290-92.

[78] *Stern v. Marshall*, 564 U.S. at 503.

[79] *Stern v. Marshall*, 564 U.S. at 504 (Scalia, J. concurring).

[80] In *In re Bellingham Ins. Agency, Inc.*, the 9th Circuit held that: "Taken together, *Granfinanciera* and *Stern* settle the question of whether bankruptcy courts have the general authority to enter final judgments on fraudulent conveyance claims asserted against noncreditors to the bankruptcy estate. They do not." *In re Bellingham Ins. Agency, Inc.*, 702 F.3d 553, 565 (9th Cir. 2012).

[81] In *In re Lyondell Chem Co.*, Judge Cote rejected the argument laid out above, writing that :

> Under both *Stern* and *Granfinanciera*, then, it is axiomatic that a fraudulent conveyance claim against a person who has not submitted a claim against a bankruptcy estate, brought solely to augment the bankruptcy estate, is a matter of private right…[t]he basic rationale for [contrary] decisions is that *Granfinanciera* addresses fraudulent conveyance claims in a Seventh Amendment context, not an Article III context, and the comments in *Stern* comparing the claims in that case to those in *Granfinanciera* are *dicta*… This argument runs directly contrary to the clear language of *Stern*.

*In re Lyondell Chem. Co.*, 467 B.R. 712, 720-21 (S.D.N.Y. 2012). That opinion was cited with approval in a decision by Judge Oetken, who criticized the characterization of *Stern*'s treatment of *Granfinanciera* as dicta, writing that: "…in reaching its conclusions in *Stern*, the Supreme Court specifically relied on

held that *Stern* extends *Granfinanciera* to the Article III context. However, that position on the matter is by no means inescapably correct. In fact, the Supreme Court itself, in a case in which a debtor pursued a fraudulent conveyance action against a non-claimant, indicated that there is ambiguity on the matter: "[t]he Court of Appeals held, and we assume *without deciding*, that the fraudulent conveyance claims in this case are *Stern* claims."[82] Perhaps *Stern* provides compelling evidence of how the Supreme Court *would* rule on this issue if it were to address it directly, but it does not decide it.[83]

Because neither *Stern* nor *Granfinanciera* control on this issue, Movants are not asking this Court to apply controlling precedents to the matter at hand. Instead, Movants are asking this Court to *extend* the holdings of those cases, in order to find that 28 U.S.C. § 157(a) is unconstitutional to the extent that it directs bankruptcy judges to enter final orders in fraudulent transfer claims against parties who have not filed claims against the bankruptcy estate. The Court declines to make that leap.

---

*Granfinanciera*'s characterization of fraudulent conveyance actions as private rights where the creditor had filed no proof of claim…" *In re Arbco Capital Management, LLP*, 479 B.R. 254, 264 (S.D.N.Y. 2012). Similarly, in *Kirschner v. Agoglia*, Judge Rackoff critiques the narrow view of *Stern*, writing that:

> Beyond all else, the Bankruptcy Court relied on the Supreme Court's dictum that the holding in Stern was "limited" and "narrow," …cautionary dicta and past practice do not overcome the logic of the Supreme Court's holding in *Stern*. This Court concludes that simple logic dictates unequivocally that fraudulent conveyance claims like those brought here are "private rights" claims that, under *Stern* and the Constitution, must be finally decided by an Article III Court.

*Kirschner v. Agoglia*, 476 B.R. 75, 81 (S.D.N.Y. 2012).

[82] *Executive Benefits*, 573 U.S. at 37 (emphasis added).

[83] For example, in a 2012 memorandum opinion, Judge Walsh, after considerable analysis, determined that *Stern* should be read narrowly and that "*Stern* is not applicable to this [fraudulent transfer] action, as it does not involve a state-law counterclaim by the estate." *In re DBSI, Inc.*, 467 B.R. 767, 773 (Bankr. D. Del. 2012).

## CONCLUSION

For the reasons discussed above, the Court DENIES the Motion to Determine and finds that Counts I-V are statutorily core claims which may be finally adjudicated by this Court. The Court further finds that Counts VII-VIII are non-core claims pursuant to 28 U.S.C. § 157(b)(2). Plaintiffs are hereby directed to provide the Court with a form of order conforming to this opinion within ten (10) calendar days of the date below.